Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Susheel Kirpalani (SK 8926)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
Counsel for Official Committee
of Unsecured Creditors
of Refco Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REFCO INC., et al., | Case No. 05-60006 (RDD) |
| Debtors. | (Jointly Administered) |

**[REDACTED]**

**MOTION, PURSUANT TO 11 U.S.C. §§ 105(a), 1103(c)(5), AND 1109(b), TO AUTHORIZE OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) INTERVENE (AS OF RIGHT) IN ADVERSARY PROCEEDING COMMENCED BY BAWAG AND (II) ANSWER, DEFEND, AND PROSECUTE COUNTERCLAIMS ON BEHALF OF REFCO GROUP LTD., LLC**

TO THE HONORABLE ROBERT D. DRAIN
    UNITED STATES BANKRUPTCY JUDGE:

        The Official Committee of Unsecured Creditors (the "Committee") of Refco Inc.

and its affiliated debtors and debtors in possession (collectively, the "Debtors"), by its

undersigned counsel, Milbank, Tweed, Hadley & McCloy LLP, on behalf of Debtor Refco

Group Ltd., LLC ("RGL" or "Debtor RGL"), hereby files this motion (the "Motion") for entry of

an order, pursuant to sections 105(a), 1103(c)(5), and 1109(b) of title 11 of the United States

Code, 11 U.S.C. §§ 101-1330 (as amended, the "Bankruptcy Code") and rule 24(a) of the

Federal Rules of Civil Procedure (the "Federal Rules"),[1] (i) authorizing the Committee to intervene in adversary proceeding number 05-03161 ("Adversary Proceeding")[2] and (ii) conferring standing on the Committee to answer, defend, and prosecute counterclaims on behalf of Debtor RGL in the Adversary Proceeding.

## PRELIMINARY STATEMENT

1. On November 16, 2005, BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG") commenced the Adversary Proceeding against Phillip Bennett, certain of the Debtors, including Debtor RGL, certain John Does, and certain unnamed corporations, alleging that BAWAG was fraudulently induced to loan approximately $420 million to one or more of the defendants on October 10, 2005. In the Adversary Proceeding, BAWAG is seeking the return of the $420 million or the establishment of a constructive trust over those funds.

2. The Committee seeks to intervene in the Adversary Proceeding to ensure that the estate's resources are not diverted from innocent creditors, and to affirmatively recover from BAWAG more than $1 billion in funds transferred in fraud of Debtor RGL's creditors and damages for the benefit of Debtor RGL's estate.

3. ***Intervention as of Right.*** The Committee is an indisputable "party in interest" in the Adversary Proceeding for purposes of section 1109(b) of the Bankruptcy Code and, therefore, has the right to appear and be heard in the Adversary Proceeding. Moreover, pursuant to established Second Circuit precedent, see Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.), 303 F.3d 161, 176 (2d Cir. 2002), the Committee has an absolute

---

[1] Federal Rule 24(a) is made applicable in adversary proceedings through Rule 7024 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

[2] Upon approval of the Court, a duplicate of this Motion will be filed under seal in the Adversary Proceeding.

right to intervene in the Adversary Proceeding pursuant rule 24(a) of the Federal Rules and the Bankruptcy Code.

4. ***Conferral of Standing.*** In addition, the Committee seeks standing pursuant to, *inter alia*, sections 1103(c)(5) and 1109(b) of the Bankruptcy Code and Commodore Int'l Ltd. v. Gould (In re Commodore Int'l Ltd.), 262 F.3d 96 (2d Cir. 2001), to prosecute counterclaims and defend against BAWAG's suit on behalf of Debtor RGL. Debtor RGL, in its capacity as debtor in possession, has consented to the Committee's acting on its behalf given the efficiency of having the Committee prosecute claims uncovered as a result of the Committee's investigation to date. This approach permits a division of labor between the Committee, Debtor RGL, and the other Debtors that are defendants in the Adversary Proceeding with the minimum any burden on Debtor RGL's estate. Accordingly, suit by the Committee is in the best interests of the bankruptcy estate, and is necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings. The Court should, therefore, grant the Committee standing to bring claims on behalf of, and to defend, Debtor RGL in the Adversary Proceeding.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334.

6. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

7. The statutory predicates for the relief sought herein are sections 105(a), 1103(c)(5), and 1109(b) of the Bankruptcy Code and rule 24 of the Federal Rules.

## RELIEF REQUESTED

8. The Committee seeks authorization to intervene in the Adversary Proceeding, which it may do as of right. The Committee also seeks an order granting it

standing to defend and assert counterclaims on behalf of Debtor RGL's estate in the Adversary Proceeding. Debtor RGL supports this Motion.

9. In accordance with sections 1103(c)(5) and 1109(b) of the Bankruptcy Code and Federal Rule 24(c), the Committee has prepared an Amended Answer and Counterclaim to the claims alleged by BAWAG against Debtor RGL in the Adversary Proceeding. The Amended Answer, Affirmative Defenses, and Counterclaims are annexed hereto as Exhibit A (the "RGL Counterclaim"), and the Committee respectfully requests that the claims asserted therein be heard in connection with this Adversary Proceeding.

10. The Committee seeks the entry of an order substantially in the form annexed hereto as Exhibit B (the "Proposed Order"), authorizing the Committee to intervene and to appear and be heard, and granting the Committee standing to represent Debtor RGL, in the Adversary Proceeding.

## BACKGROUND

11. Bankruptcy Filing. On October 17, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq.

12. Debtors in Possession and RCM Trustee. With the exception of Debtor Refco Capital Markets, Ltd. ("RCM"), the Debtors continue to manage their property as debtors in possession pursuant to §§ 1107(a) and 1108 of the Bankruptcy Code. On April 19, 2006, the Court entered an amended order of appointment of a chapter 11 trustee for RCM.

13. Creditors' Committee. The Committee is a committee duly appointed and organized under section 1102 of the Bankruptcy Code. On October 28, 2005, the United States Trustee appointed the Committee, as reconstituted on March 29, 2006. The Committee

represents the interests of all of the unsecured creditors of the Debtors. The Committee is expressly authorized by statute to investigate the assets and liabilities of the Debtors, and is empowered to perform such other services as are in the interests of unsecured creditors generally. See 11 U.S.C. § 1103(c).

14.     The Bennett Receivable. On October 10, 2005, Refco announced that it had discovered, through an internal review, a previously undisclosed receivable owed to the Debtors by Refco Group Holdings, Inc. ("RGHI"), an entity controlled by Phillip Bennett, Refco's Chairman and Chief Executive Officer ("Bennett"), in the amount of approximately $430 million. The receivable had not been shown as a related-party transaction in Refco's prior financial statements or in the Registration Statement and Prospectus filed in connection with the Debtor's initial public offering.

15.     The Debtors subsequently disclosed that the receivable had not been shown as a related-party transaction because Bennett, with the assistance of other persons inside and outside of the Debtors, engaged in a series of transactions designed to disguise the related-party nature of the receivable by temporarily paying off the debt and transferring it from RGHI, the entity controlled by Bennett, to another entity seemingly unrelated to the Debtors. To date, public reports and the criminal indictment filed against Bennett have identified Liberty Corner Capital Strategies, LLC as one of the entities that entered into the transactions with the Debtors and RGHI that facilitated Bennett's deception regarding the receivable.

16.     BAWAG's Eve-of-Filing Loan. When the scheme was discovered, Bennett, in a last ditch attempt to avoid public disclosure of his wrongs, repaid RGHI's then-current indebtedness to Refco. To finance the repayment, Bennett turned to BAWAG, which funded a loan to Bennett for approximately $420 million (the "BAWAG Loan").

17.    <u>BAWAG Adversary Proceeding</u>.  On November 16, 2005, BAWAG commenced the Adversary Proceeding against Bennett, certain of the Debtors, including Debtor RGL, certain John Does, and certain unnamed corporations, alleging that BAWAG was fraudulently induced to make the BAWAG Loan to one or more of the defendants on October 10, 2005.  In the Adversary Proceeding, BAWAG is seeking the return of the $420 million or the establishment of a constructive trust over those funds.

18.    <u>BAWAG's History with Bennett</u>.  Although omitted therein, BAWAG's complaint and the BAWAG Loan must be understood in the context of a complicated web of secret relationships and historical transactions between BAWAG, Bennett, Bennett's company, RGHI, and certain of the Debtors.[3]

19.    <u>Fraudulent Conveyances and Subsequent Transfers</u>.  In August 2004, in connection with a series of transactions (the "<u>Leveraged Recapitalization</u>"), Debtor RGL, in a state of undercapitalization and/or insolvency, transferred more than $1.325 billion to RGHI without fair consideration (the "<u>Fraudulent Transfers</u>").  The same day, Bennett caused RGHI to transfer more than $1.325 billion to BAWAG (the "<u>Subsequent Transfers</u>").

20.    Plaintiff BAWAG was not an innocent recipient of the Subsequent Transfers, as illustrated by the following:

a.    First, from as early as February 2000, through February 2005, BAWAG had been an active participant in Bennett's scheme to hide at quarter- and year-end financial reporting periods the presence of uncollectible bad debts owed by Bennett's entity, RGHI, to the Debtors (the "<u>Bennett Receivables Scheme</u>");

b.    Second, BAWAG was a longtime business partner with RGHI and Bennett.  As recent news reports have revealed, Bennett and BAWAG were partners in crime working jointly to hide €1 billion in losses suffered by BAWAG;

---

[3]    For a more detailed description of the relationships, the Committee respectfully refers the Court to the Counterclaim.  <u>See</u> Exh. A.

  c.  Third, until August 2004, BAWAG held a disclosed ten percent interest in Debtor RGL, giving BAWAG substantial knowledge of, and control over, RGL's affairs; and

  d.  Fourth, pursuant to a secret arrangement between BAWAG and Bennett, and through a complex maze of transactions with its own offshore affiliates, BAWAG held a far greater economic stake in Debtor RGL than was publicly disclosed, thereby giving it even greater control over Debtor RGL.

21.  Despite these complex and long-running schemes and close relationships, BAWAG alleged in this Adversary Proceeding it was "duped" into loaning Bennett $420 million.

## BASIS FOR RELIEF REQUESTED

**A.  THE COMMITTEE MAY INTERVENE AS OF RIGHT IN THE ADVERSARY PROCEEDING**

22.  Section 1109(b) of the Bankruptcy Code is a statute of the United States that confers upon statutory creditors' committees an unconditional right to appear and be heard on any issue in a chapter 11 case:

> (b) A party in interest, including the debtor, the trustee, a ***creditors' committee***, an equity holders' committee, a creditor, an equity security holder, or any indenture trustee, may raise and may appear and be heard on ***any issue*** in a case under this chapter.

11 U.S.C. § 1109(b) (emphasis added); see also <u>Term Loan Holder Comm. v. Ozer Group, L.L.C. (In re Caldor Corp.)</u>, 303 F.3d 161, 176 (2d Cir. 2002) (debtor's largest administrative claimant had unconditional right as a party-in-interest to intervene in adversary proceeding). By statutory definition, a creditors' committee is a party in interest. 11 U.S.C. § 1109(b).

23.  In <u>In re Caldor Corp.</u>, the Second Circuit, after reviewing the legislative history of section 1109(b) and prior case law, concluded that "the phrase 'any issue in a case' [in section 1109(b)] plainly grants a right to raise, appear and be heard on ***any issue*** regardless whether it arises in a contested matter or an adversary proceeding." <u>Id.</u> at 169; see also <u>In re</u>

Adelphia Comme'n Corp., 285 B.R. 848, 850 (Bankr. S.D.N.Y. 2002) (acknowledging official committees' right to intervene in adversary proceeding).

24.     Accordingly, the Committee seeks to intervene and to participate in the Adversary Proceedings pursuant to its unconditional right as a party in interest.

**B.      THIS COURT SHOULD GRANT THE COMMITTEE STANDING TO ACT AS REPRESENTATIVE OF DEBTOR RGL'S ESTATE IN THE ADVERSARY PROCEEDING**

25.     The Committee requests Court approval to act on behalf of Debtor RGL in the Adversary Proceeding both to defend RGL against the claims asserted by BAWAG and to assert counterclaims against BAWAG on RGL's behalf.

26.     It has long been the established law in this circuit that sections 1103(c)(5) and 1109(b) of the Bankruptcy Code provide a "qualified right for creditors' committees to initiate adversary proceedings in the name of the debtor in possession" with the approval of the bankruptcy court. Unsecured Creditors Comm. of Debtor STN Enters., Inc. v. Noyes (In re STN Enters.), 779 F.2d 901, 904 (2d Cir. 1985).

27.     "A creditors' committee may acquire standing to pursue the debtor's claims if (1) the committee has the consent of the debtor in possession or trustee, and (2) the court finds that suit by the committee is (a) in the best interest of the bankruptcy estate, and (b) is 'necessary and beneficial' to the fair and efficient resolution of the bankruptcy proceedings." In re Commodore Int'l Ltd., 262 F.3d at 100.

28.     Where, as here, Debtor RGL consents to the conferral of standing to prosecute estate claims, the Committee need only address the second prong of the Commodore test, namely, that the proposed litigation is (a) in the best interest of the bankruptcy estate and (b) necessary and beneficial to the fair and efficient resolution of the bankruptcy proceedings.

29.     In <u>Adelphia Comms. Corp. v. Bank of America, N.A., (In re Adelphia</u>
<u>Comms. Corp.)</u>, 330 B.R. 364 (Bankr. S.D.N.Y. 2005), the court enumerated certain factors to
consider in undertaking this inquiry, including: whether the prosecution of the claims is
consistent with the maximization of the value of the estate; whether the deputization of the
Committee would permit the Debtor to concentrate its resources on rehabilitating its business;
whether the Committee's interests do not conflict with those of the estate; and whether the
assignment would prejudice the equality of distribution among the debtors' creditors. <u>Id.</u> at 375.

30.     As an initial matter, the claims must be "colorable." <u>Id.</u> at 376-77. The
Committee has set forth in the attached Counterclaim detailed allegations that BAWAG was the
subsequent transferee of fraudulent conveyances depleting Debtor RGL's estate of more than
$1.325 billion, and that BAWAG was guilty of aiding and abetting of Bennett's wrongful
activities, whereby BAWAG was unjustly enriched.

31.     Moreover, there is no conflict whatsoever between the Committee's
interests and those of the estate of Debtor RGL; indeed, the Committee's efforts, if successful,
would augment the Debtor RGL's estate, with no adverse consequences whatsoever. Pursuant to
its express statutory authority, the Committee has taken the lead on investigating numerous third
parties entangled in the web of the Debtors' pre-petition affairs, and is particularly well-suited to
serve as estate representative here. Furthermore, assignment of standing will not prejudice the
equality of distribution amongst creditors as any recovery will revert to RGL's estate for
distribution in accordance with statutory priorities.

32.     Finally, it is beyond question that the proposed litigation is consistent with
maximization of the value of the estate. The substantial sums to be recovered (a function of the
damage done to Debtor RGL and its stakeholders) more than justify the costs of prosecuting the

litigation. If the Committee is successful, the recovery will augment the estate potentially by *$1.325 billion* or more.

33. Accordingly, the Court should confer standing on the Committee to pursue the Counterclaims on behalf of Debtor RGL because, consistent with <u>Commodore</u>, (i) Debtor RGL has consented to the relief requested herein and (ii) the prosecution of the litigation by the Committee would be necessary and beneficial to the fair and efficient resolution of RGL's estate.

### WAIVER OF MEMORANDUM OF LAW

34. Because this Motion presents no novel issues of law and authorities relied upon by the Committee are set forth herein, the Committee respectfully requests that the Court waive the requirement for filing of a separate memorandum of law in support of this Motion pursuant to L.B.R. 9013-1(b); however, the Committee reserves the right to file a brief in reply to any objection to this Motion.

### NOTICE

35. The Committee provided notice of this Motion to counsel for the Debtors, who consented to relief sought herein. If the Court enters the Proposed Order, the Committee will provide telephonic notice, and will serve by whatever means practicable, including but not limited to by electronic mail, by facsimile or by hand, a copy of the Order and the papers upon which it is based upon the counsel to BAWAG and a copy of the Order on any other person or entity on which notice is ordered by the Court. The Committee submits that such notice will be adequate and sufficient, and, therefore, no other or further notice is required.

### NO PRIOR REQUEST

36. No previous application for the relief requested herein has been made to this or any other court.

**WHEREFORE**, the Committee respectfully requests entry of the Proposed Order, (i) authorizing the Committee to intervene in the Adversary Proceeding pursuant to sections 105(a) and 1109(b) of the Bankruptcy Code and Rule 24(a) of the Federal Rules of Bankruptcy Procedure, (ii) conferring standing on the Committee to represent Debtor RGL in the Adversary Proceeding by, including, among other things, filing the RGL Counterclaim, and (iii) granting the Committee such other and further relief as the Court may deem just and proper.

Dated: New York, NY
      April 21, 2006

               MILBANK, TWEED, HADLEY & McCLOY LLP

               *Scott Edelman*

               Luc A. Despins (LD 5141)
               Scott A. Edelman (SE 5247)
               Susheel Kirpalani (SK 8926)
               1 Chase Manhattan Plaza
               New York, NY 10005
               (212) 530-5000

               Counsel for Official Committee
               of Unsecured Creditors
               of Refco Inc., et al.

# EXHIBIT A

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Susheel Kirpalani (SK 8926)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000
Counsel for Official Committee
of Unsecured Creditors
of Refco Inc., et al.

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>REFCO INC., et al.,<br><br>               Debtors. | Chapter 11<br><br>Case No. 05-60006 (RDD)<br>(Jointly Administered) |
| BAWAG P.S.K. BANK FÜR ARBEIT UND WIRTSCHAFT UND ÖSTERREICHISCHE POSTSPARKASSE AKTIENGESELLSCHAFT,<br><br>               Plaintiff,<br><br>       - against -<br><br>REFCO INC., et al.,<br><br>               Defendants,<br><br>       - and -<br><br>THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF REFCO INC. ET AL., on behalf of REFCO GROUP LTD., LLC,<br><br>               Intervenor-<br>               Defendant and<br>               Counterclaim<br>               Plaintiff. | Adv. Pro. No. 05-03161 (RDD)<br><br><br><br>**AMENDED ANSWER,**<br>**AFFIRMATIVE DEFENSES,**<br>**AND COUNTERCLAIMS**<br><br>**[REDACTED]** |

The Official Committee of Unsecured Creditors (the "Committee") of Refco Inc. and its affiliated debtors and debtors in possession (collectively, the "Debtors"), on behalf of Intervenor-Defendant and Counterclaim Plaintiff Refco Group Ltd., LLC ("RGL" or "Counterclaim-Plaintiff RGL"), by and through its undersigned counsel, Milbank, Tweed, Hadley & McCloy LLP ("Milbank"), in response to the Complaint filed by BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG" or "Counterclaim-Defendant BAWAG"), files this Amended Answer, Affirmative Defenses, and Counterclaims as follows:

## AMENDED ANSWER

1.        States that the allegations set forth in Paragraph 1 of the Complaint are conclusions of law to which no answer is required.  To the extent the allegations in Paragraph 1 constitute allegations of fact, they are denied.

2.        Denies knowledge or information sufficient to form a belief as to the truth or falsity of the first sentence of Paragraph 2 of the Complaint.  Denies the allegations contained in the second sentence of Paragraph 2 of the Complaint.

3.        Admits that on October 10, 2005, Refco Inc. issued a press release.  The press release speaks for itself.  Denies the remaining allegations contained in Paragraph 3 of the Complaint in all other respects, except states that the trading prices of Refco Inc.'s stock is a matter of public record.

4.        States that the allegations set forth in Paragraph 4 of the Complaint are conclusions of law to which no answer is required.  To the extent the allegations in Paragraph 4 constitute allegations of fact, they are denied.

## PARTIES

5.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 5 of the Complaint.

6.      Denies the allegations contained in Paragraph 6 of the Complaint, except that Counterclaim-Plaintiff RGL admits that Refco Inc. is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business at One World Trade Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281 and is a debtor and debtor-in-possession in a bankruptcy proceeding jointly administered under Case No. 05-60006 (RDD). By way of further response, Counterclaim-Plaintiff RGL admits that the businesses of the Refco Defendants included a diversified financial services organization with operations in 14 countries and an extensive global institutional and retail client base, and that certain worldwide subsidiaries are members of principal U.S. and international exchanges.

7.      Admits the allegations contained in Paragraph 7 of the Complaint.

8.      Admits the allegations contained in Paragraph 8 of the Complaint.

9.      Admits the allegations contained in Paragraph 9 of the Complaint.

10.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 10 of the Complaint.

11.      Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 11 of the Complaint.

12.      Denies the allegations in Paragraph 12 of the Complaint, except that Counterclaim-Plaintiff RGL admits that Mr. Bennett was at one time the President, Chief Executive Officer and Chairman of Refco Inc. As to the allegations regarding Mr. Bennett's residences, Counterclaim-Plaintiff RGL lacks knowledge or information sufficient to form a

belief as to the truth or falsity of those allegations.

13. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 13 of the Complaint.

## JURISDICTION AND VENUE

14. Denies the allegations contained in Paragraph 14 of the Complaint, except as they set forth legal conclusions as to which no response is necessary, and except that Counterclaim-Plaintiff RGL admits that this Court has jurisdiction over this adversary proceeding under 28 U.S.C. §§ 157 and 1334 and that this is a core proceeding pursuant to 28 U.S.C. § 157.

## FACTUAL BACKGROUND

15. Admits the allegations contained in Paragraph 15 of the Complaint.

16. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 16 of the Complaint, except that Counterclaim-Plaintiff RGL admits that on October 10, 2005, Refco Inc. issued a press release, which press release speaks for itself.

17. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 17 of the Complaint, except that Counterclaim-Plaintiff RGL admits that on October 10, 2005, Refco Inc. issued a press release, which press release speaks for itself.

18. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 18 of the Complaint, except that Counterclaim-Plaintiff RGL admits that Refco Group Holdings, Inc. and certain of the Refco Defendants had a World Financial Center mailing address.

19. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 19 of the Complaint.

20. Denies knowledge or information sufficient to form a belief as to the truth

or falsity of Paragraph 20 of the Complaint.

21. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 21 of the Complaint.

22. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 22 of the Complaint.

23. Denies the first and second sentences of Paragraph 23 of the Complaint, except to the extent those sentences are conclusions of law to which no answer is required. Denies knowledge or information sufficient to form a belief as to the truth or falsity of the third sentence of Paragraph 23 of the Complaint.

24. Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 24 of the Complaint.

25. Admits the allegations contained in Paragraph 25 of the Complaint.

26. Admits that Mr. Dispenza communicated with BAWAG on a number of occasions on the morning of October 10, 2005 regarding the wiring of the proceeds of the Loan.

27. Denies the allegations contained in Paragraph 27 of the Complaint.

28. Denies the allegations contained in Paragraph 28 of the Complaint, except that Counterclaim-Plaintiff RGL admits that BAWAG wired funds to an account at Refco Capital Markets, Ltd. By way of further response, Counterclaim-Plaintiff RGL denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 28 concerning BAWAG's reliance on representations made by Mr. Bennett.

29. Admits that Refco Inc. issued a press release on October 10, 2005. The press release dated October 10, 2005 speaks for itself.

30. Denies the allegations contained in Paragraph 30 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

31.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 31 of the Complaint.

32.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 32 of the Complaint.

33.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 33 of the Complaint, except that Counterclaim-Plaintiff RGL denies the allegations in the final sentence of paragraph 33 to the extent those allegations relate to Counterclaim-Plaintiff RGL.

34.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 34 of the Complaint.

35.     Denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 35 of the Complaint.

36.     For its response to Paragraph 36 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 35 of the Complaint, as if fully set forth herein.

37.     Denies the allegations contained in Paragraph 37 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

38.     Denies the allegations contained in Paragraph 38 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

39.     For its response to Paragraph 39 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 38 of the Complaint, as if fully set forth herein.

40.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 40 is necessary because the "Second Claim for Relief" is not asserted against Counterclaim-Plaintiff

RGL and because Paragraph 40 sets forth legal conclusions. To the extent the allegations in paragraph 40 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

41.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 41 is necessary because the "Second Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 41 sets forth legal conclusions. To the extent the allegations in paragraph 41 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

42.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 42 is necessary because the "Second Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 42 sets forth legal conclusions. To the extent the allegations in paragraph 42 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

43.     For its response to Paragraph 43 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 42 of the Complaint, as if fully set forth herein.

44.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 44 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 44 sets forth legal conclusions. To the extent the allegations in paragraph 44 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

45.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 45 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 45 sets forth legal conclusions. To the extent the allegations in

paragraph 45 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

46. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 46 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 46 sets forth legal conclusions. To the extent the allegations in paragraph 46 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

47. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 47 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 47 sets forth legal conclusions. To the extent the allegations in paragraph 47 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

48. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 48 is necessary because the "Third Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 48 sets forth legal conclusions. To the extent the allegations in paragraph 48 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

49. For its response to Paragraph 49 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 42 of the Complaint, as if fully set forth herein.

50. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 50 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 50 sets forth legal conclusions. To the extent the allegations in paragraph 50 constitute allegations of fact that require a response from Counterclaim-Plaintiff

RGL, denies.

51.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 51 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 51 sets forth legal conclusions.  To the extent the allegations in paragraph 51 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

52.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 52 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 52 sets forth legal conclusions.  To the extent the allegations in Paragraph 52 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

53.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 53 is necessary because the "Fourth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 53 sets forth legal conclusions.  To the extent the allegations in Paragraph 53 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

54.     For its response to Paragraph 54 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 53 of the Complaint, as if fully set forth herein.

55.     Denies the allegations contained in Paragraph 55 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

56.     Denies the allegations contained in Paragraph 56 of the Complaint, except as they set forth legal conclusions as to which no response is necessary.

57.     Denies the allegations contained in Paragraph 57 of the Complaint, except

as they set forth legal conclusions as to which no response is necessary.

58. For its response to Paragraph 58 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 57 of the Complaint, as if fully set forth herein.

59. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 59 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 59 sets forth legal conclusions. To the extent the allegations in Paragraph 59 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 59 of the Complaint.

60. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 60 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 60 sets forth legal conclusions. To the extent the allegations in Paragraph 60 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 60 of the Complaint.

61. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 61 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 61 sets forth legal conclusions. To the extent the allegations in Paragraph 61 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 61 of the Complaint.

62. Counterclaim-Plaintiff RGL asserts that no response to Paragraph 62 is necessary because the "Sixth Claim for Relief" is not asserted against Counterclaim-Plaintiff

RGL and because Paragraph 62 sets forth legal conclusions. To the extent the allegations in Paragraph 62 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies knowledge or information sufficient to form a belief as to the truth or falsity of Paragraph 62 of the Complaint.

63.     For its response to Paragraph 63 of the Complaint, Counterclaim-Plaintiff RGL repeats and realleges its responses to Paragraphs 1 through 62 of the Complaint, as if fully set forth herein.

64.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 64 is necessary because the "Seventh Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 64 sets forth legal conclusions. To the extent the allegations in Paragraph 64 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

65.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 65 is necessary because the "Seventh Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 65 sets forth legal conclusions. To the extent the allegations in Paragraph 65 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

66.     Counterclaim-Plaintiff RGL asserts that no response to Paragraph 66 is necessary because the "Seventh Claim for Relief" is not asserted against Counterclaim-Plaintiff RGL and because Paragraph 66 sets forth legal conclusions. To the extent the allegations in Paragraph 66 constitute allegations of fact that require a response from Counterclaim-Plaintiff RGL, denies.

## AFFIRMATIVE DEFENSES

67.     The following Affirmative Defenses are raised without waiver of any

defenses which may become available to Counterclaim-Plaintiff RGL, and Counterclaim-Plaintiff RGL expressly reserves the right to raise and rely on any and all defenses available, including any defenses which may be revealed through discovery, pretrial or trial proceedings. In addition, Counterclaim-Plaintiff RGL incorporates all defenses raised by other defendants in this adversary proceeding, to the extent they are applicable to Counterclaim-Plaintiff RGL.

## FIRST AFFIRMATIVE DEFENSE

68. The Complaint, and each cause of action thereof, fails to state a cause of action against Counterclaim-Plaintiff RGL upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

69. BAWAG's claims are barred, in whole or in part, by the equitable doctrines of waiver, estoppel, laches and in pari delicto.

## THIRD AFFIRMATIVE DEFENSE

70. BAWAG's claims are barred, in whole or in part, by the doctrines of unclean hands and BAWAG's inequitable conduct.

## FOURTH AFFIRMATIVE DEFENSE

71. BAWAG's claims are barred, in whole or in part, because BAWAG suffered no cognizable injury as a result of any conduct of Counterclaim-Plaintiff RGL.

## FIFTH AFFIRMATIVE DEFENSE
### (Equitable Subordination)

72. BAWAG's claim should be equitably subordinated under section 510(c) of the Bankruptcy Code.

## SIXTH AFFIRMATIVE DEFENSE
### (Reservation Of Rights)

73. Counterclaim-Plaintiff RGL presently lacks sufficient knowledge or information to form a belief as to whether it may have additional affirmative defenses and expressly reserves any and all rights to assert additional affirmative defenses in the event

Counterclaim-Plaintiff RGL discovers facts supporting such defenses. Moreover, Counterclaim-Plaintiff RGL adopts and incorporates by reference the affirmative defenses asserted by any other defendant in the above-captioned proceeding to the extent any such affirmative defense applies to Counterclaim-Plaintiff RGL.

74. Counterclaim-Plaintiff RGL also expressly reserves any and all rights to amend, supplement or modify this Answer to assert additional affirmative defenses that may become available or be discovered by Counterclaim-Plaintiff RGL during the course of discovery or otherwise.

## RGL'S COUNTERCLAIMS

The Committee, by its counsel, Milbank, on behalf of Intervenor-Defendant and Counterclaim-Plaintiff Refco Group Ltd., LLC ("RGL" or "Plaintiff RGL"), as and for its counterclaim against BAWAG P.S.K. Bank für Arbeit und Wirtschaft und Österreichische Postsparkasse Aktiengesellschaft ("BAWAG" or "Defendant BAWAG"), alleges, upon information and belief, as follows:

## INTRODUCTION

1. Plaintiff RGL's former Chairman and CEO, Phillip Bennett, presently awaits trial on criminal charges arising out of his scheme, over the course of many years, to hide the existence of a multi-hundred million receivable owed by Refco Group Holdings, Inc. ("RGHI" and the "RGHI Receivable"), the personal holding company that he controlled, to one or more of the Debtors.

2. Within a week of the partial public disclosure on October 10, 2005 of the existence of the RGHI Receivable, Plaintiff RGL and the other Debtors went into a whirlwind tailspin that led to the Debtors' filing for bankruptcy on October 17, 2005.

3. Phillip Bennett did not act alone in the perpetration of his scheme to hide the existence of the RGHI Receivable (the "Bennett Receivables Scheme"). To hide the RGHI Receivable, Bennett needed willing co-conspirators who would enter into financial transactions that allowed him to hide the existence of RGHI's receivable at critical quarter-end and year-end periods.

4. BAWAG was one of those co-conspirators, year after year, between 2000 and 2005. To date, defendant BAWAG has successfully hidden from public view its participation in the Bennett Receivable Scheme. As detailed herein, financial records establish that at the end of each February between 2000 and 2005, BAWAG provided Bennett's company,

13

RGHI, with substantial loans, ranging in size from $250 to $300 million, while simultaneously accepting loans from the Debtors. These round-trip, triangular transactions served no proper commercial purpose and did little more than circulate money from the Debtors to BAWAG to RGHI for the sake of appearances at the end of an accounting period.

5.     BAWAG's knowledge of, and participation in, these transactions gave BAWAG knowledge that many of the Debtors' other counterparties lacked. BAWAG knew that Bennett was hiding the substantial RGHI receivable, that the Debtors' financial statements were inaccurate, and that there was something seriously amiss at the Debtors.

6.     Until August 2004, BAWAG was also a large equity holder in Plaintiff RGL. In addition to the 10% equity stake that BAWAG disclosed publicly, BAWAG entered into a complex maze of transactions with certain of its own offshore affiliates, which transactions were designed to allow BAWAG to participate in any sale of Plaintiff RGL, while at the same time publicly disclaiming that it owned any more than a 10% stake. In fact, BAWAG's maze of transactions gave it a far greater stake in Plaintiff RGL, along with a much larger degree of control over its affairs, than has been publicly disclosed to date.

7.     The scope of BAWAG's fraudulent activities with Bennett was not limited to transactions that affected the Debtors' financial statements. BAWAG has recently admitted that it hid over one billion euros of losses it incurred between 1996 and 2000. Reflecting their collective willingness to engage in criminal and fraudulent conduct to suit their own purposes, BAWAG perpetrated this deception with the active assistance of Phillip Bennett.

8.     Fully aware of its own facilitation of the Bennett Receivables Scheme, in August 2004, BAWAG assisted Bennett in consummating a leveraged recapitalization of Plaintiff RGL through which both Bennett and BAWAG cashed out, while at the same time, increasing Plaintiff RGL's debt obligations to $1.4 billion. In connection with the leveraged

recapitalization transactions, on or about August 5, 2004, Plaintiff RGL made transfers to RGHI totaling $1.325 billion (which transfers are referred to herein as the "Fraudulent Transfers").

9.    In addition, Plaintiff RGL distributed an asset management business with substantial economic value to RGHI. And RGHI also sold a significant interest in Plaintiff RGL to new investors, thereby pocketing an addition $511 million for itself as a result of the transaction.

10.    After receiving the Fraudulent Transfers from Plaintiff RGL, RGHI subsequently transferred $1.325 billion (the "Subsequent Transfers") to Defendant BAWAG. Prior to the Fraudulent Transfers and Subsequent Transfers, Plaintiff RGL's financial condition can be illustrated as follows:

**RGL Immediately Prior to Fraudulent Transfers**



11.    Notwithstanding its highly leveraged condition, with the active assistance of BAWAG, Plaintiff RGL distributed $1.325 billion of the loan proceeds to its shareholders for

which RGL received nothing of value.  Immediately following the leveraged recapitalization,

Plaintiff RGL's liquid assets were substantially depleted, yet it was left obligated on $1.4 billion

of bank and bond debt, as depicted below:

**The Fraudulent Transfers**

**STEP ONE**



**The Subsequent Transfers**

**STEP TWO**

12.     This action is brought to declare the Fraudulent Transfers avoidable under section 544(b), incorporating section 270 et seq. of the New York Debtor and Creditor Law ("N.Y. DCL"), and to recover the Subsequent Transfers from BAWAG pursuant to section 550 of the Bankruptcy Code. Within the meaning of the N.Y. DCL, the Fraudulent Transfers, alternatively, (a) were made by RGL while insolvent, (b) rendered RGL insolvent, or (c) left RGL with unreasonably small capital.

13.     Defendant BAWAG was an immediate or mediate transferee, within the meaning of section 550(a)(2) of the Bankruptcy Code, of the Subsequent Transfers (*i.e.,* $1.325 billion of the $1.342 billion that was received by Defendant BAWAG). Given BAWAG's active participation of, and knowledge concerning, the Bennett Receivables Scheme (along with BAWAG's other misconduct involving its ownership of, and dealings with, the Debtors), BAWAG was not a good faith transferee within the meaning of section 550(b)(2) of the Bankruptcy Code. Plaintiff alternatively seeks to recover the $1.325 billion on an unjust enrichment theory.

14.     In addition, Plaintiff RGL seeks to recover the damages that it incurred as a result of BAWAG's aiding and abetting of Bennett's breach of his fiduciary duties to Plaintiff RGL in connection with the consummation of the leveraged recapitalization. Bennett and BAWAG structured and effected those transactions as a means of stripping billions of dollars in value out of Plaintiff RGL. In doing so, Bennett left Plaintiff RGL with $1.4 billion in debt, as to which it was immediately in default on at least $800 million, if not all of the $1.4 billion (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) because of, among other things, the Bennett Receivables Scheme being perpetuated by Bennett, BAWAG, and others. Thus, BAWAG was fully aware of the harm that Bennett was inflicting on Plaintiff

RGL and actively assisted Bennett in consummating the transactions as a means of accomplishing BAWAG's own payday.

15.     To date, BAWAG, through a campaign of stonewalling and foot dragging, has largely resisted, over the course of more than three months, providing documents in response to the Bankruptcy Rule 2004 subpoena issued by the Committee, which sought, among other things, documents relating to BAWAG's relationship with the Debtors and RGHI. Those documents will help to reveal the full extent of BAWAG's participation in Bennett's financial shenanigans, and disclose the full extent of the BAWAG-Bennett relationship. As of the end of March 2006, however, BAWAG had failed to produce a single document to the Committee. As a result, BAWAG's relationship with each of Bennett, RGHI and the Debtors remains shrouded in some mystery that has been purposefully created by BAWAG to conceal the full details of BAWAG's relationship with Bennett, RGHI and the Debtors.

16.     Although discovery may identify additional claims against Defendant BAWAG, as well as other potential defendants, Plaintiff RGL files this Complaint, and seeks temporary and preliminary relief, to ensure the recovery of the Subsequent Transfers received by Defendant BAWAG that are recoverable by Plaintiff RGL under the Bankruptcy Code (which makes the NY DCL applicable to the Fraudulent Transfers) and the common law.

## JURISDICTION, VENUE AND STANDING

17.     On October 17, 2005 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (as amended, the "Bankruptcy Code"). With the exception of Debtor Refco Capital Markets, Ltd. ("RCM"), for which a Trustee has been appointed, the Debtors, including Plaintiff RGL, continue to manage their property as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

18.     The Committee is a committee duly appointed and organized under section 1102 of the Bankruptcy Code. On October 28, 2005, the United States Trustee appointed the Committee, as reconstituted on March 29, 2006. The Committee was conferred standing to prosecute this action in the name of Plaintiff RGL, for the benefits of RGL's bankruptcy estate.

19.     On November 16, 2005, BAWAG filed an adversary complaint against Bennett, certain of the Debtors, certain John Does, and certain unnamed corporations, alleging that it was fraudulently induced to loan approximately $420 million to one or more of the defendants on October 10, 2005 (the "Adversary Proceeding"). In the Adversary Proceeding, BAWAG is seeking the return of the $420 million or the establishment of a constructive trust over those funds.

20.     This counterclaim is brought pursuant to rule 7001 of the Federal Rules of Bankruptcy Procedures ("Bankruptcy Rules") seeking, among other things, to recover pursuant to section 550 of the Bankruptcy Code, the Subsequent Ttransfers totaling more than $1.325 billion, as set forth below.

21.     This counterclaim is a "core" proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (E), and (H).

22.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334.

23.     Venue over this adversary proceeding resides in this Court pursuant to 28 U.S.C. § 1409(a).

## THE PARTIES

24.     Plaintiff RGL. RGL is a corporation organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street,

Tower A, New York, NY 10281. RGL is a debtor in the jointly administered chapter 11 cases captioned above.

25.    Defendant BAWAG. BAWAG is a banking and financial services corporation organized and existing under the laws of Austria with its principal place of business at Seitzergass 2-4, A-1010 Vienna, Austria. BAWAG is Austria's fourth largest bank. BAWAG is not authorized to do business in the State of New York. BAWAG has submitted to the jurisdiction of this Court by commencing the Adversary Proceeding against the Debtors.

## THE FACTS GIVING RISE TO THE CLAIMS

### A.    Refco and the Debtors

26.    Plaintiff RGL through its direct and indirect subsidiaries was a provider of execution and clearing services for exchange-traded derivatives and were major providers of prime brokerage services in the fixed income and foreign exchange markets. Many of the Debtors were holding companies for either regulated domestic entities, such as futures commission merchants, or other foreign futures brokerages. Other Debtors, including RCM, a non-regulated entity with operations in New York City, provided clients with access to the foreign exchange markets and other securities markets.

27.    On August 16, 2005, Refco Inc. ("Refco") completed an initial public offering ("IPO").

### B.    The Bennett Receivables Scheme

28.    On October 10, 2005, Refco announced that it had discovered, through an internal review, a previously undisclosed receivable owed to the Debtors by RGHI, an entity controlled by Phillip Bennett, Refco's Chairman and Chief Executive Officer ("CEO"), in the amount of approximately $430 million. The receivable had not been shown as a related-party

transaction in Refco's prior financial statements or in the Registration Statement and Prospectus filed in connection with the IPO.

29.     The Debtors subsequently disclosed that the receivable had not been shown as a related-party transaction because Bennett, with the assistance of other persons inside and outside of the Debtors, engaged in a series of transactions designed to disguise the related-party nature of the receivable by temporarily paying off the debt and transferring it from RGHI, the entity controlled by Bennett, to another entity seemingly unrelated to the Debtors. To date, public reports and the criminal indictment filed against Bennett have identified Liberty Corner Capital Strategies, LLC as one of the entities that entered into the transactions with the Debtors and RGHI that facilitated Bennett's deception regarding the receivable. As demonstrated below, BAWAG also entered into transactions with the Debtors and RGHI that actively assisted Bennett in his ability to hide the existence of RGHI's substantial debt to the Debtors.

30.     Bennett took an indefinite leave of absence when the news of the foregoing scheme broke on October 10, 2005. Bennett was arrested on October 11, 2005, after the United States Attorney for the Southern District of New York filed a criminal complaint against him for securities fraud. Bennett was indicted in November 2005. Bennett is currently awaiting trial, after being released on $50 million bail.

31.     On October 17, 2005, the Debtors filed for bankruptcy under chapter 11 of the Bankruptcy Code.

32.     The Debtors have stated publicly that the scheme could have commenced as early as 1998 – at or around the same time Defendant BAWAG acquired a 10 percent interest in Plaintiff RGL – because, at least initially, the obligations related to bad receivables from clients of the Debtors adversely affected by the Asian financial crisis of the late 1990's.

33. Apparently out of concern about the effect of the uncollectible obligations on the Debtors' financial condition (and the value of Bennett's equity interest in Plaintiff RGL), at least as early as February 2000, Bennett caused the uncollectible obligations to be transferred to RGHI. To avoid revealing the debt from RGHI to one or more of the Debtors, toward the end of every relevant reporting period, RCM, or another one of the Debtors, would extend loans of between $175 million and $720 million to entities appearing to have no relation to Bennett or RGHI. Those entities would, in turn, lend funds to RGHI to enable it to pay down the debt it owed to one or more of the Debtors. For many of the transactions, Bennett caused RGL to guarantee repayment of the obligation to the "third party" lenders on RGHI's behalf.

34. A few days following the close of the reporting period, the parties would then unwind the entire transaction. In the case of Liberty Corner, it would receive interest on its loan to RGHI at a rate that was typically 75 basis points higher than the interest rate on the loan from the Debtors to Liberty Corner, thus ensuring a "no-risk" profit for Liberty Corner.

35. The effect of these transactions (which together comprised the Bennett Receivables Scheme) was to substitute at the end of each accounting period, for bookkeeping purposes only, an obligation owed by RGHI to one or more of the Debtors into an obligation owed by an entity purportedly unrelated to Bennett or RGHI. For the remainder of the accounting period, however, RGHI held the obligation to one or more of the Debtors.

36. Although not previously the subject of public disclosure, financial records and emails establish that BAWAG was also an active participant in the Bennett Receivables Scheme. The BAWAG transactions are cumulative with the Liberty Corner transactions, thereby making the magnitude of the Bennett Receivables Scheme much greater than has been previously reported.

37.     Beginning in February 2000, and at each of the Debtors' fiscal year-ends thereafter, up to and including February 2005, Defendant BAWAG engaged in a series of round-trip loan transactions with RGHI and certain of the Debtors.

38.     For example, at the end of the Debtors' 2004 fiscal year (February and March 2004), less than six months before BAWAG received the Subsequent Transfers, one or more of the Debtors, RGHI and BAWAG completed a series of transactions that had no economic effect other than to allow RGHI to hide the existence of its then-existing multi-hundred million receivable owed to the Debtors.

39.     On or about February 25, 2004, one or more of the Debtors transferred $210 million to BAWAG.  On the same day, from its account at Wachovia International NY, BAWAG transferred two amounts to RGHI, one transfer of $210 million, and one of $40 million.  RGHI used the $250 million to reduce its outstanding obligation to one or more of the Debtors for a period of approximately one week at the end of the Debtors' fiscal year, which was February 28, 2004.

40.     In effecting these transactions, BAWAG, RGHI and Bennett understood and secretly agreed in advance that the transfers would be reversed on March 4, 2004.  The parties also agreed that both of the $210 million transfers – from the Debtors to BAWAG, and from BAWAG to RGHI – would bear an identical rate of interest, thereby ensuring that that portion of the transaction had no economic consequences.  For the $40 million transfer, RGHI agreed to pay BAWAG interest at a per annum rate of 1.58%.

41.     On March 4, 2004, the transfers were reversed as had previously been agreed among the parties to the transfers.  BAWAG repaid its "loan" to the Debtors at the same time that RGHI repaid its "loans" to BAWAG.

42.     Thus, the BAWAG loans had the same effect as the Liberty Corner loans. That is, BAWAG's loans enabled RGHI to substitute at the end of each fiscal year-end, for bookkeeping purposes only, an obligation owed by RGHI to one or more of the Debtors into an obligation owed by BAWAG to the Debtors. A few days after the fiscal year-end, the transactions would be unwound and, for the remainder of the year, RGHI held the obligation to one or more of the Debtors. Through this mechanism, Bennett (with the active assistance of BAWAG) was able to alchemize a receivable from RGHI into a bank deposit with BAWAG.

43.     The BAWAG transactions that took place in February-March 2004 are substantially similar to round-trip transactions effected between RGHI, the Debtors and BAWAG at each fiscal year end for the years 2000, 2001, 2002, 2003, 2004 and 2005. The amounts of the loans at each of those year ends is reflected in the chart set forth below:

| Loan Date | Repayment Date | Debtors' loan to BAWAG ($m) | BAWAG loan(s) to RGHI ($m) |
|-----------|----------------|------------------------------|----------------------------|
| 02/24/00  | 03/02/00       | $225                         | $225 + $75                 |
| 02/26/01  | 03/05/01       | $225                         | $225 + $75                 |
| 02/25/02  | 03/04/02       | $210                         | $210 + $90                 |
| 02/25/03  | 03/04/03       | $175                         | $175 + $75                 |
| 02/25/04  | 03/04/04       | $210                         | $210 + $40                 |
| 02/23/05  | 03/08/05       | $175                         | $175 + $75                 |

44.     Moreover, the BAWAG transactions were made in addition to the Liberty Corner transactions. Thus, based on available information to date, a more complete picture of the magnitude of the Bennett Receivables Scheme over the Debtors' fiscal year-end is as follows:

| Loan Date | Repayment Date | BAWAG loan(s) to RGHI ($m) | Liberty Corner / Customer Loans ($m) | Total Loans to RGHI |
|-----------|----------------|----------------------------|--------------------------------------|---------------------|
| 02/24/00  | 03/02/00       | $225 + $75                 |                                      | $300                |
| 02/26/01  | 03/05/01       | $225 + $75                 | $200                                 | $500                |
| 02/25/02  | 03/04/02       | $210 + $90                 | $325                                 | $525                |
| 02/25/03  | 03/04/03       | $175 + $75                 | $500                                 | $750                |
| 02/25/04  | 03/04/04       | $210 + $40                 | $720                                 | $970                |
| 02/23/05  | 03/08/05       | $175 + $75                 | $345                                 | $595                |

45.     As co-owner of Plaintiff RGL with RGHI, there can be no dispute that BAWAG had a thorough understanding of the relationship between Plaintiff RGL and RGHI.

46.     To date, the Debtors have been unable to locate any formal loan documents pertaining to BAWAG's multi-hundred million dollar loans. Emails sent between the parties make clear, however, that BAWAG had full knowledge of the scheme in which it was engaging. For example, a February 24, 2004 email between a Refco executive on the one hand and multiple BAWAG representatives on the other hand, describes the proposed transactions as having the following steps:

> "1. we take from Refco Capital Bermuda USD 210,000,000, from 25.2. to 4.03.04 . . . .
>
> 2. we place on deposit with Refco Group Holding USD 40,000,000 from 25.2. to 4.3.04 . . . .
>
> 3. we place on deposit with Refco Group Holding USD 210,000,000 from 25.2. to 4.3.04 . . . .
>
> . . . .
>
> For Repayment value 04.03.2004 . . . ."

47.     Likewise, on February 14, 2005, Phillip Bennett wrote a letter to Selcuk Sari of BAWAG in which Bennett confirmed a $250 million loan from BAWAG to RGHI, and a simultaneous loan of $175 million from BAWAG to RCM. The letter further provided that the loan "will be repaid for value Tuesday, March 8, 2005." And Bennett expressly stated in the letter that he understood "that the rate to be paid to Refco Capital Markets will be the same as the rate charged on the deposits placed with Refco Group Holdings, Inc. with a separate rate to be paid by Refco Group Holdings Inc. on the difference of $75 million."

48.     On the following day, Santo Maggio sent a second letter on behalf of RCM to Selcuk Sari of BAWAG referring to the $250 million loan to RGHI and making clear that in the event RGHI failed to repay the loan, "we herewith irrevocably instruct you to transfer an amount up to USD 175 million from our account . . . held with BAWAG to the account . . . of RGHI held with BAWAG in order to balance the said account of RGHI." In other words, the loan to RGHI was a sham and BAWAG had a letter making clear that it was taking no credit risk because it could look to the assets of RCM in the event that RGHI failed to repay the loan.

49.     At the time BAWAG was participating in the Bennett Receivables Scheme, BAWAG was relying on Bennett to help hide BAWAG's own losses. See infra at ¶¶ 105-107.

C.     **The Leveraged Recapitalization and Fraudulent Transfers**

50.     The Debtors' bankruptcy filing followed only fifteen months after a leveraged recapitalization that had allowed RGHI to obtain payments in excess of $1.9 billion, $1.342 billion of which was paid out by RGHI to BAWAG.

51.     In or about July 2004, the Debtors' businesses were owned by, and conducted through, subsidiaries of Plaintiff RGL. At that time, Plaintiff RGL was co-owned by BAWAG Overseas (an affiliate of BAWAG), holding approximately 10 percent of Plaintiff

RGL, and by RGHI, holding approximately 90 percent of Plaintiff RGL. RGHI in turn, was co-owned by Bennett, then CEO of Plaintiff RGL, and by Tone Grant, the preceding CEO of Plaintiff RGL.

52.     In August 2004, through a series of transactions, described in additional detail below, Thomas H. Lee Partners, L.P., with certain affiliates and co-investors, acquired approximately 57 percent of the equity interests in Plaintiff RGL in a leveraged recapitalization (the "Leveraged Recapitalization"). Concurrent with the Leveraged Recapitalization, Bennett purchased Tone Grant's shares of RGHI and became the sole owner of RGHI. Accordingly, starting in August 2004, RGHI was wholly owned by Bennett.

53.     On August 5, 2004, Refco Finance Holdings LLC ("Refco Finance") and its affiliates, with the approval of RGHI, borrowed a total of approximately $1.4 billion, $800 million pursuant to a senior secured credit facility, and $600 million pursuant to the issuance by Refco Finance and its wholly-owned subsidiary Refco Finance Inc. of unsecured subordinated notes. On the same day, and as part of the same series of transactions, Refco Finance merged with and into Plaintiff RGL with Plaintiff RGL as the surviving entity (the "Refco Finance Merger").

54.     As described in more detail below, on August 5, 2004, as part of the same series of transactions, Plaintiff RGL and Refco Finance (which was subsequently merged into Plaintiff RGL) transferred more than $1.325 billion through the Fraudulent Transfers to RGHI. As described in more detail below, RGHI then transferred all of the Fraudulent Transfers through the Subsequent Transfers to Defendant BAWAG.

(1)     The Fraudulent Transfers

55.     On August 5, 2004, Plaintiff RGL's predecessor in interest, Refco Finance, transferred $825,377,839.76 ███████████████

28

████████████ – to RGHI's account at JPMorgan Chase in New York (the "$825 Million Fraudulent Transfer").

56.     On August 5, 2004, Plaintiff RGL transferred $500 million from its account at BAWAG in Vienna, Austria, to RGHI's account at BAWAG in Vienna, Austria (the "$500 Million Fraudulent Transfer"). Plaintiff RGL also transferred to RGHI the equity interests in certain asset management companies (which had substantial additional monetary value), as defined by the agreement between the parties, which entities included Forstmann-Leff International Associates, LLC.

(2)     The Subsequent Transfers

57.     Also on August 5, 2004, the same day Plaintiff RGL made or caused to be made Fraudulent Transfers to RGHI in an amount not less than $1.325 billion, RGHI made significant transfers of its own to BAWAG in an amount of $1.342 billion. Those transfers consisted of the following:

(a)     The $191 Million Subsequent Transfer

58.     On August 5, 2004, RGHI transferred $191 million to BAWAG's account ████████████████ (the "$191 Million Subsequent Transfer"). BAWAG had dominion and control over the $191 million during the period that it held the funds in its account ████████████████. The payment purported to represent consideration for the merger of BAWAG Overseas with and into a subsidiary of RGHI, and the purported elimination of BAWAG's direct or indirect ownership interest in RGL or its affiliates. Upon information and belief, BAWAG further transferred the $191 Million Subsequent Transfer to an account at BAWAG held in the name of Alinea Holding GmBH ("Alinea"), an affiliate of BAWAG (the "BAWAG-Alinea Transfer").

59.     Thereafter, upon information and belief, a substantial portion of the $191 Million Subsequent Transfer was transferred by Alinea to BAWAG as consideration for BAWAG's right to repayment of loans owed to it by BAWAG Overseas.

60.     On information and belief, Alinea is a wholly-owned subsidiary of BAWAG. BAWAG's 2004 annual report described the transaction as follows: "In the course of a change in the majority ownership of the Refco Group . . . *BAWAG* sold its 10% share. The agreements to this effect were signed in June. The successful cooperation with the Refco Group will be continued in the future without an equity stake, so that the BAWAG P.S.K. Group will continue to benefit from this access route to international customers in the future." (emphasis added.)

(b)     The $566 Million and $110 Million Subsequent Transfers

61.     In or about August 2004, RGHI also entered into a purchase agreement ("Purchase Agreement") with Desana Foundation ("Desana"), a Liechtenstein Stiftung (a/k/a a Liechtenstein Foundation), and the sole stockholder of DF Capital, Inc. ("DF Capital"), a corporation organized under the laws of Delaware. Desana, through DF Capital, owned equity-like contingent rights in Plaintiff RGL which, upon information and belief, were acquired by DF Capital with funds borrowed from BAWAG in exchange for a security interest in such equity-like rights. Upon information and belief, Desana and BAWAG are affiliates and are under common control. The Purchase Agreement provided that RGHI agreed to purchase from Desana all of its ownership interests in DF Capital for a purchase price of $676 million.

62.     Pursuant to the Purchase Agreement, upon the closing of the DF Capital transaction, all outstanding loans owed by DF Capital to BAWAG were to be repaid by Desana upon receipt of the $676 million from RGHI.

63. On August 5, 2004, RGHI wired $566 million to BAWAG, specifically BAWAG's account at ██████████████████ (the "$566 Million Subsequent Transfer"). BAWAG had complete dominion and control over the $566 million during the period that BAWAG held such funds in its account at Wachovia International NY.

64. Upon information and belief, BAWAG subsequently transferred the $566 Million Subsequent Transfer to an account at BAWAG held in the name of its affiliate, Desana (the "BAWAG-Desana Transfer"). Thereafter, upon information and belief, all or a substantial portion of such funds were transferred to BAWAG's control as consideration for BAWAG's right to repayment of loans owed to it by DF Capital, as contemplated by the Purchase Agreement.

65. Also on August 5, 2004, upon information and belief, RGHI transferred $110 million of the $500 Million Fraudulent Transfer that had previously been disbursed that same day by Plaintiff RGL to RGHI, from an account at BAWAG held by RGHI to an account at BAWAG held by Desana (the "$110 Million Subsequent Transfer"). Thereafter, upon information and belief, all or a substantial portion of such funds were transferred to BAWAG as the balance of consideration for BAWAG's right to repayment of loans owed to it by DF Capital, as contemplated by the Purchase Agreement.

66. At all relevant times, Desana, BAWAG, BAWAG Overseas, and Alinea were all represented by the law firm of McDermott Will & Emery in connection with the foregoing transactions, thereby reflecting the affiliation of Desana, BAWAG, BAWAG Overseas, and Alinea.

(c) The $85 Million Subsequent Transfer

67. On August 5, 2004, RGHI wired $85 million to BAWAG's account at ██████████████████ (the "$85 Million Subsequent Transfer"). BAWAG had dominion

and control over the $85 million during the period that BAWAG held such funds in its account at
████████████████████. Upon information and belief, this wire transfer to BAWAG was
made by RGHI to repay a loan of $85 million that BAWAG had previously made to RGHI.

(d)     The $390 Million Subsequent Transfer

68.     On August 5, 2004, upon information and belief, RGHI transferred the
$390 million balance of the $500 Million Fraudulent Transfer (net of the $110 Million
Subsequent Transfer, described above), from RGHI's account at BAWAG to RGHI's overdraft
account at BAWAG (the "$390 Million Subsequent Transfer"). Upon information and belief,
the $390 Million Subsequent Transfer was made by RGHI to repay an overdraft facility it had
previously drawn down upon in the amount of $390 million.

69.     In total, on August 5, 2004, RGHI made transfers totaling $1.342 billion
to Defendant BAWAG. These transfers were either retained by BAWAG or subsequently
transferred by BAWAG to one of its affiliates.

70.     At no point in connection with Refco's subsequent Initial Public
Offering did Refco disclose that BAWAG had held any direct or indirect equity interest in Refco
beyond the 10% ownership interest that it held through BAWAG Overseas. The IPO Prospectus
disclosed the existence of a $861.7 million payment to a former shareholder in connection with
the August 2004 Leveraged Recapitalization. Nowhere did BAWAG or Refco ever disclose,
however, that such former shareholder had any connection to BAWAG, let alone that such
shareholder was BAWAG or a BAWAG affiliate that acquired its equity interest in RGL with
funds borrowed from BAWAG and in which BAWAG held a security interest.

**D.      Precarious Financial Condition of Plaintiff RGL**

71.     At the time RGL made the $1.325 billion in Fraudulent Transfers to
RGHI, the Bennett Receivables Scheme, the history of uncollectible receivables at one or more

of the Debtors, and the materially misleading nature of the Debtors' financial statements, were being concealed by Bennett and RGHI.

72.     At the time that it received the Subsequent Transfers from RGHI, Defendant BAWAG had been an active participant in that scheme, and Defendant BAWAG's participation in the scheme continued at least through February 2005 after BAWAG had already received the $1.325 billion in Subsequent Transfers.

73.     As a business that depended heavily on winning and keeping the confidence of its customers for its creditworthiness and integrity, the existence of the Bennett Receivables Scheme, and the consequences of disclosure of the Bennett Receivables Scheme to the Debtors' investors, creditors and customers, were catastrophic to Plaintiff RGL's business.

74.     Had the truth been known about the Bennett Receivables Scheme on August 5, 2004 or at any time thereafter, Plaintiff RGL would rapidly have imploded and been forced to file for bankruptcy, as proved to be the case when the Bennett Receivables Scheme was disclosed in October 2005.

75.     Plaintiff RGL's balance sheet reflected that, after the Leveraged Recapitalization, RGL had approximately $81.5 million in shareholders equity.  That amount, in turn, depended on the balance sheet's inclusion of more than $1 billion in goodwill and various intangible assets such as customer relationships.  In other words, Plaintiff RGL had in excess of $1 billion in **negative** tangible net worth.

76.     Plaintiff RGL's assets were significantly overstated as a result of Bennett's failure to disclose the Bennett Receivables Scheme.

77.     First, through Bennett's financial alchemy, the balance sheet did not take into account the speculative nature of recovery on the RGHI receivable, which through the

Bennett Receivables Scheme, was converted into a third-party receivable with no seeming collectability issues.

78.     Second, Plaintiff RGL's valuation of its intangible assets and goodwill was predicated on the false assumptions that: (a) the Debtors had experienced much lower levels of customer losses, and (b) the Debtors would continue, in the future, to enjoy an excellent reputation with their customers. Both those assumptions were false in that (a) Bennett had hidden the Debtors' historical customer losses through the Bennett Receivables Scheme, and (b) the inevitable disclosure of the Bennett Receivables Scheme would irreparably damage its customer relationships.

79.     As a result of Bennett's failure to disclose the Bennett Receivables Scheme, the Debtors were immediately in default (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) on at least $800 million, if not all, of the $1.4 billion in borrowings that were drawn on the eve of the Fraudulent Transfers.

80.     The crisis in confidence that would have ensued had the truth about the Bennett Receivables Scheme been known, combined with the highly leveraged nature of RGL's capital structure and the immediacy of default (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) on at least $800 million, if not all, of its $1.4 billion of debt, rendered Plaintiff RGL undercapitalized for its continuing business. Specifically, at the time of the $1.325 billion in Fraudulent Transfers were made by Plaintiff RGL to RGHI, Plaintiff RGL was engaged or about to engage in a business for which the property remaining in its hands was unreasonably small capital as to creditors and other persons who subsequently became creditors during the continuance of Plaintiff RGL's business.

81.     In the alternative, at or around the time that the $1.325 billion in Fraudulent Transfers were made by Plaintiff RGL to RGHI, and no later than upon their

34

completion, Plaintiff RGL was "insolvent" within the meaning of the New York Debtor and
Creditor Law.

**E.    The Disclosure of the Bennett Receivables Scheme and Refco's Collapse**

82.    The Bennett Receivables Scheme allowed Bennett to hide the
uncollectible debts and the related-party nature of RGHI's continuing indebtedness to one or
more of the Debtors. For this reason, the Debtors announced on October 10, 2005, that the
financial statements, as of, and for the periods ended, February 28, 2002, February 28, 2003,
February 28, 2004, February 28, 2005, and May 31, 2005, taken as a whole, for each of Refco,
RGL, and Refco Finance, Inc., should no longer be relied upon.

83.    On October 10, 2005, after the Bennett Receivables Scheme was
discovered by certain members of Refco's board of directors who had previously, upon
information and belief, been unaware of such scheme, RGHI appears to have repaid in full
RGHI's indebtedness to one or more of the Debtors. To finance the repayment Phillip Bennett
turned to BAWAG, which in only three business days approved and funded a loan to RGHI of
approximately $420 million. Notwithstanding this repayment, as of October 10, 2005, the
damage to the Debtors as a consequence of the alleged fraud had already been done.

84.    BAWAG has filed this adversary proceeding alleging that it was
defrauded in to making the $420 million loan to RGHI by virtue of its claimed lack of
knowledge regarding the problems at the Debtors. BAWAG's claim is absolutely false. The
$420 million loan in October 2005 was approved by the same BAWAG executive, Selcuk Sari,
who engaged in many of the year-end, round-trip loan transactions that were essential to the
Bennett Receivables Scheme over a period of five years.

85.    Disclosure of the existence of the Bennett Receivables Scheme launched
the Debtors into a rapid death spiral. The market price of Refco stock plummeted from

35

approximately $28.56 per share, its closing price on October 7, 2005, to $13.85, its closing price

on October 11, 2005, resulting in a loss of more than $1.5 billion in market capitalization by the

time of Bennett's arrest on October 12, 2005. Trading in Refco's stock was halted for most of

Tuesday, October 11, 2005. When trading resumed on October 12, 2005, the stock continued to

fall, closing at $10.85 per share. On October 13, 2005, trading was again suspended after the

stock dropped an additional 27% in pre-market activity. Refco stock, which peaked at $30.12 on

Sept. 7, 2005 – and which is now suspended from trading – is currently quoted at approximately

$0.25 per share. The disclosures also caused the prices of Plaintiff RGL and Refco Finance

Inc.'s publicly traded bonds to collapse. The bonds declined more than 80% in less than a week,

trading as low as 16% of par on October 14, 2005, down from their close at 108.625% of par on

October 7, 2005.

86.     The public disclosure of these events precipitated a crisis of confidence

among the Debtors' customers, counter-parties and others with whom the Debtors did business,

resulting in an avalanche of customer defections and massive disruptions in the Debtors'

business. On October 13, 2005, the Debtors announced that the liquidity within their non-

regulated subsidiary, RCM, which represented a material portion of the business of the Debtors,

was no longer sufficient to accommodate customer withdrawals and imposed a 15-day

moratorium on the withdrawal of customer accounts from RCM. Four days later, on October 17,

2005, the Debtors filed for bankruptcy, only one week after the public announcement of the

Bennett Receivables Scheme.

**F.      The Relationship Between BAWAG and Bennett**

87.     At all relevant times, BAWAG and Bennett enjoyed a close business

relationship, which included a variety of secret, undisclosed arrangements. As a result of these

arrangements, BAWAG had substantial control and influence over Plaintiff RGL's affairs prior to, and at the time of, the August 5, 2004 transfers from Plaintiff RGL to RGHI to BAWAG.

(1)    BAWAG's Disclosed Equity Interest in RGL

88.    In or about 1998 or 1999, BAWAG, through its affiliates Alinea and BAWAG Overseas, Inc. ("BAWAG Overseas"), became a stockholder of Plaintiff RGL, acquiring an equity interest of approximately 10 percent. At the time, the remaining 90 percent stake in RGL was purportedly held by RGHI, a company that was partly, and later wholly, controlled by Bennett.

(2)    BAWAG's Undisclosed Interest in RGL

89.    BAWAG, RGHI, and Plaintiff RGL were also linked through a company called DF Capital. DF Capital was originally organized under the laws of Delaware on July 10, 2002 under the name DF Overseas Inc. On July 11, 2002, by amendment to its Certificate of Incorporation, signed by its Secretary, Phillip Bennett, DF Overseas Inc. changed its name to DF Capital Inc.

90.    On July 12, 2002, Plaintiff RGL and DF Capital entered into a series of agreements ███████████████████████████████████████████████ ███████████████ " (the "Rights Acquisition"). ███████████████████████████ ██████████████████████████████████████████████████.

91.    Central to the Rights Acquisition was a Proceeds Participation Agreement between Plaintiff RGL and DF Capital (the "Proceeds Agreement"). The Proceeds Agreement was amended in part by a Letter Agreement dated the same day, entered into by the shareholders of Plaintiff RGL, i.e., RGHI, Refco Group Holdings LLC, DF Capital, and BAWAG Overseas.

92.    In essence, the Proceeds Agreement provided that, ███████████████ ████████████████████████████████████████████████████████.

███████████████████████████████████████

████████████████████████████████████████

█████████████████████████████████████████

██████████████.[1]

93.    ██████████████████████████████

███████████████████████████████████████

█████████████████████████.

94.    ██████████████████████████████

████████████████████:

i.    █████████████████████████████

████████████████████████████████

████████████████████████████████

████████████████████████████

████████████████████████████████

████████████████████.

ii.    ████████████████████████████

█████████████████████████████████

█████████████████████████████████

████████████████████████.

████████████████.

iii.    ██████████████████████████████

██████████████████████████████

---

[1] ████████████████████████████████████████.

95. ███████████████████

███████████████████████

███████████████████.

96. ████████████████████

██████████████████████

███████████████████████

████████████████████████

████████████████████████.

97. ████████████████████

███████████████████.

98. █████████████████████

███████████████████████████

██████████████████████████

██████████████████████████

█████████████████████████

████████████████████.

99. █████████████████████

███████████████████████████

████████████████████████

████████████████.

100. █████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████████████
█████████████████████████████████.

101.   Subsequent to the signing of the Proceeds Agreement, in or about

November 2003, BAWAG appears to have made a loan of approximately $254 million to DF

Capital (the "<u>BAWAG - DF Capital Loan</u>").  BAWAG's loan was secured by a Security

Agreement, also dated in or around November 2003, between DF Capital and BAWAG.  In

connection with that Security Agreement, a UCC-1 Financing Statement was filed with the

Secretary of State of Delaware stating that DF Capital had pledged as collateral to BAWAG,

among other things, "all [DF Capital's] rights under the Proceeds Participation Agreement with

[Plaintiff RGL]."

102.   ████████████████████████████
█████████████████████████████████████████
███████████████████████████████████████
██████████████████████████████████████
███████████████████████████████████
█████████████████████████████████████████
███████████████ The BAWAG-DF Capital Loan was also for $254 million.

103.   ███████████████████████████ BAWAG lent $254

million to an entity (DF Capital) ██████████████████████

█████████████████████████████████████. Because

DF Capital had no source for the repayment of the loan to BAWAG other than the Participation Right, BAWAG was practically guaranteed to get the proceeds from the Participation Right.

(3)     BAWAG's Participation in the Bennett Receivables Scheme

104.    As discussed above in paragraphs 4-5, BAWAG was also an active participant in the Bennett Receivables Scheme.

(4)     BAWAG's Hidden Losses

105.    On March 24, 2006, BAWAG held a press conference in which it announced that between 1995 and 2000, BAWAG had suffered losses of approximately one billion euros in connection with various interest rate and derivative transactions. These losses were hidden through securities transactions that were run through accounts held by BAWAG-related entities at Refco.

106.    According to an article by Matthew Goldstein of TheStreet.com:

… Bawag officials said Friday that by the end of 2000, the bank had run up $1.2 billion in losses, much of them stemming from a series of bad investments made by a hedge fund run by the son of a former CEO. Vienna-based Bawag shifted the losses to six obscure Anguilla-based companies and several brokerage accounts at Refco, until it could eventually write off all its bad debts by 2005

… The latest revelation adds a new twist to last year's collapse of Refco, in which Bawag continues to be a pivotal player. Separately, *TheStreet.com* has learned that Bawag's one-time ownership interest in Refco may have been far greater than the 10% equity stake that's been previously reported.

… Indeed, the behind-the-scenes shifting of debt by the bank is eerily similar to the scheme hatched by former Refco CEO Phillip Bennett, who allegedly hid hundreds of millions of dollars in customer trading losses in a series of hedge funds and a private company he controlled, Refco Group Holdings Inc.

… That Bawag was hiding losses in Refco accounts could provide new point of inquiry for federal prosecutors, regulators and Refco creditors, all of whom are trying to determine just how widespread the fraud at Refco extended.

... Speaking at a press conference in Vienna, Bawag CEO Ewald Nowotny says the bank might sue Wolfgang Flottl, the former hedge fund manage allegedly responsible for the $1 billion in losses. Nowotny, according to *Bloomberg*, says, "Flottl influenced these investments and he is to be held accountable."

... Bawag always has said it owned 10% of Refco from 1999 to August 2004, when the brokerage was acquired by the private equity firm Thomas H. Lee Partners in a $1.4 billion leveraged buyout. Neither Bawag nor Refco has ever said how much Bawag received in the buyout, a transaction that set the stage for Refco's initial public offering last August.

107.   The Austrian Financial Market Authority ("FMA") is currently investigating BAWAG and its transactions with Refco and the Anguillan entities.

(5)   Other Ties

108.   BAWAG had other business ties with the Debtors as well. In or about 1998, Helmut Elsner, then CEO of BAWAG, established a joint venture between BAWAG and the Debtors. This venture provided the Debtor's futures- and options-clearing services to European exchanges.

109.   BAWAG's purchase in or about 1998 of its stake in the Debtors was coordinated in part by Christopher Sugrue, then a senior vice president at Plaintiff RGL. In or around 1998, Sugrue left RGL to start a hedge fund manager, PlusFunds Ltd.

110.   BAWAG maintained close ties with Sugrue and PlusFunds Ltd. (now PlusFunds Group Inc.) ("Plus Funds"). BAWAG was granted the Austrian distribution rights for a PlusFunds hedge fund index called SPhinX. BAWAG is also listed as a creditor of PlusFunds in the PlusFunds' recent bankruptcy filings and the Anguillan entities used by BAWAG to conceal its losses shared at least one director with certain of the SPhinX entities.

111.   Likewise, the Debtors maintained a close business relationship with Sugrue and PlusFunds. From at least 2002 to October 12, 2005, Refco served as the clearing

broker and futures commission merchant for investment vehicles and funds that PlusFunds advised. In addition, PlusFunds was retained by non-Debtor Recount Holdings, LLC in its capacity as general partner of the S&P Managed Futures Index Fund, LP, to be subadvisor to the S&P Managed Fund.

112.     There are also ties between the Debtors, BAWAG, and Bank Frick & Co. Atkiengesellschaft ("Bank Frick"), a Lichtenstein joint stock company. The Debtor Refco Global Finance Ltd. purchased in June 2003, and still holds, a 4% stake in Bank Frick. BAWAG also holds a 26% stake in Bank Frick. Moreover, there are overlapping connections between Bank Frick and DF Capital. ██████████████████████████

████████████████████████████████████████████

████████████████████████████. In addition, Thomas Hackl, a former executive at BAWAG, and an executive at one of the Debtors through December 2004, is believed to be a director of Bank Frick.

## G.     Bennett's Breach of Fiduciary Duties Owed to Plaintiff RGL

113.     At all relevant times, Bennett was a director and officer of Plaintiff RGL, and, as such, owed fiduciary duties to act at all times with the utmost good faith and fair dealing, and in the best interests of, Plaintiff RGL and its stockholders. Those duties included duties of loyalty, duties of care, and duties of candor.

114.     In effecting the Leveraged Recapitalization, Bennett acted to benefit himself, and not to benefit Plaintiff RGL. The Leveraged Recapitalization resulted in Plaintiff RGL increasing its debt obligations to $1.4 billion in exchange for cash. Bennett used the proceeds of the Leveraged Recapitalization to effectuate the Fraudulent Transfers to, and to benefit his company, RGHI, thereby obtaining assets with an aggregate value of more than $2 billion.

115.     Bennett breached his fiduciary duties to Plaintiff RGL in connection with the Leveraged Recapitalization transactions by effecting the Fraudulent Transfers that were contrary to Plaintiff RGL's best interests.

116.     The series of transactions, including the Leveraged Recapitalization and the Fraudulent Transfers, left Plaintiff RGL engaged in business with unreasonably small capital and/or rendered Plaintiff RGL insolvent.

117.     Plaintiff RGL received no benefit from the series of transactions, including the Leveraged Recapitalization and Fraudulent Transfers, because, in addition to increasing Plaintiff RGL's debt obligations to $1.4 billion in exchange for cash, Bennett caused Plaintiff RGL to immediately distribute the proceeds to Bennett's company, RGHI. To make matters worse, Plaintiff RGL was immediately in default on at least $800 million, if not all, of the $1.4 billion in debt (albeit apparently unbeknownst to the Debtors' lenders, bondholders, or customers) because of the then undisclosed existence of the Bennett Receivables Scheme, which, *inter alia*, rendered Plaintiff RGL's financial statements materially misleading, thereby constituting an event of default under the agreement governing the bank debt.

118.     Bennett abandoned Plaintiff RGL's interests by going forward with the Leveraged Recapitalization and the Fraudulent Transfers notwithstanding his knowledge of the Bennett Receivables Scheme. In causing Plaintiff RGL to distribute billions of dollars in assets to RGHI, Bennett failed to advise Plaintiff RGL's Board of Managers (which by the time of the distributions to RGHI included designees of Thomas H. Lee) of the Bennett Receivables Scheme, the material misstatements in Plaintiff RGL's financial statements and/or the fact that the distributions would result in Plaintiff RGL's insolvency.

**H.** **BAWAG'S Aiding and Abetting of Bennett's Breach of Fiduciary**
**Duties Owed to Plaintiff RGL**

119.    As an active participant in the Bennett Receivables Scheme, BAWAG

was well aware that Bennett's consummation of the Leveraged Recapitalization was a breach of

Bennett's fiduciary duties to Plaintiff RGL.

120.    BAWAG actively assisted Bennett in his consummation of the

Leveraged Recapitalization transactions in a variety of ways, including the following:

(a)    providing Bennett's company, RGHI, with multi-hundred million

loans that were outstanding just prior to the consummation of the

Leveraged Recapitalization, which loans were paid off with the

assets that RGHI/Bennett obtained from Plaintiff RGL through his

dishonest conduct; and

(b)    entering into various agreements relating to the Leveraged

Recapitalization that were necessary steps to the effectuation of the

transaction.

## COUNTERCLAIMS

### COUNT I
**Recovery from Immediate or Mediate Transferee of Fraudulent Transfers**
**(11 U.S.C. §§ 544(b), 550(a)(2); N.Y. DCL 270 et seq.)**

121.    The allegations in paragraphs 1 through 120 of this Counterclaim are

incorporated herein by reference.

122.    Pursuant to Bankruptcy Code section 544(b), Plaintiff RGL has the rights

of an existing unsecured creditor of Plaintiff.  Section 544(b) permits Plaintiff RGL to assert

claims and causes of action that such a creditor could assert under applicable state law.

123. In or about August 5, 2004, Plaintiff RGL, made or caused to be made, the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer, to or for the benefit of RGHI.

124. The $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer constituted transfers of interests in property of Plaintiff RGL.

125. Plaintiff RGL did not receive fair consideration (as that term is defined in NY DCL § 271) in exchange for each of the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer.

126. Each of the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer were made to or for the benefit of RGHI and/or BAWAG as an initial transferee or beneficiary.

127. At the time that the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfers were made, Plaintiff RGL (i) was engaged in business or a transaction, or was about to engage in business or a transaction, for which its remaining property was unreasonably small capital, or, in the alternative, (ii) was insolvent, or became insolvent as a result of the transfers.

128. The $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfer are avoidable as fraudulent conveyances or fraudulent transfers under section 544(b) of the Bankruptcy Code and N.Y. DCL section 270 et seq.

129. Because the Fraudulent Transfers are avoidable under the Bankruptcy Code and applicable state law, then, pursuant to Bankruptcy Code section 550, Plaintiff RGL may recover from BAWAG, the Subsequent Transfers, as the immediate or mediate transferee, the property transferred, or the value of the property transferred for the benefit of Plaintiff RGL's estate.

130. BAWAG did not take the transfers for value, in good faith, and without knowledge of the voidability of the transfers.

## COUNT II
### Unjust Enrichment

131. The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

132. When BAWAG received, either directly or indirectly, the monies described herein, BAWAG was enriched at Plaintiff RGL's expense by receiving something of value that belonged to Plaintiff RGL.

133. The enrichment violates equity and good conscience.

134. The enrichment did not result from a valid and enforceable contract between Plaintiff RGL and BAWAG Defendants.

## COUNT III
### Aiding and Abetting Bennett's Breach of Fiduciary Duty

135. The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

136. At all relevant times, Bennett owed a fiduciary duty to Plaintiff RGL.

137. In causing Plaintiff RGL to increase its debt obligations to $1.4 billion in debt, and distribute billions of dollars in cash and assets to Bennett's company, RGHI, Bennett breached his fiduciary duties to Plaintiff RGL. Bennett knew that, in light of the Bennett Receivables Scheme, it was imprudent for Plaintiff RGL to increase its debt obligations to $1.4 billion and at the same time distribute billions of dollars in value to RGHI. Bennett failed to disclose the existence of the Bennett Receivables Scheme, knowing that to have done so would have imperiled his opportunity to effect the Leveraged Recapitalization, and would have thereby

left him unable to strip billions of dollars in value out of Plaintiff RGL for the benefit of himself and BAWAG.

138.    At the time of the Leveraged Recapitalization and the Fraudulent Transfers, Defendant BAWAG was aware of, and had actively participated in, the Bennett Receivables Scheme. Defendant BAWAG was aware that Bennett was breaching his fiduciary duties to Plaintiff RGL in connection with the Leveraged Recapitalization and the resulting distribution of property from Plaintiff RGL to RGHI, much of which ultimately benefited BAWAG.

139.    Defendant BAWAG aided and abetted and gave substantial assistance to Bennett in connection with his effectuation and consummation of the Leveraged Recapitalization and the resulting distribution of property from Plaintiff RGL to RGHI.

140.    As a direct and proximate result of the substantial assistance given by Defendant BAWAG to Bennett in the conduct, acts and omissions set forth above, Plaintiff RGL has been injured and suffered damage in an amount to be proven at trial, but not less than $1.4 billion.

## COUNT IV
### Disallowance of Claims
### (11 U.S.C. § 502(d))

141.    The allegations in paragraphs 1 through 120 of this Counterclaim are incorporated herein by reference.

142.    By reason of the foregoing facts, and pursuant to Bankruptcy Code section 502(d), the claims of BAWAG must be disallowed unless and until Defendant BAWAG has turned over to Plaintiff RGL the property transferred, or paid Plaintiff RGL the value of such property, for which Defendant BAWAG is liable under section 550 of the Bankruptcy Code.

48

WHEREFORE, the Committee respectfully requests entry of judgment as follows:

(a)     Denying all relief requested by BAWAG;

(b)     Entering judgment in favor of Plaintiff RGL and against BAWAG in this action;

(c)     Dismissing the Complaint herein;

(d)     Equitably subordinating BAWAG's claim pursuant to Bankruptcy Code 510(c);

(e)     Declaring that the $825 Million Fraudulent Transfer and the $500 Million Fraudulent Transfers avoidable pursuant to Bankruptcy Code section 544(b), and N.Y. Debtor and Creditor Law sections 270 *et seq*.;

(f)     Awarding Plaintiff RGL judgment against BAWAG in an amount not less than $1.325 billion, as recovery of the Subsequent Transfers;

(g)     Preserving Plaintiff RGL's transfers or the value thereof for Plaintiff RGL's estate;

(h)     Awarding Plaintiff RGL interest commencing on the date of the transfers;

(i)     Awarding Plaintiff RGL damages in an amount to be determined at trial, but not less than $1.4 billion on each of its Second and Third Causes of Action;

(j)     Awarding to Plaintiff the Committee's attorneys' fees, costs and other expenses incurred in this action; and

(f)     Granting the Committee such other and further relief as the Court considers appropriate.

Dated: New York, NY
      April 21, 2006

MILBANK, TWEED, HADLEY & McCLOY LLP

*Scott A. Edelman*

Luc A. Despins (LD 5141)
Scott A. Edelman (SE 5247)
Susheel Kirpalani (SK 8926)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

Counsel for Official Committee
of Unsecured Creditors
of Refco Inc., et al.

# EXHIBIT B

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REFCO INC., <u>et</u> <u>al.</u>, | Case No. 05-60006 (RDD) |
| Debtors. | (Jointly Administered) |

# ORDER AUTHORIZING OFFICIAL COMMITTEE OF UNSECURED CREDITORS TO (I) INTERVENE IN ADVERSARY PROCEEDING COMMENCED BY BAWAG AND (II) ANSWER AND PROSECUTE COUNTERCLAIMS ON BEHALF OF DEFENDANT REFCO GROUP LTD., LLC

Upon the motion of the Official Committee of Unsecured Creditors (the "<u>Committee</u>") of Refco Inc. and its affiliated debtors and debtors in possession (collectively, the "<u>Debtors</u>") in the above-captioned cases, on behalf of Debtor Refco Group Ltd., LLC ("<u>RGL</u>"), pursuant to 11 U.S.C. §§ 105(a), 1103(c)(5), and 1109(b) and Rule 24 of the Federal Rules of Civil Procedure, made applicable by Rule 7024 of the Federal Rules of Bankruptcy Procedure, authorizing the Committee to intervene as of right and answer, defend, and prosecute counterclaims on behalf of Debtor RGL in the adversary proceeding number 05-03161 (the "<u>Adversary Proceeding</u>"); and upon the consent of Debtor RGL to the relief sought in the Motion; and upon the Committee having performed an investigation into the causes of action sought to be prosecuted; and it appearing that conferral of standing on the Committee is the most efficient manner in which the estate of Debtor RGL may assert colorable counterclaims in the Adversary Proceeding; it is hereby found and determined that the relief sought in the Motion is necessary and beneficial to the fair and efficient resolution of RGL's bankruptcy proceedings, and it is accordingly:

**ORDERED** that the Motion is granted; and it is further

**ORDERED** that the Committee is authorized to intervene in the Adversary Proceeding; and it is further

**ORDERED** that the Committee is authorized to answer, defend, and prosecute counterclaims as representative of the estate on behalf of Debtor RGL, Defendant in the Adversary Proceeding; and it is further

**ORDERED** that the caption in the Adversary Proceeding shall hereafter be amended to read as follows:

[CONTINUED ON NEXT PAGE]

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re: | Chapter 11 |
| REFCO INC., et al., | Case No. 05-60006 (RDD) |
| Debtors. | (Jointly Administered) |
| BAWAG P.S.K. BANK FÜR ARBEIT UND WIRTSCHAFT UND ÖSTERREICHISCHE POSTSPARKASSE AKTIENGESELLSCHAFT, | |
| Plaintiff, | Adv. Pro. No. 05-03161 (RDD) |
| - against - | |
| REFCO INC., et al., | |
| Defendants, | |
| - and - | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF REFCO INC. ET AL., on behalf of REFCO GROUP LTD., LLC, | |
| Intervenor-Defendant and Counterclaim Plaintiff. | |

Dated: New York, NY
　　　April __, 2006

_____
HONORABLE ROBERT D. DRAIN
UNITED STATES BANKRUPTCY JUDGE