Marc T.G. Dworsky (MD 9256)
Dennis C. Brown (DB 6758)
Thomas B. Walper (TW 3932)
Richard St. John (RS 0999)
Todd J. Rosen (TR 4388)
MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone:     (213) 683-9100
Facsimile:     (213) 687-3702

*Counsel for Merrill Lynch International, SPhinX
Access LLC, SPhinX Access Ltd., Raymond James &
Associates, and Raymond James Financial Services,
and Rydex Capital Partners LLC and Rydex Capital
Partners SPhinX Fund*

## UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| In re | Chapter 11 |
| REFCO, INC., et al., | Case No. 05-60006 (RDD) |
| Debtors. | (Jointly Administered) |

## OPPOSITION OF MERRILL LYNCH, RAYMOND JAMES AND RYDEX TO MOTION UNDER 11 U.S.C. §§ 105 AND 363 AND FED. R. BANKR. P. 9019(A) FOR APPROVAL OF PROPOSED SETTLEMENT AND COMPROMISE OF AVOIDANCE CLAIMS ASSERTED AGAINST SPHINX MANAGED FUTURES FUND SPC, ET AL.

**TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION .......................................................................................................... 1

II.   ANALYSIS ................................................................................................................... 3

     1.    THE COURT LACKS AN ADEQUATE EVIDENTIARY BASIS FOR
          APPROVING THE PROPOSED SETTLEMENT ............................................... 6

     2.    THE EVIDENCE TO DATE SUGGESTS THAT THE PROPOSED
          SETTLEMENT TERMS, WHILE MANIFESTLY GENEROUS TO THE
          ESTATE, ARE NEITHER FAIR NOR EQUITABLE TO THE
          INVESTORS, WHO ARE THE *ONLY* ENTITIES PARTING WITH
          CONSIDERATION HERE ..................................................................................... 6

     3.    THE EVIDENCE TO DATE SUGGESTS THAT THE PROPOSED
          SETTLEMENT WAS NOT THE PRODUCT OF *ARMS'-LENGTH*
          NEGOTIATIONS, BY ACTUALLY *ADVERSE PARTIES,*
          BARGAINING IN *GOOD FAITH* ....................................................................... 8

     4.    THAT THE INVESTORS MIGHT THEORETICALLY HAVE CLAIMS
          AGAINST SPHINX OR OTHERS FOR BREACH OF DUTY OR
          WORSE IS IRRELEVANT HERE .................................................................... 14

III.  CONCLUSION ........................................................................................................... 15

# TABLE OF AUTHORITIES

**Page**

**Federal Cases**

*Feld v. Zale Corp.*
   62 F.3d 746 (5th Cir. 1995) ............................................................................................ 4

*Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.),*
   375 F.3d 51 (1st Cir. 2004) ........................................................................................... 11

*In re Drexel Burnham Lambert Group,*
   995 F.2d 1138 (2d Cir. 1993) ..................................................................................... 4, 5

*In re Drexel Burnham Lambert Group, Inc.,*
   134 B.R. 499 (Bankr. S.D.N.Y. 1991) .......................................................................... 6

*In re Masters Mates & Pilots Pension Plan,*
   957 F.2d 1020 (2d Cir. 1992) ........................................................................................ 5

*In re Matco Elecs Group, Inc.,*
   287 B.R. 68  (Bankr. N.D.N.Y. 2002) ........................................................................ 4, 6

*In re Overview Equities, Inc.,*
   240 B.R. 683 (Bankr. E.D.N.Y. 1999) .......................................................................... 5

*In re Present Co.,*
   141 B.R. 18 (Bankr. W.D.N.Y. 1992) ........................................................................ 6, 9

*In re Remsen Partners, Ltd.,*
   294 B.R. 557 (Bankr. S.D.N.Y. 2003) ........................................................................ 4, 5

*Pan Am Corp. v. Delta Air Lines,*
   175 B.R. 438 (S.D.N.Y. 1994) .................................................................................... 13

*Pension Ben. Guaranty Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corp.,*
   42 B.R. 960 (E.D. Pa. 1984) ....................................................................................... 13

*Pepper v. Litton,* 308 U.S. 295 (1939) ............................................................................. 15

*Protective Comm. for Indep. Stockholders of TMT Trailer Ferry. v. Anderson,*
   390 U.S. 414 (1968) ...................................................................................................... 4

*Unofficial Comm. of Zero Coupon Noteholders v. Grand Union Co.(In Re Grand Union Company),*
   179 B.R. 56 (D. Del. 1995) ........................................................................................... 5

**Federal Statutes**

11 U.S.C. § 1109(b) ............................................................................................................ 5

11 U.S.C. § 363 .................................................................................................................. 3

11 U.S.C. §502(h) ............................................................................................................ 11

Bankr. Code § 502(h) ................................................................................................... 7, 11

Fed. R. Bankr. P. 9019(a) ............................................................................................. 3, 4

**Other Authorities**

Chapter 11 Roundup: DEBTWIRE (05/12/2006 17:19:00), *Refco: Sphinx investors to challenge settlement; PlusFunds could liquidate; sources say* ............................................................... 13

# I. Introduction

1.      This objection is filed on behalf of the parties most directly – and adversely – affected by the proposed settlement entered into on behalf of Sphinx Managed Futures Fund SPC ("Sphinx") and the Committee of Unsecured Creditors.  Under the proposed settlement, the undersigned financial institutions and their customers, together with other investors in Sphinx, many of whom are simultaneously joining this Objection or filing their own objections (collectively the "Investors")[1] stand to have the value of their investments slashed by $263 million dollars, *and* to forfeit their claims against the estate.  For the reasons that follow, the Investors are profoundly concerned that the proposed settlement is an attempted breach of fiduciary duty (or worse) against them, and that the settlement approval now being sought actually represents a cynical effort by the nominal settling party – Sphinx, the entity that has been supposed (wrongly, it appears) to have been protecting the Investors' interests – to abuse this Court's process as the final step in perfecting that wrongdoing.

2.      While the Investors do not yet know all the facts surrounding the proposed settlement, nor does the Court.  The few facts known to the Investors, however, are troubling. By way of example:

---

[1] The undersigned Investors include: various Merrill Lynch entities (collectively, "Merrill Lynch"), including (i) SPhinX Access LLC and SPhinX Access Ltd., two feeder funds sponsored by Merrill Lynch Alternative Investments LLC, which, through their investments in SPhinX On-Shore Investment Fund LLC and SPhinX Ltd., respectively, have approximately $17 million in exposure to SPhinX Managed Futures Fund SPC ("Sphinx"); and (ii) Merrill Lynch International, which has approximately $8 million in exposure to the SPhinX Managed Futures Fund SPC, through direct investments in SPhinX Ltd; Raymond James & Associates and Raymond James Financial Services (collectively, "Raymond James"), whose customers, through their investments in the SPhinX Investment Fund, LP, SPhinX, Ltd., and the S&P Managed Futures Index Fund, LP, have almost $16 million in exposure to Sphinx; and Rydex Capital Partners LLC and Rydex Capital Partners SPhinX Fund (collectively, "Rydex") which, through their investments, have between $18-$22 million in exposure to Sphinx.  The undersigned Investors, in addition to asserting their own interests, also hope hereby to protect their customers' interests, even though under no duty at law to do so, because the entities who are meant to be representing those interests certainly seem not to be doing so.

   The undersigned Investors and those who we anticipate will join in this objection or file their own objections represent a substantial cross-segment of all Investors in Sphinx.  Unfortunately, it is impossible to solicit the views of *all* Investors because *both Sphinx and PlusFunds Group, Inc. ("PlusFunds"), Sphinx's investment advisor (see fn. 2 below), have refused to disclose the identities of those Investors. See* Dworsky Decl. ¶ 6.

- *The available evidence suggests that the proposed settlement yields a result for the Investors that is worse than an outright loss of the preference action:*  As shown below, the proposed settlement seeks to compromise the Investors' claims for approximately 50% of the market value of those claims.

- *The available evidence suggests that Sphinx is improperly spending its Investors' money to shield its own board from scrutiny:*  According to Sphinx's own lawyers, a principal motivation for Sphinx's entry into the proposed settlement was to avoid having to litigate new allegations by the Committee of wrongdoing by one of Sphinx's directors, entailing alleged ties to the Austrian bank BAWAG P.S.K.  Sphinx's counsel refused to disclose to the Investors, however, any details regarding the alleged misconduct, the identity of the alleged wrongdoer, or even whether that wrongdoer participated in the purported approval by the two-person Sphinx "board" of the proposed settlement.  Sphinx's counsel did admit, however, that despite Sphinx's purported fears that the alleged misconduct could lead to an equitable subordination defense against Sphinx's § 502(h) claims, Sphinx remarkably *made no effort whatsoever to investigate* those allegations, on the theory that the proposed settlement eliminated the need to do so.

- *The available evidence suggests that Sphinx also is improperly spending its Investors' money to benefit its allies at PlusFunds and Refco:*  Sphinx's counsel further claimed that another driver behind the proposed settlement was that its entire defense of the preference action was purportedly a sham.  According to Sphinx's counsel, from the very *inception* of the preference action, Sphinx couldn't restore to the estate the amount of the preference in light of the $110 million it had preferentially distributed to Refco-affiliated Sphinx investors just before the music stopped.  Sphinx's never-disclosed claim to be unable to restore the preference amount to the estate, however, is a contrived disability.  PlusFunds Group, Inc., Sphinx's investment advisor, and the entity that controls the funds at Sphinx,[2] has consistently assured the Investors that Sphinx had tens of millions of dollars *in excess* of the alleged preference.  Given the close relationships among Refco, PlusFunds and Sphinx, this specious rationale for settling only reinforces other evidence, discussed below, indicating that the settlement also was intended to benefit Sphinx's cohorts at Refco and PlusFunds, at the direct expense of the Investors on whose behalf Sphinx (and indeed PlusFunds) was meant to be acting.

---

[2] PlusFunds is a registered investment advisor that serves as the manager of Sphinx and, among other things, controls its investment activities.  In its complaint in the preference action, the Committee played up the incestuous relationships between and among Sphinx, PlusFunds (via its chairman, Chris Sugrue), and Refco, noting, among other things, that Sugrue was a former Refco employee, that Refco had extended him personal loans of approximately $200 million to facilitate his purchase of a majority stake in PlusFunds (which loans were, in turn, secured by all of PlusFunds' stock), and that a Refco affiliate controlled by Refco's disgraced CEO Phillip Bennett had invested "substantially all of its assets" in Sphinx.  Complaint ¶¶ 12-16.  As the Court knows, PlusFunds itself filed for bankruptcy protection in early March 2006, thus effectively insulating itself from exposure for wrongdoing against the Investors.

3.     These, and other facts discussed below, strongly suggest that Sphinx simply threw the fight in order to protect its own insiders, and others, from scrutiny and legal exposure. Accordingly, the Investors respectfully submit that the proposed settlement cannot meaningfully be evaluated by this Court without further investigation into the circumstances surrounding the settlement. Even if a short delay of the hearing is necessary, no prejudice can result. If the proposed settlement was reached as the product of negotiations by true adversaries, acting in good faith and based on legitimate considerations, and is substantively fair, the Court surely will approve it in due course. But if, as the known facts suggest, the proposed settlement was reached in an effort to serve the interests of Sphinx's management and others, at the literal expense of its Investors, this Court can arrest that attempted breach of duty before it is consummated.

## II. ANALYSIS

4.     In its memorandum seeking approval of the proposed settlement, the Committee asserts that the Court should not concern itself with any question *other than* the maximum dollar recovery for the estate. Of course, if the Committee were right that this is the *only* legitimate consideration for the Court in deciding whether to grant its *imprimatur* to the proposed settlement, the motion would have to be granted, for the settlement appears to be a terrific victory for the estate (as well as for Committee counsel, who already has indicated that it may apply for a performance bonus in light of the settlement result).[3]

5.     Fortunately for the Investors and for the integrity of our judicial system, the appropriate purview of this Court is not nearly as blinkered as the Committee portrays it. In considering a motion for settlement approval pursuant to Bankruptcy Rule 9019(a), a court's role in evaluating a proposed settlement does not begin and end with a representation of contentment by the Committee.

---

[3] Motion to Approve Compromise/Motion Under 11 U.S.C. Sections 105 And 363 And Fed. R. Bankr. P. 9019(a) For Approval Of Settlement And Compromise Of Avoidance Claims Asserted Against SPhinX Managed Futures Fund SPC, *et al.* dated April 26, 2006, at ¶13 n.3.

1183973.2

6.    To begin with, the reviewing court must make an *independent* determination that the proposed settlement is fair and equitable.  *Protective Comm. for Indep. Stockholders of TMT Trailer Ferry. v. Anderson*, 390 U.S. 414, 424 (1968) ("essential that every important determination in reorganization proceedings receive the informed, independent judgment of the bankruptcy court") (internal citations omitted).  It follows that the *ipse dixits* of the proponents of the settlement do not suffice; affirmative evidence of fairness is required.  *In re Matco Elecs Group, Inc.*, 287 B.R. 68, 76 (Bankr. N.D.N.Y. 2002) (burden of persuading the court that the settlement should be approved rests with the proponents of the settlement); *In re Remsen Partners, Ltd.*, 294 B.R. 557, 565 (Bankr. S.D.N.Y. 2003) (approval inquiry requires an adequate evidentiary record).

7.    Second, and contrary to the Committee's statement of the applicable standard, in exercising its equitable jurisdiction under Rule 9019(a) a court must evaluate fairness and equity not only to the estate, but also to affected third parties such as the Investors.  To be sure, in most cases, the only interests affected by a settlement are those of the parties themselves; not surprisingly, then, one can find numerous decisions that approve a proposed settlement on the ground that it is fair and equitable to the settling parties – typically the estate and its creditors.  But it is emphatically *not* the law that third parties' interests are to be ignored where they will actually be affected by a settlement agreement.  For example, in *In re Drexel Burnham Lambert Group*, 995 F.2d 1138 (2d Cir. 1993), the Court of Appeal explained that a court considering an approval motion under Rule 9019 "is *obligated* to make an examination of how the accord affects the rights of third parties." *Id*. at 1146 (emphasis added).[4]  The third party interests at stake here, as in *Drexel*, were of entities that were *not* creditors of the bankruptcy estate, but instead were competing with the estate for moneys that were proposed to be paid to the estate through a settlement.  Just as in this case, the proposed settlement would have paid the proceeds

---

[4] *Accord Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 754 (5th Cir. 1995) ("While it is true that the bankruptcy court has jurisdiction to determine whether a settlement between the debtor and other parties is fair and equitable, looking only to the fairness of the settlement as between the debtor and the settling claimant [and ignoring third-party rights] *contravenes a basic notion of fairness*.") (Emphasis added).

of a fund (there, a disgorgement fund established by the SEC) into a bankruptcy estate, such that the fund would arguably become judgment-proof once it had settled with the estate. *Id.* at 1141-43.

8.       As the courts have recognized in *Drexel* and elsewhere, the obligation to consider the effects of putative settlements upon third-parties is not a unique creature of the bankruptcy laws. Whenever a court is asked to approve a settlement – whether in the context of class actions, consent decrees, ERISA, or otherwise – "where the rights of one who is not a party to a settlement are at stake, the fairness of the settlement to the settling parties is not enough to earn the judicial stamp of approval." *E.g., In re Masters Mates & Pilots Pension Plan*, 957 F.2d 1020, 1026 (2d Cir. 1992); *see also Drexel,* 995 F.2d at 1146-47 (applying *Masters* in context of motion to approve settlement under Rule 9019).

9.       Indeed, describing the Investors as "third parties" does not begin to do them justice. Sphinx is a shell: it has no employees, and it has no assets other than those entrusted to it by its Investors. If those investors, who are the *only* entities actually parting with consideration (albeit unwillingly) in connection with the proposed settlement, were denied the right to be heard, the approval process would be farcical.[5]

10.       And third, the case law recognizes that a court cannot simply evaluate the end-result obtained by the negotiating parties without also scrutinizing the *process* by which that outcome was reached. *In re Drexel Burnham Lambert Group, Inc.*, 134 B.R. 499, 506 (Bankr.

---

[5] It similarly is clear that the Investors have standing in this matter because they have a substantial and direct economic interest which will be irreparably harmed by the proposed settlement. *See* 11 U.S.C. § 1109(b); *cf. Remsen*, 294 B.R. 557, 563 (Bankr. S.D.N.Y. 2003) (recognizing, albeit in somewhat different circumstances, standing of an entity "aggrieved" by a proposed settlement even if Section 1109(b) might not apply). The basis for standing is particularly compelling in this instance, where the party purportedly protecting the Investors' interests is conflicted, as is at least the case here (*see* discussion at Part II.3 below). *See Unofficial Comm. of Zero Coupon Noteholders v. Grand Union Co.(In Re Grand Union Company)*, 179 B.R. 56, 59 (D. Del. 1995) (finding that even in the absence of a direct claim against the estate, where entity has a sufficient stake in the outcome of the proceeding and where its representative's interests are not properly aligned, the court should allow that entity to be heard); *In re Overview Equities, Inc.*, 240 B.R. 683, 687 (Bankr. E.D.N.Y. 1999): ("The test employed under section 1109(b) is 'whether the prospective party in interest has a sufficient stake in the outcome of the proceeding so as to require representation.'")

S.D.N.Y. 1991) (emphasizing the importance of evidence of arms'-length negotiations); *In re Present Co.*, 141 B.R. 18 (Bankr. W.D.N.Y. 1992) (refusing to approve settlement based on absence of arms'-length negotiations and parties' failure to give objecting entities access to information); *Matco Electronics*, *supra*, 287 B.R. 68 (Bankr. N.D.N.Y. 2002) (following *Present* and refusing to approve settlement agreement where "red flags" indicated negotiations not at arms'-length).

11.     Based on these principles, as explained below, the Investors respectfully submit that the proposed settlement does not pass even superficial muster.

**1.     THE COURT LACKS AN ADEQUATE EVIDENTIARY BASIS FOR APPROVING THE PROPOSED SETTLEMENT.**

12.     Although the Committee bears the burden of persuading the Court to approve the proposed settlement, its motion rests upon rote assurances that the settlement was reached at arms'-length, is fair and equitable, and good for the estate.  Those assurances simply pose, but do not answer, the questions before the Court.  Neither settling party has offered any evidence whatsoever upon which the Court can make its necessary determinations.  And the scant evidence to which the Investors have access raises a wave of red flags suggesting that the proposed settlement is not substantively fair and equitable, and was not arrived at by fair and equitable means.

**2.     THE EVIDENCE TO DATE SUGGESTS THAT THE PROPOSED SETTLEMENT TERMS, WHILE MANIFESTLY GENEROUS TO THE ESTATE, ARE NEITHER FAIR NOR EQUITABLE TO THE INVESTORS, WHO ARE THE *ONLY* ENTITIES PARTING WITH CONSIDERATION HERE.**

13.     The subject matter of the preference action was $312 million in excess cash that allegedly had been transferred from segregated accounts at Refco LLC into unsegregated accounts at Refco Capital Markets, Ltd. ("RCM"), an unregulated offshore affiliate of Refco LLC.  Typically, as this Court knows, preference actions are settled, if at all, at some premium over what the transferee might expect to receive as a general creditor, reflecting the risk that the estate might not prevail in its attempt to establish that the transfer amounted to a preference.  But

- 6 -

here, Sphinx proposes to return nearly the entire purported preference – $263 million of the Investors' money – to RCM, *and* to abandon all related claims under Bankruptcy Code § 502(h) against the Refco estate. Logic alone suggests that this proposed settlement leaves the Investors in a significantly worse position than had Sphinx simply *lost* the preference action. The evidence supports this conclusion.

14.     As Sphinx itself conceived the issue in its court filings, the net preference it arguably received was just $202 million (*i.e.,* $312 million less the $110 million that Sphinx and PlusFunds distributed to three Refco non-debtor affiliates as soon as the $312 million was transferred out of RCM at the behest of Mr. Sugrue).[6] Thus, according to Sphinx's own analysis, it has agreed to return to the estate *$61 million more* than it ultimately received from the alleged preference.

15.     But even if one did not buy Sphinx's contention that any preference here should be offset by the $110 million transfer – which, like so many of its initial litigation positions seems hastily to have been abandoned – the proposed settlement would still be difficult to defend as remotely rational for Sphinx's Investors. Under the proposed settlement, Sphinx would cede $312 million in claims against the RCM estate in exchange for just $49 million – a paltry 15.7 cents on the dollar. In contrast, the market information we thus far have been able to gather indicates that so-called "F/X Claims" – unsecured claims of investors that are deemed not to be RCM securities customers – were trading both before and after the proposed settlement was announced not at 15 cents on the dollar, but in the mid-20 to mid-30 cent range.[7] While the Investors are far from persuaded that their claims are properly characterized merely as "F/X Claims," that the proposed settlement throws away Sphinx's claims at about a 50% discount to the market value of such claims raises a very red flag.

[6] Defendants' Memorandum of Law in Opposition to Plaintiffs' Motion for Summary Judgment, dated April 10, 2006, at ¶ 3.
[7] *See* Dworsky Decl. ¶ 7.

**3.  THE EVIDENCE TO DATE SUGGESTS THAT THE PROPOSED SETTLEMENT WAS NOT THE PRODUCT OF *ARMS'-LENGTH* NEGOTIATIONS, BY ACTUALLY *ADVERSE PARTIES,* BARGAINING IN *GOOD FAITH*.**

16.     Certainly, the record before the Court to date provides no evidentiary basis for the Court to reach an independent conclusion respecting the purported fairness of a proposed settlement that puts the Investors in a worse position than had Sphinx simply lost the action it proposes to settle.  As shown below, however, what little the Investors have been able to learn raises profound concerns that the proposed settlement represents at best an effort by Sphinx to shield its management from scrutiny and liability, at the expense of its investors' interests, and at worst, an effort affirmatively to serve Refco – its purported adversary – at the expense of its Investors.  Either is an affront to justice.

17.     Early in the course of the preference litigation, concerned at learning that Sphinx had no employees of its own and was run entirely by PlusFunds – especially in light of allegations that Mr. Sugrue of PlusFunds had previously undisclosed allegiances to Refco (*see* fn. 2 above) – counsel for certain of the Investors contacted counsel for Sphinx, Pillsbury Winthrop Shaw Pittman ("Pillsbury").  The Investors sought Pillsbury's assurance that their interests were being adequately protected in the litigation; its assurance that Sphinx's litigation judgments were not being dictated by PlusFunds, which was certainly not an ally of the Investors, having been intimately involved in placing the Investors' funds at RCM in the first place; and access to all discovery being conducted in the preference litigation.  Dworsky Decl. at ¶ 3.  The Investors received these assurances – that the interests of the Investors were being and would be protected, and that PlusFunds, while a necessary source of factual evidence, was not in any way involved with Sphinx's conduct of the litigation.  *Id.*  Among other things, the Investors received very specific assurances that Sphinx would pursue all appropriate arguments that Sphinx was not a general creditor of RCM, including, for example, that the Investors' assets should be protected under constructive trust principles.  *Id.*

18.     On the other hand, the Investors' request for access to discovery materials was rebuffed, on the ground that "counsel both to SMFF and to the Board of Directors of all of the SPhinX entities [have advised] that they believe dissemination of the requested information is not in the best interests of investors as a whole." *Id.* ¶¶ 3-4. (Indeed, to this very date, the Investors have been unable to secure access to discovery in the preference action, most recently on the additional theory that an order issued by this Court has been interpreted to prevent the parties from sharing such information with the Investors. *Id.* ¶ 6.)[8] In retrospect, the latter was perhaps the first shoe dropping.

19.     The next shoe dropped when Sphinx filed its purported opposition to the Committee's summary judgment motion. In contrast to its earlier pleadings, where Sphinx affirmatively claimed that it had instructed RCM to keep the Investors' assets segregated, and that RCM had affirmatively represented it would do just that,[9] and – more broadly – that the transfer at issue was not "on account of an antecedent debt," Sphinx's April 10 Opposition essentially conceded every element of the preference action, save a seemingly half-baked argument about solvency, supported by an expert who wasn't. Although the Investors had no insight into the reasons for this capitulation, they had the comfort of knowing that they would get to fight another round, since even if Sphinx lost the preference action it would at least have the rights of a very substantial creditor ($312 million) of the estate. Even that proved overly optimistic, for on April 21, news of the "worse than losing" proposed settlement hit the street.

20.     When the Investors' counsel contacted Pillsbury for an explanation of the proposed settlement, however, it became clear that the proposed settlement had nothing to do with realizing fair value for Investors. Instead, Pillsbury offered three, equally illegitimate, reasons for Sphinx's capitulation.

---

[8] *Cf. In re Present Co.*, 141 B.R. at 24 (identifying the settling parties' efforts to limit the information available to objectors as a factor militating against approval).

[9] Defendants' Statement of Contested Facts in Opposition to Summary Judgment, dated January 20, 2006, at No. 25 and *passim*.

21.     First, Pillsbury claimed Sphinx settled because it couldn't restore to the estate the amount of the preference in light of the redemptions that had occurred (including most significantly, over $100 million in redemptions at the behest of the three Refco-affiliated funds) in the period between the transfer of the $312 million from RCM and the December 15 filing of the preference action.  More precisely, it claimed that Sphinx actually had the necessary funds, but portions of it were in accounts it purportedly couldn't access.  This raises a variety of questions Pillsbury has refused to answer: by way of example only:

- Since this wasn't a new impediment, but rather one that allegedly had subsisted from the outset of the preference action, was the entire purported defense of that action over the past three months a sham – a waste of Sphinx's (*i.e.*, its Investors') money and the Court's time and resources?

- Why wasn't this alleged futility previously disclosed to the Investors? Was it so that Sphinx could secure a release, rather than buy a lawsuit, in connection with this disclosure?  Or was it to allow Sphinx to keep its moribund symbiotic partner PlusFunds alive with an unbroken stream of funds?

- Indeed, the issue isn't simply nondisclosure.  Precisely the opposite had been represented to the Investors.  *See* Letter from PlusFunds to Investors, dated 12/20/05, reassuring Investors that although $312 million of Sphinx assets had been frozen, Sphinx had "approximately $347 million in assets."  Dworsky Decl. ¶ 8.  Was PlusFunds deceiving the Investors then, or was Sphinx doing so now?

- What happened to the Investors' money?  Did the entities that were permitted to withdraw funds – such as the three Refco-affiliated funds – improperly receive special treatment relative to those who were not so fortunate?  If so, could that money be reclaimed?

- And most important, why couldn't Sphinx, which concedes it has sufficient funds, temporarily reallocate investments within its various portfolios so as to restore the requisite funds?  Indeed, the available evidence indicates that PlusFunds, as investment manager, has the power to reallocate money among the various Sphinx accounts to ensure there is adequate cash to pay back the preference.

It thus seems that this purported impediment was a contrivance to justify a settlement that had everything to do with protecting Sphinx and PlusFunds, and nothing to do with advancing the interests of the Investors.

22.     Second, Pillsbury asserted that Sphinx was concerned about the threat that the claim to which Sphinx would be entitled upon losing the preference action and returning the

transferred funds would be subject to equitable subordination as a result of Mr. Sugrue's alleged "inequitable" conduct in securing the transfer of the funds from RCM. As a justification for the proposed settlement, this argument, and the alleged succor derivable by Sphinx from avoiding having to deal with it, however, verges on the frivolous. Obtaining a preference is not inequitable; the remedy is return of the funds, not subordination of the claims. Once a preference has been returned, the transferee is entitled to a claim as if the preferential transfer had not occurred. 11 U.S.C. §502(h); *Fleet Nat'l Bank v. Gray (In re Bankvest Capital Corp.)*, 375 F.3d 51, 57 (1st Cir. 2004) ("a transferee of an avoidable transfer has an allowable claim once it turns over such property for which it is liable").

23.     Third, and most disturbingly, Pillsbury stated that a key consideration for Sphinx was that the Committee had threatened a new and improved equitable subordination argument based on the alleged misconduct of one of Sphinx's directors, on the grounds of that director's purported ties to the Austrian bank BAWAG P.S.K. Sphinx's counsel refused to elaborate on the nature of the alleged misconduct, refused to disclose the identity of the alleged wrongdoer, and refused to disclose whether that wrongdoer participated in the Sphinx "board of directors" (there apparently only are two directors) approval of the proposed settlement. But they did concede – remarkably – that they had made no effort whatsoever to investigate the allegations because, as they put it, "it wasn't worth the time, worry and expense of litigating the issue given the money that was certain to be available by way of the settlement." Dworsky Decl. ¶ 5. Needless to say, the Investors cannot evaluate the merits of a threatened claim that Sphinx won't disclose to them, but it is difficult to imagine how any such allegations could justify equitable subordination of Sphinx's § 502(h) claims. Far more likely, of course, is that disclosure of those allegations would simply have led to claims by the Investors (at least) against the alleged wrongdoers for any deficiencies in the Investors' recoveries. In other words, Sphinx spent its Investors' money in order to protect insiders of PlusFunds and Sphinx from having their underlying misconduct scrutinized.

24.     The list of concerns about the reasons underlying this proposed settlement does not end here.  Among other questions we believe we (and the Court) are entitled to have answered – under oath – are the following:

25.     *Whose interests besides its unnamed, allegedly wrongdoing director, was Sphinx serving?*  Was it the interests of PlusFunds, which staffed and ran Sphinx?  Note that no sooner was the ink dry on the proposed settlement than PlusFunds made a filing in its own bankruptcy case representing that "The Sphinx Fund has determined to pay increased fees to provide necessary liquidity to [support PlusFunds through its winding-down process,]" and also will receive an exclusive purchase option for certain intellectual property of PlusFunds.  *See* Dworsky Decl. ¶ 9.  This remarkably generous act of Sphinx, volunteering to spend what little would remain of its Investors' money on things such as PlusFunds' bankruptcy counsel and employee salaries, is curiously supported by not a single piece of paper – a board resolution, brief, declaration, or otherwise – from Sphinx.  Apparently, in the wake of the proposed settlement, PlusFunds no longer feels the need to maintain even the pretense of Sphinx's independence.

26.     Or was Sphinx instead serving the interests of Refco, which in the course of the preference action was disclosed to have extended Mr. Sugrue of PlusFunds personal loans of approximately $200 million to facilitate his purchase of a majority stake in PlusFunds?  Conspicuously, PlusFunds artfully reassured the Investors on March 21, 2006 that while Refco had noticed a default on the Sugrue loans, *which were secured by all of PlusFunds' stock*, "Refco … has not sought to *exercise* any rights pursuant to this Notice…."  (Emphasis added.)  *See* Dworsky Decl. ¶ 10.  In other words, "Take our word for it; although Refco owns PlusFunds, it isn't (yet) acting like an owner."  Since Refco owned PlusFunds, and since PlusFunds controlled Sphinx, it certainly is appropriate in light of the proposed result to question not merely whether Sphinx had conflicts of interest, but, more fundamentally, whether there was even any meaningful adversity in these negotiations.  Indeed, the settling parties seemed to have been inordinately focused on making their pact seem as much like a *fait accompli* as possible: otherwise why would it have been necessary for the proposed settlement funds, which were

- 12 -

*already subject to a TRO*, to be wired immediately to Refco, especially in light of the proposed deal's requirement of court approval as a condition of its validity?

27.     *Whose instructions did Pillsbury follow?*  Which among the foregoing constituents held most sway with Pillsbury?  (Even the media seems to have made the apparently legitimate mistake of supposing that Pillsbury represented someone other than Sphinx.)[10]  Or was it none of these constituents, but instead its *other* client in these proceedings, RB Securities Limited, a substantial creditor of the estate and hence a direct beneficiary of the proposed settlement?  (Indeed, on the one occasion Pillsbury had to choose sides publicly as between its two clients, namely, on the motion to convert the RCM bankruptcy into a stockbroker liquidation, it *filed* the moving papers on behalf of RB Securities, even though this motion was fundamentally antithetical to Sphinx's interests, especially if one credits Pillsbury's recent concession that its other client, Sphinx, does not qualify as a securities customer.)

28.     *Has the estate, however unwittingly, acted unfairly?*  A creditors committee has a fiduciary obligation to treat all creditors fairly.  See *Pan Am Corp. v. Delta Air Lines*, 175 B.R. 438, 514 (S.D.N.Y. 1994)); *Pension Ben. Guaranty Corp. v. Pincus, Verlin, Hahn, Reich & Goldstein Professional Corp.*, 42 B.R. 960, 963 (E.D. Pa. 1984) (noting "a broad sense of equity and fiduciary duty pervades the entire bankruptcy administration and that counsel to a creditors' committee undertakes the obligation to represent the interests of the entire class fairly").  The Investors believe that his means, at the very least, that while the Committee is entitled to strike a fair deal with one group of creditors, it is not entitled to a more than fair deal by exploiting, even unwittingly, its counterparty's conflicts of interest and willingness to settle for illegitimate reasons.

29.     In addition, Pillsbury indicated to counsel for the Investors that while it would not have made a difference to Sphinx's settlement analysis had it known about the BAWAG lawsuit

---

[10] *See* Chapter 11 Roundup: DEBTWIRE (05/12/2006 17:19:00), *Refco: Sphinx investors to challenge settlement; PlusFunds could liquidate; sources say*, reporting that "Karen Dine, a lawyer representing PlusFunds from Pillsbury Winthrop, did not return phone calls for comment." *See* Dworsky Decl. ¶ 11.

and settlement discussions that together were announced a few days after the proposed settlement of the preference action, it was not aware of the discussions with BAWAG. That Sphinx maintains that the potential addition of several hundred million dollars to the estate would have made no difference to it only underscores that its settlement calculus had nothing to with the upside to the Investors from litigating, but rather everything to do with the downside to other, illegitimate constituencies from doing so. Without suggesting that the Committee acted wrongfully – which we have no reason to believe is so – the Investors nonetheless believe that the circumstances of the BAWAG settlement are highly relevant to the fairness of the proposed settlement, and is another legitimate topic for further inquiry.

**4. THAT THE INVESTORS MIGHT THEORETICALLY HAVE CLAIMS AGAINST SPHINX OR OTHERS FOR BREACH OF DUTY OR WORSE IS IRRELEVANT HERE.**

30. Based on the available record, the proponents of the settlement certainly have not met their burden of establishing that the proposed settlement is fair and equitable. On the contrary, the only evidence before the Court indicates that Sphinx – and its counsel – have served the interests of every constituency except that of Sphinx's Investors, the sole constituency on whose behalf they are supposed to act. Accordingly, under the applicable principles governing this approval process, the Court should decline to approve the settlement.

31. In discussions with Committee counsel, counsel expressed two preliminary views as to why the Investors' effort to set aside the proposed settlement is misplaced. First, counsel argued, the Investors' interests are not a legitimate consideration for the Court in the approval process. As already shown, that view is simply wrong as a matter of law. Second, counsel argued, if the Investors are harmed, they should seek a remedy from Sphinx, not the Court. That argument is not just wrong, but cynically so. Any rights the Investors might have against Sphinx are utterly academic once the Investors' money is gone. More to the point, as much as the parties have sought to make their proposed settlement seem to be a *fait accompli* (going so far as to arrange for the immediate wiring to RCM of the funds already subject to a TRO pending further order of this Court), it is anything but that; this Court still has the last clear opportunity,

- 14 -

and, the Investors' respectfully urge, the obligation, to prevent the parties from consummating their breach of duty, and thus averting the very harm that the Committee wishes to depict as a given. As a court of equity, surely the Bankruptcy Court must, if it can, assure that "fraud will not prevail, that substance will not give way to form, that technical considerations will not prevent substantial justice from being done." *Pepper v. Litton*, 308 U.S. 295, 305 (1939).

### III. CONCLUSION

32. For the reasons set forth above, the undersigned Investors respectfully request that the Court deny the Committee's motion for settlement approval, or in the alternative continue the hearing on that motion so that a more complete record of the facts surrounding the settlement can be developed and presented.


Dated: May 17, 2006                        Respectfully submitted,


By:/s/ *Marc T.G. Dworsky*
            Marc T.G. Dworsky (MD 9256)
            Dennis C. Brown (DB 6758)
            Thomas B. Walper (TW 3932)
            Richard St. John (RJ 0999)
            Todd J. Rosen (TR 4388)

MUNGER, TOLLES & OLSON LLP
355 South Grand Avenue
Thirty-Fifth Floor
Los Angeles, CA 90071-1560
Telephone:      (213) 683-9100
Facsimile:      (213) 687-3702

*Counsel for Merrill Lynch International, SPhinX Access LLC, SPhinX Access Ltd., Raymond James & Associates, and Raymond James Financial Services, and Rydex Capital Partners LLC and Rydex Capital Partners SPhinX Fund*

- 15 -