UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
                                              :
In re:                                        :          Chapter 11
                                              :
Refco Inc., *et al.*,                         :          Case No. 05-60006 (RDD)
                                              :
                            Debtors.          :          (Jointly Administered)
                                              :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

## JOINT CHAPTER 11 PLAN OF REFCO INC. AND
## CERTAIN OF ITS DIRECT AND INDIRECT SUBSIDIARIES

J. Gregory Milmoe
Sally McDonald Henry
J. Gregory St. Clair
SKADDEN, ARPS, SLATE, MEAGHER
        & FLOM LLP
Four Times Square
New York, New York 10036-6522
(212) 735-3000

Attorneys for Refco Inc., *et al.*

Tina L. Brozman
Timothy B. DeSieno
Mark W. Deveno
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
(212) 705-7000

Attorneys for Marc S. Kirschner, the Chapter 11 Trustee
for Refco Capital Markets, Ltd.

Luc A. Despins
Susheel Kirpalani
Dennis C. O'Donnell
MILBANK, TWEED, HADLEY & McCLOY LLP
One Chase Manhattan Plaza
New York, New York 10005
(212) 530-5000

Attorneys for the Official Committee of Unsecured
Creditors of Refco Inc., *et al.*

David S. Rosner
Andrew K. Glenn
Jeffrey R. Gleit
KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, New York 10019
(212) 506-1700

Attorneys for the Additional Committee of Unsecured
Creditors of Refco Inc., *et al.*

Dated:   New York, New York
             October 20, 2006

# TABLE OF CONTENTS

Page

ARTICLE I    DEFINED TERMS AND RULES OF INTERPRETATION ...................................................... 1
1.1    Additional Committee ............................................................................................... 1
1.2    Additional RCM Claim .............................................................................................. 1
1.3    Adjusted Contributing Debtors Distributive Assets ................................................. 1
1.4    Administrative Claim ................................................................................................. 1
1.5    Administrative/Priority Claims Reserve ................................................................... 2
1.6    Administrative Claims Adjustment ........................................................................... 2
1.7    Administrative Claims Objection Deadline .............................................................. 2
1.8    Administrative Professionals .................................................................................... 2
1.9    Affiliate Debtor(s) ..................................................................................................... 2
1.10   AlixPartners .............................................................................................................. 2
1.11   Allotted Administrative Claims ................................................................................ 2
1.12   Allowed ..................................................................................................................... 2
1.13   "Allowed ... Claim" ................................................................................................... 3
1.14   Asset Schedule .......................................................................................................... 3
1.15   Ballot ......................................................................................................................... 3
1.16   Bankruptcy Code ....................................................................................................... 3
1.17   Bankruptcy Court ...................................................................................................... 3
1.18   Bankruptcy Rules ...................................................................................................... 3
1.19   Bar Date .................................................................................................................... 3
1.20   BAWAG ..................................................................................................................... 3
1.21   BAWAG Allocation Order ........................................................................................ 3
1.22   BAWAG Contingent Proceeds .................................................................................. 3
1.23   BAWAG Guaranteed Proceeds ................................................................................. 3
1.24   BAWAG Proceeds ..................................................................................................... 3
1.25   BAWAG Settlement ................................................................................................... 3
1.26   Business Day ............................................................................................................. 4
1.27   Capstone .................................................................................................................... 4
1.28   Cargill ....................................................................................................................... 4
1.29   Cargill Administrative Claim .................................................................................... 4
1.30   Cash ........................................................................................................................... 4
1.31   Cash-Out Option Agreement ..................................................................................... 4
1.32   Chapter 11 Case(s) ................................................................................................... 4
1.33   Claim ......................................................................................................................... 4
1.34   Claims Distribution Account ..................................................................................... 4
1.35   Claims Objection Deadline ....................................................................................... 4
1.36   Class .......................................................................................................................... 4
1.37   Class Actions Claims ................................................................................................ 4
1.38   Committees ................................................................................................................ 4
1.39   Confirmation ............................................................................................................. 4
1.40   Confirmation Date ..................................................................................................... 5
1.41   Confirmation Hearing ............................................................................................... 5
1.42   Confirmation Order ................................................................................................... 5
1.43   Contributed Claims ................................................................................................... 5
1.44   Contributed Claims Recoveries ................................................................................ 5
1.45   Contributing Debtors ................................................................................................ 5
1.46   Contributing Debtors BAWAG Proceeds .................................................................. 5
1.47   Contributing Debtors Cash Distribution ................................................................... 5
1.48   Contributing Debtors Distributive Assets ................................................................. 5
1.49   Contributing Debtors Effective Date Claims ............................................................ 5

| | | |
|---|---|---|
| 1.50 | Contributing Debtors General Unsecured BAWAG Proceeds | 5 |
| 1.51 | Contributing Debtors General Unsecured Claim | 6 |
| 1.52 | Contributing Debtors General Unsecured Distribution | 6 |
| 1.53 | Contributing Debtors Post-Effective Date Claims | 6 |
| 1.54 | Contributing Debtors Projection | 6 |
| 1.55 | Contributing Non-Debtor Affiliate | 6 |
| 1.56 | Contributing Non-Debtor Affiliate Management | 6 |
| 1.57 | Contributing Non-Debtor Affiliate Trigger Date | 6 |
| 1.58 | Convenience Claims | 6 |
| 1.59 | Credit Agreement | 6 |
| 1.60 | Creditors' Committee | 6 |
| 1.61 | Debtor | 6 |
| 1.62 | Debtors | 7 |
| 1.63 | Disbursing Agent | 7 |
| 1.64 | Disclosure Statement | 7 |
| 1.65 | Disputed Claim | 7 |
| 1.66 | "Disputed ... Claim" | 7 |
| 1.67 | Disputed Claim Amount | 7 |
| 1.68 | Disputed Claims Reserve | 7 |
| 1.69 | Distribution | 7 |
| 1.70 | Distribution Date | 7 |
| 1.71 | Distribution Record Date | 7 |
| 1.72 | Early Payment Order | 7 |
| 1.73 | Effective Date | 7 |
| 1.74 | Effective Beneficiaries | 7 |
| 1.75 | Employee Benefit Plans | 7 |
| 1.76 | ERISA | 8 |
| 1.77 | Estate(s) | 8 |
| 1.78 | Estimated Unsatisfied Credit Agreement Claims | 8 |
| 1.79 | Examine | 8 |
| 1.80 | Examiner Order | 8 |
| 1.81 | Excess Priority Claims | 8 |
| 1.82 | Exhibit | 8 |
| 1.83 | Exhibit Filing Date | 8 |
| 1.84 | Fee Committee | 8 |
| 1.85 | Final Order | 8 |
| 1.86 | FXA | 8 |
| 1.87 | FXA Cash Accounts | 8 |
| 1.88 | XA Convenience Claims | 8 |
| 1.89 | FXA Distributive Assets | 9 |
| 1.90 | FXA General Unsecured Claim | 9 |
| 1.91 | FXA General Unsecured Claim Distribution | 9 |
| 1.92 | FXCM | 9 |
| 1.93 | FXCM Committee | 9 |
| 1.94 | General Unsecured Claim | 9 |
| 1.95 | Holder | 9 |
| 1.96 | Houlihan | 9 |
| 1.97 | Impaired | 9 |
| 1.98 | Intercompany Claim | 9 |
| 1.99 | Interest | 9 |
| 1.100 | IPO Underwriter Claims Recovery | 9 |
| 1.101 | Joinder Parties | 9 |
| 1.102 | Joint Sub-Committee | 10 |
| 1.103 | KK Japan | 10 |
| 1.104 | Leuthold | 10 |

| | | |
|---|---|---|
| 1.105 | Lien | 10 |
| 1.106 | Litigation Claims | 10 |
| 1.107 | Litigation Trust | 10 |
| 1.108 | Litigation Trust Agreement | 10 |
| 1.109 | Litigation Trust Beneficiaries | 10 |
| 1.110 | Litigation Trust Committee | 10 |
| 1.111 | Litigation Trustee | 10 |
| 1.112 | Litigation Trust Interests | 10 |
| 1.113 | Loan Documents | 10 |
| 1.114 | Loans | 10 |
| 1.115 | MAC Contributing Debtors Assets | 10 |
| 1.116 | MAC RCM Assets | 11 |
| 1.117 | MCG Members | 11 |
| 1.118 | Master Ballot | 11 |
| 1.119 | Non-Debtor Affiliates | 11 |
| 1.120 | Non-Estate Refco Claims | 11 |
| 1.121 | Non-Tax Priority Claim | 11 |
| 1.122 | Old Equity Interests | 11 |
| 1.123 | Other Related Claim | 11 |
| 1.124 | Other Secured Claim | 12 |
| 1.125 | Person | 12 |
| 1.126 | Petition Date | 12 |
| 1.127 | Plan | 12 |
| 1.128 | Plan Administrator | 12 |
| 1.129 | Plan Administrator Agreement | 12 |
| 1.130 | Plan Committee | 12 |
| 1.131 | Plan Document | 12 |
| 1.132 | Plan Filing Date | 12 |
| 1.133 | Plan Proponents | 12 |
| 1.134 | Plan Support Agreement | 12 |
| 1.135 | Post-Confirmation RCM | 12 |
| 1.136 | Post-Petition Management | 13 |
| 1.137 | Pre-Conversion Administrative Claim Amount | 13 |
| 1.138 | Priority Claims | 13 |
| 1.139 | Priority Tax Claim | 13 |
| 1.140 | Private Actions Trust | 13 |
| 1.141 | Private Actions Trust Agreement | 13 |
| 1.142 | Private Actions Trustee | 13 |
| 1.143 | Professional | 13 |
| 1.144 | Professional Fee Claim | 13 |
| 1.145 | Pro Rata | 13 |
| 1.146 | Qualifying Plan | 13 |
| 1.147 | Quarterly Distribution Date | 13 |
| 1.148 | RCM | 13 |
| 1.149 | RCM Administrative/Priority Claims Reserve | 14 |
| 1.150 | RCM Administrative Professional | 14 |
| 1.151 | RCM Advance | 14 |
| 1.152 | RCM BAWAG Proceeds | 14 |
| 1.153 | RCM Cash Distribution | 14 |
| 1.154 | RCM Difference | 14 |
| 1.155 | RCM Claims Distribution Account | 14 |
| 1.156 | RCM Distribution Reserve | 14 |
| 1.157 | RCM Excess Priority Claims | 14 |
| 1.158 | RCM FX/Unsecured Claims | 14 |
| 1.159 | RCM FX/Unsecured Claims Distribution | 14 |

| | | |
|---|---|---|
| 1.160 | RCM FX/Unsecured Convenience Claims | 14 |
| 1.161 | RCM Implied Deficiency Claim | 15 |
| 1.162 | RCM Intercompany Claims | 15 |
| 1.163 | RCM Intercompany Claim Distribution | 15 |
| 1.164 | RCM Leuthold Metals Claim | 15 |
| 1.165 | RCM Leuthold Metals Claim Distribution | 15 |
| 1.166 | RCM Projection | 15 |
| 1.167 | RCM Related Claims | 15 |
| 1.168 | RCM Related Claim Subordination Form | 15 |
| 1.169 | RCM Reserves | 15 |
| 1.170 | RCM Rights Distribution | 15 |
| 1.171 | RCM Securities Customer Claims | 16 |
| 1.172 | RCM Securities Customer Convenience Claims | 16 |
| 1.173 | RCM Securities Customer Claims Distribution | 16 |
| 1.174 | RCM Settlement Agreement | 16 |
| 1.175 | RCM Substantial Contribution Fees | 16 |
| 1.176 | RCM Trustee | 16 |
| 1.177 | RCM Unclaimed Distribution Reserve | 16 |
| 1.178 | RCM Wind-Down Reserve | 16 |
| 1.179 | Reinstated | 16 |
| 1.180 | Refco Entities | 17 |
| 1.181 | Related Claims | 17 |
| 1.182 | Released/Subordinated Claims | 17 |
| 1.183 | Released Parties | 17 |
| 1.184 | Reorganized Debtors | 17 |
| 1.185 | Reorganized FXA | 17 |
| 1.186 | Reorganized Refco | 17 |
| 1.187 | Reserves | 17 |
| 1.188 | Restated Corporate Governance Documents | 17 |
| 1.189 | Retained Causes of Action | 17 |
| 1.190 | RGL | 17 |
| 1.191 | RGL FXCM Distribution | 17 |
| 1.192 | Rogers Funds | 17 |
| 1.193 | Scheduled | 17 |
| 1.194 | Schedules | 17 |
| 1.195 | Secured Lender(s) | 17 |
| 1.196 | Secured Lender Agent | 17 |
| 1.197 | Secured Lender BAWAG Proceeds | 18 |
| 1.198 | Secured Lender Claims | 18 |
| 1.199 | Secured Lender Indemnification Claims | 18 |
| 1.200 | Secured Lender Payment Date | 18 |
| 1.201 | Secured Lender Released Claims | 18 |
| 1.202 | Secured Lender Releasee | 18 |
| 1.203 | Secured Lender's Collateral | 18 |
| 1.204 | Securities Class Action Stipulation | 18 |
| 1.205 | Senior Subordinated Note Allocation | 18 |
| 1.206 | Senior Subordinated Note Claims | 18 |
| 1.207 | Senior Subordinated Note Holder Ad Hoc Committee Fees and Expenses | 18 |
| 1.208 | Senior Subordinated Note Holder BAWAG Proceeds | 19 |
| 1.209 | Senior Subordinated Note Holder Distribution | 19 |
| 1.210 | Senior Subordinated Note Holder Fee Distribution | 19 |
| 1.211 | Senior Subordinated Note Indenture | 19 |
| 1.212 | Senior Subordinated Note Indenture Trustee | 19 |
| 1.213 | Senior Subordinated Note Indenture Trustee Charging Lien | 19 |
| 1.214 | Senior Subordinated Note Indenture Trustee Fees | 19 |

| | | |
|---|---|---|
| 1.215 | Senior Subordinated Notes | 19 |
| 1.216 | Specified Difference | 19 |
| 1.217 | Subordinated Claim | 20 |
| 1.218 | Subsidiary Claims and Interests | 20 |
| 1.219 | Tranche A Litigation Trust Interests | 20 |
| 1.220 | Tranche B Litigation Trust Common Interests | 20 |
| 1.221 | Tranche B Litigation Trust Preferred Interests | 20 |
| 1.222 | Unclaimed Distribution Reserve | 20 |
| 1.223 | Unclassified Claims | 20 |
| 1.224 | Unimpaired | 20 |
| 1.225 | Voting Deadline | 20 |
| 1.226 | Voting Record Date | 20 |
| 1.227 | VR | 20 |
| 1.228 | VR/Leuthold Guarantee Claims | 20 |
| 1.229 | Wind-Down Reserves | 20 |
| | | |
| ARTICLE II | CLASSIFICATION OF CLAIMS AND INTERESTS | 21 |
| 2.1 | Introduction | 21 |
| 2.2 | Classification of Claims and Interests of the Contributing Debtors | 22 |
| 2.3 | Classification of Claims of FXA | 23 |
| 2.4 | Classification of Claims of RCM | 23 |
| | | |
| ARTICLE III | TREATMENT OF CLAIMS AND INTERESTS | 24 |
| 3.1 | Treatment of Claims and Interests of the Contributing Debtors | 24 |
| 3.2 | Treatment of Claims of FXA | 26 |
| 3.3 | Treatment of Claims of RCM | 28 |
| 3.4 | Allowed Claims and Interests | 30 |
| 3.5 | Alternative Treatment | 30 |
| 3.6 | Limitation on Recoveries | 30 |
| 3.7 | Special Provision Regarding Unimpaired Claims | 30 |
| 3.8 | Claims and Interests of Non-Debtor Affiliates | 31 |
| 3.9 | Classification and Treatment of Intercompany Claims | 31 |
| 3.10 | Claims of Debtors against RCM | 31 |
| | | |
| ARTICLE IV | ACCEPTANCE OR REJECTION OF THE PLAN | 31 |
| 4.1 | Classes Entitled To Vote | 31 |
| 4.2 | Presumed Acceptance by Unimpaired Classes | 31 |
| 4.3 | Classes Deemed to Reject the Plan | 31 |
| 4.4 | Summary of Classes Voting on the Plan | 31 |
| 4.5 | Elimination Of Classes | 32 |
| 4.6 | Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code | 32 |
| | | |
| ARTICLE V | MEANS FOR IMPLEMENTATION OF THE PLAN | 32 |
| 5.1 | Merger Of Subsidiaries Into Refco Inc. | 32 |
| 5.2 | Continued Corporate Existence And Dissolution Of Reorganized Debtors | 32 |
| 5.3 | Corporate Governance Documentation | 32 |
| 5.4 | Directors, Managers And Officers; Effectuating Documents; Further Transactions | 33 |
| 5.5 | The Plan Administrator | 33 |
| 5.6 | Administration of Post-Confirmation RCM | 35 |
| 5.7 | Litigation Trust | 37 |
| 5.8 | Private Actions Trust | 39 |
| 5.9 | No Revesting of Assets | 39 |
| 5.10 | Preservation of Rights of Action; Settlement of Litigation | 40 |
| 5.11 | The Committees and the Plan Committee | 40 |
| 5.12 | Fee Committee | 41 |

| | | |
|---|---|---|
| 5.13 | Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests | 42 |
| 5.14 | Sources of Cash for Plan Distributions | 42 |
| 5.15 | Risk Sharing in Respect of Cargill Administrative Claim | 42 |
| 5.16 | Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims | 42 |
| 5.17 | Additional RCM Claim | 43 |
| 5.18 | Contributing Debtors BAWAG Proceeds | 43 |
| 5.19 | Exemption from Transfer Taxes | 44 |
| 5.20 | RCM Settlement Agreement and Conversion | 44 |
| 5.21 | Allowance of VR/Leuthold Guarantee Claims | 44 |
| 5.22 | Wind-Up of Non-Debtor Affiliates | 44 |
| 5.23 | FXCM | 44 |
| 5.24 | Examiner | 45 |

| ARTICLE VI | PROVISIONS GOVERNING DISTRIBUTIONS | 45 |
|---|---|---|
| 6.1 | RCM Rights Distribution | 45 |
| 6.2 | Distributions for Claims Allowed as of the Effective Date | 45 |
| 6.3 | Distributions of Proceeds of the Litigation Trust | 45 |
| 6.4 | Single Distribution | 45 |
| 6.5 | Accounts; Escrows; Reserves for the Reorganized Debtors | 46 |
| 6.6 | Accounts; Escrows; Reserves for the Post-Confirmation RCM | 47 |
| 6.7 | Interest and Penalties on Claims | 49 |
| 6.8 | Distributions by Disbursing Agent and RCM Trustee | 49 |
| 6.9 | Delivery of Distributions and Undeliverable or Unclaimed Distributions | 49 |
| 6.10 | Record Date for Distributions | 50 |
| 6.11 | Distributions to Holders of Senior Subordinated Note Claims | 50 |
| 6.12 | Senior Subordinated Notes Indenture Trustee as Claim Holder | 51 |
| 6.13 | Allocation of Plan Distributions Between Principal and Interest | 51 |
| 6.14 | Means of Cash Payment | 51 |
| 6.15 | Withholding and Reporting Requirements | 51 |
| 6.16 | Setoffs | 51 |
| 6.17 | Fractional Dollars | 51 |
| 6.18 | Release of Liens | 51 |

| ARTICLE VII | TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES | 52 |
|---|---|---|
| 7.1 | Rejected Contracts and Leases | 52 |
| 7.2 | Bar to Rejection Damages | 52 |
| 7.3 | Assumed and Assigned Contracts and Leases | 52 |
| 7.4 | Compensation and Benefit Programs | 52 |
| 7.5 | Treatment of RCM Executory Contracts and Unexpired Leases | 52 |

| ARTICLE VIII | PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS | 52 |
|---|---|---|
| 8.1 | Objection Deadline; Prosecution of Objections | 52 |
| 8.2 | No Distributions Pending Allowance | 53 |
| 8.3 | Distributions After Allowance | 53 |

| ARTICLE IX | CONFIRMATION AND CONSUMMATION OF THE PLAN | 53 |
|---|---|---|
| 9.1 | Conditions to Confirmation | 53 |
| 9.2 | Conditions to Effective Date | 54 |
| 9.3 | Waiver of Conditions | 54 |
| 9.4 | Consequences of Non-Occurrence of Effective Date | 55 |

| ARTICLE X | EFFECT OF PLAN CONFIRMATION | 55 |
|---|---|---|
| 10.1 | Binding Effect | 55 |
| 10.2 | Releases | 55 |

| | | |
|---|---|---|
| 10.3 | Exculpation and Limitation of Liability | 57 |
| 10.4 | No Discharge of Claims; Injunction | 57 |
| 10.5 | Term of Bankruptcy Injunction or Stays | 58 |
| 10.6 | Continuation of Forex Adversary | 58 |
| **ARTICLE XI** | **RETENTION OF JURISDICTION** | 58 |
| 11.1 | Exclusive Jurisdiction of the Bankruptcy Court | 58 |
| **ARTICLE XII** | **MISCELLANEOUS PROVISIONS** | 60 |
| 12.1 | Effectuating Documents and Further Transactions | 60 |
| 12.2 | Corporate Action | 60 |
| 12.3 | Bar Dates for Certain Claims | 60 |
| 12.4 | Payment of Statutory Fees | 61 |
| 12.5 | Amendment or Modification of the Plan | 61 |
| 12.6 | Severability of Plan Provisions | 61 |
| 12.7 | Successors and Assigns | 62 |
| 12.8 | Revocation, Withdrawal, or Non-Consummation | 62 |
| 12.9 | Notice | 62 |
| 12.10 | Governing Law | 63 |
| 12.11 | Tax Reporting and Compliance | 63 |
| 12.12 | Filing of Additional Documents | 63 |
| 12.13 | Limit on Precedential Effect | 63 |
| 12.14 | Claims Preserved Pending Consummation | 63 |
| 12.15 | Continuation of RCM Settlement Agreement | 63 |
| 12.16 | Continuation of Early Payment Order | 64 |

EXHIBITS

EXHIBIT A          LISTING OF AFFILIATE DEBTORS

EXHIBIT B          RCM SETTLEMENT AGREEMENT

EXHIBIT C          RESTATED CORPORATE GOVERNANCE DOCUMENTS

EXHIBIT D          EXECUTORY CONTRACTS AND UNEXPIRED LEASES TO BE ASSUMED

EXHIBIT E          PLAN ADMINISTRATOR AGREEMENT

EXHIBIT F          LITIGATION TRUST AGREEMENT

EXHIBIT G          PRIVATE ACTIONS TRUST AGREEMENT

EXHIBIT H          ASSET SCHEDULE

EXHIBIT I          EARLY PAYMENT ORDER

EXHIBIT J          BYLAWS OF FXCM COMMITTEE

EXHIBIT K          NON-EXCLUSIVE LIST OF RETAINED CAUSES OF ACTION

EXHIBIT L          LISTING OF CONTRIBUTING NON-DEBTOR AFFILIATES

SCHEDULES

SCHEDULE 1.56       LIST OF CONTRIBUTING NON-DEBTOR AFFILIATE MANAGEMENT

SCHEDULE 2.2(c)     SUB-CLASSES OF CLAIMS AGAINST THE CONTRIBUTING DEBTORS

# INTRODUCTION

Refco Inc. and certain of its direct and indirect subsidiaries identified on the annexed <u>Exhibit A</u> along with co-Plan Proponents Marc S. Kirschner, the chapter 11 trustee of the Estate of Refco Capital Markets, Ltd., the Official Committee of Unsecured Creditors of Refco Inc., *et al.*, and the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* propose the following joint chapter 11 plan that contemplates the disposition of the Debtors' assets and the resolution of the outstanding Claims against and Interests in the Debtors and RCM. This Plan does not contemplate the disposition of assets or the resolution of Claims against and Interests in Refco, LLC as such Claims and Interests are being addressed separately in conjunction with the administration of the Refco, LLC chapter 7 case. In addition, although the Plan outlines certain aspects of the disposition of the assets of RCM and the votes by certain creditors of RCM will be solicited, the Plan contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. In the event of such a conversion to chapter 7, this Plan shall constitute a settlement and compromise between the RCM Estate and the Debtors' Estates and among the Estates of the various Debtors and certain creditors, for which approval is sought simultaneously with the confirmation of this Plan. Furthermore, the Plan incorporates the terms of the Early Payment Order, a copy of which is attached hereto as <u>Exhibit I</u>. To the extent that the provisions herein, or in the Confirmation Order, differ from the terms of the Early Payment Order with respect to the treatment of the Secured Lenders, the terms of the Early Payment Order shall govern. Reference is made to the Disclosure Statement, distributed contemporaneously herewith, for a discussion of (i) the Debtors' history, business, properties, and operations, (ii) a summary and analysis of this Plan, and (iii) certain related matters, including risk factors relating to the consummation of this Plan. Subject to certain restrictions and requirements set forth in section 1127 of the Bankruptcy Code and Bankruptcy Rule 3019, the Plan Proponents reserve the right to alter, amend, modify, revoke, or withdraw this Plan prior to its substantial consummation.

# ARTICLE I

## DEFINED TERMS AND RULES OF INTERPRETATION

*Defined Terms.* As used herein, capitalized terms shall have the meanings set forth below. Any term that is not otherwise defined herein, but that is used in the Bankruptcy Code or the Bankruptcy Rules, shall have the meaning given to that term in the Bankruptcy Code or the Bankruptcy Rules, as applicable.

1.1 ***Additional Committee*** means the Additional Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code by notice on August 3, 2006 (and as amended from time to time).

1.2 ***Additional RCM Claim*** means the additional Claim of RCM, if any, as more fully set forth in section 5.17 hereof.

1.3 ***Adjusted Contributing Debtors Distributive Assets*** means the Contributing Debtors Distributive Assets after reduction for the payment of the RCM Excess Priority Claim.

1.4 ***Administrative Claim*** means a Claim for costs and expenses of administration of the Chapter 11 Cases under sections 503(b), 507(b), or 1114(e)(2) of the Bankruptcy Code and entitled to priority under section 507(a)(1) of the Bankruptcy Code, including, without duplication: (a) any actual and necessary costs and expenses, incurred after the Petition Date, of preserving the Estates and operating the businesses of the Debtors and RCM (such as wages, salaries, and commissions for services and payments for inventory, leased equipment, and

premises) and Claims of governmental units for taxes (including tax audit Claims related to tax years commencing after the Petition Date, but excluding Claims relating to tax periods, or portions thereof, ending on or before the Petition Date); (b) compensation for legal, financial, advisory, accounting, and other services and reimbursement of expenses under sections 328, 330, 331, or 503(b) of the Bankruptcy Code to the extent incurred after the Petition Date and prior to the Effective Date; (c) the amounts contributed to the Wind-Down Reserve; (d) all fees and charges assessed against the Estates under 28 U.S.C. § 1930; (e) the Senior Subordinated Note Indenture Trustee Fees, (f) the substantial contribution claims represented by the RCM Substantial Contribution Fees and the Senior Subordinated Note Holder Ad Hoc Committee Fees and Expenses, to the extent allowed by the Bankruptcy Court; (g) any amounts due to RCM for the RCM Advance and (h) all other claims entitled to administrative expense status pursuant to a Final Order of the Bankruptcy Court. In the event that the Chapter 11 Case of RCM is converted to a case administered under chapter 7, an Allowed Claim against RCM or its Estate of the type described above in respect of administering the RCM case in chapter 7 shall be included in the definition of Administrative Claim.

       **1.5**     ***Administrative/Priority Claims Reserve*** means the Reserve account(s) to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the Distribution to Holders of Administrative and Allowed Priority Claims against FXA and the Contributing Debtors.

       **1.6**     ***Administrative Claims Adjustment*** means an adjustment whereby the amount of the RCM Cash Distribution shall be reduced by the Pre-Conversion Administrative Claim Amount, if any. For the avoidance of doubt, while the Administrative Claims Adjustment, if any, shall affect the timing and accounts from which Distributions in respect of Allowed Administrative Claims are made, such adjustment shall not affect the ultimate allocation of Administrative Claims as set forth in section 5.16 of this Plan.

       **1.7**     ***Administrative Claims Objection Deadline*** means the last day for filing an objection to any request for the payment of an Allowed Administrative Claim, which shall be (a) the later of (i) 60 days after the Effective Date or (ii) 30 days after the filing of such Administrative Claim or (b) such other date specified in this Plan or ordered by the Bankruptcy Court. The filing of a motion to extend the Administrative Claims Objection Deadline shall automatically extend the Administrative Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Administrative Claims Objection Deadline is denied by the Bankruptcy Court, or if approved by the Bankruptcy Court and reversed on appeal, the Administrative Claims Objection Deadline shall be the later of the current Administrative Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Administrative Claims Objection Deadline.

       **1.8**     ***Administrative Professionals*** means the agents, financial advisors, attorneys, consultants, independent contractors, representatives, and other professionals of the Plan Administrator (in their capacities as such).

       **1.9**     ***Affiliate Debtor(s)*** means, individually or collectively, the debtors and debtors-in-possession identified on Exhibit A annexed hereto.

       **1.10**     ***AlixPartners*** means collectively, AlixPartners LLC and its affiliate, AP Services, LLC.

       **1.11**     ***Allotted Administrative Claims*** means Allowed Administrative Claims accrued against RCM or the Contributing Debtors from the Petition Date through the Effective Date, but excluding (A) Allowed Administrative Claims paid prior to August 31, 2006, (B) rent and other ordinary operating expenses of the Debtors or RCM, (C) fees and commissions of the RCM Trustee, and (D) repayment of the RCM Advance.

       **1.12**     ***Allowed*** means (a) when used with respect to an Administrative Claim, all or any portion of an Administrative Claim (i) that has been allowed, or adjudicated in favor of the holder by estimation or liquidation, by a Final Order, or (ii) that was incurred by the Debtors or RCM in the ordinary course of business during the Chapter 11 Cases; *provided, however*, that in no event shall a post-petition obligation that is contingent or disputed and subject to liquidation through pending or prospective litigation, including, but not limited to, alleged obligations arising from personal injury, property damage, products liability, consumer complaints, employment law (excluding claims arising under workers' compensation law), secondary payor liability, or any other disputed legal

or equitable claim based on tort, statute, contract, equity, or common law, be considered to be an obligation which is payable in the ordinary course of business; or (b) when used with respect to a Claim other than an Administrative Claim, such Claim against a Debtor or RCM or any portion thereof (i) that has been allowed by a Final Order of the Bankruptcy Court, (ii) as to which, on or by the Effective Date, (w) no proof of claim has been filed with the Bankruptcy Court and (x) the liquidated and noncontingent amount of which is Scheduled, other than a Claim that is Scheduled at zero, in an unknown amount, or as disputed, (iii) for which a proof of claim in a liquidated amount has been timely filed with the Bankruptcy Court pursuant to the Bankruptcy Code, any Final Order of the Bankruptcy Court, or other applicable bankruptcy law, and as to which either (y) no objection to its allowance has been filed by the Claims Objection Deadline or the Administrative Claims Objection Deadline (as applicable), or within any period specified by the Bankruptcy Code or an order of the Bankruptcy Court, or (x) any objection to its allowance has been settled or withdrawn, or has been denied by a Final Order, or (iv) that is expressly allowed in a liquidated amount in the Plan.

    1.13  *"Allowed ... Claim"* means an Allowed Claim of the particular type or Class described.

    1.14  *Asset Schedule* means the schedule prepared by Houlihan to describe the estimated value of assets of the Debtors as of August 31, 2006, attached hereto as <u>Exhibit H</u>.

    1.15  *Ballot* means each of the ballot forms distributed to each Holder of a Claim or Interest entitled to vote to accept or reject this Plan.

    1.16  *Bankruptcy Code* means title 11 of the United States Code, as now in effect or hereafter amended (if such amendment applies to the Debtors and RCM).

    1.17  *Bankruptcy Court* means the United States Bankruptcy Court for the Southern District of New York, or any other court with jurisdiction over the Chapter 11 Cases.

    1.18  *Bankruptcy Rules* means the Federal Rules of Bankruptcy Procedure and the local rules of the Bankruptcy Court, as now in effect or hereafter amended.

    1.19  *Bar Date* means the deadline established by the Bankruptcy Court by order dated March 27, 2006, for filing proofs of Claim in the Chapter 11 Cases.

    1.20  *BAWAG* means the BAWAG Parties as such term is defined in paragraph 4(a) of the Stipulation and Order of Settlement entered by the Bankruptcy Court on July 6, 2006 (Docket No. 2348).

    1.21  *BAWAG Allocation Order* means one or more orders of the Bankruptcy Court approving the allocation of the BAWAG Proceeds, which may include the Confirmation Order.

    1.22  *BAWAG Contingent Proceeds* means an amount, if any, whether or not monetized prior to the Effective Date, of the BAWAG Proceeds up to $150,000,000 to be paid pursuant to the BAWAG Settlement upon a sale or recapitalization as set forth in the BAWAG Settlement within two (2) years of the date of approval of the BAWAG Settlement.

    1.23  *BAWAG Guaranteed Proceeds* means that portion of the BAWAG Proceeds equal to a guaranteed amount of $506,250,000 in Cash paid pursuant to the BAWAG Settlement.

    1.24  *BAWAG Proceeds* means the sum of (a) the BAWAG Guaranteed Proceeds plus (b) the BAWAG Contingent Proceeds, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement.

    1.25  *BAWAG Settlement* means the settlement stipulation among the Creditors Committee, BAWAG, and the Refco Entities as approved by the Bankruptcy Court by an order entered on July 6, 2006. A copy of the BAWAG Settlement is annexed as an Exhibit to the Disclosure Statement.

**1.26** *Business Day* means any day, other than a Saturday, Sunday, or "legal holiday" (as defined in Bankruptcy Rule 9006(a)).

**1.27** *Capstone* means Capstone Advisory Group, LLC.

**1.28** *Cargill* means Cargill, Incorporated and any of Cargill, Incorporated's affiliates who filed proofs of claim in any of the Chapter 11 Cases.

**1.29** *Cargill Administrative Claim* means an Administrative Claim of Cargill, if any, against the Contributing Debtors.

**1.30** *Cash* means legal tender of the United States of America and equivalents thereof.

**1.31** *Cash-Out Option Agreement* means the agreement, if any, between one or more third parties and the Holders of Litigation Trust Interests to be executed as of the Effective Date establishing the terms and conditions by which third parties may purchase Litigation Trust Interests from such Holders, the form of which Cash-Out Option Agreement will be attached as an exhibit to the Litigation Trust Agreement.

**1.32** *Chapter 11 Case(s)* means (a) when used with reference to a particular Debtor or RCM, the case under chapter 11 of the Bankruptcy Code commenced by such Debtor in the Bankruptcy Court and (b) when used with reference to the Debtors and RCM, the cases under chapter 11 of the Bankruptcy Code commenced by the Debtors and RCM in the Bankruptcy Court.

**1.33** *Claim* means a "claim" as defined in section 101(5) of the Bankruptcy Code.

**1.34** *Claims Distribution Account* means the account established and maintained by the Reorganized Debtors from which Distributions to Holders of Allowed Claims against the Contributing Debtors or FXA shall be made and from which reserves on behalf of the Reorganized Debtors will be funded for the benefit of Holders of Disputed Claims.

**1.35** *Claims Objection Deadline* means the last day for filing objections to Claims against the Debtors, which day shall be (a) the later of (i) 90 days after the Effective Date or (ii) 60 days after the filing of a proof of claim for, or request for payment of, such Claim or (b) such other date as the Bankruptcy Court may order. The filing of a motion to extend the Claims Objection Deadline shall automatically extend the Claims Objection Deadline until a Final Order is entered on such motion. In the event that such motion to extend the Claims Objection Deadline is denied by the Bankruptcy Court, or approved by the Bankruptcy Court and reversed on appeal, the Claims Objection Deadline shall be the later of the current Claims Objection Deadline (as previously extended, if applicable) or 30 days after entry of a Final Order denying the motion to extend the Administrative Claims Objection Deadline.

**1.36** *Class* means a category of Holders of Claims or Interests, as described in Article II hereof.

**1.37** *Class Actions Claims* means (i) claims for violation of securities laws arising under and pursuant to Section 10(b) and 20(a) of the Securities Exchange Act of 1934 that currently are being asserted in the class action styled In re Refco Capital Markets, Ltd. Brokerage Customer Securities Litigation, 06-CIV 643 (GEL) (S.D.N.Y.) (the "Brokerage Customer Securities Litigation"), and (ii) claims currently being asserted in certified class actions relating to the Debtors and RCM, if any.

**1.38** *Committees* means, collectively, the Creditors' Committee and the Additional Committee.

**1.39** *Confirmation* means the confirmation of the Plan by the Bankruptcy Court under section 1129 of the Bankruptcy Code.

**1.40**    *Confirmation Date* means the date on which the Bankruptcy Court enters the Confirmation Order on the docket of the Chapter 11 Cases.

**1.41**    *Confirmation Hearing* means the hearing held by the Bankruptcy Court pursuant to section 1128 of the Bankruptcy Code to consider confirmation of this Plan, as such hearing may be adjourned or continued from time to time.

**1.42**    *Confirmation Order* means the order of the Bankruptcy Court confirming this Plan pursuant to section 1129 of the Bankruptcy Code.

**1.43**    *Contributed Claims* means any and all Litigation Claims of the Debtors, RCM or their Estates (including claims being pursued by the Committees on behalf of the Debtors), which shall be contributed by the Debtors, RCM and their Estates to the Litigation Trust and, to the extent of any election, or deemed election, by Holders of RCM Related Claims to exchange and subordinate such Claims in accordance with section 6.6(c) of this Plan, such RCM Related Claims shall be deemed to remain unpaid liabilities of the Debtors and their Estates immediately prior to the contribution of Litigation Claims to the Litigation Trust. The term Contributed Claims shall specifically exclude the Released/Subordinated Claims.

**1.44**    *Contributed Claims Recoveries* means any recoveries obtained on account of the Contributed Claims net of the costs of administration of the Litigation Trust, including, but not limited to, fees associated with the litigation of the Contributed Claims.

**1.45**    *Contributing Debtors* means the Debtors excluding FXA.

**1.46**    *Contributing Debtors BAWAG Proceeds* means that portion of the BAWAG Proceeds that compose the Secured Lender BAWAG Proceeds, the Senior Subordinated Note Holder BAWAG Proceeds and the Contributing Debtors General Unsecured BAWAG Proceeds.

**1.47**    *Contributing Debtors Cash Distribution* means $94 million of Cash, which amount shall be adjusted, upwards or downwards, by an amount equal to the Specified Difference.

**1.48**    *Contributing Debtors Distributive Assets* means the assets of the Contributing Debtors after the payment of the Contributing Debtors Effective Date Claims, Allowed Other Secured Claims against the Contributing Debtors, Allowed Secured Lender Claims against the Contributing Debtors, the Senior Subordinated Note Holder Distribution, the Senior Subordinated Note Holder Fee Distribution (each to the extent payable under the Plan) and the funding of any required reserves (provided that upon the release of any funds from reserves for payment of the Contributing Debtors General Unsecured Distribution or RCM Intercompany Claim Distribution, such released funds shall be counted as Contributing Debtors Distributive Assets). The term Contributing Debtors Distributive Assets shall include the assets of the Contributing Debtors reflected on the Asset Schedule and, without duplication, to the extent not inconsistent with the Asset Schedule, (i) any amounts paid to the Contributing Debtors or RCM on or after September 1, 2006, (ii) the BAWAG Proceeds, and (iii) any amounts paid to the Contributing Debtors or RCM from Non-Debtor Affiliates on or after September 1, 2006; *provided, however*, that any amounts paid by direct or indirect subsidiaries of RCM on or after September 1, 2006 shall not constitute Contributing Debtors Distributive Assets.  The term Contributing Debtors Distributive Assets shall not include any value in respect of the RGL FXCM Distribution nor any interest in Contributed Claims.

**1.49**    *Contributing Debtors Effective Date Claims* means Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims and Allowed Administrative Claims accrued through and including the Effective Date, each to the extent required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan.

**1.50**    *Contributing Debtors General Unsecured BAWAG Proceeds* means (i) $56,250,000 of the BAWAG Guaranteed Proceeds and (ii) a portion of the BAWAG Contingent Proceeds allocable to the Contributing Debtors Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds,

pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases offered by the BAWAG Settlement, Holders of Allowed Contributing Debtors General Unsecured Claims.

**1.51** *Contributing Debtors General Unsecured Claim* means a General Unsecured Claim against a Contributing Debtor.

**1.52** *Contributing Debtors General Unsecured Distribution* means a Distribution from the Contributing Debtors Distributive Assets equal to (A) the Contributing Debtors Cash Distribution after reduction for the payment of the Allowed Contributing Debtors Post-Effective Date Claims plus (B) 50% of the RGL FXCM Distribution; *provided, however*, the amount of such Distribution under (A) and (B) shall not exceed 40% of the Allowed Contributing Debtors General Unsecured Claims. The Contributing Debtors General Unsecured Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

**1.53** *Contributing Debtors Post-Effective Date Claims* means Administrative Claims accrued after the Effective Date by the Contributing Debtors, which are required to be borne by the Contributing Debtors pursuant to section 5.16 of this Plan (including amounts, if any, in respect of repaying the RCM Advance).

**1.54** *Contributing Debtors Projection* means a projection of the Cash or value to be available from the MAC Contributing Debtors Assets for Distribution in respect of the Contributing Debtors Cash Distribution.

**1.55** *Contributing Non-Debtor Affiliate* means the Non-Debtor Affiliates listed on <u>Exhibit L</u> hereto who are reasonably expected to contribute assets to or release Claims against the Debtors or RCM pursuant to the provisions of this Plan, including, but not limited to, section 5.22.

**1.56** *Contributing Non-Debtor Affiliate Management* means the directors and officers of certain foreign Contributing Non-Debtor Affiliates, a list of which officers and directors is set forth on Schedule 1.56 hereto.

**1.57** *Contributing Non-Debtor Affiliate Trigger Date* means, with respect to any Contributing Non-Debtor Affiliate, the earlier of (i) the date at which such Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash (consistent with its books and records and claims pending against it) to the Contributing Debtors and RCM or, if insufficient Cash will be available (consistent with the Contributing Non-Debtor Affiliate's books and records and claims pending against it) for Distribution to the Contributing Debtors and RCM, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors, or, if such events occur prior to the Effective Date, the Effective Date or (ii) a date determined by the RCM Trustee, with the consent of the Plan Committee, on notice to the Bankruptcy Court, as necessary to accomplish the purposes of clause (i) of this definition.

**1.58** *Convenience Claims* means collectively FXA Convenience Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims.

**1.59** *Credit Agreement* means the credit agreement, dated August 5, 2004 (as amended), among RGL as successor by merger to Refco Finance Holdings LLC, New Refco Group Ltd, LLC, the Secured Lender Agent and the Secured Lenders party thereto.

**1.60** *Creditors' Committee* means the Official Committee of Unsecured Creditors of Refco Inc., *et al.* appointed by the United States Trustee in the Chapter 11 Cases pursuant to section 1102 of the Bankruptcy Code on October 28, 2006, as reconstituted on March 29, 2006, July 21, 2006 and August 3, 2006 (and as amended from time to time).

**1.61** *Debtor* means any of Refco Inc. or the Affiliate Debtors in its individual capacity.

**1.62** **_Debtors_** means, collectively, Refco Inc. and all of the Affiliate Debtors.

**1.63** **_Disbursing Agent_** means, solely in its capacity as agent to effectuate Distributions on behalf of FXA and the Contributing Debtors pursuant to the Plan, the Plan Administrator or such other entity as may be designated by the Plan Proponents and appointed by the Bankruptcy Court as set forth in the Confirmation Order. For the avoidance of doubt, the RCM Trustee shall act as the Disbursing Agent for Post-Confirmation RCM.

**1.64** **_Disclosure Statement_** means the disclosure statement (including all exhibits and schedules thereto) relating to this Plan, distributed contemporaneously herewith in accordance with sections 1125 and 1126(b) of the Bankruptcy Code and Bankruptcy Rule 3018, as it may be amended or supplemented from time to time.

**1.65** **_Disputed Claim_** means any Claim other than an Allowed Claim.

**1.66** **_"Disputed ... Claim"_** means a Disputed Claim of the type described.

**1.67** **_Disputed Claim Amount_** means (a) with respect to a contingent or unliquidated Claim, zero or the amount estimated by the Bankruptcy Court prior to the initial Distribution Date, for purposes of allowance, reserves or Distributions in respect of such Claim in accordance with section 502(c) of the Bankruptcy Code or (b) with respect to any Disputed Claim that is not contingent or unliquidated, the amount set forth in a timely filed proof of claim; _provided, however_, that for purposes of establishing the Disputed Claims Reserve, the Disputed Claim Amount shall not exceed an amount equal to the applicable deductible or self-retention portion plus any uninsured amount in respect of Disputed Claims that are covered by insurance.

**1.68** **_Disputed Claims Reserve_** means the reserve of Contributing Debtors Distributive Assets and FXA Distributive Assets established and maintained by the Reorganized Debtors for Holders of Disputed Claims; _provided, however_, that any reserve from Contributing Debtors Distributive Assets shall be a reserve from amounts to be paid on the Contributing Debtors Unsecured Claim Distribution and shall not result in a reserve against amounts to be paid on the RCM Cash Distribution in accordance with section 6.6(b) of this Plan.

**1.69** **_Distribution_** means any distribution pursuant to the Plan to the Holders of Allowed Claims.

**1.70** **_Distribution Date_** means the Effective Date (subject to section 6.2 hereof) or any Quarterly Distribution Date.

**1.71** **_Distribution Record Date_** means, with respect to all Claims other than Senior Subordinated Note Claims, initially the Voting Deadline (unless a different date is agreed to by the Plan Proponents and filed with the Bankruptcy Court) and thereafter, 45 days prior to each scheduled Distribution Date.

**1.72** **_Early Payment Order_** means the Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Settlement of Controversies and Disputes Among the Debtors, the RCM Trustee, the Secured Lenders, and Certain Other Parties dated September 27, 2006 (Docket No. 2958) attached hereto as Exhibit I.

**1.73** **_Effective Date_** means the Business Day this Plan becomes effective as provided in Article IX hereof.

**1.74** **_Effective Beneficiaries_** means (i) the Litigation Trust Beneficiaries (other than RCM) and (ii) the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that benefit from RCM's beneficial interest in the Litigation Trust.

**1.75** **_Employee Benefit Plans_** means those "employee benefit plans" (as defined in Section 3(3) of ERISA (whether or not such plan is subject to ERISA)), other material plans, policies, programs, practice,

agreements, and understandings or arrangements maintained, sponsored, or contributed to for the benefit of current or former employees of the Debtors.

1.76 **_ERISA_** shall mean the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder.

1.77 **_Estate(s)_** means, individually, the estate of any of the Debtors or RCM and, collectively, the estates of all of the Debtors and RCM created under section 541 of the Bankruptcy Code.

1.78 **_Estimated Unsatisfied Credit Agreement Claims_** has the meaning ascribed to such term in the Early Payment Order.

1.79 **_Examiner_** means Joshua R. Hochberg, the examiner appointed by United States Trustee pursuant to 11 U.S.C. § 1104(c)(2) and approved by the Bankruptcy Court in accordance with the Examiner Order.

1.80 **_Examiner Order_** means the Order Granting the Motion of the United States Trustee for the Appointment of an Examiner entered on March 16, 2006 (Docket No. 1487).

1.81 **_Excess Priority Claims_** means that portion of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims against the Contributing Debtors and RCM, or their respective Estates, accrued through the Effective Date that exceed $180 million in the aggregate, excluding any amounts paid as of August 31, 2006, as more particularly set forth in section 5.16 of this Plan.

1.82 **_Exhibit_** means an exhibit annexed to either this Plan or as an appendix to the Disclosure Statement.

1.83 **_Exhibit Filing Date_** means the date on which Exhibits to the Plan shall be filed with the Bankruptcy Court and posted on the refcodocket.com website, which date shall be at least ten (10) days prior to the Voting Deadline or such later date as may be approved by the Bankruptcy Court without further notice to parties-in-interest.

1.84 **_Fee Committee_** means the committee established by the Bankruptcy Court pursuant to the order entered on July 24, 2006 (Docket No. 2482).

1.85 **_Final Order_** means an order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, as entered on the docket in any Chapter 11 Case, the operation or effect of which has not been stayed, reversed, or amended and as to which order or judgment (or any revision, modification, or amendment thereof) the time to appeal or seek review or rehearing has expired and as to which no appeal or petition for review or rehearing was filed or, if filed, remains pending; _provided, however_, that the possibility that a motion under section 502(j) of the Bankruptcy Code, Rule 59 or Rule 60 of the Bankruptcy Rules or any analogous rule may be, but has not been filed shall not cause an order not to be a Final Order.

1.86 **_FXA_** means Refco F/X Associates, LLC.

1.87 **_FXA Cash Accounts_** means the Cash accounts of FXA listed in the Schedules of FXA, which consist of the following accounts at the bank and with the account numbers designated herein: (i) Fleet Bank of New York, acct: 9421286511; (ii) Fleet Bank of New York, acct: 9421286589; (iii) Fleet Bank of New York, acct: 9421286693; (iv) Fleet Bank of New York, acct: 9421286896; (v) Fleet Bank of New York, acct: 9489924815; (vi) HK and Shanghai Banking Corp., acct: 009-030925-001; and (vii) Wachovia Bank, N.A., acct: 200017918646.

1.88 **_FXA Convenience Claims_** means any FXA General Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the FXA General Unsecured Claim to $10,000 on the applicable Ballot; _provided_, _however_, that for purposes of the Plan and

the Distributions to be made hereunder, the aggregate amount of Distributions to FXA Convenience Claims shall be limited to $5 million. To the extent that the amount of FXA General Unsecured Claims electing to receive a FXA Convenience Claim exceeds $5 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $5 million cap is reached.

       1.89    **_FXA Distributive Assets_** means (i) the FXA Cash Accounts, allocated as agreed or otherwise resolved between FXA and KK Japan, plus (ii) proceeds, if any, of the sale of the customer list of FXA.

       1.90    **_FXA General Unsecured Claim_** means a General Unsecured Claim against FXA.

       1.91    **_FXA General Unsecured Claim Distribution_** means a Distribution from the FXA Distributive Assets after the payment of Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Non-Priority Tax Claims, Allowed Other Secured Claims and Allowed Secured Lender Claims against FXA, and less any amounts paid to the Holders of Allowed FXA Convenience Claims. The FXA General Unsecured Claim Distribution shall also include the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

       1.92    **_FXCM_** means Forex Capital Markets, LLC.

       1.93    **_FXCM Committee_** means a five person committee composed of the RCM Trustee and four creditors of either RCM or the Contributing Debtors (and chaired by the RCM Trustee) formed to coordinate on all matters relating to the disposition or distribution of RGL's 35% interest in FXCM.

       1.94    **_General Unsecured Claim_** means a Claim that is not an Administrative Claim, Priority Tax Claim, Non-Tax Priority Claim, Other Secured Claim, Secured Lender Claim, Senior Subordinated Note Claim, RCM Intercompany Claim, FXA Convenience Claim, RCM Securities Customer Claim, RCM Leuthold Metals Claim, RCM Securities Customer Convenience Claim, RCM FX/General Unsecured Convenience Claim, Subordinated Claim or Old Equity Interest.

       1.95    **_Holder_** means an entity holding a Claim or Interest and, with respect to Senior Subordinated Note Claims, the beneficial holder of the Senior Subordinated Notes.

       1.96    **_Houlihan_** means Houlihan Lokey Howard & Zukin Capital Advisors, Inc.

       1.97    **_Impaired_** means, when used in reference to a Claim or Interest, a Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

       1.98    **_Intercompany Claim_** means any Claim held by a Refco Entity against any other Refco Entity, including any intercompany book entries reflecting obligations owed by one Refco Entity with respect to any other Refco Entity.

       1.99    **_Interest_** means the legal, equitable, contractual, and other rights of any Person with respect to any capital stock or other ownership interest in any Debtor or RCM, whether or not transferable, and any option, warrant, or right to purchase, sell, or subscribe for an ownership interest or other equity security in any Debtor.

       1.100    **_IPO Underwriter Claims Recovery_** means any recovery from a claim brought by the Litigation Trust against an underwriter in connection with the initial public offering of Refco Inc., net of the fees and expenses incurred in pursuing such recovery.

       1.101    **_Joinder Parties_** has the meaning set forth in the RCM Settlement Agreement.

**1.102** *Joint Sub-Committee* means the joint sub-committee comprised of the Committee and the Additional Committee pursuant to a stipulation and protocol approved by order of the Bankruptcy Court, dated August 17, 2006 (Docket No. 2711).

**1.103** *KK Japan* means RefcoFX Japan KK.

**1.104** *Leuthold* means, collectively, Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

**1.105** *Lien* shall mean any lien, security interest, pledge, title retention agreement, encumbrance, charge, mortgage or hypothecation, other than, in the case of securities and any other equity ownership interests, any restrictions imposed by applicable United States or foreign securities laws.

**1.106** *Litigation Claims* means the claims, rights of action, suits, or proceedings, whether in law or in equity, whether known or unknown, that any Debtor or RCM may hold against any Person (after netting cross margin obligations, if applicable, to the extent required under the cross margining arrangement or to the extent determined necessary by the applicable Debtor or RCM) excluding the Released/Subordinated Claims and also excluding any claims, rights of action, suits, or proceedings held by the RCM Estate pursuant to sections 547, 550 and 749 of the Bankruptcy Code; *provided, however*, that the claims commenced and settled by the Creditors' Committee against SPhinX Managed Futures Fund, LLC, and BAWAG shall not constitute Litigation Claims.

**1.107** *Litigation Trust* means the trust established on the Effective Date to hold the Litigation Claims.

**1.108** *Litigation Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Litigation Trust pursuant to the Plan attached as Exhibit F hereto.

**1.109** *Litigation Trust Beneficiaries* means the Estate of RCM, Holders of Allowed Debtors General Unsecured Claims, Holders of Allowed FXA General Unsecured Claims, Holders of Allowed Contributing Debtors Subordinated Claims, Holders of Allowed Old Equity Interests and the Disputed Claims Reserve.

**1.110** *Litigation Trust Committee* means the Committee established pursuant to section 5.7(d) of this Plan to participate in management of the Litigation Trust.

**1.111** *Litigation Trustee* means the Person appointed pursuant to section 5.7(a) of the Plan to act as trustee of and administer the Litigation Trust and identified on or before the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Private Actions Trustee.

**1.112** *Litigation Trust Interests* means the beneficial interests in the Litigation Trust.

**1.113** *Loan Documents* has the meaning ascribed to such term in the Early Payment Order.

**1.114** *Loans* has the meaning ascribed to such term in the Early Payment Order.

**1.115** *MAC Contributing Debtors Assets* means (x) the estimated value of the sum of the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds), less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the RCM Cash Distribution (without reduction for the Administrative Claims Adjustment), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan, provided that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be

assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

   **1.116** *MAC RCM Assets* means (x) the estimated value of the sum of (A) the Contributing Debtors Distributive Assets (including the RCM BAWAG Proceeds) less (y) the estimated sum of, without duplication, (A) payments to be made in respect of the RCM Excess Priority Claims (whether funded from the RCM Cash Distribution or as part of the Pre-Conversion Administrative Claim Amount), (B) payments to be made in respect of the Contributing Debtors Cash Distribution (without adjustment for the Contributing Debtors Post-Effective Date Claims), and (C) payments to be made by RCM pursuant to clause (iii) of section 5.15 of this Plan; *provided, however,* that for purposes of making the estimate in this sub-section (C), total Allowed Contributing Debtors General Unsecured Claims will be assumed to be $502 million (unless the actual total amount of Allowed Contributing Debtors General Unsecured Claims are known at the time).

   **1.117** *MCG Members* has the meaning set forth in the RCM Settlement Agreement.

   **1.118** *Master Ballot* means the ballot distributed to brokers, nominees or other agents for Holders of the Senior Subordinated Notes to record the votes of the beneficial Holders of Senior Subordinated Notes.

   **1.119** *Non-Debtor Affiliates* means Refco LLC, Refco Canada Finance Inc., Refco Commodity Management Inc., Refco Administrative Services Inc., EasyScreen Inc., Refco Mortgage Services LLC, Refco Securities LLC, Refco Clearing LLC, Refco EasySolutions LLC, RefcoFund Management LLC, Haut Commodities LLC, Refco Local Divisions LLC, RefcoFund Holdings LLC, Refco Alternative Investments LLC, Refco Trading Services LLC, Refco Screens Trustees Ltd. (in liquidation), Refco Screens Link Ltd. (in liquidation), Refco MF Ltd. (in liquidation), Refco Securities Ltd. (in liquidation), Refco Screens Employee Services Ltd., Refco Energy (UK) Ltd., Refco TC Ltd., RGE Ltd., Refco MT Limited, Refco Ltd., Westminster Clearing Ltd., Refco Screens Ltd., Refco Trading Services Ltd., Refco Trading Services (UK) Ltd., CI Investor Services Ltd., Refco Equity Derivatives Ltd., Refco Europe Ltd., Refco Overseas Ltd., Refco East Services Ltd. (in liquidation), Just Commodity Inc., Just (Dalian) Trading Co Ltd., Refco Capital Singapore Pte Ltd, Refco India Pvt Ltd, Easy Tiger Pte Ltd, EasyScreen Pty Ltd, Refco Singapore Pte Ltd, Refco Investment Services Pte Ltd, Refco Forex Ltd (in liquidation), Refco Securities SA, Refco Futures (HK) Limited, Refco Trading Services (Gibraltar) Ltd., Refco Capital Markets International Ltd, Refco Capital Markets International Services Ltd, ACM Advanced Currency Markets SA.

   **1.120** *Non-Estate Refco Claims* means non-estate causes of action arising from any matter involving any Refco Entity, excluding (i) contract claims against third parties and (ii) Class Action Claims. Non-Estate Refco Claims include, without limitation, causes of action against: (i) all current and former officers, directors or employees of the Refco Entities; (ii) all persons or entities that conducted transactions with the Refco Entities; and (iii) all persons or entities that provided services to the Refco Entities, including, without limitation, all attorneys, accountants, financial advisors and parties providing services to the Refco Entities in connection with the public issuance of debt or equity, including, without limitation, all underwriters.

   **1.121** *Non-Tax Priority Claim* means a Claim, other than an Administrative Claim or Priority Tax Claim, which is entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code.

   **1.122** *Old Equity Interests* means the common stock of Refco Inc. outstanding immediately prior to the Petition Date, including treasury stock and all options, warrants, calls, rights, participation rights, puts, awards, commitments, or any other agreements of any character to acquire such common stock, and shall also include any Claim subordinated pursuant to section 510(b) arising from the rescission of a purchase or sale of any such common stock or rights relating to such common stock, or any Claim for damages arising from the purchase or sale of common stock of Refco Inc. or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such claims.

   **1.123** *Other Related Claim* means, other than an RCM Related Claim, any Claim or cause of action of any Holder of an Impaired Claim against RCM or any Debtor arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against its primary Debtor obligor; *provided, however,* that

the term Other Related Claim shall not include any Claim, based on a contractual guarantee or other direct contractual undertaking, against RCM or any Debtor that is not such Holder's primary Debtor obligor.

**1.124** *Other Secured Claim* means a Claim (other than an Administrative Claim or Secured Lender Claim) that is secured by a lien on property in which a Debtor's Estate or RCM's Estate has an interest or that is subject to setoff under section 553 of the Bankruptcy Code, to the extent of the value of the Claim Holder's interest in the applicable Estate's interest in such property or to the extent of the amount subject to setoff, as applicable, as determined pursuant to section 506(a) of the Bankruptcy Code or, in the case of setoff, pursuant to section 553 of the Bankruptcy Code.

**1.125** *Person* means an individual, corporation, partnership, joint venture, association, joint stock company, limited liability company, limited liability partnership, trust, estate, unincorporated organization, or other entity.

**1.126** *Petition Date* means, with respect to a Debtor or RCM, the date on which such Debtor filed its petition for relief commencing its Chapter 11 Case.

**1.127** *Plan* means this chapter 11 plan, including the Exhibits and all supplements, appendices, and schedules hereto, either in its current form or as the same may be altered, amended, or modified from time to time in accordance with the Bankruptcy Code and the Bankruptcy Rules.

**1.128** *Plan Administrator* means the person designated pursuant to section 5.5 hereof prior to the Confirmation Date and approved by the Bankruptcy Court pursuant to the Confirmation Order to administer the Plan on behalf of the Contributing Debtors and FXA in accordance with the terms of the Plan and the Plan Administrator Agreement and to take such other actions as may be authorized under the Plan Administrator Agreement, and any successor thereto.

**1.129** *Plan Administrator Agreement* means the agreement between and among the Contributing Debtors and the Plan Administrator specifying the rights, duties, and responsibilities of and to be performed by the Plan Administrator under the Plan, in substantially the same form as the agreement attached to the Plan as Exhibit E.

**1.130** *Plan Committee* means the committee as appointed pursuant to section 5.11(b) hereof as of the Effective Date, which will supervise and direct the Plan Administrator, to monitor implementation of the Plan, and to take such other actions and have such other rights as are set forth in the Plan, all as described in Article V of this Plan.

**1.131** *Plan Document* means the Plan, together with any contract, instrument, release, or other agreement or document entered into in connection with Plan.

**1.132** *Plan Filing Date* means September 14, 2006.

**1.133** *Plan Proponents* means the Debtors, the RCM Trustee and the Committees.

**1.134** *Plan Support Agreement* means that certain agreement among the RCM Trustee, certain Non-Debtor Affiliates, the Committees, certain individual customers and creditors of RCM and the Debtors, and the chapter 7 trustee for Refco, LLC, in his capacity as chapter 7 trustee for Refco, LLC, filed with the Bankruptcy Court on September 15, 2006 (Docket No. 2861).

**1.135** *Post-Confirmation RCM* means the estate of RCM on and after the entry of the Confirmation Order as administered by the RCM Trustee.

**1.136**  *Post-Petition Management* means AlixPartners and Harrison J. Goldin, Goldin Associates, LLC, and any directors appointed to the board of directors of Refco Inc. subsequent to Mr. Goldin's appointment as Chief Executive Officer of Refco Inc. on January 25, 2006.

**1.137**  *Pre-Conversion Administrative Claim Amount* means, if determined necessary by the RCM Trustee, any amount deposited by the Contributing Debtors into a reserve for the benefit of Holders of Administrative Claims against RCM arising or accruing prior to the date of conversion, if any, of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code (including RCM Substantial Contribution Fees).  The Pre-Conversion Administrative Claim Amount shall in no case exceed an amount equal to (i) $60 million plus (ii) the RCM Excess Priority Claims that RCM is responsible for bearing pursuant to section 5.16 of this Plan.

**1.138**  *Priority Claims* means, collectively, all Priority Tax Claims and Non-Tax Priority Claims.

**1.139**  *Priority Tax Claim* means a Claim of a governmental unit of the kind specified in sections 502(i) and 507(a)(8) of the Bankruptcy Code.

**1.140**  *Private Actions Trust* means the trust established on the Effective Date pursuant to section 5.8 of the Plan to hold certain claims and causes of action against third-parties owned by Holders of Claims against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates.

**1.141**  *Private Actions Trust Agreement* means the agreement to be executed as of the Effective Date establishing the Private Actions Trust pursuant to the Plan attached as Exhibit G hereto.

**1.142**  *Private Actions Trustee* means the Person appointed pursuant to the Private Actions Trust Agreement of the Plan to act as trustee of and administer the Private Actions Trust and identified on or before the date of the hearing before the Bankruptcy Court seeking confirmation of the Plan, who may be the Plan Administrator and/or the Litigation Trustee.

**1.143**  *Professional* means (a) any professional employed in these Chapter 11 Cases pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise and (b) any professional or other entity seeking compensation or reimbursement of expenses in connection with the Chapter 11 Cases pursuant to section 503(b)(4) of the Bankruptcy Code.

**1.144**  *Professional Fee Claim* means an Administrative Claim of a Professional for compensation for services rendered or reimbursement of costs, expenses, or other charges incurred after the Petition Date and prior to and including the Effective Date.

**1.145**  *Pro Rata* means, with respect to Claims or Interests (i) within the same Class or sub-Class, the proportion that a Claim or Interest bears to the sum of all Claims or Interests, as the case may be, within such Class or sub-Class, and (ii) among all Classes, the proportion that a Class of Claims or Interests bears to the sum of all Claims or Interests, as the case may be; *provided, however*, that for purposes of distributing Litigation Trust Interests, Pro Rata share shall exclude Convenience Claims.

**1.146**  *Qualifying Plan* has the meaning ascribed to such term in the Early Payment Order.

**1.147**  *Quarterly Distribution Date* means the last Business Day of the month following the end of each calendar quarter after the Effective Date; *provided, however*, that if the Effective Date is within 30 days of the end of a calendar quarter, the first Quarterly Distribution Date shall be the last Business Day of the month following the end of the first calendar quarter after the calendar quarter in which the Effective Date falls.

**1.148**  *RCM* means Refco Capital Markets, Ltd.

**1.149    *RCM Administrative/Priority Claims Reserve*** means the Reserve account(s) to be established and maintained by the RCM Trustee, on behalf of Post-Confirmation RCM, to fund the Distribution to Holders of Administrative and Priority Claims against RCM.

**1.150    *RCM Administrative Professional*** means any professional employed in the RCM Chapter 11 Case pursuant to sections 327, 328, or 1103 of the Bankruptcy Code or otherwise.

**1.151    *RCM Advance*** means a post-petition advance, if any, by RCM to or for the benefit of one or more of the Contributing Debtors in the amount of up to $115 million.

**1.152    *RCM BAWAG Proceeds*** means (i) $200,000,000.00 of the BAWAG Guaranteed Proceeds (whether directly allocated to RCM or recovered by RCM on account of its RCM Intercompany Claim), and (ii) a portion of the BAWAG Contingent Proceeds allocable to payment of the RCM Cash Distribution from the Contributing Debtors Distributive Assets, which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for the releases required by the BAWAG Settlement, Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims.

**1.153    *RCM Cash Distribution*** means the sum of (i) $460 million of Cash (inclusive of RCM BAWAG Proceeds) payable from Contributing Debtor Distributive Assets, which amount shall be adjusted upwards or downwards, by an amount equal to the Specified Difference plus (ii) payment to RCM of any amounts available from the Contributing Debtors General Unsecured Distribution, to the extent that such amounts are not paid to Holders of Allowed Contributing Debtors General Unsecured Claims as a result of recoveries for Holders of Allowed Contributing Debtors General Unsecured Claims (from Contributing Debtors Distributive Assets and the RGL FXCM Distribution) having reached 40%; *provided, however*, such Distribution shall be subject to the Administrative Claims Adjustment.

**1.154    *RCM Difference*** means the amount by which the Allowed amount of any RCM FX/Unsecured Claim filed by Cargill is reduced by allowance of the Cargill Administrative Claim.

**1.155    *RCM Claims Distribution Account*** means the account established and maintained by the Post-Confirmation RCM from which Distributions to Holders of Allowed Claims against RCM shall be made and from which reserves on behalf of RCM will be funded.

**1.156    *RCM Distribution Reserve*** means the reserve established by the Plan Administrator or RCM, as the case may be, to hold that portion of the RCM Cash Distribution and that portion of the RGL FXCM Distribution applicable to Holders of a right to demand an applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, but who have not tendered an RCM Related Claim Subordination Form.

**1.157    *RCM Excess Priority Claims*** means that portion of Excess Priority Claims that are to be borne by RCM pursuant to section 5.16 of this Plan.

**1.158    *RCM FX/Unsecured Claims*** has the meaning given to the term "FX/Unsecured Claim" in the RCM Settlement Agreement.

**1.159    *RCM FX/Unsecured Claims Distribution*** means the Distribution for Holders of RCM FX/Unsecured Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM FX/ Unsecured Convenience Claims.

**1.160    *RCM FX/Unsecured Convenience Claims*** means any RCM FX/Unsecured Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM FX/Unsecured Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM FX/ Unsecured Convenience Claims shall be limited to $1.458 million. To the extent that the amount of RCM FX/Unsecured Claims reducing and electing treatment of such Claims as RCM FX/Unsecured Convenience Claims exceeds $1.458 million, the

Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $1.458 million cap is reached.

1.161    ***RCM Implied Deficiency Claim*** has the meaning given to the term "Implied Deficiency Claim" in §8(b) of the RCM Settlement Agreement.

1.162    ***RCM Intercompany Claims*** means Claims of RCM against one or more of the Debtors. Unless and until Allowed in a definitive amount, for purposes of calculations herein, the RCM Intercompany Claims shall be deemed to be in an amount that is no less than the amount necessary to cause all Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims to receive payment in full.

1.163    ***RCM Intercompany Claim Distribution*** means the sum of (i) the RCM Rights Distribution, (ii) the Additional RCM Claim, (iii) 50% of the RGL FXCM Distribution, (iv) the RCM BAWAG Proceeds and (v) the allocable share of the Tranche A Litigation Trust Interests set forth in section 5.7 of this Plan.

1.164    ***RCM Leuthold Metals Claim*** has the meaning given to the term "Leuthold Metals Claim" in the RCM Settlement Agreement.

1.165    ***RCM Leuthold Metals Claim Distribution*** means the Distribution for Holders of RCM Leuthold Metals Claims set forth in the RCM Settlement Agreement.

1.166    ***RCM Projection*** means a projection of the Cash or value to be available from the MAC RCM Assets for Distribution in respect of the RCM Cash Distribution and the Additional RCM Claim.

1.167    ***RCM Related Claims*** means any Claim or cause of action of any Holder of an Impaired Claim against the Debtors and Non-Debtor Affiliates arising from the same facts, transactions or occurrences giving rise to such Holder's Impaired Claim against RCM; *provided, however*, that the term RCM Related Claim shall not include any Claim of a Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim against any Contributing Debtor or FXA based on contractual guarantees or other direct contractual undertakings.

1.168    ***RCM Related Claim Subordination Form*** means, in respect of a Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim, either (i) a ballot cast by such Holder in respect of the Plan whereby the Holder has elected (by means of not affirmatively opting out of such election) to (A) assign such Holder's RCM Related Claims against the Debtors, if any, to the Litigation Trust; (B) affirming its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate will be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing claims against and equity interests in the applicable Contributing Non-Debtor Affiliate (and that such RCM Related Claim may be deemed released upon the determination of the RCM Trustee, with the consent of the Plan Committee, in accordance with section 10.2(c) of the Plan); (C) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any; and (D) receive such Holder's applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution or (ii) any agreement, in a form satisfactory to the Plan Administrator, by which such Holder agrees to do the forgoing. For the avoidance of doubt, any ballot properly cast by the Voting Deadline and satisfying the conditions above shall be deemed to have been "provided" to the RCM Trustee and the Plan Administrator for purposes of section 6.6(c) of this Plan.

1.169    ***RCM Reserves*** means (A) the RCM Disputed Claims Reserve, (B) the RCM Administrative/Priority Reserve, (C) the RCM Wind-Down Reserve, (D) the RCM Unclaimed Distribution Reserve, and (E) any other reserves required to be established by the RCM Trustee under the RCM Settlement Agreement.

1.170    ***RCM Rights Distribution*** means the transfer to the RCM Trustee, as part of the RCM Intercompany Claims Distribution, of rights which will allow each Holder of an Allowed RCM Securities

Customers Claim on account of its RCM Implied Deficiency Claim and each Holder of an Allowed RCM FX/Unsecured Claim to make a demand for payment from the Plan Administrator or RCM, as the case may be, for such Holder's Pro-Rata share of the RCM Distribution Reserve to the extent that such Holder satisfies the conditions set forth in section 6.6(c) of this Plan.

**1.171    *RCM Securities Customer Claims*** has the meaning given to the term "Securities Customer Claims" in the RCM Settlement Agreement.

**1.172    *RCM Securities Customer Convenience Claims*** means any RCM Securities Customer Claim equal to or less than $10,000 or greater than $10,000 but, with respect to which, the Holder thereof voluntarily reduces the RCM Securities Customer Claim to $10,000 on the applicable Ballot; *provided, however*, that for purposes of the Plan and the Distributions to be made hereunder, the aggregate amount of Distributions to RCM Securities Customer Convenience Claims shall be limited to $0.333 million.  To the extent that the amount of RCM Securities Customer Convenience Claims reducing and electing treatment of such Claims as RCM Securities Customer Convenience Claims exceeds $0.333 million, the Claims permitted to elect such treatment shall be determined by reference to the amount of the Claim, with the Claim in the lowest amount being selected first and the next largest Claims being selected thereafter until the $0.333 million cap is reached.

**1.173    *RCM Securities Customer Claims Distribution*** means the Distribution for Holders of RCM Securities Customer Claims set forth in the RCM Settlement Agreement less any amounts paid to the Holders of Allowed RCM Securities Customer Convenience Claims.

**1.174    *RCM Settlement Agreement*** means, collectively, (i) the settlement agreement dated as of June 29, 2006 by and among the RCM Trustee and certain creditors of RCM and (ii) the Joinder Agreement dated as of July 20, 2006 between the RCM Trustee and the Rogers Funds, in each case as amended (copies of which are attached hereto as Exhibit B).

**1.175    *RCM Substantial Contribution Fees*** means the approximate amount of $4.3 million constituting the substantial contribution Claim of the MCG Members and the Joinder Parties under sections 503(b)(3)(d), 507(a)(2) and 752(a) of the Bankruptcy Code as set forth in the RCM Settlement Agreement.

**1.176    *RCM Trustee*** means Marc S. Kirschner, the chapter 11 trustee appointed in the RCM Chapter 11 Case in connection with the March 22, 2006 order issued by the Bankruptcy Court authorizing appointment of one disinterested person as Chapter 11 trustee for the Estate of RCM.  The term includes any successor chapter 11 trustee or, if the RCM Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7 of the Bankruptcy Code, the chapter 7 trustee.

**1.177    *RCM Unclaimed Distribution Reserve*** means the reserve or reserves established in respect of unclaimed Distributions for RCM pursuant to Article VI of the Plan.

**1.178    *RCM Wind-Down Reserve*** means a reserve, if determined necessary by the RCM Trustee, of up to $15 million from the Cash or value available for the RCM Cash Distribution, with the amount of such RCM Wind-Down Reserve to be subject to downward adjustment from time to time by the RCM Trustee, to the extent the RCM Trustee determines that RCM's wind-down expenses after the Effective Date will be less than $15 million.

**1.179    *Reinstated*** means (a) leaving unaltered the legal, equitable, and contractual rights to which a Claim entitles the Holder of such Claim so as to leave such Claim Unimpaired in accordance with section 1124 of the Bankruptcy Code or (b) notwithstanding any contractual provision or applicable law that entitles the Holder of such Claim to demand or receive accelerated payment of such Claim after the occurrence of a default, (i) curing any such default that occurred before or after the Petition Date, other than a default of a kind specified in section 365(b)(2) of the Bankruptcy Code, (ii) reinstating the maturity of such Claim as such maturity existed before such default, and (iii) not otherwise altering the legal, equitable, or contractual rights to which such Claim entitles the Holder of such Claim.

1.180    ***Refco Entities*** means the Debtors, RCM and the Non-Debtor Affiliates.

1.181    ***Related Claims*** means any RCM Related Claim or Other Related Claim.

1.182    ***Released/Subordinated Claims*** means the claims or causes of actions described in sections 10.2(a), (b) and (c) of the Plan or claims or causes of action that have been otherwise released or waived pursuant to an order of the Bankruptcy Court (including, without limitation, the Early Payment Order).

1.183    ***Released Parties*** means, acting in such capacity, (i) the Post-Petition Management, (ii) the Secured Lender Releasees, (iii) the Senior Subordinated Note Indenture Trustee, its directors, officers, and employees (all in such capacity) and (iv) present and former holders of the Senior Subordinated Notes in their capacity as Holders of the Senior Subordinated Notes.

1.184    ***Reorganized Debtors*** means Reorganized Refco and Reorganized FXA.

1.185    ***Reorganized FXA*** means FXA on and after the Effective Date.

1.186    ***Reorganized Refco*** means Refco Inc. on and after the Effective Date.

1.187    ***Reserves*** means, collectively, the Disputed Claims Reserve, Unclaimed Distribution Reserve, Administrative/Priority Claims Reserve and the RCM Reserves (if held by the Plan Administrator, rather than the RCM Trustee) and the Wind-Down Reserve.

1.188    ***Restated Corporate Governance Documents*** means the restated corporate governance documents of the Reorganized Debtors in substantially the form attached to this Plan as Exhibit C.

1.189    ***Retained Causes of Action*** means the claims and causes of action of the Debtors and RCM retained as set forth in section 5.10(a) of this Plan and of which a non-exclusive list is set forth on Exhibit K attached hereto.

1.190    ***RGL*** means Refco Group Limited LLC.

1.191    ***RGL FXCM Distribution*** means RGL's 35% interest in FXCM, which for purposes of the cap on Distributions to Holders of Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets and the RGL FXCM Distribution shall have a value equal to (i) if liquidated prior to the Effective Date, the value obtained through liquidation and (ii) if not liquidated prior to the Effective Date, a deemed value of $90 million.

1.192    ***Rogers Funds*** means Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund, L.P.

1.193    ***Scheduled*** means, with respect to any Claim, the status, priority, and amount, if any, of such Claim as set forth in the Schedules.

1.194    ***Schedules*** means the schedules of assets and liabilities, the list of Holders of Interests, and the statements of financial affairs filed by the Debtors or RCM pursuant to section 521 of the Bankruptcy Code and Bankruptcy Rules, as such schedules have been or may be further modified, amended, or supplemented in accordance with Bankruptcy Rule 1009 or orders of the Bankruptcy Court.

1.195    ***Secured Lender(s)*** has the meaning assigned to the term "Lender(s)" in the Early Payment Order.

1.196    ***Secured Lender Agent*** has the meaning assigned to the term "Agent" in the Early Payment Order.

**1.197** *Secured Lender BAWAG Proceeds* means $100 million of the BAWAG Guaranteed Proceeds, which proceeds, pursuant to section 5.18 hereof, shall be deemed exclusively offered to pay and accepted by the Holders of Allowed Secured Lender Claims.

**1.198** *Secured Lender Claims* has the meaning assigned to the term "Secured Claim" in the Early Payment Order.

**1.199** *Secured Lender Indemnification Claims* means any and all Estimated Unsatisfied Credit Agreement Claims and all other claims of the Secured Lender Agent and/or the Secured Lenders of the type specified in paragraph 9(b) of the Early Payment Order.

**1.200** *Secured Lender Payment Date* has the meaning assigned to the term "Payment Date" in the Early Payment Order.

**1.201** *Secured Lender Released Claims* means any and all actual or potential demands, claims, causes of action (including, without limitation, derivative causes of action), suits, assessments, liabilities, losses, costs, damages, penalties, fees, charges, expenses and all other forms of liability whatsoever, in law or equity (including, without limitation, actions seeking to recharacterize, avoid, subordinate, set aside or disallow the liens or claims of any Secured Lender Releasee, or seeking turnover of property, damages or any other affirmative recovery from any Secured Lender Releasee, including, without limitation, any claim for contribution), whether asserted or unasserted, known or unknown, foreseen or unforeseen, pending or anticipated, arising under the Bankruptcy Code or under otherwise applicable law, that any Person ever had, now has or hereafter may have (whether by assignment or otherwise) based in whole or in part upon any act or failure to act by any of the Secured Lender Releasees, on or prior to the Secured Lender Payment Date, in contemplation of the execution of the Loan Documents, in connection with the execution of the Loan Documents or the making or repayment of the Loans, or in connection with any transactions directly or indirectly related or connected in any way to the Loan Documents, the Secured Lender's Collateral, the use of proceeds of Loans made under the Loan Documents, or any other transactions related to or in connection with any of the foregoing.

**1.202** *Secured Lender Releasee* has the meaning assigned to the term "Lender Releasee" in the Early Payment Order.

**1.203** *Secured Lender's Collateral* has the meaning assigned to the term "Collateral" in the Early Payment Order.

**1.204** *Securities Class Action Stipulation* means that certain Stipulation and Agreement of Settlement entered into on September 7, 2006 between BAWAG and the lead plaintiffs in the securities class action entitled *In re Refco Inc. Securities Litigation*, Case No. 05 Civ. 8626 (GEL), filed in the United States District Court for the Southern District of New York, or any future settlement between the parties as contemplated therein.

**1.205** *Senior Subordinated Note Allocation* means an allocation of the Senior Subordinated Note Holder Fee Distribution on account of the Senior Subordinated Note Indenture Trustee Fees and Senior Subordinated Note Holder Ad Hoc Committee Fees and Expenses, which allocation shall be agreed upon between the Senior Subordinated Note Indenture Trustee and the Senior Subordinated Note Ad Hoc Committee. Any amount of Senior Subordinated Note Indenture Trustee Fees not paid on account of such allocation may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

**1.206** *Senior Subordinated Note Claims* means all Claims of any kind arising from or related to the Senior Subordinated Notes, and including, without limitation, any Claims arising from any guarantees under the Senior Subordinated Note Indenture, which Claims shall be Allowed Claims in the amount of $397,413,324.50.

**1.207** *Senior Subordinated Note Holder Ad Hoc Committee Fees and Expenses* means fees and expenses of counsel to the ad hoc committee of Holders of Senior Subordinated Notes subject to application pursuant to section 503(b) of the Bankruptcy Code, to which the parties to the Plan Support Agreement, other than

the Debtors may not object and (ii) the Debtors, in the event that they do object to such application, may object solely with respect to the reasonableness, compensability and allocation of the fees and expenses incurred.

**1.208** *Senior Subordinated Note Holder BAWAG Proceeds* means $150,000,000 of the BAWAG Guaranteed Proceeds plus all BAWAG Contingent Proceeds (if any), which proceeds, pursuant to section 5.18 hereof, shall be deemed to be exclusively offered to pay, in exchange for releases required in the BAWAG Settlement, Holders of Allowed Senior Subordinated Note Claims.

**1.209** *Senior Subordinated Note Holder Distribution* means $331,522,195.30, which, pursuant to the compromises and settlements contained in this Plan document, constitutes 83.42% of the outstanding balance of principal and prepetition interest of the Senior Subordinated Note Claims. Such Distribution shall be paid to the Senior Subordinated Note Indenture Trustee on the Effective Date to the extent of available Cash after taking into account the funding of the Administrative/Priority Claims Reserve, with any balance paid from time to time to the Senior Subordinate Note Indenture Trustee from available Cash with interest accruing, beginning January 1, 2007, on the unpaid balance at the same rate of interest that Refco LLC earns on its invested Cash and cash equivalents, payable from the Senior Subordinated Note Holder BAWAG Proceeds and, to the extent of any deficiencies, the Contributing Debtors Distributive Assets.

**1.210** *Senior Subordinated Note Holder Fee Distribution* means an amount up to $6.0 million of the (i) Senior Subordinated Note Indenture Trustee Fees, and (ii) the Allowed Senior Subordinated Note Ad Hoc Committee Fees and Expenses. Such Distribution shall be paid on the Effective Date from the Contributing Debtors Distributive Assets to the Senior Subordinated Note Indenture Trustee and counsel to the Senior Subordinated Note ad hoc committee, subject to the Senior Subordinated Note Allocation. For the avoidance of doubt, any portion of the Senior Subordinated Note Indenture Trustee Fees not paid by the Senior Subordinated Note Holder Fee Distribution may be satisfied pursuant to the Senior Subordinated Note Indenture Trustee Charging Lien.

**1.211** *Senior Subordinated Note Indenture* means the indenture dated as of August 5, 2004, among Refco Finance Holdings LLC (now known as Refco Group Ltd., LLC) and Refco Finance Inc., as issuers, and Wells Fargo Bank, National Association, as indenture trustee, relating to the Senior Subordinated Notes, as it may be amended, supplemented, or modified from time to time.

**1.212** *Senior Subordinated Note Indenture Trustee* means Wells Fargo Bank, National Association, the indenture trustee under the Senior Subordinated Note Indenture, or any successor thereto.

**1.213** *Senior Subordinated Note Indenture Trustee Charging Lien* means any Lien or other priority in payment or right available to the Senior Subordinated Note Indenture Trustee pursuant to the Senior Subordinated Note Indenture or otherwise available to the Senior Subordinate Note Indenture Trustee under applicable law, for the payment of Senior Subordinated Note Indenture Trustee Fees.

**1.214** *Senior Subordinated Note Indenture Trustee Fees* means the fees, costs, expenses and indemnity claims of the Senior Subordinated Note Indenture Trustee and the fees and expenses of its counsel and financial advisor.

**1.215** *Senior Subordinated Notes* means the 9% Senior Subordinated Notes due 2012 issued by RGL and Refco Finance Inc. under the Senior Subordinated Note Indenture and guaranteed by certain of the Debtors.

**1.216** *Specified Difference* means 50% of the difference (positive or negative) between the value of the Adjusted Contributing Debtors Distributive Assets and $554 million (in making such calculation the Adjusted Contributing Debtors Distributive Assets shall not be subject to the Administrative Claims Adjustment); *provided, however*, that once the portion of the Contributing Debtors General Unsecured Distribution has reached 40% exclusive of the value of the Tranche A Litigation Trust Interests, 100% of the remainder of the positive difference shall be added to the RCM Cash Distribution. For the avoidance of doubt, any BAWAG Proceeds received pursuant to the BAWAG Settlement, even if returned to BAWAG pursuant to the terms of this Plan and the BAWAG Settlement, shall be included in the calculation of Adjusted Contributing Debtors Distributive Assets.

1.217    ***Subordinated Claim*** means any Claim which (i) is subordinated pursuant to section 510(c) of the Bankruptcy Code, (ii) arising from recision of a purchase or sale of a debt security of the Debtors, for damages arising from the purchase or sale of such debt security, or any Claim for reimbursement, contribution, or indemnification arising from or relating to any such Claims, or (iii) is a Claim for a fine, penalty, forfeiture, multiple, exemplary or punitive damages, or otherwise not predicated upon compensatory damages, and that would be subordinated in a chapter 7 case pursuant to section 726(a)(4) of the Bankruptcy Code or otherwise.

1.218    ***Subsidiary Claims and Interests*** means Claim against or an Interest in any of the Refco Entities held by any other Refco Entity other than the RCM Intercompany Claims.

1.219    ***Tranche A Litigation Trust Interests*** means the Litigation Trust Interests distributed to (i) the RCM Estate, (ii) Holders of Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lender Claims or, the Senior Subordinated Note Claims) and (iii) the Holders of FXA General Unsecured Claims (which for the sake of clarity, shall not include FXA Convenience Class Claims, RCM Securities Customer Convenience Claims and RCM FX/General Unsecured Convenience Claims).

1.220    ***Tranche B Litigation Trust Common Interests*** means the Litigation Trust Interests distributed to the Old Equity Interests.

1.221    ***Tranche B Litigation Trust Preferred Interests*** means the Litigation Trust Interests distributed to the Holders of Subordinated Claims.

1.222    ***Unclaimed Distribution Reserve*** means the reserve or reserves established in respect of unclaimed Distributions for FXA and the Contributing Debtors pursuant to Article VI of the Plan.

1.223    ***Unclassified Claims*** means Administrative Claims and Priority Tax Claims

1.224    ***Unimpaired*** means a Claim or Interest that is not impaired within the meaning of section 1124 of the Bankruptcy Code.

1.225    ***Voting Deadline*** means [●], 2006 at [●] p.m. (prevailing Eastern Time).

1.226    ***Voting Record Date*** means [●].

1.227    ***VR*** means, collectively, VR Global Partners, L.P. and its affiliates.

1.228    ***VR/Leuthold Guarantee Claims*** means the Claims against RGL arising from (i) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Capital Group Ltd., (ii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Argentina Recovery Fund, Ltd., (iii) that certain guarantee agreement, dated July 11, 2003 between Refco Group Ltd., LLC and VR Global Partners, L.P., and (iv) that certain guarantee agreement, dated September 1, 2005 between Refco Group Ltd., LLC and Leuthold Funds, Inc. and (v) any other documents, agreements or transactions in any way related to (i) through (iv) above.

1.229    ***Wind-Down Reserves*** means the reserve accounts to be established and maintained by the Plan Administrator, on behalf of the Reorganized Debtors, to fund the administration of this Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals.

*Rules Of Interpretation And Computation Of Time*.  For purposes of this Plan, unless otherwise provided herein: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural; (b) unless otherwise provided in this Plan, any reference in this Plan to a contract, instrument, release, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) any reference in this Plan to an existing document or schedule filed or to be filed means such

document or schedule, as it may have been or may be amended, modified, or supplemented pursuant to this Plan; (d) any reference to an entity as a Holder of a Claim or Interest includes that entity's successors and assigns; (e) all references in this Plan to sections and articles are references to sections and articles of or to this Plan; (f) the words "herein," "hereunder," and "hereto" refer to this Plan in its entirety rather than to a particular portion of this Plan; (g) captions and headings to articles and sections are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Plan; (h) subject to the provisions of any contract, certificates of incorporation, by-laws, instrument, release, or other agreement or document entered into in connection with this Plan, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (j) in computing any period of time prescribed or allowed by this Plan, the provisions of Bankruptcy Rule 9006(a) shall apply; (k) "including" means "including without limitation;" and (l) with reference to any Distribution under this Plan, "on" a date means on or as soon as reasonably practicable after that date.

*Exhibits.* All Exhibits to the Plan are incorporated into and are a part of this Plan as if set forth in full herein, and, to the extent not annexed hereto, such Exhibits shall be filed with the Bankruptcy Court on or before the Exhibit Filing Date. After the Exhibit Filing Date, copies of Exhibits can be obtained upon written request to Skadden, Arps, Slate, Meagher & Flom LLP, Four Times Square, New York, New York, 10036-6522 (Attn. David R. Hurst, Esq.), counsel to the Debtors or by downloading such Exhibits from the Bankruptcy Court's website at http://www.nysb.uscourts.gov (registration required), the Refco website at http://www.refcoinc.com or http://www.refcodocket.com. To the extent any Exhibit is inconsistent with the terms of this Plan, unless otherwise ordered by the Bankruptcy Court, the non-Exhibit portion of this Plan shall control; *provided, however,* in all relevant cases, to the extent this Plan is inconsistent with the RCM Settlement Agreement, the RCM Settlement Agreement shall control.

# ARTICLE II

# CLASSIFICATION OF CLAIMS AND INTERESTS

## 2.1    *Introduction*.

Pursuant to section 1122 of the Bankruptcy Code, set forth below is a designation of Classes of Claims against and Interests in the Debtors and RCM. In accordance with section 1123(a)(1) of the Bankruptcy Code, Administrative Claims and Priority Tax Claims, as described below, have not been classified and are not entitled to vote on the Plan. A Claim or Interest is placed in a particular Class only to the extent that the Claim or Interest falls within the description of that Class and is classified in other Classes to the extent that any portion of the Claim or Interest falls within the description of such other Classes. A Claim or Interest is also placed in a particular Class for the purpose of receiving Distributions pursuant to the Plan only to the extent that such Claim or Interest is an Allowed Claim in that Class and such Claim or Interest has not been paid, released, or otherwise settled prior to the Effective Date.

This Plan is premised on a consensual pooling of assets and liabilities by the Contributing Debtors solely to implement the settlements and compromises reached by the primary constituencies in the Chapter 11 Cases, including the Debtors, the RCM Trustee, the Committees, the Secured Lenders and certain of the Holders of Senior Subordinated Notes. If for any reason the Bankruptcy Court determines that such compromises and settlements, as embodied herein, should not be implemented as set forth herein, the Plan Proponents may elect to seek confirmation of the Plan on the basis of complete or partial substantive consolidation or on a Debtor by Debtor basis identifying sub-Classes of each of the listed Classes of Claims of the Contributing Debtors for each Contributing Debtor.

**The provisions set forth below also describe the classification of RCM Claims and Interests, but the provisions applicable to the RCM Claims and Interests are qualified in their entirety by reference to the RCM Settlement Agreement with respect to the Claims against RCM. To the extent that the summary below conflicts with the provisions of the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code shall govern. This Plan**

contemplates that on or prior to the Effective Date, the RCM Chapter 11 Case shall, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code. Any conversion of the RCM chapter 11 case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases. Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of Claims between the Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan.

The provisions set forth below also describe the classification of Secured Lender Claims, but the provisions applicable to the Secured Lender Claims are qualified in their entirety by reference to the Early Payment Order.

**2.2**    *Classification of Claims and Interests of the Contributing Debtors*.

(a)    *Unclassified Claims – Contributing Debtors* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b)    *Unimpaired Classes of Claims – Contributing Debtors* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

Class 3 - Secured Lender Claims.

(c)    *Impaired Classes of Claims – Contributing Debtors* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, is not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - General Unsecured Claims.

Class 5(b) - Related Claims

Class 6 - RCM Intercompany Claims.

Class 7 - Subordinated Claims.

Each of Classes 4 and 5 shall contain sub-Classes corresponding to each of the Contributing Debtors. A schedule of such sub-Classes is attached hereto as Schedule 2.2(c).

(d)    *Impaired Classes of Interests – Contributing Debtors* (deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 8 - Old Equity Interests.

**2.3** **Classification of Claims of FXA**.

(a) *Unclassified Claims – FXA* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b) *Unimpaired Classes of Claims – FXA* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - FXA Non-Tax Priority Claims.

Class 2 - FXA Other Secured Claims.

Class 3 - Secured Lender Claims.

(c) *Impaired Classes of Claims – FXA* (Classes 4, 5 and 6 are entitled to vote on the Plan; Class 7 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 4 - Senior Subordinated Note Claims.

Class 5(a) - FXA General Unsecured Claims.

Class 5(b) - Related Claims.

Class 6 - FXA Convenience Claims.

Class 7 - FXA Subordinated Claims.

**2.4** **Classification of Claims of RCM**.

(a) *Unclassified Claims – RCM* (not entitled to vote on the Plan).

Administrative Claims.

Priority Tax Claims.

(b) *Unimpaired Classes of Claims – RCM* (deemed to have accepted the Plan and, therefore, not entitled to vote on the Plan).

Class 1 - Non-Tax Priority Claims.

Class 2 - Other Secured Claims.

(c) *Impaired Classes of Claims – RCM* (Classes 3, 4, 5, 6, 7 and 8 are entitled to vote on the Plan; Class 9 shall be deemed to have rejected the Plan and, therefore, not entitled to vote on the Plan).

Class 3 - RCM FX/Unsecured Claims.

Class 4 - RCM Securities Customer Claims.

Class 5 - RCM Leuthold Metals Claims.

Class 6 - RCM FX/Unsecured Convenience Claims.

Class 7 - RCM Securities Customer Convenience Claims.

Class 8 - Related Claims.

Class 9 - RCM Subordinated Claims.

# ARTICLE III

## TREATMENT OF CLAIMS AND INTERESTS

3.1     *Treatment of Claims and Interests of the Contributing Debtors*.

(a)     *Unclassified Claims – Contributing Debtors*

(i)     *Administrative Claims*.  On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim against the Contributing Debtors, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by a Contributing Debtor in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the Contributing Debtors or the Plan Administrator.  Subsection (b) of the second sentence in this section 3.1(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)     *Priority Tax Claims*. On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the Contributing Debtors, each Holder of an Allowed Priority Tax Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim against the Contributing Debtors, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which the Contributing Debtors and the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)     *Unimpaired Classes of Claims – Contributing Debtors*.

(i)     *Class 1 - Non-Tax Priority Claims.*  On (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim against the Contributing Debtors, each Holder of an Allowed Class 1 Non-Tax Priority Claim shall receive, in full and final satisfaction, release, and

discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)     *Class 2 - Other Secured Claims.*  On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against the Contributing Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii)     *Class 3 - Secured Lender Claims.*  The Secured Lender Claims against the Contributing Debtors shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims, to the extent not paid in cash prior to the Effective Date or estimated at zero pursuant to the Early Payment Order, shall be paid the full amount set forth in and required to be paid by the Early Payment Order.  In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c)     *Impaired Classes of Claims – Contributing Debtors.*

(i)     *Class 4 - Senior Subordinated Note Claims.*  On the Effective Date, each Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors shall receive, to the extent not previously paid, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Senior Subordinated Note Claim and any and all Claims against the Refco Entities, its Pro Rata share of the Senior Subordinated Note Holder Distribution (subject to the Senior Subordinated Note Indenture Trustee Charging Lien); and the Debtors shall pay the Senior Subordinated Note Holder Fee Distribution; *provided, however*, to the extent that a Holder of an Allowed Class 4 Senior Subordinated Note Claim against the Contributing Debtors elects to not receive the Senior Subordinated Note Holder BAWAG Proceeds, such Holder's Distribution shall consist of its Pro Rata share of the Senior Subordinated Note Holder Distribution less such Holder's portion of the Senior Subordinated Note Holder BAWAG Proceeds.

(ii)     *Class 5(a) - Contributing Debtors General Unsecured Claims.*  Subject to section 6.4 of this Plan, on the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), each Holder of an Allowed Class 5(a) Contributing Debtors General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Contributing Debtors General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of  the Contributing Debtors General Unsecured Distribution; *provided, however*, to the extent that a Holder of an Allowed Class 5(a) General Unsecured Claim against the Contributing Debtors elects to not receive the Contributing Debtors General Unsecured BAWAG Proceeds, if any, such Holder's Distribution shall consist of its Pro Rata share of the Contributing Debtors General Unsecured Distribution less such Holder's portion of the Contributing Debtors General Unsecured BAWAG Proceeds.

(iii)     *Class 5(b) - Related Claims.*  On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against any Contributing Debtor shall be subordinated and shall receive no Distribution from the Contributing Debtors Distributive

Assets unless and until such time as all Holders of Allowed Contributing Debtors General Unsecured Claims and Allowed RCM Intercompany Claims have been paid in full; *provided, however*, that any Holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

     (iv) *Class 6 - RCM Intercompany Claims*. On the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), the RCM Trustee, on behalf of RCM, shall receive the RCM Intercompany Claim Distribution.

     (v) *Class 7 - Subordinated Claims.* On the Effective Date (but in no case prior to payment in full of the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution), each Holder of an Allowed Class 7 Subordinated Claim against the Contributing Debtors shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 7 Subordinated Claim, its Pro Rata share of the Tranche B Litigation Trust Preferred Interests as more particularly set forth below in section 5.7(c) of this Plan.

   (d) *Impaired Classes of Interests – Contributing Debtors.*

     (i) *Class 8 - Old Equity Interests*. On the Effective Date, each Holder of an Allowed Class 8 Old Equity Interest shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Old Equity Interest, the greater of (a) a Pro Rata share of 10% of the IPO Underwriter Claims Recovery or (b) a Pro Rata share of Tranche B Litigation Trust Common Interests as more particularly set forth in section 5.7(c) of the Plan; *provided, however*, that the Contributing Debtors and all parties in interest reserve the right to assert that the Interests of insider Refco Inc. shareholders' should not be entitled to any Distribution under the Plan.

  **3.2**  ***Treatment of Claims of FXA***.

   (a) *Unclassified Claims – FXA.*

     (i) *Administrative Claims*. On the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Allowed Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Administrative Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Administrative Claim, Cash equal to the unpaid portion of such Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan. Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by FXA in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and FXA or the Plan Administrator. Subsection (b) of the second sentence in this section 3.2(a)(i) of the Plan shall not be construed to avoid the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

     (ii) *Priority Tax Claims*. On the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of FXA, each Holder of an Allowed Priority Tax Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in

accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such other treatment as to which FXA or the Plan Administrator and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b) *Unimpaired Classes of Claims – FXA.*

(i) *Class 1 - FXA Non-Tax Priority Claims.* On (a) the Effective Date if such Non-Tax Priority Claim against FXA is an Allowed Non-Tax Priority Claim on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against FXA shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Class 1 FXA Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Class 1 FXA Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii) *Class 2 - FXA Other Secured Claims.* On the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against FXA shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 2 Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Class 2 Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Class 2 Other Secured Claim to the extent of the lesser of the amount of such Allowed Other Secured Claim and the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Class 2 Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(iii) *Class 3 - FXA Secured Lender Claims.* The Secured Lender Claims against FXA shall be allowed to the extent provided in the Early Payment Order, the terms and conditions of which are incorporated by reference herein, and such Allowed Secured Lender Claims against FXA, to the extent not paid in Cash prior to the Effective Date or estimated at zero pursuant to the Early Payment Order, shall be paid the full amount set forth in and required to be paid by the Early Payment Order. In addition, the Secured Lenders shall have the benefit of the releases to the full extent contemplated by paragraph 8 of the Early Payment Order and section 10.2 of the Plan.

(c) *Impaired Classes of Claims – FXA.*

(i) *Class 4 - FXA Senior Subordinated Note Claims.* On the Effective Date, based on the agreements and settlement set forth in this Plan, each Holder of an Allowed Class 4 FXA Senior Subordinated Note Claim shall waive its share of the FXA General Unsecured Claims Distribution in return for the releases set forth in sections 10.2(a) and (b) of the Plan.

(ii) *Class 5(a) - FXA General Unsecured Claims.* On the Effective Date, each Holder of an Allowed Class 5(a) FXA General Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 5(a) FXA General Unsecured Claim and any and all Other Related Claims, its Pro Rata share of the FXA General Unsecured Claim Distribution.

(iii) *Class 5(b) –Related Claims.* On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 5(b) Related Claim against FXA shall be subordinated

and shall receive no Distribution from the FXA Distributive Assets unless and until such time as all Holders of Allowed FXA General Unsecured Claims have been paid in full; *provided*, *however*, that any holder of an RCM Related Claim that provides an RCM Related Claim Subordination Form in accordance with section 6.6(c) of this Plan shall, on account of its RCM Securities Customer Claim or RCM FX/Unsecured Claim (if Allowed), receive its applicable share of the RCM Distribution Reserve as more fully set forth in section 6.6(c) hereof.

(iv)     *Class 6 - FXA Convenience Claims.*  On the Effective Date, each Holder of an Allowed Class 6 FXA Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 FXA Convenience Claim, Cash equal to 40% of its Allowed Class 6 FXA Convenience Claim.  Holders of Allowed Class 6 FXA Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v)     *Class 7 - FXA Subordinated Claims.*  No Holder of a Class 7 Subordinated Claim against FXA shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 7 Subordinated Claim.

3.3     *Treatment of Claims of RCM.*

**The following section is a summary of the treatment of RCM Claims set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.  This Plan summary of the treatment of RCM Claims is qualified in its entirety by reference to the RCM Settlement Agreement.  To the extent that the summary treatment below conflicts with the treatment afforded in the RCM Settlement Agreement, the terms and conditions set forth in the RCM Settlement Agreement shall govern the treatment of RCM Claims.**

(a)     *Unclassified Claims – RCM.*

(i)     *Administrative Claim.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date, (b) the date on which its Administrative Claim becomes Allowed, or (c) the date on which its Administrative Claim becomes payable under any agreement relating thereto, each Holder of an Allowed Administrative Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Administrative Claim, Cash equal to the unpaid portion of such Allowed Administrative Claim in accordance with the allocation set forth in section 5.16 of the Plan.  Notwithstanding the foregoing, (a) any Administrative Claim based on a liability incurred by RCM in the ordinary course of business during the Chapter 11 Cases may be paid in the ordinary course of business in accordance with the terms and conditions of any agreement relating thereto and (b) any Administrative Claim may be paid on such other terms as may be agreed on between the Holder of such Claim and the RCM Trustee.  Subsection (b) of the second sentence in this section 3.3(a)(i) of the Plan shall not be construed to avoid relieving the need for Court approval of an Administrative Claim when such Court approval is otherwise required by the Bankruptcy Code.

(ii)     *Priority Tax Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the later of (a) the Effective Date or (b) the date on which its Priority Tax Claim becomes an Allowed Priority Tax Claim, in the sole discretion of the RCM Trustee, each Holder of an Allowed Priority Tax Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Priority Tax Claim, (i) Cash equal to the unpaid portion of such Allowed Priority Tax Claim in accordance with the allocation set forth in section 5.16 of the Plan, (ii) treatment in any other manner such that its Allowed Priority Tax Claims shall not be impaired pursuant to section 1124 of the Bankruptcy Code, including payment in accordance with the provisions of section 1129(a)(9)(C) of the Bankruptcy Code, or (iii) such

other treatment as to which the RCM Trustee and such Holder shall have agreed upon in writing. Clause (iii) of the preceding sentence shall not be construed to avoid the need for Bankruptcy Court approval of a Priority Tax Claim when such Bankruptcy Court approval is otherwise required by the Bankruptcy Code.

(b)     *Unimpaired Classes of Claims – RCM.*

(i)     *Class 1 - RCM Non-Tax Priority Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on (a) the Effective Date if such Non-Tax Priority Claim is an Allowed Non-Tax Priority Claim against RCM on the Effective Date or (b) the Quarterly Distribution Date following the date on which such Non-Tax Priority Claim becomes an Allowed Non-Tax Priority Claim, each Holder of an Allowed Class 1 Non-Tax Priority Claim against RCM shall receive, in full and final satisfaction, release, and discharge of, and in exchange for, such Allowed Non-Tax Priority Claim, Cash equal to the unpaid portion of such Allowed Non-Tax Priority Claim in accordance with the allocation set forth in section 5.16 of the Plan.

(ii)     *Class 2 - RCM Other Secured Claims.*  As is more fully set forth in and governed by the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code, on the Effective Date, each Holder of an Allowed Class 2 Other Secured Claim against RCM shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Other Secured Claim, one of the following Distributions: (i) the payment of such Holder's Allowed Other Secured Claim in full, in Cash; (ii) the sale or disposition proceeds of the property securing such Allowed Other Secured Claim to the extent of the value of the interests in such property; (iii) the surrender to the Holder or Holders of such Allowed Other Secured Claim of the property securing such Claim; or (iv) such other Distributions as shall be necessary to satisfy the requirements of section 1124 of the Bankruptcy Code.

(c)     *Impaired Classes of Claims – RCM.*

(i)     *Class 3 - RCM FX/Unsecured Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 3 RCM FX/Unsecured Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM FX/Unsecured Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM FX/Unsecured Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(ii)     *Class 4 - RCM Securities Customer Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 4 RCM Securities Customer Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Securities Customer Claim, its applicable share (as more fully set forth in the RCM Settlement Agreement) of (A) the RCM Securities Customer Claims Distribution and (B) unless a Holder elects not to provide a RCM Related Claim Subordination Form in respect of its RCM Related Claims, the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which shall include, unless such Holder affirmatively elects otherwise prior to the Voting Deadline, the RCM BAWAG Proceeds portion of the RCM Cash Distribution.

(iii)     *Class 5 - RCM Leuthold Metals Claims.*  Subject to section 6.4 of this Plan, as is more fully set forth in and governed by the RCM Settlement Agreement, on the Effective Date, each Holder of an Allowed Class 5 RCM Leuthold Metals Claim shall receive, in

full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed RCM Leuthold Metals Claim, its Pro Rata share of the RCM Leuthold Metals Claim Distribution.

(iv) *Class 6 – RCM FX/Unsecured Convenience Claims.* On the Effective Date, each Holder of an Allowed Class 6 RCM FX/Unsecured Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 6 RCM FX/Unsecured Convenience Claim, Cash equal to 60% of its Allowed Class 6 RCM FX/Unsecured Convenience Claim. Holders of Allowed Class 6 RCM FX/Unsecured Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(v) *Class 7 – RCM Securities Customer Convenience Claims.* On the Effective Date, each Holder of an Allowed Class 7 RCM Securities Customer Convenience Claim shall receive, in full and final satisfaction, settlement, release, and discharge of, and in exchange for, such Allowed Class 7 RCM Securities Customer Convenience Claim, Cash equal to 100% of its Allowed Class 7 RCM Securities Customer Convenience Claim. Holders of Allowed Class 7 RCM Securities Customer Convenience Claims shall <u>not</u> receive any interest in the Litigation Trust described in section 5.7 of this Plan.

(vi) *Class 8 - Related Claims.* On the Effective Date, pursuant to section 6.4 hereof, each Allowed Class 8 Other Related Claim against RCM shall be subordinated and shall receive no Distribution from RCM unless and until such time as all Holders of Allowed RCM FX/Unsecured Claims, Allowed RCM Securities Customer Claims and Allowed RCM Leuthold Metals Claims have been paid in full.

(vii) *Class 9 - RCM Subordinated Claims.* No Holder of a Class 6 Subordinated Claim against RCM shall be entitled to, nor shall it receive or retain, any property or interest in property on account of such Class 9 RCM Subordinated Claim. On the Effective Date, all Class 9 RCM Subordinated Claims shall be cancelled and extinguished.

3.4 *Allowed Claims and Interests*. Except as provided in the Early Payment Order, notwithstanding any provision herein to the contrary, the Disbursing Agent, on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall make Distributions only to Holders of Allowed Claims and Interests. A Holder of a Disputed Claim or Disputed Interest shall receive only a Distribution on account thereof when and to the extent that its Disputed Claim or Disputed Interest becomes an Allowed Claim or an Allowed Interest, as applicable.

3.5 *Alternative Treatment*. Notwithstanding any provision herein to the contrary, any Holder of an Allowed Claim or Interest may receive, instead of the Distribution or treatment to which it is entitled hereunder, any other less favorable Distribution or treatment to which it, the Plan Proponents and FXA (in respect of FXA), the Plan Administrator (in respect of the Contributing Debtors) or the RCM Trustee (in respect of RCM) may agree in writing.

3.6 *Limitation on Recoveries*. Notwithstanding anything contained herein to the contrary but subject to interest on Claims set forth in section 5.7 of the Plan, in the event that each Holder of an Allowed Claim in any Class of Claims is to receive Distributions in excess of one hundred percent (100%) of each Holder's Allowed Claim in such Class, then, any amounts remaining to be distributed to such Holders in excess of one hundred percent (100%) shall be redistributed to Holders of Allowed Claims or Interests immediately junior to such class as set forth in Article III of this Plan and shall be distributed in accordance with the provisions of the documents, instruments and agreements governing such Claims or Interests, including, without limitation, the RCM Settlement Agreement and the Bankruptcy Code.

3.7 *Special Provision Regarding Unimpaired Claims*. Except as otherwise provided in this Plan, the RCM Settlement Agreement or a Final Order of the Bankruptcy Court (including, without limitation, the Early Payment Order), nothing shall affect the Debtors', RCM's, the Reorganized Debtors' or Post-Confirmation

RCM's rights and defenses, both legal and equitable, with respect to any Unimpaired Claims, including, but not limited to, all rights with respect to legal and equitable defenses to, setoffs against, or recoupments of Unimpaired Claims.

**3.8** ***Claims and Interests of Non-Debtor Affiliates***. Claims of Non-Debtor Affiliates against the Debtors or RCM , unless otherwise resolved prior to the Effective Date, shall be released and receive no Distribution under the Plan; *provided, however*, that, notwithstanding such release of Claims, the Contributing Debtors, RCM and the Non-Debtor Affiliates may, but are not obligated to, treat such Claims as though they survive solely for purposes of entering into netting or similar arrangements between the Contributing Debtors, RCM and one or more Non-Debtor Affiliates. Interests of Non-Debtor Affiliates shall be treated in accordance with the provisions of this Plan, including, but not limited to, sections 5.1 and 5.22 below.

**3.9** ***Classification and Treatment of Intercompany Claims***. Except as provided herein, Intercompany Claims among the Debtors or RCM are deemed to be resolved and satisfied by the provisions of and in accordance with this Plan. Notwithstanding the compromises and settlements set forth herein**,** each such Intercompany Claim shall be deemed to be an unsatisfied liability of each of the Debtors and RCM immediately prior to their contribution of Contributed Claims to the Litigation Trust.

**3.10** ***Claims of Debtors against RCM***. Notwithstanding anything in this Plan to the contrary, Claims against RCM held by any other Debtor will receive no Distribution consistent with the settlement among RCM and the Debtors contained in and implemented by this Plan.

# ARTICLE IV

## ACCEPTANCE OR REJECTION OF THE PLAN

**4.1** ***Classes Entitled To Vote***. Each Impaired Class of Claims of the Contributing Debtors, FXA or RCM  that is entitled to receive or retain property or any interest in property under the Plan (other than Contributing Debtor Classes 7 and 8) is entitled to vote to accept or reject the Plan.  By operation of law, each Unimpaired Class of Claims is deemed to have accepted the Plan and, therefore, is not entitled to vote.  Holders of Claims and Interests in Classes that are not entitled to receive or retain any property under the Plan are presumed to have rejected the Plan and such Holders  are also not entitled to vote.

Acceptance By Impaired Classes.  An Impaired Class of Claims shall have accepted the Plan if (i) the Holders of at least two-thirds in amount of the Allowed Claims actually voting in the Class have voted to accept the Plan and (ii) the Holders of more than one-half in number of the Allowed Claims actually voting in the Class have voted to accept the Plan, not counting the vote of any Holder designated under section 1126(e) of the Bankruptcy Code or any insider.

**4.2** ***Presumed Acceptance by Unimpaired Classes***. Classes 1, 2 and 3 of each of the Contributing Debtors and FXA and RCM Classes 1 and 2 are Unimpaired by this Plan.  Under section 1126(f) of the Bankruptcy Code, Holders of such Claims or Interests are conclusively presumed to accept this Plan, and the votes of the Holders of such Claims or Interests will not be solicited.

**4.3** ***Classes Deemed to Reject the Plan***. Classes 7 and 8 of the Contributing Debtors, FXA Class 7 and RCM Class 9 are deemed to reject the Plan and, therefore, votes to accept or reject the Plan will not be solicited from Holders of Claims or Interests in such Classes.

**4.4** ***Summary of Classes Voting on the Plan***. As a result of the provision of sections 4.3 and 4.4 of this Plan, only the votes of Holders of Claims of the Contributing Debtors in Classes  4, 5 and 6, Holders of FXA Claims in Classes  4, 5 and 6 and Holders of RCM Claims in Classes 3, 4, 5,6 ,7 and 8 will be solicited with respect to this Plan.

**4.5     Elimination Of Classes**.  Any Class that does not contain any Allowed Claims or any Claims temporarily allowed for voting purposes under Bankruptcy Rule 3018, as of the date of the commencement of the Confirmation Hearing, shall be deemed to have been deleted from the Plan for purposes of (a) voting to accept or reject the Plan and (b) determining whether it has accepted or rejected the Plan under section 1129(a)(8) of the Bankruptcy Code.

**4.6     Confirmation Pursuant to Section 1129(b) of the Bankruptcy Code**.  To the extent that any Impaired Class votes to reject the Plan or is deemed to have rejected it, the Plan Proponents shall request Confirmation of the Plan under section 1129(b) of the Bankruptcy Code.

## ARTICLE V

## MEANS FOR IMPLEMENTATION OF THE PLAN

**5.1     Merger Of Subsidiaries Into Refco Inc.**  On the Effective Date or as soon thereafter as practicable, (a) the members of the board of directors of each of the Affiliate Debtors, other than FXA, shall be deemed to have resigned and (b) each of the Affiliate Debtors shall be deemed to have merged with and into Refco Inc., with Refco Inc. as the surviving entity.  Notwithstanding anything to the contrary in this section of the Plan, mergers in fact of each of the Affiliate Debtors, other than FXA, with and into Refco Inc. referenced in such section shall occur on the Effective Date.  As soon as reasonably practicable after the Effective Date, the Plan Administrator, on behalf of the Reorganized Debtors, shall file all appropriate and required documentation with applicable state governmental agencies to reflect the occurrence of such mergers.

**5.2     Continued Corporate Existence And Dissolution Of Reorganized Debtors**.

(a)     Refco Inc. and FXA shall continue to exist as Reorganized Refco and Reorganized FXA, respectively, after the Effective Date pursuant to the certificate of incorporation, certificate of formation or other corporate governance document, as applicable, and by-laws, operating agreement or other corporate governance document in effect prior to the Effective Date, except to the extent that such corporate governance documents are amended under the Plan, for the limited purposes of liquidating all of the assets of the Estates, and making Distributions in accordance with the Plan.

(b)     As soon as practicable after the Plan Administrator, liquidates or otherwise disposes of assets of the Estates of the Reorganized Debtors and makes the final Distribution under the Plan, the Plan Administrator shall, at the expense of the Estates of the Reorganized Debtors and in consultation with the Plan Committee, (i) provide for the retention and storage of the books, records, and files that shall have been delivered to or created by the Plan Administrator until such time as all such books, records, and files are no longer required to be retained under applicable law, and file a certificate informing the Bankruptcy Court of the location at which such books, records, and files are being stored, (ii) file a certification stating that the Plan Administrator has liquidated or otherwise disposed of the assets of the Estates of the Reorganized Debtors and made a final Distribution under the Plan, (iii) file the necessary paperwork with the Office of the Secretary of State for the State of Delaware to effectuate the dissolution of the Reorganized Debtors in accordance with the laws of the State of Delaware, and (iv) resign as the sole officer, manager or director, as applicable, of the Reorganized Debtors.  Upon the filing of the certificates described in sub-section (ii) of the preceding sentence, the Reorganized Debtors shall be deemed dissolved for all purposes without the necessity for any other or further actions to be taken by or on behalf of the Reorganized Debtors or payments to be made in connection therewith.

(c)     The RCM Trustee shall have sole discretion with respect to determining the timing and manner of dissolution of Post-Confirmation RCM in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

**5.3     Corporate Governance Documentation**.  The certificate of incorporation of Reorganized Refco shall be restated to, among other things: (a) authorize issuance of one share of new common stock, $0.01 par value per share that will be held by the Plan Administrator; (b) provide, pursuant to section 1123(a)(6) of the

Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (c) limit the activities of the Reorganized Refco to matters related to the implementation of the Plan and to matters reasonably incidental thereto. The corporate governance documents of Reorganized FXA shall be restated to, among other things: (a) provide, pursuant to section 1123(a)(6) of the Bankruptcy Code, for a provision prohibiting the issuance of non-voting equity securities; and (b) limit the activities of the Reorganized FXA to matters related to the implementation of the Plan and to matters reasonably incidental thereto. The form of each restated corporate governance document is attached hereto as Exhibit C.

**5.4** ***Directors, Managers And Officers; Effectuating Documents; Further Transactions***. From and after the Effective Date, the Plan Administrator shall serve as the sole officer and director or manager, as applicable, of the Reorganized Debtors and the RCM Trustee shall serve as the sole representative of RCM. The Plan Administrator on behalf of the Reorganized Debtors, and the RCM Trustee, on behalf of RCM, shall be authorized to execute, deliver, file, or record such documents, instruments, releases, and other agreements and to take such actions as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan.

**5.5** ***The Plan Administrator***.

(a) *Appointment.* From and after the Effective Date, a person or entity designated by the Joint Sub- Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) prior to the Confirmation Date, shall serve as the Plan Administrator pursuant to the Plan Administrator Agreement and the Plan, until the resignation or discharge and the appointment of a successor Plan Administrator in accordance with the Plan Administrator Agreement and the Plan.

(b) *Plan Administrator Agreement.* Prior to or on the Effective Date, the Contributing Debtors and FXA shall execute a Plan Administrator Agreement in substantially the same form as Exhibit E hereto with the Plan Administrator. The form of Plan Administrator Agreement is hereby approved. Any nonmaterial modifications to the Plan Administrator Agreement by the Debtors prior to the Effective Date are hereby ratified. The Plan Administrator Agreement will contain provisions permitting the amendment or modification of the Plan Administrator Agreement necessary to implement the provisions of this Plan.

(c) *Separate Administration of the RCM Estates.* Notwithstanding anything herein to the contrary, all references in the Plan to the Plan Administrator shall refer exclusively to the administration of the Estates of the Contributing Debtors and FXA. The RCM Estate shall be administered separately by the RCM Trustee and the RCM Trustee shall wind down the RCM Estate in accordance with the terms and conditions set forth in the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

(d) *Rights, Powers, And Duties Of The Reorganized Debtors And The Plan Administrator.* The Reorganized Debtors shall retain and have all the rights, powers, and duties necessary to carry out their responsibilities under the Plan. Such rights, powers, and duties, which shall be exercisable by the Plan Administrator on behalf of the Reorganized Debtors and the Estates pursuant to the Plan and the Plan Administrator Agreement, shall include, among others:

(i) liquidating the Reorganized Debtors' assets;

(ii) investing the Cash of the Estates of the Reorganized Debtors, including, but not limited to, the Cash held in the Reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under section 345 of the Bankruptcy Code or as otherwise ordered by the Bankruptcy Court;

(iii)     calculating and paying all Distributions in accordance with the terms of the Plan, the Plan Administrator Agreement, and other orders of the Bankruptcy Court by the Plan Administrator to Holders of Allowed Claims;

(iv)     employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Reorganized Debtors and their Estates;

(v)     making and filing tax returns for any of the Contributing Debtors, FXA or the Reorganized Debtors;

(vi)     as provided in Article V, objecting to Claims or Interests filed against the Estates of any of the Contributing Debtors, FXA or the Reorganized Debtors on any basis except to the extent such Claims or Interests have previously been allowed by a Final Order;

(vii)     seeking estimation of contingent or unliquidated Claims against the Contributing Debtors, FXA or the Reorganized Debtors under section 502(c) of the Bankruptcy Code;

(viii)     seeking determination of tax liability for the Contributing Debtors, FXA and the Reorganized Debtors under section 505 of the Bankruptcy Code;

(ix)     closing the Chapter 11 Cases of the Reorganized Debtors;

(x)     dissolving and winding up the Reorganized Debtors;

(xi)     exercising all powers and rights, and taking all actions, contemplated by or provided for in the Plan Administrator Agreement; and

(xii)     taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the Plan Administrator Agreement.

(e)     *Compensation Of The Plan Administrator.*  The Plan Administrator shall be compensated from the Wind-Down Reserve pursuant to the terms and conditions of the Plan Administrator Agreement.  Any professionals retained by the Plan Administrator shall be entitled to reasonable compensation for services rendered and reimbursement of expenses incurred from the Wind-Down Reserve.  The payment of the reasonable fees and expenses of the Plan Administrator and its retained professionals shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court; *provided*, *however*, that any disputes related to such fees and expenses shall be brought before the Bankruptcy Court.

(f)     *Indemnification.*  The Reorganized Debtors shall indemnify and hold harmless (i) the Plan Administrator (in its capacity as such and as officer,  director or manager, as applicable of the Reorganized Debtors), (ii) such individuals as may serve as officers, directors or managers, as applicable of the Reorganized Debtors, if any, and (iii) the Administrative Professionals (collectively, the "Indemnified Parties"), from and against, and with respect to any and all liabilities, losses, damages, claims, costs, and expenses, including, but not limited to, attorneys' fees, arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than acts or omissions resulting from such Indemnified Party's willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan or Plan Administration Agreement.  To the extent an Indemnified Party asserts a claim for indemnification as provided above, the legal fees and related costs incurred by counsel to the Indemnified Party in the defense of such claims giving rise to the asserted right of indemnification shall be advanced to such Indemnified Party (and such Indemnified Party undertakes to repay such amounts if it ultimately shall be determined that such Indemnified Party is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any insurance purchased using the Wind-Down Reserve. The indemnification provisions of the Plan Administrator Agreement shall remain available to and be binding upon

any former Plan Administrator or the estate of any decedent Plan Administrator and shall survive the termination of the Plan Administrator Agreement.

(g)     *Insurance.*  The Plan Administrator shall be authorized to obtain and pay for out of the Wind-Down Reserve all reasonably necessary insurance coverage for itself, its agents, representatives, employees, or independent contractors, and the Reorganized Debtors, including, but not limited to, coverage with respect to (i) any property that is or may in the future become the property of the Reorganized Debtors or their Estates and (ii) the liabilities, duties, and obligations of the Plan Administrator and its agents, representatives, employees, or independent contractors under the Plan Administrator Agreement (in the form of an errors and omissions policy or otherwise), the latter of which insurance coverage may, at the sole option of the Plan Administrator, remain in effect for a reasonable period (not to exceed seven years) after the termination of the Plan Administrator Agreement.

(h)     *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder or by Court order, after consultation with the Plan Committee, (i) to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle Disputed Claims against any of the Contributing Debtors' or FXA's Estates, in accordance with the following procedures, which shall constitute sufficient notice in accordance with the Bankruptcy Code and the Bankruptcy Rules for compromises and settlements of claims:

(i)     If the proposed face amount at which the Disputed Claim is to be allowed is less than or equal to $500,000, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, in its sole discretion and without notice to any party or Bankruptcy Court approval and the Plan Administrator shall have no liability to any party for the reasonableness of such settlement, except to the extent such settlement is determined by a Final Order to have been the product of the Plan Administrator's gross negligence or willful misconduct.

(ii)     If the proposed face amount at which the Disputed Claim is to be allowed is greater than $500,000, but less than or equal to $10 million, the Plan Administrator, on behalf of the Reorganized Debtors, shall be authorized and empowered to settle such Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee approval or, if such approval of the Plan Committee is not forthcoming, upon Bankruptcy Court approval of such settlement.

(iii)     If the proposed face amount at which the Disputed Claim is to be allowed is greater than $10 million, the Plan Administrator shall be authorized and empowered to settle the Disputed Claim and execute necessary documents, including a stipulation of settlement or release, only upon receipt of Plan Committee and Bankruptcy Court approval of such settlement.

Other than as set forth in section 5.21 herein, parties in interest (other than the Reorganized Debtors and Plan Administrator, whose objection deadlines are set forth in section 8.1 of the Plan) shall have 90 days following the Effective Date to object to any Claims or Interests filed against any of the Contributing Debtors' or FXA's Estates to the extent that under the Bankruptcy Code such parties are permitted (to the extent not previously allowed pursuant to the Plan or by order of the Bankruptcy Court), and have standing, to assert such objections.  Notwithstanding anything to the contrary in this section of the Plan, Disputed Claims may not be resolved absent Bankruptcy Court approval under the procedures set forth in this section of the Plan until the date that is on or after 90 days following the Effective Date.

**5.6     *Administration of Post-Confirmation RCM.***

(a)     *Rights, Powers, And Duties Of The RCM Trustee.*  The RCM Trustee shall retain and have all the rights, powers, and duties necessary to carry out his responsibilities under the Plan, the RCM Settlement Agreement or applicable law.  Such rights, powers, and duties, which shall be exercisable by the RCM Trustee on behalf of Post-Confirmation RCM and the RCM Estate pursuant to the Plan and the RCM Settlement Agreement, shall include, among others:

(i)     liquidating Post-Confirmation RCM's assets;

(ii)     investing Post-Confirmation RCM's Cash, including, but not limited to, the Cash held in any reserves, in (A) direct obligations of the United States of America or obligations of any agency or instrumentality thereof that are backed by the full faith and credit of the United States of America, including funds consisting solely or predominantly of such securities, (B) money market deposit accounts, checking accounts, savings accounts or certificates of deposit, or other time deposit accounts that are issued by a commercial bank or savings institution organized under the laws of the United States of America or any state thereof, or (C) any other investments that may be permissible under  section 345 of the Bankruptcy Code or as otherwise order by the Bankruptcy Court;

(iii)     calculating and paying all Distributions to be made under the Plan, the RCM Settlement Agreement, and other orders of the Bankruptcy Court to Holders of Allowed Claims against RCM;

(iv)     employing, supervising, and compensating professionals retained to represent the interests of and serve on behalf of the Post-Confirmation RCM including professionals engaged for the valuation, sale or other disposition of Post-Confirmation RCM's assets or proceeds thereof;

(v)     making and filing tax returns, if any are required, for Post-Confirmation RCM;

(vi)     as provided in Article V, objecting to Claims or Interests filed against RCM or Post-Confirmation RCM on any basis except to the extent such Claims or Interests have previously been Allowed;

(vii)     seeking estimation of contingent or unliquidated Claims against RCM or Post-Confirmation RCM under section 502(c) of the Bankruptcy Code;

(viii)     seeking determination of tax liability, if any, for RCM and Post-Confirmation RCM under section 505 of the Bankruptcy Code;

(ix)     closing the RCM Chapter 11 Case or chapter 7 case;

(x)     dissolving and winding up Post-Confirmation RCM;

(xi)     exercising all powers and rights, and taking all actions, contemplated by or provided for in the RCM Settlement Agreement or applicable law; and

(xii)     taking any and all other actions necessary or appropriate to implement or consummate the Plan and the provisions of the RCM Settlement Agreement or to administer the RCM Estate.

(b)     *Authority To Object To Claims And Interests And To Settle Disputed Claims.* From and after the Effective Date, the RCM Trustee, on behalf of Post-Confirmation RCM, shall be authorized, with respect to those Claims or Interests which are not Allowed hereunder, under the RCM Settlement Agreement or by

Court order (i) to object to any Claims or Interests filed against the RCM Estate and (ii) pursuant to Bankruptcy Rule 9019(b) and section 105(a) of the Bankruptcy Code, to compromise and settle any such Disputed Claims asserted against RCM.

### 5.7    *Litigation Trust*.

(a)    *Establishment of the Litigation Trust*.  The Litigation Trust shall be established for pursuit of the Contributed Claims and shall become effective on the Effective Date as summarized below and in accordance with the terms and conditions set forth in more detail in the Litigation Trust Agreement attached hereto as Exhibit F.  The Litigation Trustee will be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee), and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing.

(b)    *Transfer of Assets*.  The transfer of the Contributed Claims to the Litigation Trust shall be made, as provided herein, for the ratable benefit of the Litigation Trust Beneficiaries as set forth herein.  On the Effective Date, the Contributed Claims, held by the Debtors and RCM on behalf of the Litigation Trust Beneficiaries shall be transferred to the Litigation Trust in exchange for Litigation Trust Interests for the ratable benefit of the Litigation Trust Beneficiaries.  Upon transfer of the Contributed Claims to the Litigation Trust, the Debtors, RCM and the Plan Administrator shall have no interest in or with respect to the Contributed Claims or the Litigation Trust.

(c)    *Structure of the Litigation Trust and Trust Distributions*.  The Litigation Trust shall be structured in a manner that provides for a senior Tranche A and a junior Tranche B.  No Distributions of Litigation Trust Interests shall be made in respect of Tranche B until Tranche A has been fully and indefeasibly paid; *provided, however*, that Holders of Allowed Old Equity Interests may receive recoveries directly from 10% of the IPO Underwriter Claims Recovery in Tranche A as more fully set forth in section 5.7(c)(iii) below.  Tranche A shall have a fluctuating balance equal to the amount necessary to cause Holders of Allowed RCM Implied Deficiency Claims, RCM FX/Unsecured Claims, Contributing Debtors General Unsecured Claims and FXA General Unsecured Claims to be paid in full, plus simple interest at the rate of 10% on the unpaid balance of such Claims from the Petition Date through the date of final payment.  All Contributed Claims Recoveries, whether applicable to Tranche A or Tranche B, will be distributed Pro Rata according to the beneficial interests in Tranche A and Tranche B.  The Litigation Trustee (in consultation with the Litigation Trust Committee) may establish further separate sub-Tranches, as necessary, in respect of the beneficial interests of the Litigation Trust Beneficiaries in Tranche A and Tranche B.  To the extent deemed "securities," the Litigation Trust Interests (or any redistribution of such interests or related interests by the RCM Trustee to the Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims) will be exempt from registration to the extent provided in section 1145 of the Bankruptcy Code.

(i)    *Tranche A Litigation Trust Interests*.  Beneficiaries of Tranche A Litigation Trust Interests will be the RCM Estate (for Distribution in accordance with the RCM Settlement Agreements), Holders of Allowed Contributing Debtors General Unsecured Claims (which for the sake of clarity, shall not include the Secured Lenders, the Senior Subordinated Note Indenture Trustee or the Holders of Senior Subordinated Notes) and Holders of Allowed FXA General Unsecured Claims (which for the sake of clarity, shall not include Holders of FXA Convenience Class Claims, RCM Securities Customer Convenience Claims or RCM FX/General Unsecured Convenience Claims) and such Beneficiaries shall share the Tranche A Litigation Trust Interests Pro Rata based on (x) in the case of the RCM Estate, the aggregate amount of Allowed RCM Implied Deficiency Claims and the Allowed RCM FX/Unsecured Claims and (y) in the case of Holders of Contributing Debtors General Unsecured Claims and the Holders of FXA General Unsecured Claims, the amount of each such Holder's Allowed Claim.

(ii)    *Tranche B Litigation Trust Preferred Interests*.  Beneficiaries of Tranche B Litigation Trust Preferred Interests will be the Holders of Allowed Contributing Debtors Class 7 Subordinated Claims who will receive their Pro Rata share of the Contributed

Claims Recoveries after the beneficiaries of the Tranche A Litigation Trust Interests have been paid in full; *provided, however*, that the Debtors, the RCM Trustee and all parties in interest reserve the right to assert that any creditor whose claim is equitably subordinated pursuant to section 510(c) of the Bankruptcy Code, should not be entitled to any Distribution under the Global Plan.

        (iii)    *Tranche B Litigation Trust Common Interests*. Beneficiaries of Tranche B Litigation Trust Common Interests will be the Holders of Old Equity Interests who will receive their Pro Rata share of the Contributed Claims Recoveries after the beneficiaries of the Tranche B Litigation Trust Preferred Interests have been paid in full; *provided, however*, that, to the extent that recoveries from 10% of the IPO Underwriter Claim Recovery would exceed that obtained from Tranche B Litigation Trust Common Interests, the Holders of Old Equity Interests will receive a Pro Rata share of 10% of the IPO Underwriter Claims Recovery.

        (d)    *Management of the Litigation Trust*. The Litigation Trust shall be managed and operated by the Litigation Trustee. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings shall have certain approval rights on key issues relating to the operation and management of the Litigation Trust until Tranche A has been fully and indefeasibly paid. The Four members (other than VR) shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee). Tranche B beneficiaries shall have no such approval rights in respect of management and operation of the Litigation Trust, unless and until Tranche A has been fully and indefeasibly paid. Once Tranche A has been paid in full, a committee of the five largest Tranche B beneficiaries shall have like approval rights.

        (e)    *Funding the Litigation Trust*. The Litigation Trust may be funded (i) from a loan that is non-recourse to RCM, the Debtors or the Estates, secured only by the proceeds of the Contributed Claims from one or more lenders who agree to make such loan on terms acceptable to the RCM Trustee, the Committees and the Super Majority (as defined in the RCM Settlement Agreement) or (ii) with up to $25 million drawn from the Contributing Debtors Distributive Assets, deducted on a Pro Rata basis from the Distributions that otherwise would be made to (x) Holders of Contributing Debtors General Unsecured Claims in accordance with the calculation of the Contributing Debtors General Unsecured Distribution and (y) to the RCM Estate in accordance with the calculation of the RCM Intercompany Claims Distribution in section 3.1 of this Plan. Any failure or inability of the Litigation Trust to obtain funding will not affect the consummation of this Plan.

        (f)    *Distributions by the Litigation Trust*. Any Contributed Claims Recoveries will first be used to repay the funding described in section 5.7(e) above and then will be transferred to the Disbursing Agent or the RCM Trustee, as applicable, for Distribution to the Litigation Trust Beneficiaries as set forth herein. In addition, to the extent that the Reorganized Debtors or Post-Confirmation RCM become liable for the payment of any Claims arising under section 502(h) of the Bankruptcy Code by reason of the Litigation Trustee's prosecution of the Litigation Claims, the Litigation Trustee will be responsible for making Distributions on account of such Claims from the assets of the Litigation Trust.

        (g)    *Cash-Out Option*. As set forth more fully in the Cash-Out Option Agreement, if any, the form of which would be attached as an exhibit to the Litigation Trust Agreement, one or more third parties may offer, to Purchase Litigation Trust Interests from the Litigation Trust Beneficiaries.

        (h)    *Duration of Trust*. The Litigation Trust shall have an initial term of five (5) years, provided that if reasonably necessary to realize maximum value with respect to the assets in the Litigation Trust and following Bankruptcy Court approval, the term of the Litigation Trust may be extended for one or more one (1) year terms. The Litigation Trust may be terminated earlier than its scheduled termination if (i) the Bankruptcy Court has entered a Final Order closing all of or the last of the Chapter 11 Cases pursuant to section 350(a) of the Bankruptcy Code and the RCM Case to the extent the RCM Case was converted to chapter 7; and (ii) the Litigation Trustee has administered all assets of the Litigation Trust and performed all other duties required by the Plan and the Litigation Trust Agreement.

(i)     *Certain Federal Income Tax Matters.*

(i)     For federal income tax purposes, the Debtors, RCM, the Litigation Trustee and the Effective Beneficiaries will treat the transfer of assets to the Litigation Trust and issuance of Litigation Trust Interests as a transfer by the Debtors and RCM of the assets to the Effective Beneficiaries, followed by a transfer of such assets by the Effective Beneficiaries to the Litigation Trust in exchange for direct or indirect beneficial interests in the Litigation Trust. For federal income tax purposes, the Effective Beneficiaries will be treated as the grantors, deemed owners and beneficiaries of the Litigation Trust.

(ii)     The Litigation Trustee, the Debtors and RCM will determine the fair market value as of the Effective Date of all assets transferred to the Litigation Trust, and such determined fair market value shall be used by the Debtors, RCM, the Litigation Trust, the Litigation Trustee and the Effective Beneficiaries for all federal income tax purposes.

**5.8**     ***Private Actions Trust***. On the Effective Date the Private Actions Trust will be established on the terms set forth in the Private Actions Trust Agreement attached hereto as Exhibit G. The Private Actions Trust shall hold certain claims and causes of action against third-parties owned by Holders of Claims against RCM or the Debtors and which claims, even after contribution, are not assets of the Estates. Beneficiaries of the Private Actions Trust will be Holders of Contributing Debtors General Unsecured Claims, FXA General Unsecured Claims, RCM Securities Customer Claims and RCM FX/Unsecured Claims that elect to contribute their Non-Estate Refco Claims and their rights to proceeds of Class Action Claims to the Private Actions Trust; *provided, however,* that a secondary purchaser of a Contributing Debtors General Unsecured Claim, FXA General Unsecured Claim, RCM Securities Customer Claim or RCM FX/Unsecured Claim may participate in the Private Actions Trust only if such purchaser has received an assignment of Non-Estate Refco Claims from the original holder of such claims and has elected to (i) assign such Non-Estate Refco Claims to the Private Actions Trust and (ii) assign (or cause to be assigned) its allocable share of any proceeds of Class Action Claims to the Private Actions Trust. The Private Actions Trust shall be managed and operated by the Private Actions Trustee. The Private Actions Trustee will be selected by the members of the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust, and shall be identified in advance of the Confirmation Hearing and approved by the Bankruptcy Court at the Confirmation Hearing. A committee composed of VR and four Holders of Claims against RCM that do not assert Claims against any Contributing Debtor based on guarantees or other direct contractual undertakings (in each case, only to the extent such parties have assigned their Non-Estate Refco Claims to the Private Actions Trust) shall have certain approval rights on key issues relating to the operation and management of the Private Actions Trust. The Four members (other than VR) shall be selected by the members of the Joint Sub- Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee) that have signed the Plan Support Agreement and thereby agreed to assign their Non-Estate Refco Claims to the Private Actions Trust.

**5.9**     ***No Revesting of Assets***. Other than as set forth herein, the remaining property of the respective Estates, other than the Contributed Claims, which shall be transferred to and vest in the Litigation Trust, shall not revest in the Debtors or RCM on or following the Confirmation Date or Effective Date, but shall remain property of the respective Estates and continue to be subject to the jurisdiction of the Bankruptcy Court until distributed to Holders of Allowed Claims in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement. From and after the Effective Date, all such property shall be distributed in accordance with the provisions of the Plan, the Confirmation Order and the RCM Settlement Agreement, without further order of the Court (except as specifically required). For the avoidance of doubt, the Debtors' or RCM's insurance policies shall remain property of their respective Estates in accordance with this section of the Plan, and shall not be subject to the rejection provisions of section 7.1 of the Plan.

**5.10**     *Preservation of Rights of Action; Settlement of Litigation*

(a)     *Preservation Of Rights Of Action.*  Except as otherwise provided herein, the Confirmation Order, the RCM Settlement Agreement, or in any other Plan Document, in accordance with section 1123(b) of the Bankruptcy Code, the Reorganized Debtors' and RCM's rights in the Litigation Claims shall be retained and transferred to the Litigation Trust on the Effective Date; *provided, however*, the RCM Estate shall retain all of its causes of action (excluding Released/Subordinated Claims) arising under sections 547, 550 and 749 of the Bankruptcy Code and shall pursue such causes of action in the sole discretion of the RCM Trustee.

(b)     *Settlement Of Litigation Claims Prior to the Effective Date.*  At any time prior to the Effective Date, notwithstanding anything in the Plan to the contrary, the Debtors (and the RCM Trustee on behalf of RCM with respect to Litigation Claims of RCM) may settle any or all of the Litigation Claims with Bankruptcy Court approval pursuant to Bankruptcy Rule 9019, following notice to parties-in-interest and a hearing. Any net proceeds obtained in respect of Litigation Claims prior to the Effective Date shall be contributed to the Litigation Trust.

**5.11**     *The Committees and the Plan Committee*.

(a)     *Dissolution of the Committees.*  The Committees shall continue in existence until the Effective Date to exercise those powers and perform those duties specified in section 1103 of the Bankruptcy Code and such other duties as they may have been assigned by the Bankruptcy Court prior to the Effective Date.  On the Effective Date, the Committees shall be dissolved and their members shall be deemed released of all their duties, responsibilities and obligations in connection with the Chapter 11 Cases or the Plan and its implementation, and the retention or employment of the Committees' attorneys, accountants, professionals and other agents shall terminate, except with respect to (i) all Professional Fees, (ii) any appeals of the Confirmation Order and (iii) the continuation and completion of any litigation to which the Creditors' Committee or the Additional Committee, as applicable, is a party as of the Effective Date.  All expenses of members of the Committees and the fees and expenses of the Committees' professionals through the Effective Date shall be paid in accordance with any applicable orders of the Bankruptcy Court.  Counsel to the Committees shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses for post-Effective Date activities authorized hereunder without further court approval upon the submission of invoices to the Reorganized Debtors.  Following the Effective Date, subject to actual conflicts of interest, none of the Committees' professionals shall be precluded from representing any entity acting for any successor fiduciaries or other entities created by this Plan, including the Plan Administrator, Plan Committee, Litigation Trustee or any of the Reorganized Debtors.

(b)     *Creation of Plan Committee; Procedures.*

(i)     Unless there are no parties in interest willing to serve, on the Effective Date, the Plan Committee shall be formed and constituted.  The Plan Committee shall be of a size determined by and composed of members chosen by the Joint Sub-Committee (exclusive of the Senior Subordinated Note Indenture Trustee and any Holder of a Senior Subordinated Note Claim); *provided, however*, that the Plan Committee shall include VR, Leuthold and Cargill and shall include the Senior Subordinated Note Indenture Trustee until such time as all payments in respect of the Senior Subordinated Note Holder Distribution have been made.  All proposed members of the Plan Committee shall be disclosed to the Bankruptcy Court on or before the Confirmation Hearing.  Membership on the Plan Committee shall be on an institutional and not on an individual basis.  In the event that a member of the Plan Committee resigns from its position on the Plan Committee, the remaining members shall have the right to designate its successor on the Plan Committee as set forth in the Plan Administrator Agreement.  The Plan Committee shall, absent further order of the Bankruptcy Court, have not fewer than three members.

(ii)     In the event that there are fewer than three members of the Plan Committee for a period of sixty (60) consecutive days, then the Plan Administrator may, during such vacancy and thereafter, in its sole discretion, ignore any reference in the Plan, the Plan Administrator Agreement or the Confirmation Order to the Plan Committee, and all references to

the Plan Committee's ongoing duties and rights in the Plan, the Plan Administrator Agreement and the Confirmation Order shall be null and void.

(c) *Standing of Plan Committee.* The Plan Committee shall have independent standing to appear and be heard in the Bankruptcy Court as to any matter relating to the Plan, the Plan Administrator, the Estates or the Reorganized Debtors, including any matter as to which the Bankruptcy Court has retained jurisdiction pursuant to Article XI of the Plan.

(d) *Function and Duration; Compensation and Expenses.* The Plan Committee shall have ultimate supervisory authority over the Plan Administrator (but shall have no authority over the RCM Trustee, the RCM Estate or the Litigation Trustee, in such capacity). The Plan Administrator shall report to the Plan Committee and the Plan Committee shall have the power to remove the Plan Administrator with or without cause. The Plan Committee (i) shall be responsible for (A) instructing and supervising the Reorganized Debtors and the Plan Administrator with respect to their responsibilities under the Plan and the Plan Administrator Agreement, (B) reviewing and approving the prosecution of adversary and other proceedings, if any, including approving proposed settlements thereof, (C) reviewing and approving objections to and proposed settlements of Disputed Claims against the Contributing Debtors, FXA or the Reorganized Debtors, (D) performing such other duties that may be necessary and proper to assist the Plan Administrator and its retained professionals, and (ii) shall remain in existence until such time as the final Distributions under the Plan have been made by the Disbursing Agent, on behalf of the Reorganized Debtors. The members of the Plan Committee shall serve without compensation for their performance of services as members of the Plan Committee, except that they shall be entitled to reimbursement of reasonable expenses by the Reorganized Debtors to be paid from the Wind-Down Reserve. The Plan Committee may retain counsel or other professionals who shall be entitled to reasonable compensation and reimbursement of actual, necessary expenses to be paid from the Wind-Down Reserve upon the submission of invoices to the Reorganized Debtors; provided, however, that any disputes related to such fees and expenses may be brought before the Bankruptcy Court.

(e) *Liability; Indemnification.* Neither the Plan Committee, nor any of its members or designees, nor any duly designated agent or representative of the Plan Committee, or their respective employees, shall be liable for the act or omission of any other member, designee, agent or representative of the Plan Committee, nor shall any member be liable for any act or omission taken or omitted to be taken in its capacity as a member of the Plan Committee, other than acts or omissions resulting from such member's willful misconduct or gross negligence. The Reorganized Debtors shall indemnify and hold harmless the Plan Committee and its members and designees, and any duly designated agent or representative thereof (in their capacity as such), from and against and with respect to any and all liabilities, losses, damages, claims, costs and expenses, including, but not limited to, attorneys' fees arising out of or due to their actions or omissions, or consequences of such actions or omissions, other than as a result of their willful misconduct or gross negligence, with respect to the Reorganized Debtors or the implementation or administration of the Plan. To the extent the Reorganized Debtors indemnify and holds harmless the Plan Committee and its members and designees, or any duly designated agent or representative thereof (in their capacity as such), as provided above, the legal fees and related costs incurred by counsel to the Plan Committee in monitoring and participating in the defense of such claims giving rise to the right of indemnification shall be advanced to the Plan Committee (and the Plan Committee undertakes to repay such amounts if it ultimately shall be determined that the Plan Committee is not entitled to be indemnified therefor) out of the Wind-Down Reserve or any applicable insurance.

5.12 **Fee Committee.** From and after the Confirmation Date, the members of the Fee Committee (including the RCM Trustee) and the Fee Committee's professionals shall continue to serve and be authorized to continue, in a manner consistent with practice before the Confirmation Date, to review, analyze, and prepare advisory reports with respect to applications for the payment of fees and the reimbursement of expenses of professionals retained in the Chapter 11 Cases pursuant to an order of the Bankruptcy Court during the period up to and including the Confirmation Date, including, without limitation, final fee applications in accordance with sections 328, 330, 331, and 503 of the Bankruptcy Code. From and after the Confirmation Date, the Reorganized Debtors shall pay the reasonable fees and expenses of the members of the Fee Committee to satisfy their duties and responsibilities. Notwithstanding the foregoing, unless otherwise provided by the Bankruptcy Court, the Fee Committee shall be dissolved and the members thereof and the professionals retained by the Fee Committee shall be released and discharged from their respective obligations upon the earlier to occur of (i) the date which is six (6)

months after the Confirmation Date and (ii) resolution of all duties of the Fee Committee set forth in this section of the Plan.

**5.13    *Cancellation of Securities, Instruments, and Agreements Evidencing Claims and Interests***.  With the exception of the LLC Interests of FXA and RCM, except as otherwise provided in the Plan and in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Article V, the promissory notes, share certificates (including treasury stock), other instruments evidencing any Claims or Interests, and all options, warrants, calls, rights, puts, awards, commitments, or any other agreements of any character to acquire such Interests shall be deemed canceled and of no further force and effect, without any further act or action under any applicable agreement, law, regulation, order, or rule, and the obligations of the Debtors or RCM under the notes, share certificates, and other agreements and instruments governing such Claims and Interests shall be discharged; *provided, however*, that the Senior Subordinated Notes Indenture shall continue in effect solely for the purposes of allowing the Senior Note Indenture Trustee to enforce the indemnity provisions of the Senior Subordinated Note Indenture on account of the Senior Subordinated Note Indenture Trustee's service on the Plan Committee, to make the Distributions to be made on account of Senior Subordinated Note Claims under the Plan and, to the extent necessary, enforce the Senior Subordinated Note Indenture Trustee Charging Lien, after which point the Senior Subordinated Note Indenture shall be cancelled and discharged.  The Holders of or parties to such canceled notes, share certificates, and other agreements and instruments shall have no rights arising from or relating to such notes, share certificates, and other agreements and instruments, or the cancellation thereof, except the rights provided pursuant to the Plan.

**5.14    *Sources of Cash for Plan Distributions***.  Except as otherwise provided in the Plan or the Confirmation Order, all Cash necessary for the Reorganized Debtors and the Plan Administrator to make payments pursuant to the Plan shall be obtained from the Reorganized Debtors' Cash balances and the liquidation of the Reorganized Debtors' and the Reorganized Debtors' remaining non-Cash assets, if any, including the Contributing Debtors BAWAG Proceeds.  Cash payments to be made pursuant to the Plan to Holders of Allowed Claims and to the Senior Subordinated Note Indenture Trustee for the benefit of the Holders of Senior Subordinated Note Claims shall be made by the Reorganized Debtors (or any successor thereto) or, if the Disbursing Agent is an entity other than the Reorganized Debtors, the Disbursing Agent, which may be the Senior Subordinated Note Indenture Trustee.  Distributions to be made on behalf of the RCM Estate pursuant to the Plan or the RCM Settlement Agreement shall be made by the RCM Trustee in accordance with the Plan, the RCM Settlement Agreement and applicable law.

**5.15    *Risk Sharing in Respect of Cargill Administrative Claim***.  In the event that Cargill receives a Cargill Administrative Claim, the amount of such Claim shall be borne by RCM and the Contributing Debtors as follows: (i) to the extent the allowance of the Cargill Administrative Claim reduces the Allowed amount of any RCM FX/Unsecured Claim held by Cargill, RCM shall bear for the benefit of the Contributing Debtors a portion of the Cargill Administrative Claim equal to forty percent (40%) of the amount of the RCM Difference; (ii) the Contributing Debtors shall next pay an amount up to the remainder of the Cargill Administrative Claim Amount; *provided, however*, that such payment pursuant to this subsection (ii) shall be capped at the amount that would cause recoveries of Holders of Allowed Contributing Debtors General Unsecured Claims from Contributing Debtors Distributive Assets plus the Contributing Debtors portion of the RGL FXCM Distribution to fall below 30% of the face amount of such Allowed Contributing Debtors General Unsecured Claims; and (iii) if not yet paid in full, the remainder of the Cargill Administrative Claim will be borne by the Contributing Debtors and RCM equally.  For the avoidance of doubt, amounts to be borne by the Contributing Debtors shall be deducted from the amounts available for the Contributing Debtors General Unsecured Distribution and amounts to be borne by RCM shall be deducted from the amounts available for the RCM Cash Distribution.

**5.16    *Allocation of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims***.
Payment of Allowed Priority Tax Claims and Allowed Non-Tax Priority Claims of the Contributing Debtors and of the RCM Estate and Allowed Administrative Claims of the Contributing Debtors and of the RCM Estate, other than amounts in respect of the RCM Advance, accrued through the Effective Date (excluding any amounts paid as of August 31, 2006) will be allocated such that RCM will first provide up to $60 million, the Contributing Debtors will next provide up to $120 million and to the extent that such Claims exceed $180 million in the aggregate, RCM and the Contributing Debtors will bear the cost of such excess (the "Excess Priority Claims") equally.  Notwithstanding the preceding sentence, the Contributing Debtors may fund the payment of any Pre-Conversion Administrative

Claim Amounts if and to the extent that the RCM Trustee and the Contributing Debtors determine such funding necessary to facilitate Distributions in respect of such amounts on the Effective Date; *provided, however,* that any amounts so paid by the Contributing Debtors shall be deducted from the RCM Cash Distribution in a manner that causes RCM to ultimately bear the cost of the Pre-Conversion Administrative Claim Amounts. FXA shall be responsible for all of its Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Non-Tax Priority Claims, *provided, however*, that professional services (other than those related to FXA's claims resolution process and issues unique to FXA after the initial date of the filing of this Plan) and overhead allocable to FXA in the period between the Plan Filing Date and the Plan Effective Date shall be borne by RCM and the Contributing Debtors as set forth in the preceding sentence. Only Allowed Administrative Claims accrued from the Petition Date through the Plan Effective Date that were or are paid after August 31, 2006 shall be counted toward the sharing allocation of the preceding two sentences; provided that the Contributing Debtors shall alone bear the cost of repaying the RCM Advance. To the extent RCM is responsible for bearing amounts in respect of Excess Priority Claims, payment of such amounts shall be made from Cash otherwise available for the RCM Cash Distribution. Allowed Administrative Claims incurred by the Contributing Debtors after the Effective Date shall be borne by the Contributing Debtors out of the Cash or value that would otherwise be paid to Holders of Allowed Contributing Debtors General Unsecured Claims. Allowed Administrative Claims incurred by RCM after the Effective Date shall be borne by RCM from the RCM Wind-Down Reserve, and, to the extent the RCM Wind-Down Reserve is not sufficient to pay such Allowed Administrative Claims, such Claims shall be paid directly by RCM out of the Cash or value that would otherwise be paid to Holders of Allowed Securities Customer Claims and RCM FX/Unsecured Claims as more particularly set forth in the RCM Settlement Agreement. Allowed Administrative Claims incurred by FXA after the Effective Date shall be borne by the FXA out of the Cash or value that would otherwise be paid to Holders of Allowed FXA General Unsecured Claims. All costs and expenses of administering the Litigation Trust described in section 5.7 shall be separately funded by the Litigation Trust and shall not be included in the calculation of the allocations of Administrative Claims, Priority Tax Claims and Non-Tax Priority Claims above.

**5.17    *Additional RCM Claim*.** If, at the conclusion of the claims reconciliation process, (x) the total Allowed Contributing Debtors General Unsecured Claims are less than $394 million, and (y) the Distributions to be made to Holders of Allowed Contributing Debtors General Unsecured Claims would result in a recovery for such Holders in excess of 35% from the sum of the Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution, RCM shall be entitled to an additional Claim. Specifically, RCM shall be entitled to an additional Claim equal to the positive difference between $394 million minus the amount of the Allowed Contributing Debtors General Unsecured Claims. This "Additional RCM Claim" shall participate Pro Rata in all Distributions from Contributing Debtors Distributive Assets and the Contributing Debtors' portion of the RGL FXCM Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims that exceed the 35% recovery threshold set forth in clause (y) above; *provided, however*, that such Additional RCM Claim shall not be subject to the 40% limit on Distributions set forth in the Contributing Debtors General Unsecured Distribution.

**5.18    *Contributing Debtors BAWAG Proceeds*.** Notwithstanding the actual timing and source of any payments hereunder, so long as not inconsistent with the BAWAG Allocation Order, (i) a portion of BAWAG Guaranteed Proceeds equal to $100 million will be deemed to have been received by the Contributing Debtors and paid to the Secured Lenders under the Early Payment Order, (ii) a portion of BAWAG Guaranteed Proceeds equal to $150 million will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Senior Subordinated Note Claims, (iii) a portion of BAWAG Guaranteed Proceeds equal to $56.25 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by the Contributing Debtors and made available for Distribution to Holders of Allowed Contributing Debtors General Unsecured Claims, and (iv) a portion of BAWAG Guaranteed Proceeds equal to $200 million plus an applicable share of BAWAG Contingent Proceeds (if any) will be deemed to have been received by RCM or the Contributing Debtors and made available for Distribution to Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims. To the extent that a Holder of an Allowed Senior Subordinated Note Claim against the Contributing Debtors, a Holder of an Allowed Contributing Debtors General Unsecured Claim, a Holder of an Allowed RCM Securities Customer Claim or a Holder of an Allowed RCM FX/Unsecured Claim elects not to receive its allocable share of the Senior Subordinated Note Holder BAWAG Proceeds, the Contributing Debtors General Unsecured BAWAG Proceeds or the RCM BAWAG Proceeds, as applicable, such portion of BAWAG Proceeds shall be returned to BAWAG in accordance with the BAWAG Settlement.

**5.19    *Exemption from Transfer Taxes*.**  Pursuant to section 1146 of the Bankruptcy Code, (a) the issuance, transfer or exchange of notes or equity securities under the Plan, (b) the creation of any mortgage, deed of trust, lien, pledge, or other security interest, (c) the making or assignment of any contract, lease, or sublease; or (d) the making or delivery of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, any merger agreements; agreements of consolidation, restructuring, disposition, liquidation or dissolution; deeds; bills of sale; and transfers of tangible property, shall not be subject to any stamp tax, recording tax, transfer tax, or other similar tax.  Unless the Bankruptcy Court orders otherwise, all sales, transfers, and assignments of owned and leased property, approved by the Bankruptcy Court on or prior to the Effective Date, shall be deemed to have been in furtherance of, or in connection with, the Plan.  Notwithstanding anything in this section of the Plan to the contrary, the exemption from taxes referenced in this section of the Plan shall only be to the extent permitted for under section 1146 of the Bankruptcy Code.

**5.20    *RCM Settlement Agreement and Conversion*.**  This Plan incorporates the RCM Settlement Agreement in its entirety.  On or prior to the Effective Date, the RCM Chapter 11 Case will, upon notice and a hearing, be converted to a case under subchapter III of chapter 7 of the Bankruptcy Code unless the Debtors and the RCM Trustee agree that the RCM Estate should be administered under chapter 11 of the Bankruptcy Code.  Any conversion of the RCM Chapter 11 Case to a case under subchapter III of chapter 7 or any dispute between the RCM Trustee and the Debtors regarding RCM remaining in chapter 11 will be determined or resolved upon motion of the RCM Trustee with notice to the parties listed on the service list maintained in these Chapter 11 Cases.  Upon conversion of RCM's Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, this Plan shall proceed as a chapter 11 plan for the Debtors and shall constitute a settlement and compromise of claims between the chapter 7 Estate of RCM and the Debtors, for which RCM and the Debtors seek approval simultaneously with the confirmation of this Plan. In the event that the RCM Estate does not convert to chapter 7, the Distributions to RCM's creditors shall be governed by the terms of the RCM Settlement Agreement and this Plan.

**5.21    *Allowance of VR/Leuthold Guarantee Claims*.**  The VR/Leuthold Guarantee Claims shall be Allowed Contributing Debtors General Unsecured Claims (subject, however, to allowance of the underlying Claims against RCM) unless objected to by the Contributing Debtors prior to entry of the Confirmation Order.  No party other than the Contributing Debtors shall be authorized to object to or otherwise challenge the VR/Leuthold Guarantee Claims.  The Contributing Debtors will not object to or otherwise challenge the VR/Leuthold Guarantee Claims based on or related to any of the following theories or issues: the corporate structure or business practices of any of the Contributing Debtors; alter ego; substantive consolidation; fraud; or any other theories or causes of action similar to the foregoing.  The Contributing Debtors, however, may object to the VR/Leuthold Guarantee Claims based on facts specific to a particular VR/Leuthold Guarantee Claim, including, but not limited to, objections based on Bankruptcy Code avoidance theories or challenges to the purported dollar amount of the asserted claims.

**5.22    *Wind-Up of Non-Debtor Affiliates*.**  All Non-Debtor Affiliates, other than the direct or indirect subsidiaries of RCM and Refco LLC, shall be wound up and dissolved as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to the Contributing Debtors and Refco LLC on account of intercompany balances (or equity dividends where applicable).  All Non-Debtor Affiliates that are direct or indirect subsidiaries of RCM shall be wound up as soon as practicable and all available Cash, after appropriate wind-up activities, shall be distributed to RCM on account of intercompany balances (or equity dividends where appropriate).  The direct and indirect subsidiaries of RCM shall be wound up and dissolved by the RCM Trustee and the remainder of the Non-Debtor Affiliates shall be wound up and dissolved by the Plan Administrator.

**5.23    *FXCM*.**  If not liquidated in advance of the Effective Date, RGL's 35% interest in FXCM shall become an interest of and be held by Reorganized Refco upon the merger of RGL into Reorganized Refco pursuant to section 5.1 of this Plan.  The Plan Administrator shall exercise all rights of Reorganized Refco in respect of the 35% interest in FXCM.  Notwithstanding the above, the FXCM Committee shall be formed to coordinate on all matters relating to the disposition or distribution of the 35% interest in FXCM.  If not formed as of the Effective Date pursuant to the Plan Support Agreement, the members of the FXCM Committee, other than the RCM Trustee, shall be selected by the Joint Sub-Committee (inclusive of its ex-officio members, but exclusive of Holders of Senior Subordinated Note Claims and the Senior Subordinated Note Indenture Trustee).  All decisions in respect of the disposition or distribution of the 35% interest in FXCM shall be made by Reorganized Refco; *provided, however*,

that no such decision shall be made by Reorganized Refco without first consulting with the FXCM Committee and, to the extent permitted by applicable law, obtaining the consent of the FXCM Committee. Bylaws of the FXCM Committee shall be established by the FXCM Committee after its formation and shall be substantially in the form attached hereto as Exhibit J.

        **5.24**    *Examiner*. No provision of the Plan shall be construed as impairing the Examiner's investigation, and his authority to file his report in accordance with the provisions of the Examiner Order and the additional directions given by the Bankruptcy Court at the Hearing held on June 21, 2006, even if such investigation concludes, and such filing occurs, after the occurrence of the Effective Date. Unless otherwise ordered by the Bankruptcy Court prior to the Effective Date, the procedures with respect to the filing and consideration of the Examiner's Fee Applications and Requests for Reimbursements of Expenses shall continue after the Effective Date in the same manner as prior to the Effective Date as provided in the Examiner Order.

# ARTICLE VI

# PROVISIONS GOVERNING DISTRIBUTIONS

        **6.1**    *RCM Rights Distribution*. On the Effective Date the Plan Administrator shall be deemed to have made the RCM Rights Distribution to the RCM Trustee and the Plan Administrator or the RCM Trustee, as the case may be, shall establish the RCM Distribution Reserve. Unless a Holder of an RCM FX/Unsecured Claim or RCM Securities Customer Claim has decided to not participate in the RCM Cash Distribution by electing not to (i) assign such Holder's RCM Related Claims, if any, to the Litigation Trust; (ii) affirm its understanding that its RCM Related Claim against any Contributing Non-Debtor Affiliate shall be subordinated pursuant to the Plan, as of each applicable Contributing Non-Debtor Affiliate Trigger Date, to all other existing Claims against and equity Interests in the applicable Contributing Non-Debtor Affiliate, and (iii) release the Secured Lenders (in such capacities) from the Secured Lender Released Claims held by such Holder, if any, such Holder will receive its applicable share of the RCM Cash Distribution and 50% of the RGL FXCM Distribution, which, unless such Holder elects not to receive RCM BAWAG Proceeds, shall include such Holders' applicable share of the RCM BAWAG Proceeds portion of the RCM Cash Distribution. Upon contribution of the RCM Related Claims against any Debtor to the Litigation Trust, such Claims will be deemed Allowed.

        **6.2**    *Distributions for Claims Allowed as of the Effective Date*. Except as otherwise provided herein or as ordered by the Bankruptcy Court, Distributions to be made on account of Claims against FXA, the Contributing Debtors or RCM that are Allowed Claims as of the Effective Date shall be made on the Effective Date or as soon thereafter as is practicable; *provided*, *however*, that the Disbursing Agent, on behalf of the Reorganized Debtors, shall not make Distributions to Holders of Allowed Claims (other than Allowed Secured Lender Claims) that are not Senior Subordinated Note Claims until all Reserves have been established and adequately funded in accordance with the terms of this Plan and the Senior Subordinated Note Holder Distribution and the Senior Subordinated Note Holder Fee Distribution have been paid in full; *provided further*, *however*, that the RCM Trustee shall not be required to make Distributions until all RCM Reserves have been established and adequately funded in accordance with the terms of this Plan and the RCM Settlement Agreement. Any payment or Distribution required to be made under this Plan on a day other than a Business Day shall be made on the next succeeding Business Day.

        **6.3**    *Distributions of Proceeds of the Litigation Trust*. Pursuant to the terms and conditions set forth in the Litigation Trust Agreement, the Litigation Trustee shall transfer all the Contributed Claims Recoveries to the Disbursing Agent or the RCM Trustee for Distribution in accordance with the provisions of this Plan and the RCM Settlement Agreement.

        **6.4**    *Single Distribution*. Except with respect to Allowed Secured Lender Claims and Senior Subordinated Note Claims, any Holder of a Claim asserted against more than one Debtor (or a Debtor and RCM), shall be entitled to a Distribution from only the Refco Entity with which such Holder was in privity or had another direct right to payment not predicated upon theories of fraud, piercing the corporate veil, alter ego, domination, constructive trust or other equitable principles arising from a lack of knowledge of the true prepetition financial condition of the Refco Entities (whether that results in Distribution from RCM, FXA, or the Contributing Debtors),

and all RCM Related Claims and Other Related Claims shall be subordinated and shall receive no Distribution from the assets of the applicable Debtor or RCM, as the case may be, unless and until such time as all Allowed General Unsecured Claims (or in the case of RCM, all Allowed RCM Securities Customer Claims, Allowed RCM FX/Unsecured Claims and Allowed Leuthold Metals Claims) against the applicable Debtor or RCM, as the case may be, have been paid in full; *provided, however,* that (A) any Holder of an RCM Securities Customer Claim or an RCM FX/Unsecured Claim with an independent Claim against any Contributing Debtor based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by RCM, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from RCM under this Plan), and (B) any Holder of a Claim against FXA with an independent Claim against the Contributing Debtors or RCM based on a contractual guarantee or other direct contractual undertaking may also recover once from the Contributing Debtors on such Claim based on the full underlying Claim amount owed by FXA, as of the Petition Date, for which such guarantee or other direct contractual undertaking was provided (and such Claim against the Contributing Debtors shall not be limited to the amount remaining after recovery from FXA under this Plan). In addition, subject to the earning of interest in respect of the Litigation Trust as set forth in section 5.7 of this Plan no Holder of a Claim against one or more Debtors (or a Debtor and RCM) shall receive a Distribution under the Plan that results in greater than a 100% recovery on such Holder's Claim (which, in the case of a Holder of both a primary Claim against a Debtor or RCM and a contractual guarantee from another Debtor or RCM, shall mean no more than a cumulative 100% recovery on the underlying Claim amount owed by the primary obligor).

**6.5** ***Accounts; Escrows; Reserves for the Reorganized Debtors***. The Plan Administrator, on behalf of the Reorganized Debtors, in accordance with the provisions of the Plan Administrator Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan. The Plan Administrator shall dispose of non-Cash assets of the Estates of the Reorganized Debtors, if any, in accordance with the provisions of the Plan and the Plan Administrator Agreement.

(a) *Administrative/Priority Claims Reserve.* On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator shall, subject to the provisions of section 5.16 hereof, create and fund the Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of the Contributing Debtors and FXA, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full. The Plan Administrator may increase the amount of the Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the Claims Distribution Account.

(b) *Disputed Claims Reserve.*

(i) The Plan Administrator shall create and fund the Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Contributing Debtors General Unsecured Distribution or the FXA General Unsecured Distribution, as applicable, that would have been made to each Holder of a Disputed Claim against the Contributing Debtors or FXA if such Claim were an Allowed Contributing Debtors General Unsecured Claim or an Allowed FXA General Unsecured Claim for the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however,* that the Debtors, the Plan Administrator or the Reorganized Debtors may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii) The Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at

the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims against the Contributing Debtors or FXA whose Claims have become Allowed Claims.

(iii)     If any Cash or Litigation Trust Interests remains in the Disputed Claims Reserve after all Disputed Claims against the Contributing Debtors and FXA have been resolved, such remaining assets shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof. Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, the Plan Administrator may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)     The Plan Administrator shall maintain two sub-accounts within the Disputed Claims Reserve for (i) the Contributing Debtors and (ii) FXA.

(c)     *Wind-Down Reserves.*  On the Effective Date (or as soon thereafter as is practicable), the Plan Administrator, on behalf of the Reorganized Debtors, shall create and fund the Wind-Down Reserve with sufficient Cash to administer the Plan, including, but not limited to, compensation of the Plan Administrator and Administrative Professionals. The Plan Administrator may make reasonable adjustments to the Wind-Down Reserve as necessary. Any Cash in the Wind-Down Reserve which is unnecessary for the administration of the Plan shall be transferred to Reorganized Refco or Reorganized FXA, as applicable, for Distribution to Holders of Allowed Claims against the Contributing Debtors or FXA, as applicable, in accordance with the terms hereof.

**6.6**     *Accounts; Escrows; Reserves for the Post-Confirmation RCM*.  The RCM Trustee, on behalf of Post-Confirmation RCM, in accordance with the provisions of the RCM Settlement Agreement, shall (a) establish one or more general accounts into which shall be deposited all funds not required to be deposited into any other account, RCM Reserve, or escrow and (b) create, fund, and withdraw funds from, as appropriate, such general accounts in order to comply with and implement the provisions of this Plan. The RCM Trustee shall dispose of non-Cash assets of the RCM Estate, if any, in accordance with the provisions of the Plan and the RCM Settlement Agreement and applicable law.

(a)     *RCM Administrative/Priority Claims Reserve*.  On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee shall, subject to the provisions of section 5.16 hereof, create and fund the RCM Administrative/Priority Claims Reserve with Cash equal to one hundred percent (100%) of the Distributions to which Holders of Administrative and Allowed Priority Claims of RCM, not otherwise paid in full on the Effective Date, would be entitled under the Plan if such Claims were Allowed in full. The RCM Trustee may increase the amount of the RCM Administrative/Priority Claims Reserve to satisfy disputed, contingent or unliquidated Administrative and Priority Claims (not previously estimated or allowed as of the Effective Date) with funds held in the RCM Claims Distribution Account. If the Chapter 11 Case of RCM is converted to a case in chapter 7, prior to any conversion the RCM Trustee shall be entitled to set aside appropriate reserves for Administrative Claims incurred or to be incurred prior to conversion, with the amounts of such Administrative Claims to be payable from the reserves upon allowance of the Claims therefor so long as the RCM Trustee has determined that there are or will be sufficient funds available to pay all Administrative Claims of the chapter 7 case.

(b)     *RCM Disputed Claims Reserve.*

(i)     The RCM Trustee shall create and fund the RCM Disputed Claims Reserve with Cash and Litigation Trust Interests equal to the aggregate Pro Rata share of the Distribution that would have been made to each holder of a Disputed Claim against RCM if such Claim were an Allowed RCM Securities Customer Claim or RCM FX/Unsecured Claim for

the Disputed Claim Amount or such other amount established by the Bankruptcy Court prior to the Effective Date; *provided, however*, that the RCM, Post-Confirmation RCM or the RCM Trustee may within 90 days after the Effective Date (or such other date as the Bankruptcy Court may order) file a motion(s) seeking to estimate any contingent or unliquidated Claims asserted on or before the Effective Date, with notice and an opportunity to be heard to be given to the affected Holders of such Disputed Claims.

(ii)     The RCM Disputed Claims Reserve shall be funded with Cash and Litigation Trust Interests equal to such percentage amounts approved by the Bankruptcy Court at the Confirmation Hearing and shall be reduced following each Quarterly Distribution Date by any amounts in the RCM Disputed Claims Reserve that exceed the amounts required to be reserved by section (i) above, with such amounts being distributed to the Holders of Disputed Claims whose Claims against RCM have become Allowed Claims.

(iii)     If any Cash or Litigation Trust Interests remain in the RCM Disputed Claims Reserve after all Disputed Claims against RCM have been resolved, such remaining amounts shall be transferred to Post-Confirmation RCM for Distribution in accordance with the terms of the Plan and the RCM Settlement Agreement.  Unless otherwise provided in an order of the Bankruptcy Court, in the event that the Bankruptcy Court estimates any contingent, unliquidated, or Disputed Claim against RCM, the estimated amount shall constitute either the Allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Bankruptcy Court; *provided, however*, that, if the estimate constitutes the maximum limitation on such Claim, the RCM Trustee may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim.

(iv)     The RCM Trustee shall maintain sub-accounts within the RCM Disputed Claims Reserve for RCM Securities Customer Claims and RCM FX/Unsecured Claims.  Each sub-account shall be further subdivided for Assets in Place and Additional Property (each as defined in the RCM Settlement Agreement).  The RCM Trustee may maintain such other reserves as are permitted by the RCM Settlement Agreement.

(v)     Distributions of Additional Property under the RCM Settlement Agreement on behalf of RCM Securities Customer Claims and RCM FX/Unsecured Claims shall be made Pro Rata (as such term is defined in the RCM Settlement Agreement).  True up Distributions (as defined in the RCM Settlement Agreement)  shall be made from time to time from Additional Property as determined by the RCM Trustee.  The RCM Reserves shall take into account the requirement to true up with respect to Pro Rata (as defined in the RCM Settlement Agreement) shares of Additional Property.

(c)     *RCM Distribution Reserve.*  On the Effective Date, the Plan Administrator shall create and fund the RCM Distribution Reserve.  Each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the Plan Administrator with an RCM Related Claim Subordination Form shall receive from the Plan Administrator on the next available Distribution Date its allocable share (as determined by the RCM Trustee consistent with their elections) of the RCM Distribution Reserve (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot); *provided, however*, if the RCM Settlement Agreement is amended prior to the Confirmation Hearing so as to permit the RCM Trustee to receive conditional Distributions of Additional Property (as defined in the RCM Settlement Agreement) and to not require an immediate distribution of all assets received by the RCM Trustee to Holders of Allowed Claims against RCM, any amounts that would have been held in the RCM Distribution Reserve shall be transferred to the RCM Trustee who shall then distribute such funds on the next available Distribution Date to each Holder of an Allowed RCM Securities Customer Claim or Allowed RCM FX/Unsecured Claim that has provided the RCM Trustee with an RCM Related Claim Subordination Form (net of costs, if any, with respect to obtaining such RCM Related Claim Subordination Form if such form has been provided after the Voting Deadline and the election was not made in a ballot).  In the event that any Holder of an RCM Related Claim has not provided an RCM Related Claim Subordination Form, but

the RCM Related Claim of such Holder is subsequently expunged by objection of the Plan Administrator, the reserve in respect of such Claim shall be distributed (net of costs of expunging the RCM Related Claim) by the RCM Trustee or the Plan Administrator, as applicable, Pro Rata (as defined in the RCM Settlement Agreement) to such Holder and to those Holders of Allowed RCM Securities Customer Claims and Allowed RCM FX/Unsecured Claims that provided the Plan Administrator or the RCM Trustee, as applicable, with an RCM Related Claim Subordination Form. In the event that any RCM Related Claim becomes an Allowed Claim, the reserve in respect of such Claim shall be deposited in the Claims Distribution Account for Distribution in accordance with the terms of this Plan.

(d)     *RCM Wind-Down Reserve.* On the Effective Date (or as soon thereafter as is practicable), the RCM Trustee or the Plan Administrator, as the case may be, on behalf of Post-Confirmation RCM, shall create and fund the RCM Wind-Down Reserve with sufficient Cash from the RCM Cash Distribution to administer the Plan and the RCM Settlement Agreement, including, but not limited to, compensation of the RCM Trustee and RCM Administrative Professionals. The RCM Trustee may make reasonable adjustments to the RCM Wind-Down Reserve as necessary. Any Cash in the RCM Wind-Down Reserve which is unnecessary for the administration of the Plan and the RCM Settlement Agreement shall be transferred to Post-Confirmation RCM for Distribution to Holders of Allowed Claims against RCM in accordance with the terms hereof.

**6.7     *Interest and Penalties on Claims*.** Unless otherwise specifically provided for in this Plan, the Confirmation Order or another order of the Court (including, without limitation, the Early Payment Order), or if required by applicable bankruptcy law, postpetition interest and penalties shall not accrue or be paid on any Claims and no Holder of a Claim shall be entitled to interest and penalties accruing on or after the Petition Date through the date such Claim is satisfied in accordance with the terms of this Plan.

**6.8     *Distributions by Disbursing Agent and RCM Trustee*.** All Distributions under the Plan on behalf of the Reorganized Debtors shall be made by the Disbursing Agent at the direction of the Plan Administrator and all Distributions under the Plan and the RCM Settlement Agreement on behalf of RCM shall be made by the RCM Trustee. The Disbursing Agent and the RCM Trustee shall be deemed to hold all property to be distributed by each hereunder in trust for Persons entitled to receive the same. The Disbursing Agent and the RCM Trustee shall not hold an economic or beneficial interest in such property.

**6.9     *Delivery of Distributions and Undeliverable or Unclaimed Distributions*.**

(a)     *Delivery Of Distributions In General.* Distributions to Holders of Allowed Claims shall be made at the addresses set forth in the Debtors' or RCM's records unless such addresses are superseded by proofs of claim or transfers of claim filed pursuant to Bankruptcy Rule 3001; *provided, however,* Distributions on account of Senior Subordinated Note Claims shall be made to the Senior Subordinated Note Indenture Trustee who shall, in turn, administer such Distributions to the Holders of Senior Subordinated Note Claims in accordance with the terms of the Senior Subordinated Note Indenture. The Senior Subordinated Note Indenture Trustee shall be authorized but not required to effect any Distribution under the Plan through the book entry transfer facilities of The Depositary Trust Company pursuant to the procedures used for effecting distributions thereunder on the date of any such distribution. Distributions on account of Secured Lender Claims shall be made to the Secured Lender Agent, who shall in turn administer such Distributions in accordance with the terms of the Credit Agreement.

(b)     *Undeliverable and Unclaimed Distributions.*

(i)     *Holding and Investment of Undeliverable and Unclaimed Distributions.* If the Distribution to any Holder of an Allowed Claim is returned to the Disbursing Agent or the RCM Trustee, as applicable, as undeliverable or is otherwise unclaimed, no further Distributions shall be made to such Holder unless and until the Disbursing Agent or the RCM Trustee, as applicable, is notified in writing of such Holder's then current address. Undeliverable and unclaimed Distributions shall be deposited in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as the case may be, until such time as a Distribution becomes deliverable or is unclaimed in accordance with this section of the Plan. The accounts for the Unclaimed Distribution Reserve and RCM Unclaimed Distribution Reserve may be interest-

bearing accounts, provided that any interest accruing on funds in the Unclaimed Distribution Reserve shall be transferred to the Reorganized Refco or Reorganized FXA, as applicable, for Distribution in accordance with the terms hereof and any interest accruing on funds in the RCM Unclaimed Distribution Reserve shall be transferred to the RCM Trustee for Distribution in accordance with the terms of this Plan and the RCM Settlement Agreement.

        (ii)    *After Distributions Become Deliverable.*  The Disbursing Agent or RCM Trustee, as applicable, shall make all Distributions that have become deliverable or have been claimed since the Effective Date or the next Quarterly Distribution Date as soon as practicable after such Distribution has become deliverable.

        (iii)    *Failure to Claim Undeliverable Distributions.*  Any Holder of an Allowed Claim that does not assert a claim pursuant to this Plan for an undeliverable or unclaimed Distribution within one year after the applicable date of Distribution shall be deemed to have forfeited its claim for such undeliverable or unclaimed Distribution and shall be forever barred and enjoined from asserting any such claim for an undeliverable or unclaimed Distribution against the Debtors, RCM or their Estates, the Reorganized Debtors, the Plan Administrator, Post-Confirmation RCM, the RCM Trustee or their property.  In such cases, any Cash in the Unclaimed Distribution Reserve or the RCM Unclaimed Distribution Reserve, as applicable, for Distribution on account of such Claims for undeliverable or unclaimed Distributions shall become the property of the applicable Estate free of any restrictions thereon.  Such unclaimed or undeliverable funds shall be transferred to the Reorganized Debtors or Post-Confirmation RCM, as applicable, to be distributed in accordance with the terms of the Plan or the RCM Settlement Agreement.  Nothing contained in this Plan, the Plan Administrator Agreement or the RCM Settlement Agreement shall require the Disbursing Agent or the RCM Trustee to attempt to locate any Holder of an Allowed Claim.

        (c)    *Time Bar to Cash Payments.*  Checks issued by the Disbursing Agent or the RCM Trustee, as applicable, on account of Allowed Claims shall be null and void if not negotiated within ninety (90) days from and after the date of issuance thereof.  Requests for reissuance of any check shall be made directly to the Disbursing Agent or the RCM Trustee, as applicable, by the Holder of the Allowed Claim with respect to which such check originally was issued.  Any claim in respect of such a voided check shall be made on or before the later of (a) the second (2nd) anniversary of the Effective Date or (b) ninety (90) days after the date of issuance of such check, if such check represents a final Distribution hereunder on account of such Claim.  After such date, all Claims in respect of voided checks shall be discharged and forever barred and the Reorganized Debtors or RCM, as the case may be, shall retain all monies related thereto for the sole purpose of redistribution to Holders of Allowed Claims or Interests in accordance with the terms of this Plan and the RCM Settlement Agreement, as applicable.

        **6.10**    **Record Date for Distributions**.  With respect to all Claims except Senior Subordinated Note Claims, the Disbursing Agent or the Plan Administrator or the RCM Trustee, as applicable, shall have no obligation to recognize the transfer of, or the sale of any participation in, any Claim that occurs after the close of business on the Distribution Record Date, and shall be entitled for all purposes herein to recognize and distribute only to those Holders of Claims who are Holders of such Claims, or participants therein, as of the close of business on the Distribution Record Date.  The Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, shall instead be entitled to recognize and deal for all purposes under this Plan with only those record holders stated on the official claims register as of the close of business on the Distribution Record Date.  No Distribution Record Date shall be established for Distributions on account of Senior Subordinated Note Claims.

        **6.11**    **Distributions to Holders of Senior Subordinated Note Claims**.  As a condition precedent to receiving any Distribution under this Plan on account of an Allowed Senior Subordinated Note Claim, the registered Holders (as defined in the Senior Subordinated Note Indenture) of such Senior Subordinated Note Claim shall surrender any certificate(s) evidencing such Senior Subordinated Note Claim in accordance with written instructions to be provided to such registered Holders (as defined in the Senior Subordinated Note Indenture) and the Senior Subordinated Note Indenture Trustee by the Plan Administrator (in consultation with the Senior Subordinated

Note Indenture Trustee, and consistent with customary market practice), unless waived in writing by the Debtors or the Plan Administrator.

**6.12** ***Senior Subordinated Notes Indenture Trustee as Claim Holder***. Consistent with Bankruptcy Rule 3003(c), the Debtors or the Plan Administrator, as the case may be, shall recognize a proof of claim filed by the Senior Subordinated Notes Indenture Trustee in respect of the Senior Subordinated Notes Claims. Accordingly, any Senior Subordinated Note Claim, proof of which is filed by the registered or beneficial Holder of a Senior Subordinated Note Claim, may be disallowed as duplicative of any Senior Subordinated Note Claims of the Senior Subordinated Notes Indenture Trustee, without need for any further action or Bankruptcy Court order. For the avoidance of doubt, the Senior Subordinated Notes Indenture Trustee shall be authorized to distribute amounts received in respect of Senior Subordinated Note Holder Distributions.

**6.13** ***Allocation of Plan Distributions Between Principal and Interest***. Except for Distributions made in respect of Allowed Secured Lender Claims, which shall be made in accordance with the Credit Agreement, to the extent that any Allowed Claim entitled to a Distribution under this Plan is composed of indebtedness and accrued but unpaid interest thereon, such Distribution shall, for all income tax purposes, be allocated to the principal amount of the Claim first and then, to the extent that the consideration exceeds the principal amount of the Claim, to the portion of such Claim representing accrued but unpaid interest.

**6.14** ***Means of Cash Payment***. Payments of Cash made pursuant to this Plan shall be in U.S. dollars and shall be made, at the option and in the sole discretion of the Plan Administrator or the RCM Trustee, as applicable, by (a) checks drawn on or (b) wire transfer from a domestic bank selected by the Plan Administrator or the RCM Trustee, as applicable. Cash payments to foreign creditors may be made, at the option of the Plan Administrator or the RCM Trustee, as applicable, in such funds and by such means as are necessary or customary in a particular foreign jurisdiction.

**6.15** ***Withholding and Reporting Requirements***. In connection with this Plan and all Distributions thereunder, the Disbursing Agent, the Plan Administrator or the RCM Trustee, as applicable, on behalf of the Reorganized Debtors, shall comply with all withholding and reporting requirements imposed by any federal, state, local, or foreign taxing authority, and all Distributions hereunder shall be subject to any such withholding and reporting requirements. The Disbursing Agent, the Plan Administrator and the RCM Trustee, on behalf of the Reorganized Debtors and RCM, as applicable, shall be authorized to take any and all actions that may be necessary or appropriate to comply with such withholding and reporting requirements.

**6.16** ***Setoffs***. Unless prohibited by the terms of this Plan or any other Plan Document, the Plan Administrator on behalf of the Reorganized Debtors or the RCM Trustee on behalf of Post-Confirmation RCM, may, pursuant to section 553 of the Bankruptcy Code or applicable nonbankruptcy laws, but shall not be required to, set off against any Claim, the payments or other Distributions to be made pursuant to this Plan in respect of such Claim, or claims of any nature whatsoever (other than the Released/Subordinated Claims) that the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM may have against the Holder of such Claim; *provided, however,* that neither the failure to do so nor the allowance of any Claim hereunder shall constitute a waiver or release by the Reorganized Debtors or Post-Confirmation RCM of any such claim that the Debtors, RCM, Post-Confirmation RCM or the Reorganized Debtors may have against such Holder.

**6.17** ***Fractional Dollars***. Notwithstanding any other provision of the Plan, the Plan Administrator Agreement or the RCM Settlement Agreement, none of the Plan Administrator, the Reorganized Debtors, the RCM Trustee or RCM, as applicable, shall be required to make Distributions or payments of fractions of dollars, and whenever any payment of a fraction of a dollar under the Plan would otherwise be called for, the actual payment made shall reflect a rounding of such fraction to the nearest whole dollar (up or down), with half dollars being rounded down.

**6.18** ***Release of Liens***. Except as otherwise provided in this Plan or in any other Plan Document, on the Effective Date and concurrently with the applicable Distributions made pursuant to this Plan, all mortgages, deeds of trust, liens, pledges, or other security interests (collectively, the "Mortgages") in and against the property of any Estate automatically shall be fully released and discharged, and all such property shall be free and

clear of all such Mortgages. Nothing in the Plan shall be deemed, asserted or construed to affect the Senior Subordinated Notes Indenture Trustee Charging Lien.

# ARTICLE VII

## TREATMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES

**7.1** *Rejected Contracts and Leases*. Except as otherwise provided in the Confirmation Order, the Plan, or in any other Plan Document, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code rejecting all prepetition executory contracts and unexpired leases to which any Debtor is a party, to the extent such contracts or leases are executory contracts or unexpired leases, on and subject to the occurrence of the Effective Date, unless such contract or lease (a) previously shall have been assumed, assumed and assigned, or rejected by the Debtors, (b) previously shall have expired or terminated pursuant to its own terms before the Effective Date, (c) is the subject of a pending motion to assume or reject on the Confirmation Date, or (d) is identified in Exhibit D to this Plan as a contract or lease to be assumed; *provided, however*, that the Debtors may amend such exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.2** *Bar to Rejection Damages*. If the rejection of an executory contract or unexpired lease pursuant to section 7.1 above gives rise to a Claim by the other party or parties to such contract or lease, such Claim shall be forever barred and shall not be enforceable against the applicable Debtor or its Estate, the Reorganized Debtors, the Plan Administrator, or their respective successors or properties unless a proof of Claim is filed and served on the Reorganized Debtors and counsel for the Reorganized Debtors within thirty (30) days after service of a notice of the Effective Date or such other date as is prescribed by the Bankruptcy Court.

**7.3** *Assumed and Assigned Contracts and Leases*. Except as otherwise provided in the Confirmation Order, the Plan, or any other Plan Document entered into after the Petition Date or in connection with the Plan, the Confirmation Order shall constitute an order under section 365 of the Bankruptcy Code assuming, as of the Effective Date, those executory contracts and unexpired leases listed on Exhibit D to this Plan; *provided, however*, that the Debtors may amend such Exhibit of assumed and assigned executory contracts and unexpired leases at any time prior to the Confirmation Date.

**7.4** *Compensation and Benefit Programs*. All Employee Benefit Plans, including programs subject to sections 1114 and 1129(a)(13) of the Bankruptcy Code, entered into before or after the Petition Date shall be deemed to be, and shall be treated as if they were, executory contracts that are subject to rejection in accordance with section 7.1 of the Plan (to the extent such rejection does not violate sections 1114 and 1129(a)(13) of the Bankruptcy Code).

**7.5** *Treatment of RCM Executory Contracts and Unexpired Leases*. Notwithstanding the preceding sections of this Article VII, the RCM Trustee shall determine the appropriate treatment for the executory contracts and unexpired leases of RCM in accordance with applicable law and the RCM Settlement Agreement.

# ARTICLE VIII

## PROCEDURES FOR RESOLVING DISPUTED, CONTINGENT, AND UNLIQUIDATED CLAIMS AND INTERESTS

**8.1** *Objection Deadline; Prosecution of Objections*. Subject to section 5.21 of this Plan, no later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the Plan Administrator on behalf of the Reorganized Debtors, after consultation with the Plan Committee, may file objections to Claims or Interests against FXA and the Contributing Debtors that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. No

later than the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable, the RCM Trustee on behalf of Post-Confirmation RCM may file objections to Claims or Interests against RCM that are not yet Allowed with the Bankruptcy Court and serve such objections upon the Holders of each of the Claims or Interests to which objections are made. Nothing contained herein, however, shall limit the ability of the Plan Administrator or the RCM Trustee, as applicable, to object to Claims or Interests, if any, filed or amended after the Claims Objection Deadline or the Administrative Claims Objection Deadline, as applicable. Subject to limitations set forth in the Plan Administrator Agreement and the Plan, as applicable, the Plan Administrator shall be authorized to, and shall, dispose of all Disputed Claims or Interests by withdrawing or settling such objections thereto, or by litigating to judgment in the Bankruptcy Court or such other court as may have jurisdiction the validity, nature, and/or amount thereof. The RCM Trustee shall have sole discretion and authority to object to any RCM Claims or Interests in accordance with the RCM Settlement Agreement and applicable provisions of the Bankruptcy Code.

        **8.2**      *No Distributions Pending Allowance*. Notwithstanding any other provision of this Plan, no payments or Distributions shall be made with respect to any disputed portion of a Disputed Claim or Interest unless and until all objections to such Disputed Claim or Interest have been settled or withdrawn or have been determined by Final Order and the Disputed Claim or Interest, or some portion thereof, has become an Allowed Claim or Interest.

        **8.3**      *Distributions After Allowance*. The Disbursing Agent on behalf of the Reorganized Debtors and the RCM Trustee on behalf of RCM shall make payments and Distributions from the Disputed Claims Reserve and the RCM Disputed Claims Reserve, as applicable, to the Holder of any Disputed Claim or Interest that has become an Allowed Claim or Interest, or any portion of which has become Allowed, on the first Quarterly Distribution Date following the date that such Disputed Claim or Interest becomes an Allowed Claim. Such Distributions shall be made in accordance with the Plan, the Plan Administrator Agreement and the RCM Settlement Agreement, as applicable.

# ARTICLE IX

## CONFIRMATION AND CONSUMMATION OF THE PLAN

        **9.1**      *Conditions to Confirmation*.

        (a)      The Confirmation Order shall be reasonably acceptable in form and substance to the Plan Proponents (and with respect to any matter affecting the Secured Lender Agent and/or the Secured Lenders, the Secured Lender Agent);

        (b)      The Confirmation Date of this Plan shall have occurred on or before December 15, 2006; and

        (c)      The Plan Proponents shall have determined and shall have filed with the Bankruptcy Court a notice confirming that the Allotted Administrative Claims are not reasonably expected to exceed, in the aggregate, $180 million;

        (d)      Houlihan and Capstone shall have each filed with the Bankruptcy Court in advance of the Voting Deadline, its respective RCM Projection and Contributing Debtors Projection.

        (e)      Either (i) both of the Houlihan and Capstone RCM Projections shall be equal to or exceed $430 million, or (ii) in the event that one such RCM Projection is less than $430 million and the other is equal to or exceeds $430 million, the Bankruptcy Court (after reviewing both RCM Projections and the assumptions therein) shall have determined that the appropriate RCM Projection is equal to or exceeds $430 million; and

        (f)      Either (i) both of the Houlihan and Capstone Contributing Debtors Projections shall be equal to or exceed $64 million, or (ii) in the event that one such Contributing Debtors Projection is less than

$64 million and the other is equal to or exceeds $64 million, the Bankruptcy Court (after reviewing both RCM Projections and the assumptions therein) shall have determined that the appropriate Contributing Debtors Projection is equal to or exceeds $64 million.

**9.2** **_Conditions to Effective Date_**. The Plan Proponents shall request that the Confirmation Order include a finding by the Bankruptcy Court that, notwithstanding Bankruptcy Rule 3020(e), the Confirmation Order shall take effect immediately upon its entry. The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived by the Plan Proponents in accordance with the terms hereof prior to December 31, 2006:

(a) The Confirmation Order, in form and substance reasonably satisfactory to the Plan Proponents, shall have been entered and not thereafter stayed, reversed or vacated and shall, among other things, provide that:

(i) the Debtors, the Plan Administrator, on behalf of the Reorganized Debtors, and the RCM Trustee on behalf of Post-Confirmation RCM are authorized to take all actions necessary or appropriate to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan; and

(ii) the provisions of the Confirmation Order are non severable and mutually dependent.

(b) Unless the condition set forth in paragraph 15(a) of the Early Payment Order that the Early Payment Order shall have become a Final Order in full force and effect shall have been waived in accordance therewith, the Early Payment Order shall have become a Final Order and shall be in full force and effect;

(c) The RCM Settlement Agreement shall have been approved by the Bankruptcy Court and shall have become effective by satisfaction of all conditions to effectiveness therein.

(d) All other actions, documents, and agreements necessary to implement the Plan shall have been effected or executed;

(e) The Secured Lender Payment Date shall have occurred; and

(f) The Debtors shall have sufficient Cash to make all required payments to be made on the Effective Date.

(g) All amounts owed, as of the Effective Date, to the Secured Lender Agent and/or any Secured Lender pursuant to paragraph 12 of the Early Payment Order shall have been paid in full.

**9.3** **_Waiver of Conditions_**. Each of the conditions to the Effective Date set forth herein may be waived in whole or in part by the Plan Proponents by agreement, without any notice to parties in interest or the Bankruptcy Court and without a hearing; _provided, however,_ in the event that such waiver is not unanimous, the waiving Plan Proponents shall be required to obtain approval of the Bankruptcy Court to effect such waiver, following notice and a hearing and; _provided further,_ the conditions set forth in the parenthetical of section 9.1(a) and sections 9.2(b), (e) and (g) hereof shall not be waived without the consent of the Secured Lender Agent and Secured Lenders that hold the number and amount of Secured Lender Claims required to accept a plan pursuant to section 1126(c) of the Bankruptcy Code (as if, for purposes of this paragraph, such Secured Lender Claims were impaired). The failure to satisfy or waive any condition to the Effective Date may be asserted by the Plan Proponents regardless of the circumstances giving rise to the failure of such condition to be satisfied, including any action or inaction by the Plan Proponents. The failure of the Plan Proponents to exercise any of the foregoing rights shall not be deemed a waiver of any other rights, and each such right shall be deemed an ongoing right that may be asserted at any time.

**9.4** ***Consequences of Non-Occurrence of Effective Date***.  In the event that the Effective Date does not timely occur, the Plan Proponents reserve all rights to seek an order from the Bankruptcy Court directing that the Confirmation Order be vacated, that the Plan be null and void in all respects, and/or that any settlement of Claims provided for in the Plan, other than those contained in the RCM Settlement Agreement, be null and void.  In the event that the Bankruptcy Court shall enter an order vacating the Confirmation Order, the time within which the Debtors may assume and assign, or reject all executory contracts and unexpired leases not previously assumed, assumed and assigned, or rejected, shall be extended for a period of 60 days after the date the Confirmation Order is vacated, without prejudice to further extensions.


# ARTICLE X

# EFFECT OF PLAN CONFIRMATION

**10.1** ***Binding Effect***.  This Plan, and all compromises and settlements contemplated hereby or incorporated by reference herein, shall be binding upon and inure to the benefit of the Debtors, all present and former Holders of Claims and Interests, and their respective successors and assigns, including, but not limited to, the Reorganized Debtors and any Chapter 7 trustee appointed to administer any of the Estates.

**10.2** ***Releases***.

(a)  ***Releases by the Debtors and RCM***.  **As of the Effective Date, for good and valuable consideration, the adequacy of which is hereby confirmed, the Debtors and RCM (in their individual capacities and as debtors and debtors in possession) will be deemed to release forever, waive, and discharge all claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, and liabilities (other than the rights of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM to enforce this Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered hereunder, and liabilities arising after the Effective Date in the ordinary course of business) whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or part on any act omission, transaction, event, or other occurrences taking place on or prior to the Effective Date in any way relating to the Debtors, the Reorganized Debtors, RCM, Post-Confirmation RCM, the Chapter 11 Cases, this Plan, the Disclosure Statement or the RCM Settlement Agreement and that could have been asserted by or on behalf of the Debtors, RCM,  their Estates, the Reorganized Debtors or Post-Confirmation RCM, including pursuant to principles of substantive consolidation, piercing the corporate veil, alter ego, domination, constructive trust and similar principles of state or federal creditors' rights laws, in any such case, against the Released Parties.  For the avoidance of doubt, Released/Subordinated Claims shall include any and all claims and causes of action against the Released Parties, acting in such capacity, arising from or relating to (w) the Debtors' and RCM's centralized cash management system and intercompany transfers other than the RCM Intercompany Claim and Intercompany Claims with respect to Non-Debtor Affiliates, (x) the leveraged recapitalization in August 2004, (y) the initial public offering, and any related transactions effectuated in August 2005/September 2005, and (z) any transfer or payment made in respect of the Credit Agreement or the Senior Subordinated Note Indenture, including any redemption of Senior Subordinated Notes, which shall include any Claim or cause of action arising therefrom pursuant to sections 541, 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code.**

(b)  ***Releases by Holders of Claims and Interests in Respect of Released Parties***.  **On the Effective Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities (other than the right to enforce Released Parties' obligations under the Plan, the Confirmation Order, and the contracts, instruments, releases, agreements, and documents delivered under the Plan), whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown,**

**foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Debtors, RCM the Chapter 11 Cases, the Plan, or the Disclosure Statement, in any such case, against the Released Parties.**

(c) ***Releases and Subordination by Holders of Claims and Interests in Respect of Contributing Non-Debtor Affiliates and Contributing Non-Debtor Affiliate Management.*** **On each Contributing Non-Debtor Affiliate Trigger Date, each Holder of an Impaired Claim, including, but not limited to any Holder of an Impaired Claim against RCM that receives a Distribution under the Plan in consideration for the obligations of the Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM under the Plan and the Cash and other contracts, instruments, releases, agreements, or documents to be delivered in connection with the Plan, shall be deemed to (a) subordinate all claims of the type described in section 10.2(b) against the applicable Contributing Non-Debtor Affiliate to all other existing claims against and equity interests in such Contributing Non-Debtor Affiliate, and (b) release all claims of the type described in section 10.2(b) against parties who are Contributing Non-Debtor Affiliate Management of such Contributing Non-Debtor Affiliate;** ***provided, however,*** **that the RCM Trustee, with the consent of the Plan Committee, may deem any subordination referenced in this section 10.2(c) to be a "release" of claims (and may request the Bankruptcy Court to enter an Order confirming the same) to the extent the RCM Trustee determines such a release necessary to ensuring that the applicable Contributing Non-Debtor Affiliate winds up its affairs and distributes on a net basis (whether on account of equity or intercompany balances) positive Cash to the Contributing Debtors and RCM or, if insufficient Cash will be available for Distribution to RCM and the Contributing Debtors, otherwise releases all Intercompany Claims of the Contributing Non-Debtor Affiliate against RCM and the Contributing Debtors.**

(d) ***Qualifying Plan Releases.*** **In order to obtain for the estates of the Debtors the full benefits of the Early Payment Order, including the final allowance of Secured Lender Indemnification Claims at zero for purposes of the Chapter 11 Cases pursuant to paragraph 9(a) and (b) of the Early Payment Order, all Secured Lender Released Claims are hereby fully, finally and forever released on the Effective Date, provided, however, if RCM is converted to a case under chapter 7 prior to the Effective Date the Secured Lender Released Claims, with respect to RCM, shall be effective on the first to occur of the date of such conversion to chapter 7 or the Effective Date. For the avoidance of doubt, the releases provided under this section 10.2(c) of the Plan shall be interpreted such that their scope will satisfy the requirements under the Early Payment Order for the Plan to be a Qualifying Plan thereunder.**

(e) ***Releases by Recipients of BAWAG Proceeds.*** **On the Effective Date, or in the case of Holders of RCM Securities Customer Claims and RCM FX/Unsecured Claims, the later of the Effective Date and the date at which an RCM Related Claim Subordination Form is provided (i) each Holder of a Secured Lender Claim, (ii) each Holder, that has not affirmatively exercised its option to be excluded from any Distribution of BAWAG Proceeds prior to the Voting Deadline, of (A) a Senior Subordinated Note Claim, or (B) a Contributing Debtors General Unsecured Claim, or (iii) each Holder, that has provided an RCM Related Claim Subordination form electing to receive RCM BAWAG Proceeds, of (A) an RCM Securities Customer Claim or (B) an RCM FX/Unsecured Claim, shall be deemed to forever release, waive, and discharge all claims, demands, debts, rights, causes of action, or liabilities against BAWAG, whether liquidated or unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, in law, equity, or otherwise that are based in whole or in part on any act or omission, transaction, event, or other occurrence taking place on or prior to the Effective Date in any way relating to the Refco Entities or the RGHI Entities (as defined in the BAWAG Settlement), and any transactions involving such parties, including, but not limited to, claims or actions arising from or related to (a) the allegations set forth in the Complaint and the Counterclaim (each as defined in the BAWAG Settlement), (b) the allegations set forth in the Adversary Proceeding (as defined in the BAWAG Settlement), or (c) any allegations that could have been made by any of the Refco Entities;** ***provided however,*** **that pursuant to the Securities Class Action Stipulation, any Holder of a Claim or Interest against the Debtors, that is also a member of the securities class action class described in the Securities Class Action Stipulation may, assuming approval of the Securities Class Action Stipulation (and the settlement contained therein), elect to receive**

**BAWAG Proceeds without releasing BAWAG of its Securities Class Action claims as set forth in this subparagraph.**

(f) *Injunction Related to Releases*. **The Confirmation Order shall permanently enjoin the commencement or prosecution by any entity, whether directly, derivatively, or otherwise, of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released pursuant to this Plan or the Early Payment Order, including, but not limited to, the claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action, or liabilities released in this section of the Plan. For the avoidance of doubt, neither the Litigation Trust nor the Private Actions Trust shall bring any action to recover on any Released/Subordinated Claims. Notwithstanding any provision contained herein or any provision in any documents incorporating or implementing in any manner the Plan to the contrary, nothing in this Plan or the transactions approved hereby is intended to or shall release any non debtor of any liabilities or obligations to the United States of America or its agencies or subdivisions (the "United States"), nor shall it enjoin or bar any claim by the United States against any Non-Debtor Affiliate.**

**10.3** *Exculpation and Limitation of Liability*. To the maximum extent permitted by the Bankruptcy Code and applicable law, none of the (a) Debtors, (b) RCM, (c) the Reorganized Debtors, (d) the Plan Administrator, (e) any professionals retained by the Debtors or the RCM Trustee pursuant to an order of the Bankruptcy Court, (f) the Committees (including any present and former members thereof), (g) the RCM Trustee, (h) the parties to the RCM Settlement Agreement and the Plan Support Agreement (in such capacities), (i) the Post-Petition Management, (j) Post-Confirmation RCM, (k) the chapter 7 trustee appointed in Refco LLC's chapter 7 case, (l) AlixPartners, (m) the members of the Portfolio Management Advisory Committee and the Plan, Negotiation, and Litigation Advisory Committee, in each case, established under the RCM Settlement Agreement and in each case acting in such capacities nor (n) any of their respective representatives, agents, officers, directors, employees, advisors, or attorneys shall have or incur any liability to, or be subject to any right of action by, any Holder of a Claim or an Interest, or any other party in interest, or any of their respective agents, employees, representatives, financial advisors, attorneys, or agents acting in such capacity, or affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of, the Chapter 11 Cases, the RCM Settlement Agreement or, if on or prior to the Effective Date, RCM's Chapter 11 Case is converted to a chapter 7 case to be administered under subchapter III of chapter 7, related to, or arising out of, the chapter 7 case, formulating, negotiating, or implementing this Plan, the solicitation of acceptances of this Plan, the pursuit of confirmation of this Plan, the confirmation of this Plan, the consummation of this Plan, or the administration of this Plan or the property to be distributed under this Plan, except for gross negligence or willful misconduct, and in all respects shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under this Plan.

**10.4** *No Discharge of Claims; Injunction*.

(a) Pursuant to section 1141(d)(3) of the Bankruptcy Code, confirmation will not discharge Claims against the Contributing Debtors, FXA and RCM; provided, however, that no holder of a Claim against or Interest in any Contributing Debtor, FXA and RCM may, on account of such Claim or Interest, seek or receive any payment or other Distribution from, or seek recourse against the Estates of any Contributing Debtor, FXA or RCM, the Reorganized Debtors, Post-Confirmation RCM or their respective successors or their respective properties, except as expressly provided herein. Accordingly, except as otherwise provided in the Plan, the Confirmation Order shall provide, among other things, that from and after the Confirmation Date all Persons who have held, hold, or may hold Claims against or Interests in the Debtors or RCM are (i) permanently enjoined from taking any of the following actions against the Estate(s) of the Contributing Debtors, FXA, RCM, the Plan Administrator, the RCM Trustee, the Reorganized Debtors, Post-Confirmation RCM or any of their property on account of any such Claims or Interests and (ii) preliminarily enjoined from taking any of the following actions against any of the Contributing Debtors, FXA, RCM, the Reorganized Debtors, Post-Confirmation RCM or their property on account of such Claims or Interests: (A) commencing or continuing, in any manner or in any place, any action or other proceeding; (B) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order; (C) creating, perfecting, or enforcing any lien or encumbrance; and (D) commencing or continuing, in any manner or in any place, any action that does not comply with or is inconsistent with the provisions of the Plan; provided, however, that (x) nothing contained herein shall preclude such Persons from exercising their rights pursuant to and consistent with the terms of this Plan and (y) the preliminary injunction of actions against the

Contributing Debtors, FXA and RCM, the Reorganized Debtors, Post-Confirmation RCM, and their property (if any) shall be dissolved and terminate one (1) day following the dissolution of the Reorganized Debtors and Post-Confirmation RCM and completion of the winding up of their affairs. Notwithstanding anything to the contrary set forth in this Plan, creditors' rights of setoff and recoupment are preserved, and the injunctions referenced in this section or section 10.5 of the Plan shall not enjoin the valid exercise of such rights of setoff and recoupment.

(b)  By accepting Distributions pursuant to this Plan, each Holder of an Allowed Claim or Allowed Interest shall be deemed to have specifically consented to the injunctions set forth in this Article X.

**10.5** *Term of Bankruptcy Injunction or Stays*.  All injunctions or stays provided for in the Chapter 11 Cases under sections 105 or 362 of the Bankruptcy Code, or otherwise, and in existence on the Confirmation Date, shall remain in full force and effect until all of the property of the Estates of the Contributing Debtors, FXA, the Reorganized Debtors and Post-Confirmation RCM have been distributed and the Contributing Debtors and the Reorganized Debtors have been merged into the Reorganized Debtors, dissolved or otherwise liquidated, as the case may be, in accordance with the terms of the Plan or any Plan Document, and the Estate of Post-Confirmation RCM shall have been fully administered and the RCM Trustee discharged from his duties; *provided, however,* that any injunction that by its terms is permanent or otherwise is intended to survive the Effective Date and Distributions hereunder (whether by law or pursuant to order of the Court), shall be continued without modification, notwithstanding anything to the contrary contained in this Plan.

**10.6** *Continuation of Forex Adversary*.  Notwithstanding any provision herein to the contrary, neither this Plan nor any contract, instrument, release, agreement or document executed or delivered in connection therewith, nor the occurrence of the Effective Date (i) shall release, waive or discharge any of the claims or causes of action asserted in that certain adversary proceeding styled Forex Trading, LLC and The Ad Hoc Refco F/X Customer Committee v. Refco F/X Associates, LLC and Refco Capital Markets, Ltd., Adv. Proc. No. 06-01748 (RDD) (the "Forex Adversary") against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property, and/or (ii) shall permanently or preliminarily enjoin, prohibit or prevent in any way the continuation and/or prosecution of the Forex Adversary and the claims and causes of action asserted therein against FXA and RCM, their successors and assigns, including Reorganized FXA and Post-Confirmation RCM, and/or any of their property; and all such claims and causes of action, as well as any and all defenses and counterclaims of FXA and RCM (including, without limitation, FXA's right to argue that the constructive trust claim asserted against RCM in the Forex Adversary belongs to FXA and not Forex Trading LLC or the Ad Hoc Refco F/X Customer Committee, as defined in the Forex Adversary), are hereby expressly preserved.

## ARTICLE XI

## RETENTION OF JURISDICTION

**11.1** *Exclusive Jurisdiction of the Bankruptcy Court*.

Pursuant to sections 105(c) and 1142 of the Bankruptcy Code and notwithstanding entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court shall retain exclusive jurisdiction (unless otherwise indicated) over all matters arising out of, and related to, the Chapter 11 Cases, this Plan and the RCM Settlement Agreement to the fullest extent permitted by law, including, among other things, jurisdiction to:

(a)  Allow, disallow, determine, liquidate, classify, estimate, or establish the priority or secured or unsecured status of any Claim or Interest, including the resolution of any request for payment of any Allowed Administrative Claim and the resolution of any objections to the allowance or priority of Claims or Interests;

(b)     Grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or this Plan for periods ending on or before the Effective Date;

(c)     Resolve any matters related to the assumption, assumption and assignment, or rejection of any executory contract or unexpired lease to which any Debtor or RCM is a party or with respect to which any Debtor or RCM may be liable and to hear, determine, and, if necessary, liquidate any Claims arising therefrom;

(d)     Ensure that Distributions to Holders of Allowed Claims are accomplished pursuant to the provisions of this Plan and the RCM Settlement Agreement, as applicable;

(e)     Decide or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters and grant or deny any applications involving the Debtors or RCM that may be pending on the Effective Date (which jurisdiction shall be non-exclusive as to any such non-core matters);

(f)     Enter such orders as may be necessary or appropriate to implement or consummate the provisions of this Plan, the RCM Settlement Agreement and all contracts, instruments, releases, and other agreements or documents created in connection with this Plan, the RCM Settlement Agreement, the Disclosure Statement or the Confirmation Order;

(g)     Resolve any cases, controversies, suits, or disputes that may arise in connection with the consummation, interpretation, or enforcement of this Plan or the RCM Settlement Agreement or any contract, instrument, release, or other agreement or document that is executed or created pursuant to this Plan the RCM Settlement Agreement or any entity's rights arising from or obligations incurred in connection with this Plan the RCM Settlement Agreement;

(h)     Modify this Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code or modify the Disclosure Statement, the Confirmation Order, or any other Plan Document, the Disclosure Statement, or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, this Plan, the Disclosure Statement, the Confirmation Order, or any contract, instrument, release, or other agreement or document created in connection with this Plan, the Disclosure Statement, or the Confirmation Order, in such manner as may be necessary or appropriate to consummate this Plan;

(i)     Hear and determine all applications for compensation and reimbursement of expenses of Professionals under this Plan or under sections 330, 331, 503(b), 1103, and 1129(a)(4) of the Bankruptcy Code; *provided, however*, that from and after the Confirmation Date the payment of fees and expenses of the Reorganized Debtors and the Plan Administrator, including professional fees, shall be made in the ordinary course of business and shall not be subject to the approval of the Bankruptcy Court;

(j)     Issue injunctions, enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any entity with consummation, implementation, or enforcement of this Plan or the Confirmation Order;

(k)     Hear and determine causes of action by or on behalf of the Contributing Debtor, FXA, RCM, the Reorganized Debtors, the Litigation Trustee, the Private Actions Trustee or Post-Confirmation RCM;

(l)     Hear and determine matters concerning state, local, and federal taxes in accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

(m)     Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked, or vacated, or Distributions pursuant to this Plan are enjoined or stayed;

(n)     Determine any other matters that may arise in connection with or relate to this Plan, the RCM Settlement Agreement, the Disclosure Statement, the Confirmation Order or any other Plan Document;

(o)     Enforce all orders, judgments, injunctions, releases, exculpations, indemnifications, and rulings entered in connection with the Chapter 11 Cases or any subsequent chapter 7 case, as applicable (which jurisdiction shall be non-exclusive except as otherwise provided by Titles 11 and 28 of the United States Code);

(p)     Hear and determine all matters related to (i) the property of the Estates of the Reorganized Debtors and Post-Confirmation RCM from and after the Confirmation Date, (ii) the winding up of the Debtors' and RCM's affairs, and (iii) the activities of the Plan Administrator and the RCM Trustee, including (A) challenges to or approvals of the Reorganized Debtors', the Plan Administrator's, the RCM Trustee's or Post-Confirmation RCM's activities, (B) resignation, incapacity, or removal of the Plan Administrator or the RCM Trustee and selection of a successor, (C) reporting by, termination of, and accounting by the Reorganized Debtors, the Plan Administrator, the RCM Trustee and Post-Confirmation RCM, and (D) release of the Plan Administrator or the RCM Trustee from their duties;

(q)     Hear and determine disputes with respect to compensation of (i) the Reorganized Debtors' and Post-Confirmation RCM's professional advisors and (ii) the Plan Administrator, the RCM Trustee, the Litigation Trustee, the Private Actions Trustee and their professional advisors;

(r)     Hear and determine such other matters as may be provided in the Confirmation Order or as may be authorized under the Bankruptcy Code; and

(s)     Enter an order closing the Chapter 11 Cases or chapter 7 case of RCM, if any, as applicable.

## ARTICLE XII

## MISCELLANEOUS PROVISIONS

**12.1    *Effectuating Documents and Further Transactions*.**  Each of the Debtors, RCM,  the Plan Administrator on behalf of the Reorganized Debtors and the RCM Trustee on behalf of Post-Confirmation RCM shall be authorized to execute, deliver, file, or record such contracts, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of this Plan and any notes or securities issued pursuant to this Plan.

**12.2    *Corporate Action*.**  Prior to, on, or after the Effective Date (as appropriate), all matters expressly provided for under this Plan that would otherwise require approval of the stockholders, members, directors or managers of one or more of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM shall be deemed to have occurred and shall be in effect prior to, on, or after the Effective Date (as appropriate) pursuant to the applicable law of the states in which the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM are incorporated or formed without any requirement of further action by the stockholders, members, directors or managers, as applicable, of the Debtors, RCM, the Reorganized Debtors or Post-Confirmation RCM.

**12.3    *Bar Dates for Certain Claims*.**

(a)     *Administrative Claims*.  The Confirmation Order shall establish an Administrative Claims Bar Date for filing Administrative Claims against all Debtors and RCM which date shall be thirty (30) days after the Effective Date.  Holders of asserted Administrative Claims not paid prior to the Confirmation Date shall submit requests for the payment of administrative expenses on or before such Administrative Claims Bar Date or forever be barred from doing so.  The notice of Confirmation to be delivered pursuant to Bankruptcy Rules 3020(c)

and 2002(f) shall set forth such date and constitute notice of this Administrative Claims Bar Date. The Reorganized Debtors and the RCM Trustee shall have until the Administrative Claims Objection Deadline to object to such claims.

(b) *Professional Fee Claims.* All Professionals and other entities requesting compensation or reimbursement of Professional Fee Claims pursuant to sections 327, 328, 330, 331, or 503(b) of the Bankruptcy Code for services rendered prior to the Confirmation Date shall file and serve on the Reorganized Debtors and counsel for the Reorganized Debtors and on the RCM Trustee and his counsel an application for final allowance of compensation and reimbursement of expenses no later than sixty (60) days after the Effective Date, unless otherwise ordered by the Bankruptcy Court. Objections to applications of such Professionals or other entities for compensation or reimbursement of expenses must be filed and served on the Reorganized Debtors, counsel for the Reorganized Debtors, the RCM Trustee and his counsel, and the requesting Professional or other entity no later than thirty (30) days (or such longer period as may be allowed by order of the Bankruptcy Court) after the date on which the applicable request for compensation or reimbursement was served. Upon the Confirmation Date, any requirement that Professionals comply with sections 328, 330, or 331 of the Bankruptcy Code in seeking retention or compensation for services rendered after such date shall terminate. Professional Fee Claims relating to fees and expenses incurred after the Effective Date shall be paid in the ordinary course of business.

(c) *Professional Fee Holdback.* Within 10 calendar days prior to the Confirmation Hearing, each Professional shall provide to the Plan Proponents (with a copy to the Fee Committee) a notice of Professional Fee Claim containing (i) a disclosure of fees and expenses incurred, unbilled and unpaid in the Chapter 11 Cases, including any amounts that may be sought by any Professional as an enhancement of the fees billed by it in the Chapter 11 Cases based on the results achieved in the Chapter 11 Cases  and (ii) an estimate of additional fees and expenses expected to be incurred by each such Professional through the Effective Date (in the aggregate, the "Professional Fee Claims"). On the Effective Date, the Reorganized Debtors and Post-Confirmation RCM shall fund an escrow account consisting of 110% of (x) the amount of any holdbacks on previously billed and paid amounts and (y) the amount of the Professional Fee Claims estimated in (ii) of the first sentence of this subparagraph 12.3(c). Amounts held in such escrow account shall be used to pay amounts not previously paid and subsequently allowed by the Bankruptcy Court following compliance with the interim compensation procedures established by the Bankruptcy Court in these Chapter 11 Cases and/or a hearing on the Professionals' final fee applications. When all Professional Fee Claims have been paid in full, amounts remaining in such escrow account, if any, shall be returned to the Reorganized Debtors and Post-Confirmation RCM.

**12.4** *Payment of Statutory Fees.* All fees payable pursuant to section 1930 of title 28, United States Code, as determined by the Bankruptcy Court at the Confirmation Hearing, shall be paid on the Effective Date. The Debtors, RCM, the Reorganized Debtors and Post-Confirmation RCM shall remain liable for any quarterly fees validly due and owing to the United States Trustee under 28 U.S.C. § 1930 through and including such dates that their respective Chapter 11 Cases are converted to cases under chapter 7, dismissed, or closed.

**12.5** *Amendment or Modification of the Plan.* Subject to section 1127 of the Bankruptcy Code and, to the extent applicable, sections 1122, 1123, and 1125 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend, or modify this Plan at any time prior to or after the Confirmation Date but prior to the substantial consummation of this Plan; *provided, however*, that no such alteration, amendment or modification shall conflict with any Final Order (including, without limitation, the Early Payment Order). A Holder of a Claim that has accepted this Plan shall be deemed to have accepted the Plan, as altered, amended or modified, if the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such Holder.

**12.6** *Severability of Plan Provisions.* If, prior to the Confirmation Date, any term or provision of this Plan is determined by the Bankruptcy Court to be invalid, void, or unenforceable, the Bankruptcy Court shall have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void, or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration, or interpretation, the remainder of the terms and provisions of this Plan shall remain in full force and effect and shall in no way be affected, impaired, or invalidated by such holding, alteration, or interpretation. The

Confirmation Order shall constitute a judicial determination and shall provide that each term and provision of this Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

**12.7** *Successors and Assigns*. This Plan shall be binding upon and inure to the benefit of the Debtors, RCM, and their respective successors and assigns, including, without limitation, any chapter 7 trustee subsequently appointed. The rights, benefits, and obligations of any entity named or referred to in this Plan shall be binding on, and shall inure to the benefit of, any heir, executor, administrator, successor, or assign of such entity.

**12.8** *Revocation, Withdrawal, or Non-Consummation*. The Plan Proponents reserve the right to revoke or withdraw the Plan at any time prior to the Confirmation Date and to file other plans of reorganization. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation or consummation of the Plan does not occur, then (i) the Plan shall be null and void in all respects, (ii) except as provided in sections 12.15 and 12.16 of the Plan, any settlement or compromise embodied in the Plan (including the fixing or limiting to an amount any Claim or Class of Claims), assumption or rejection of executory contracts or leases effected by the Plan, and any document or agreement executed pursuant to the Plan shall be deemed null and void, and (iii) nothing contained in the Plan, and no acts taken in preparation for consummation of the Plan, shall (A) constitute or be deemed to constitute a waiver or release of any Claims by or against, or any Interests in, the Plan Proponents or any other Person, (B) prejudice in any manner the rights of the Plan Proponents or any Person in any further proceedings involving the Plan Proponents, or (C) constitute an admission of any sort by the Plan Proponents or any other Person.

**12.9** *Notice*. All notices, requests, and demands to or upon the Reorganized Debtors and Post-Confirmation RCM to be effective shall be in writing and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

> SKADDEN, ARPS, SLATE, MEAGHER
>      & FLOM LLP
> Four Times Square
> New York, New York  10036-6522
> Telephone:  (212) 735-3000
> Facsimile:  (212) 735-2000
> Att'n:     J. Gregory Milmoe, Esq.
>            Sally McDonald Henry, Esq.
>            J. Gregory St. Clair, Esq.
>
> Attorneys for Debtors and Debtors-in-Possession

> MILBANK, TWEED, HADLEY & McCLOY LLP
> 1 Chase Manhattan Plaza
> New York, NY 10005
> Telephone: (212) 530-5000
> Facsimile: (212) 530-5219
> Att'n:     Luc A. Despins
>            Susheel Kirpalani
>            Dennis C. O'Donnell
>
> Counsel for the Official Committee of Unsecured Creditors of Refco Inc., *et al.*

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP
1633 Broadway
New York, NY 10019
Telephone: (212) 506-1700
Facsimile:
Att'n:    David S. Rosner
         Andrew K. Glenn
         Jeffrey R. Gleit

Counsel for Additional Committee of Unsecured Creditors of Refco Inc., *et al.*


BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
Telephone: (212) 705-7000
Facsimile: (212) 752-5378
Att'n:    Tina L. Brozman
         Timothy B. DeSieno
         Mark W. Deveno

Counsel for the Chapter 11 Trustee for Refco Capital Markets, Ltd.

**12.10    *Governing Law*.**  Except to the extent that the Bankruptcy Code, the Bankruptcy Rules or other federal law is applicable, or to the extent that an exhibit or schedule to this Plan provides otherwise, the rights and obligations arising under this Plan shall be governed by, and construed and enforced in accordance with, the laws of Delaware without giving effect to the principles of conflicts of law of such jurisdiction.

**12.11    *Tax Reporting and Compliance*.**  The Reorganized Debtors are hereby authorized, on behalf of each of the Debtors, to request an expedited determination under section 505(b) of the Bankruptcy Code of the tax liability of the Debtors for all taxable periods ending after the Petition Date through, and including, the Effective Date.

**12.12    *Filing of Additional Documents*.**  On or before substantial consummation of this Plan, the Plan Proponents shall file such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of this Plan.

**12.13    *Limit on Precedential Effect*.**  The structure of this Plan and the classification of creditors or groups of creditors within one Class contained herein shall have no evidentiary or precedential effect if the such Plan is not confirmed and consummated.

**12.14    *Claims Preserved Pending Consummation*.**  Except as provided in the Early Payment Order and the RCM Settlement Agreement, in the event this Plan is not consummated, all parties-in-interest expressly reserve their claims and rights, as well as all defenses to such claims and rights and causes of action against such other parties, including, without limitation, (i) the subrogation claim of any Debtor that is a Guarantor under the Credit Agreement against any other Debtor that is a Loan Party under the Credit Agreement, arising out of the payment to the Secured Lenders, (ii) all claims of RCM and Holders of RCM Customer Claims and RCM FX/Unsecured Claims against the Contributing Debtors, Refco LLC and other third parties, (iii) all claims of the Contributing Debtors and Refco LLC, and their respective creditors, against RCM and other third parties and (iv) avoidance actions and other causes of action against creditors of RCM and the Contributing Debtors.

**12.15    *Continuation of RCM Settlement Agreement*.**  Neither any term or provision of this Plan, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11

Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the RCM Settlement Agreement, which will at all times operate and be binding in accordance with its terms.

**12.16** ***Continuation of Early Payment Order***.  Neither any term or provision of this Plan or the Confirmation Order, nor any failure of such Plan to proceed or be confirmed or consummated nor any conversion of the RCM Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, will in any way affect the terms or effectiveness of the Early Payment Order, which will at all times operate and be binding in accordance with its terms.

Dated:   New York, New York
       October 20, 2006

REFCO INC.
    (for itself and on behalf of the Affiliate Debtors other than Refco Finance Inc. and Refco Global Finance Ltd.)


By: _____ /s/ Harrison J. Goldin _____
    Name:    Harrison J. Goldin
    Title:    Chief Executive Officer


REFCO FINANCE INC.


By: _____ /s/ Harrison J. Goldin _____
    Name:    Harrison J. Goldin
    Title:    President


REFCO GLOBAL FINANCE LTD.


By: _____ /s/ Harrison J. Goldin _____
    Name:    Harrison J. Goldin
    Title:    Executive Vice President

SKADDEN, ARPS, SLATE, MEAGHER & FLOM
LLP
    Attorneys for Refco Inc. and the Affiliate Debtors


By: _____/s/ J. Gregory Milmoe_____
    J. Gregory Milmoe (JGM 0919)
    Sally McDonald Henry (SMH 0839)
    J. Gregory St. Clair (GS 8344)
    Four Times Square
    New York, New York 10036-6522
    (212) 735-3000


REFCO CAPITAL MARKETS, LTD.


By: _____/s/ Marc S. Kirschner_____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


RCM Trustee


By: _____/s/ Marc S. Kirschner_____
    Name:    Marc S. Kirschner
    Title:    Chapter 11 Trustee for Refco Capital Markets, Ltd.


BINGHAM McCUTCHEN LLP
    Attorneys for Marc S. Kirschner, the Chapter 11 Trustee for
    Refco Capital Markets, Ltd.


By: _____/s/ Tina L. Brozman_____
    Tina L. Brozman
    Timothy B. DeSieno
    Mark W. Deveno
    399 Park Avenue
    New York, NY 10022
    (212) 705-7000

MILBANK, TWEED, HADLEY & McCLOY LLP
    Attorneys for the Official Committee of
    Unsecured Creditors of Refco Inc., *et al.*


By: /s/ Susheel Kirpalani
    Luc A. Despins
    Susheel Kirpalani
    Dennis C. O'Donnell
    One Chase Manhattan Plaza
    New York, New York 10005
    (212) 530-5000


KASOWITZ, BENSON, TORRES & FRIEDMAN
LLP
    Attorneys for the Additional Committee of
    Unsecured Creditors of Refco Inc., *et al.*


By: /s/ David S. Rosner
    David S. Rosner
    Andrew K. Glenn
    Jeffrey R. Gleit
    1633 Broadway
    New York, New York 10019
    (212) 506-1700

# Exhibit A

Bersec International LLC
Kroeck & Associates, LLC
Lind-Waldock Securities LLC
Marshall Metals, LLC
New Refco Group Ltd., LLC
Refco Administration, LLC
Refco Capital Holdings, LLC
Refco Capital Management, LLC
Refco Capital LLC
Refco Capital Trading LLC
Refco F/X Associates, LLC
Refco Finance Inc.
Refco Financial, LLC
Refco Fixed Assets Management, LLC
Refco Global Capital Management LLC
Refco Global Finance Limited
Refco Global Futures, LLC
Refco Global Holdings, LLC
Refco Group Ltd., LLC
Refco Information Services, LLC
Refco Managed Futures, LLC
Refco Mortgage Securities, LLC
Refco Regulated Companies, LLC
Summit Management, LLC
Westminster-Refco Management LLC

# Exhibit B

# SETTLEMENT AGREEMENT

This **SETTLEMENT AGREEMENT** (this "*Agreement*") is made and entered into as of June 29, 2006, among (i) Refco Capital Markets, Ltd., a Bermuda company ("*RCM*"), acting by and through Marc S. Kirschner (the "*RCM Trustee*") in his capacity as trustee of RCM in its Chapter 11 bankruptcy case referred to below and (ii) those customers and other creditors of RCM named on the signature pages below acting by and through their representatives named on the signature pages.

**WHEREAS**, on October 17, 2005 (the "*Filing Date*"), RCM and Refco, Inc. and, on the Filing Date and on subsequent dates, certain of their affiliates (RCM, Refco, Inc. and such affiliates being herein called, collectively, the "*Debtors*") filed separate petitions under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§101, et seq. (the "*Bankruptcy Code*") in the United States Bankruptcy Court for the Southern District of New York (the "*Bankruptcy Court*");

**WHEREAS**, RCM's Chapter 11 case (the "*RCM Case*") and the other Debtors' Chapter 11 cases (collectively with the RCM Case, the "*Cases*") are being jointly administered as Case No. 05-60006 (RDD);

**WHEREAS**, the Official Committee of Unsecured Creditors (the "*Creditors' Committee*") was appointed in the Cases by the Bankruptcy Court on October 28, 2005, to represent the Debtors' general unsecured creditors in the Cases;

**WHEREAS**, on December 12, 2005, certain creditors of RCM listed on <u>Exhibit A</u> as the MCG Members (the "*MCG Members*") brought a motion (the "*Conversion Motion*") against RCM alleging, among other things, that (a) RCM is a "stockbroker" as defined in § 101(53A) of the Bankruptcy Code, (b) the MCG Members are "customers" of RCM as defined in § 741(2) of the Bankruptcy Code, (c) under § 109(d) of the Bankruptcy Code RCM was not eligible to be a debtor under Chapter 11, (d) under § 1112 of the Bankruptcy Code RCM's case must be converted to Chapter 7 and administered under Subchapter III of Chapter 7, and (e) the MCG Members are entitled under § 752 of the Bankruptcy Code to enforce their claims as customers to "customer property" as defined in § 741(4) of the Bankruptcy Code;

**WHEREAS**, certain other creditors of RCM listed on <u>Exhibit A</u> as the Joinder Parties (the "*Joinder Parties*") subsequently joined with the MCG Members in the Conversion Motion;

**WHEREAS**, the Bankruptcy Court entered certain procedural orders expediting discovery and the trial of the issues raised by the Conversion Motion;

**WHEREAS**, the MCG Members and the Joinder Parties prosecuted the Conversion Motion while the Debtors, the Creditors' Committee and various objecting parties, including

foreign exchange and metals transaction customers of RCM, actively opposed the Conversion Motion;

**WHEREAS**, the litigation of the Conversion Motion included expedited discovery (interrogatories, document production and approximately 30 depositions taken), expedited briefing, and a five-day evidentiary trial that began on February 14, 2006, and concluded with final arguments on March 14, 2006;

**WHEREAS**, after final arguments were concluded before the Bankruptcy Court on the Conversion Motion on March 14, 2006, the Bankruptcy Court, over the objections of the objecting parties, issued a preliminary ruling finding that RCM met the Bankruptcy Code's definition of a stockbroker and that at least one of the MCG Members met the requirements of the Bankruptcy Code to be a customer; the Bankruptcy Court required the appointment of a Chapter 11 trustee of RCM but otherwise, at the request of the MCG Parties, the Joinder Parties and certain other parties, agreed to defer acting on the Conversion Motion while various parties in the RCM Case attempted to fashion a settlement of the priority and other issues raised by the Conversion Motion;

**WHEREAS**, on March 22, 2006, the Bankruptcy Court entered an order requiring the appointment of a Chapter 11 trustee for RCM;

**WHEREAS**, due to continuing delays in obtaining the appointment of a Chapter 11 trustee for RCM after the March 14, 2006, preliminary ruling, the MCG Parties and the Joinder Parties prepared and filed an application on April 5, 2006, with the Bankruptcy Court requesting it to establish procedures in order to conduct an immediate creditor election of a Chapter 11 trustee for RCM;

**WHEREAS,** on April 10, 2006, the U.S. Trustee filed a notice with the Bankruptcy Court that the U.S. Trustee had appointed Marc S. Kirschner as the Chapter 11 trustee for RCM, subject to further order of the Bankruptcy Court;

**WHEREAS**, on  April 13, 2006, the Bankruptcy Court entered an order authorizing Marc S. Kirschner to act as the Chapter 11 trustee of RCM in the RCM Case;

**WHEREAS**, there are pending before the Bankruptcy Court various adversary proceedings, contested matters and other actions against the RCM estate seeking a determination of whether certain property held by or on behalf of RCM constitutes property of the RCM estate and which actions have been stayed by the Bankruptcy Court's "Order Staying 'Estate Property Issue' Proceedings" dated November 28, 2005 (Docket No. 634), as modified to the date hereof (such actions being referred to in such order, and being hereinafter referred to, as the "***Stayed Proceedings***");

**WHEREAS**, the RCM Trustee and the other parties hereto have reviewed materials prepared by professionals retained by the Debtors and the Creditors' Committee and have negotiated among each other with a view to avoiding protracted litigation and expense relating to the issues raised by the Conversion Motion and the Stayed Proceedings, including whether the

RCM Case must be converted to a Chapter 7 case administered under Subchapter III of Chapter 7, who is a customer of RCM, what constitutes customer property, how to value and administer customer property and other financial assets of the RCM estate, what other assets might or might not constitute property of the RCM estate and how to address certain other claims by, on behalf of or against the RCM estate in the context of administering and liquidating the property of the RCM estate; and

**WHEREAS**, in order to resolve the issues raised by the Conversion Motion and the Stayed Proceedings to the maximum extent possible in the interests of all creditors of the RCM estate and to avoid further protracted litigation and expense, the parties hereto, having reached an agreement in principle embodied in a term sheet read into the record in camera before the Bankruptcy Court on May 16, 2006 (the "***Term Sheet***"), have agreed to enter into this Agreement based upon the Term Sheet and concurrently herewith to seek approval of this Agreement by the Bankruptcy Court pursuant to Rule 9019 of the Bankruptcy Rules and §§ 105(a) and 363 of the Bankruptcy Code to settle, upon the terms, conditions and other provisions and to the extent set forth herein, the issues raised by the Conversion Motion and the Stayed Proceedings;

**NOW, THEREFORE**, in consideration of the premises and the mutual covenants and agreements set forth herein, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**§1.** __Definitions__. In this Agreement, terms defined and exclusively used in a single Section of this Agreement have the meanings set forth in that Section. In addition, in this Agreement, the following terms have the following meanings:

"***Advance Amount***" has the meaning set forth in §4 and, in the event of any Advance Increase Amount, the term "***Advance Amounts***" includes the Advance Increase Amount.

"***Advance Increase Amount***" has the meaning set forth in §7(d)(ii).

"***Additional Property***" means all assets and claims of the RCM estate or the RCM Trustee for the benefit of creditors of the RCM estate other than Assets in Place and Specified Customer Preference Claims. The term includes, without limitation, (a) all loan receivable, intercompany and tax refund claims, (b) all claims on behalf of the RCM estate arising under Chapter 5 of the Bankruptcy Code, and, if the RCM Case is converted to a Chapter 7 case administered under Subchapter III of Chapter 7, all claims for wrongful conversion of customer property and all other claims by or on behalf of the RCM estate arising under Chapter 7, other than Specified Customer Preference Claims, and (c) all claims on behalf of the RCM estate against any other Debtors and their affiliates or against any officers, directors, employees, agents or other representatives, insurers of, lenders to or attorneys, accountants, investment bankers or other professionals or other independent contractors engaged by or having legal obligations to any of the Debtors and their affiliates.

"***Agreement***" has the meaning set forth in the first paragraph.

"*April 25 Analysis*" means the schedule of assets of the RCM estate and estimated values dated April 25, 2006, prepared by the Creditors' Committee's financial advisor, Houlihan Lokey Howard & Zukin LLC, and attached hereto as <u>Exhibit B</u>.

"*Assets in Place*" means solely (a) the property set forth on the April 25 Analysis, as supplemented by the property described in the May 12 Memorandum, (b) the proceeds of the SPhinX Settlement (see §7(b)), and (c) any and all proceeds thereof.

"*Bankruptcy Code*" has the meaning set forth in the Recitals.

"*Bankruptcy Court*" has the meaning set forth in the Recitals.

"*Cases*" has the meaning set forth in the Recitals.

"*Conversion Motion*" has the meaning set forth in the Recitals.

"*Creditor*" includes a person who, if the RCM Case were converted to a Chapter 7 case administered under Subchapter III of Chapter 7, would qualify as a "customer" as defined in § 741(2) of the Bankruptcy Code.

"*Creditors' Committee*" has the meaning set forth in the Recitals.

"*Filing Date*" has the meaning set forth in the Recitals.

"*Final Order*" means a judicial order that is not subject to stay, modification or appeal and for which any period for lodging an appeal or a request for review, rehearing or certiorari has expired. An order shall not fail to be a Final Order merely because there is a possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure or Rule 9024 of the Bankruptcy Rules may be but has not been filed.

"*FX/Unsecured Claims*" means all prepetition general unsecured claims against the RCM estate. The term includes the Leuthold Remaining Claim. The term does not include (a) administrative or priority claims against the RCM estate, (b) Securities Customer Claims or (c) the Leuthold Metals Claim.

"*Houlihan Claims Schedule*" means the schedule of claims against the RCM estate dated June 8, 2006, prepared by the Creditors' Committee's financial advisor, Houlihan Lokey Howard & Zukin LLC, and delivered to the RCM Trustee, based upon Schedules B-33 and F-1 to RCM's Schedule of Assets and Liabilities filed with the Bankruptcy Court on or about December 30, 2005, in the RCM Case.

"*Implied Deficiency Claims*" has the meaning set forth in §8(b).

"*Initial Effective Date*" has the meaning set forth in §14(b).

"*Interest Accrual*" has the meaning set forth in §14(b)(iv)(A).

"***Invested Cash Rate***" means, for any period, the average of the annual rates of interest actually earned during such period by the RCM estate on its assets consisting of cash and cash equivalents.

"***Joinder Parties***" has the meaning set forth in the Recitals.

"***Leuthold***" means Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.

"***Leuthold Claimed Metals***" means the 1,074,060 ounces of silver and the 16,493 ounces of palladium that Leuthold alleges are held by RCM in custody for Leuthold.

"***Leuthold Metals Claim***" means Leuthold's claim against the RCM estate for the Leuthold Claimed Metals.

"***Leuthold Remaining Claim***" means all claims of Leuthold against the RCM estate other than the Leuthold Metals Claim.

"***May 12 Memorandum***" means the memorandum dated May 12, 2006, from Stacey Hightower to the RCM Trustee, a copy of which is attached as <u>Exhibit C</u>.

"***Metals Sale***" has the meaning set forth in §7(c).

"***MCG Members***" has the meaning set forth in the Recitals.

"***Plan, Negotiation and Litigation Advisory Committee***" has the meaning set forth in §9(a).

"***Portfolio Management Advisory Committee***" has the meaning set forth in §9(b).

"***Pro Rata***" has the meaning set forth in §8.

"***RCM***" has the meaning set forth in the first paragraph.

"***RCM Case***" has the meaning set forth in the Recitals.

"***RCM Trustee***" has the meaning set forth in the first paragraph. The term includes any successor Chapter 11 trustee for RCM or, if the RCM Case is converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, any trustee appointed in the Chapter 7 case including, if appointed, the RCM Trustee acting in the RCM Case immediately prior to the conversion.

"***Rogers Funds Claims***" means the claims of Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund L.P. asserted against RCM in their complaint dated October 24, 2005 (Adv. Proc. No. 05-03064 (RDD)).

"***Securities Customer Claims***" means claims against the RCM estate to the extent held by entities that, if the RCM Case were converted to a Chapter 7 case to be administered under

Subchapter III of Chapter 7, would qualify and be able to assert the claims as "customers" of RCM under § 741(2) of the Bankruptcy Code, as further determined as provided in §3.

"*Specified Customer Preference Claim*" means any claim of the RCM estate or the RCM Trustee to recover money or other property for the benefit of creditors of the RCM estate if (a) the claim is a preference claim, whether arising under § 547 or § 749 of the Bankruptcy Code, seeking avoidance of a transfer of property, including cash or securities, that would, if the RCM Case were converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, be "customer property" as defined in § 741(4) of the Bankruptcy Code, (b) if the RCM Case were converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, the transfer would have been made to a transferee who, but for the transfer, would have held a Securities Customer Claim for such property or its value as "customer property", (c) the transferee was not a Debtor, an "affiliate of RCM (as such term is defined in § 101 of the Bankruptcy Code) or a non-Debtor subsidiary of Refco, Inc. and (d) the transfer was made between the period commencing on October 10, 2005, and ending on and including the Filing Date.

"*SPhinX Settlement*" means the settlement, approved by the Bankruptcy Court on June 8, 2006, of the adversary proceeding (Adv. Proc. No. 05-331(RDD)) brought by the Creditors' Committee on behalf of the RCM estate against SPhinX Managed Futures Fund SPC, et al., as set forth in the Motion dated April 26, 2006, entitled "Motion under 11 U.S.C. §§ 105 and 363 and Fed. R. Bankr. P. 9019(a) for Approval of Settlement and Compromise of Avoidance Claims against SPhinx Managed Futures fund SPC, et al."

"*Stayed Proceedings*" has the meaning set forth in the Recitals.

"*Subsequent Effective Date*" has the meaning set forth in §14(c).

"*Super Majority*" means those creditors of the RCM estate that are parties to this Agreement holding at least 75% in amount of the Securities Customer Claims held by parties to this Agreement and holding at least 75% in amount of the FX/Unsecured Claims held by parties to this Agreement. Solely for the purpose of determining the Super Majority, (a) the amount of a creditor's Securities Customer Claims or FX/Unsecured Claims shall be the amounts of the claims set forth on the Houlihan Claims Schedule, subject to the amounts of the claims, at the time of determination, having been allowed, modified or disallowed, in whole or in part, under the procedures for resolving claims in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case, (b) a creditor or a group of creditors under common control or management that holds one or more Securities Customer Claims and one or more FX/Unsecured Claims must elect to vote either its Securities Customer Claims or its FX/Unsecured Claims, and the type of claims that such creditor or group of creditors elects *not* to vote shall not be counted in the determination as to whether a Super Majority has been achieved, and (c) unless and until such creditor or group of creditors makes the election, none of the claims of such creditor or group of creditors shall be counted in the determination of whether the Super Majority has been achieved. The election, which shall be irrevocable, shall be made by the creditor or an authorized representative of the group of creditors providing notice of the election to the RCM Trustee and to the Plan, Negotiation and Litigation Advisory Committee.

"***Term Sheet***" has the meaning set forth in the Recitals.

"***True-up Distributions***" means distributions of Additional Property, subsequent to the initial distribution of Additional Property, so that the holders of the allowed Securities Customer Claims and the holders of the allowed FX/Unsecured Claims will have then received total distributions of Additional Property pursuant to this Agreement in their then respective Pro Rata shares.

## §2.    <u>Initial and Ongoing Actions.</u>

(a)    *Bankruptcy Court Approval of this Agreement*.  Concurrently with his execution and delivery of this Agreement, the RCM Trustee will file a motion in the Bankruptcy Court seeking approval of the terms, conditions and other provisions of this Agreement.  The motion shall be made with notice, including publication notice, to the other Debtors and all other parties in interest in the Cases.

(b)    *Deferral of Further Action on the Conversion Motion*. The MCG Parties and the Joinder Parties agree, except as otherwise provided in this Agreement, to defer further action on the Conversion Motion and to request, in connection with the motion referred to in §2(a), that the Bankruptcy Court suspend any further action on the Conversion Motion except as otherwise provided in this Agreement.

(c)    *Continuation of Stay of Stayed Proceedings*.  The parties hereto agree to request, in connection with the motion referred to in §2(a), that the Bankruptcy Court continue its stay order with respect to the Stayed Proceedings except as otherwise provided in this Agreement.

(d)    *Rogers Funds Claims*.  Unless otherwise agreed by the RCM Trustee and the Super Majority, if by the end of 14 days from the date of the filing of the motion referred to in §2(a), the holders of the Rogers Funds Claims shall not have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed Securities Customer Claims or, alternatively, as allowed FX/Unsecured Claims, the RCM Trustee shall promptly, and any other party hereto may, request that the Bankruptcy Court finalize and enter the Bankruptcy Court's preliminary ruling on the Conversion Motion as a final ruling, that the RCM Case be converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7 and that the Bankruptcy Court determine that the Rogers Funds Claims are FX/Unsecured Claims.  To obtain the determination that the Rogers Funds Claims are FX/Unsecured Claims, the RCM Trustee shall take such action as may be necessary or advisable including obtaining a termination of the stay relating to the adversary proceeding brought by the holders of the Rogers Funds Claims.

(e)    *Other Actions*.  The parties hereto shall, whether in the RCM Case or, if the RCM Case is converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case, (a) execute and deliver such other instruments and documents, provide such additional information and take or cause to be taken all such other actions as may be reasonably necessary or advisable to consummate and carry out the terms and other provisions of this Agreement and (b) consistent with the terms, conditions and

other provisions of this Agreement, use commercially reasonable efforts to cause distributions to creditors of the RCM estate to be made as soon as reasonably practicable.

## §3.    Classification of Claims and Net Equity Claims.

(a)    *Classification*.  In determining whether a claim is a Securities Customer Claim or an FX/Unsecured Claim, the following provisions apply:

(i)    Securities Customer Claims shall include, without limitation, all entities' net equity claims based on (A) a securities account opened with RCM as evidenced by a written "CUSTOMER AGREEMENT - Securities Account" contract signed, performed or otherwise accepted by RCM, including without limitation, as evidenced by an RCM generated monthly account statement, and (B) either (1) the actual receipt, acquisition, holding by, or deposit, delivery or other entrustment with or to RCM for the claimant's account of securities for one or more of the purposes set forth in § 741(2)(A)(i) to (vi) of the Bankruptcy Code or (2) a transaction described in § 741(2)(B)(i) or (ii) of the Bankruptcy Code.

(ii)    The RCM Trustee confirms, based on his review of the underlying documents and other materials provided to him, and the other parties to this Agreement acknowledge and agree as a condition to and for purposes of this Agreement, that all of the entities listed on the Houlihan Claims Schedule who are included in the MCG Parties or the Joinder Parties are holders of Securities Customer Claims.  Upon approval of this Agreement by the Bankruptcy Court, the status of the MCG Parties and the Joinder Parties as holders of Securities Customer Claims will be considered and conclusively determined to be holders of Securities Customer Claims.  That determination will be binding on the other parties to this Agreement and on all other parties in interest in the Cases.

(iii)    An entity listed on the Houlihan Claims Schedule as a holder of a Securities Customer Claim that is not identified as either an MCG Party or a Joinder Party is anticipated by the creditor parties to this Agreement to become an entity that will be determined to be a holder of a Securities Customer Claim based on information linking such entity to one or more specific customer securities accounts at RCM having a positive balance on the Filing Date (such Securities Customer Claim being herein called an "***Anticipated Securities Customer Claim***"). However, nothing in this Agreement relieves any entity of filing any required proof of claim relating to any Anticipated Securities Customer Claim by any applicable bar date or establishes a presumption or determination that any Anticipated Securities Customer Claim constitutes either an allowed Securities Customer Claim or an allowed FX/Unsecured Claim.  Any entity holding an Anticipated Securities Customer Claim for which a proof of claim has been timely filed shall be considered as a holder of a Securities Customer Claim, absent objection to the claim.  If an objection is made to the claim, the entity must, in order to hold an allowed claim, prove the nature, extent, amount, priority and validity of its claim in accordance with the Bankruptcy Code, Bankruptcy Rules, and applicable orders entered in connection with the RCM Case and the other Cases.

(iv)     Subject to clause (v) of this subsection, a creditor holding a claim listed on the Houlihan Claims Schedule as an FX/Unsecured Claim may request that the Bankruptcy Court determine that the claim is a Securities Customer Claim instead of an FX/Unsecured Claim, based on such creditor filing a motion (a "***Creditor Motion***") asserting the claim as a Securities Customer Claim and scheduling a hearing thereon. The claim or any portion thereof may not be determined to be or treated as a Securities Customer Claim unless and until (1) such creditor files the Creditor Motion with the Bankruptcy Court and serves it on all parties hereto and on such other persons as applicable law or rules or the Bankruptcy Court may require, at least ten days' prior to the hearing before the Bankruptcy Court, at which the RCM Trustee or any other creditor of the RCM estate may object to the proposed determination or treatment, and (2) the Bankruptcy Court enters an order approving, in whole or in part, the determination or treatment.  The moving creditor shall have the burdens of production and proof to demonstrate by a preponderance of evidence that the claim, in whole or in part, should be determined to be or treated as a Securities Customer Claim.

(v)     As a condition to and for purposes of this Agreement, each of the parties hereto listed on the Houlihan Claims Schedule exclusively as a holder of FX/Unsecured Claims hereby agrees and acknowledges that it is not a holder of any Securities Customer Claims and relinquishes any right that it may have for any of its claims to be determined to be or treated as Securities Customer Claims.

(vi)     Subject to clause (ii) of this subsection, the RCM Trustee may, in the exercise of his fiduciary duty, propose to treat all or any portion of a claim listed on the Houlihan Claims Schedule as a Securities Customer Claim instead as an FX/Unsecured Claim, based on the RCM Trustee filing a "Notice of Proposed Additional FX/Unsecured Claim" (a "***Trustee Additional FX/Unsecured Claim Notice***") identifying the claim proposed to be treated as an FX/Unsecured Claim and scheduling a hearing thereon.  The claim or any portion thereof may not be determined to be or treated as an FX/Unsecured Claim unless and until (1) the RCM Trustee files the Trustee Additional FX/Unsecured Claim Notice with the Bankruptcy Court and serves it on all parties hereto and on such other persons as applicable law or rules or the Bankruptcy Court may require, at least ten days' prior to the hearing before the Bankruptcy Court, at which any other creditor of the RCM estate may object to the proposed determination or treatment, and (2) the Bankruptcy Court enters an order approving, in whole or in part, the determination or treatment.

(vii)     The claims resolution procedures referred to in §10(b) shall be consistent with the provisions of this subsection in addition to providing for the resolution of other claims not addressed in this subsection.

(b)     *Net Equity Claims*.  For the purpose of determining the amount of a "net equity claim" in accordance with § 741(6) of the Bankruptcy Code, the following valuations of securities shall be prima facie evidence of their value as of the Filing Date:

(i)    in the case of fixed income securities commonly traded on an over-the-counter basis (excluding non-defaulted, non-restructured internationally issued US dollar denominated sovereign debt securities, US government securities and European government securities), or equity securities claimed by a customer, or group of customers under common management or control, of RCM for which the total amount of equity shares credited to one or more securities accounts of the customer or group of customers at RCM as of the Filing Date was at least five times the average daily trading volume of such equity shares for the 20 trading days prior to the Filing Date, any valuation of such securities as of the Filing Date provided not later than 30 days after the Filing Date in writing by a broker or dealer active in such securities reflecting market or replacement value of such securities, and

(ii)    in the case of other securities or, in the case of fixed income or equity securities for which the foregoing clause (i) is not applicable for any reason, any valuation of the securities contained in a regularly issued daily or monthly statement from RCM indicating the value of the securities as of a date as close as possible to the Filing Date and in any event as of a date within the period commencing thirty (30) days before and ending thirty (30) days after the Filing Date.

Such prima facie evidence may not be overcome (A) absent an agreement to a different value by the holder of the Securities Customer Claim and the RCM Trustee and approval by the Bankruptcy Court or (B) unless and until there is an objection by the RCM Trustee or the holder of a Securities Customer Claim and, after notice and a hearing, a determination of a different value by Final Order of the Bankruptcy Court.

(c)    *Exceptions*.  Any claims asserted by "insiders" or "affiliates" (as those terms are defined in § 101 of the Bankruptcy Code) must be filed and proven in strict accordance with the Bankruptcy Code and Bankruptcy Rules, and the initial prima facie evidence presumptions and shifts in the burdens of production and proof set forth above in this Section 3 in favor of creditors of the RCM estate in certain circumstances shall not apply in favor of any insider or affiliate of RCM to establish the nature, extent, amount, priority or validity of its claim.

**§4.    Advance Amount.**  The holders of the allowed FX/Unsecured Claims shall be entitled to an advance from the RCM estate, from amounts otherwise distributable pursuant to this Agreement to holders of the allowed Securities Customer Claims, in an amount equal to $123.6 million less the Interest Accrual (the "***Advance Amount***").  The Advance Amount is incorporated into the distributions set forth in §5(b) and is to be recaptured, with a risk weighted return, for the benefit of the holders of allowed Securities Customer Claims as set forth in §6(c).

**§5.    Distributions of Assets in Place**.  Except as expressly provided to the contrary in this Agreement, the Assets in Place or their proceeds shall be distributed as follows:

(a)    *Administrative and Priority Claims.*  First, to pay the allowed administrative and priority claims of the RCM estate.  The RCM Trustee shall be entitled to reserve the first $60 million of distributions for the payment of such claims, with any unused amounts reserved to be applied towards the allowed Securities Customer Claims.  If the allowed administrative and priority claims of the RCM estate exceed the amounts reserved and are not otherwise paid as

provided in §6(a) or (e), they shall be paid before there are any further distributions under subsection (d) of this Section.

(b)     *General Unsecured Claims - Initial Distributions (including the Advance Amount)*.  Second, the amount of $221 million in cash shall be distributed exclusively to the holders of allowed FX/Unsecured Claims.

(c)     *Distribution of Leuthold Claimed Metals*.  Concurrently with the initial distributions to the holders of allowed FX/Unsecured Claims in §5(b), the Leuthold Claimed Metals, or the proceeds of any Metals Sale as contemplated by §7(c), together with any interest actually earned on the proceeds after the Metals Sale, shall be distributed exclusively to Leuthold as an allowed claim.  The distribution to Leuthold shall reduce the Leuthold Remaining Claim as set forth in §7(c).

(d)     *Balance of Distributions*.  The balance to be applied towards payment of the allowed Securities Customer Claims.

**§6.     Distributions of Additional Property and Recoveries on Specified Customer Preference Claims**.  Except as expressly provided to the contrary in this Agreement, any cash or other proceeds of Additional Property, including recoveries on claims against the other Debtors or third parties included in Additional Property, shall be distributed as follows in subsections (a), (b), (c) and (d), and recoveries on Specified Customer Preference Claims shall be distributed as follows in subsection (e):

(a)     *Unpaid Administrative and Priority Claims*.  First, to be applied to the allowed administrative and priority claims of the RCM estate to the extent not covered by the reserves referred to in §5(a) or paid pursuant to §6(e).

(b)     *Initial Pro Rata Allocation*.  Second, the next $150 million shall be applied as True-up Distributions and thereafter Pro Rata to the holders of allowed Securities Customer Claims on account of their Implied Deficiency Claims and to the holders of allowed FX/Unsecured Claims towards payment of their allowed FX/Unsecured Claims.  However, if the amount of the allowed administrative and priority claims of the RCM estate paid pursuant to §5(a) exceeds the sum of $60 million, the amount of the excess shall first be paid to the holders of the allowed Securities Customer Claims from the $150 million otherwise distributable pursuant to the preceding sentence of this subsection, and only the remaining amount of the $150 million shall be distributed as provided in the preceding sentence of this subsection.

(c)     *Repayment of Advance Amounts*.  Third, any and all distributions of Additional Property to be exclusively allocated and made to the holders of the allowed Securities Customer Claims on account of their Implied Deficiency Claims until the Risk Return Amount and the Advance Amounts have been paid.  For purposes of this subsection (c):

(i)     the "***Risk Return Amount***" shall be equal to a return of 12% per annum on the Advance Amounts, calculated on the outstanding balance of each distribution included in the Advance Amounts from the date of distribution to the holders of the allowed FX/Unsecured Claims to the date of distribution to the holders of the allowed Securities Customer Claims; and

(ii)     any distribution shall be applied first to the outstanding Risk Return Amount, and thereafter shall be credited against the Advance Amounts in an amount

equal to the product of (A) the amount of the balance of the distribution and (B) the then Pro Rata percentage of the holders of the allowed FX/Unsecured Claims.

For the avoidance of doubt, even the distributions not applied to the Risk Return Amount or credited to the Advance Amounts shall be exclusively allocated and paid to the holders of the allowed Securities Customer Claims on account of their Implied Deficiency Claims until the Advance Amounts have been paid as provided in this subsection.

(d)     *Subsequent Pro Rata Allocation.*     Thereafter, to be applied as True-up Distributions and thereafter Pro Rata to the holders of allowed Securities Customer Claims on account of their Implied Deficiency Claims and to the holders of allowed FX/Unsecured Claims on account of their allowed FX/Unsecured Claims.

(e)     *Recoveries on Specified Customer Preference Claims.*     Recoveries on Specified Customer Preference Claims shall first be used to pay the fees and expenses of pursuing such claims and thereafter shall be exclusively distributed to the holders of allowed Securities Customer Claims.  Recoveries on Specified Customer Preference Claims shall be treated as distributions of customer property for purposes of recalculating Implied Deficiency Claims and making further True-up Distributions.

## §7.     Special Treatments and Adjustments.

(a)     *Rogers Funds Claims.*  Unless otherwise agreed by the RCM Trustee and the Super Majority:

(i)     if the holders of the Rogers Funds Claims have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed FX/Unsecured Claims, or the Bankruptcy Court enters an order determining that the Rogers Funds Claims are allowed FX/Unsecured Claims, then the assets claimed by the holders of the Rogers Funds Claims or their proceeds shall be distributed and applied as True-up Distributions and thereafter Pro Rata between the holders of the allowed Securities Customer Claims (based on their Implied Deficiency Claims determined without Rogers Funds' assets) and the holders of the allowed FX/Unsecured Claims (based on their allowed FX/Unsecured Claims, including the Rogers Funds Claims as allowed FX/Unsecured Claims), and the distribution of such Pro Rata amounts shall be in addition to other initial distributions to the holders of the allowed FX/Unsecured Claims and the holders of the allowed Securities Customer Claims provided in §5; or

(ii)     if the holders of the Rogers Funds Claims have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed Securities Customer Claims, or the Bankruptcy Court enters an order determining that the Rogers Funds Claims are allowed Securities Customer Claims, then the assets claimed by the holders of the Rogers Funds Claims or their proceeds shall be distributed as Assets in Place pursuant to §5.

(b)     *Proceeds of the SPhinX Settlement.*  The proceeds of the SPhinX Settlement shall be distributed as follows:

(i)     The sum of $79.5 million, together with any interest, fees or other charges claimed thereon, shall be reserved for or paid (subject to disgorgement) towards the alleged secured claims of JPMorgan Chase Bank, N.A. against the RCM estate.  If the claims of JPMorgan Chase Bank, N.A are determined by Final Order of the Bankruptcy Court not to be secured claims, are determined to be secured claims in a lesser amount or are compromised as secured claims for a lesser amount, the sum or the remaining balance reserved or, as the case may be, the amount disgorged shall be distributed as Additional Property pursuant to §6.  If any portion of the $79.5 million sum, together with any interest, fees or other charges thereon, is reserved rather than paid, the amount reserved shall include the interest actually earned on the amount; and

(ii)     The balance of the proceeds of the SPhinX Settlement shall be distributed as Assets in Place pursuant to §5.

(c)     *Leuthold Claims.*

(i)     At any time after the filing of the motion referred to in §2(a), Leuthold shall have the sole right, upon three business days' prior written notice to the RCM Trustee, to direct the RCM Trustee to sell the Leuthold Claimed Metals (the "***Metals Sale***").  Until the Initial Effective Date, the RCM Trustee shall seek any necessary Bankruptcy Court approvals for the Metals Sale on an expedited basis. After the Initial Effective Date, the order of the Bankruptcy Court approving this Agreement shall constitute the Bankruptcy Court's approval for the Metals Sale to be made through any recognized market at which sales of metals of that type are regularly conducted.  In the event that the Metals Sale occurs, all proceeds of the Metals Sale shall remain in a separate account at RCM and shall be distributed to Leuthold in lieu of the Leuthold Claimed Metals in accordance with §5(c).

(ii)     Leuthold's receipt of the Leuthold Claimed Metals or the proceeds of a Metals Sale shall (A) fully satisfy the Leuthold Metals Claim, and (B) reduce the Leuthold Remaining Claim by the difference, if positive, between (1) the value of the Leuthold Claimed Metals on the date of the filing of the motion referred to in §2(a) plus interest from the date of the filing of such motion accruing on such amount calculated at the Invested Cash Rate until the occurrence of any Metals Sale, and at the actual rate of interest earned on the proceeds of any Metals Sale from and after the time of any Metals Sale, and (2) the value of the Leuthold Claimed Metals on the Filing Date.  Any increase or decrease in the value of the Leuthold Claimed Metals after the date of the filing of such motion shall be at the sole risk or benefit of Leuthold and shall not have any effect on the amount of the Leuthold Remaining Claim.

(d)     *Adjustments for Claims under Repurchase Agreements*.  Claims against RCM included on the Houlihan Claims Schedule as FX/Unsecured Claims that are determined by a Final Order of the Bankruptcy Court to be allowed Securities Customer Claims are hereinafter referred to as "***Allowed Recharacterized Customer Claims***."  To the extent that any claims against the RCM estate with respect to repurchase agreements included on

Houlihan Claims Schedule as Securities Customer Claims are determined by Final Order of the Bankruptcy Court not to constitute Securities Customer Claims and to constitute instead allowed FX/Unsecured Claims ("***Allowed Repo Unsecured Claims***"), then, if the difference between the aggregate Allowed Repo Unsecured Claims and the aggregate Allowed Recharacterized Customer Claims (the "***Net FX/Unsecured Claim Difference***") is a positive number:

(i)      the total amount referred to in §14(b)(iv)(A) shall be increased by an amount equal to the product of (A) 12.65% and (B) an amount (the "***Repo Claim Adjustment Amount***") equal to the lesser of:

(x)      the Net FX/Unsecured Claim Difference, and

(y)      the total amount of the allowed FX/Unsecured Claims (including the total of the Allowed Repo Unsecured Claims), less $874.1 million; and

(ii)      the Advance Amount(s) shall be increased by an amount (the "***Advance Increase Amount***") equal to the product of (A) 13.84% and (B) the Repo Claim Adjustment Amount.

(e)      *Recoveries Resulting in Section 502(h) Claims*.  This subsection applies in all situations where recoveries on preference claims under § 547 or § 749 (to the extent it incorporates § 547) of the Bankruptcy Code ("***Preference Claim Recoveries***") result in an allowed claim under § 502(h) of the Bankruptcy Code ("***Section 502(h) Claim***").  This subsection does not apply to recoveries on Specified Customer Preference Claims.

(i)      A "***Preference True Up Distribution***," when applied pursuant to the remaining clauses of this subsection, means, when a Preference Claim Recovery results in an allowed Section 502(h) Claim, then the property so recovered shall be allocated as follows before it is treated as Additional Property for distribution under §6:

(A)      If the Section 502(h) Claim increases the amount of the allowed Securities Customer Claims, then a percentage of the Preference Claim Recoveries equal to the value of the Assets in Place distributed to the holders of the allowed Securities Customer Claims under §5(d) divided by the total allowed Securities Customer Claims (excluding the Section 502(h) Claim) will be exclusively distributed to the holders of the allowed Securities Customer Claims.

(B)      If the Section 502(h) Claim increases the amount of the allowed FX/Unsecured Claims, then an amount proposed by the Super Majority of the FX/Unsecured Claims (as hereinafter defined) to the other parties to this Agreement will be exclusively distributed to the holders of the allowed FX/Unsecured Claims.

After such adjustment(s), any remaining Preference Claim Recoveries will be treated as Additional Property for distribution under §6.

(ii)     If a Preference Claim Recovery results in an allowed Section 502(h) Claim that would constitute an FX/Unsecured Claim, the RCM Trustee shall promptly so advise the other parties to this Agreement in writing and provide to the Plan, Negotiation and Litigation Advisory Committee copies of any documentation that the RCM Trustee possesses showing the source of the preference payments.

(iii)     Within twenty business days after receipt of the notice and documentation provided by the RCM Trustee, a Super Majority of Securities Customer Claims must advise the other parties to this Agreement as to whether they consent to an applicable Preference True Up Distribution.  A "***Super Majority of Securities Customer Claims***" means those creditors of the RCM estate that are parties to this Agreement holding at least 75% in amount of the Securities Customer Claims held by parties to this Agreement.  Solely for the purpose of determining the Super Majority of Securities Customer Claims, (1) the amounts of a creditor's Securities Customer Claims shall be the amounts of the claims set forth on the Houlihan Claims Schedule, subject to the amounts of the claims, at the time of determination, having been allowed, modified or disallowed, in whole or in part, under the procedures for resolving claims in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case, and (2) a creditor or group of creditors under common control or management that holds both one or more Securities Customer Claims and one or more FX/Unsecured Claims and who has made an election, as contemplated by the definition of the term "Super Majority," to vote only its FX/Unsecured Claims, or who has failed to make the election contemplated by that definition, shall not have its FX/Unsecured Claims counted in determining whether a Super Majority of Securities Customer Claims has been achieved.

(iv)     If (and only if) a Super Majority of Securities Customers Claims declines to permit the Preference True Up Distribution, then a Super Majority of FX/Unsecured Claims has the option of submitting the matter to arbitration within twenty business days.   A "***Super Majority of FX/Unsecured Claims***" means those creditors of the RCM estate that are parties to this Agreement holding at least 75% in amount of the FX/Unsecured Claims held by parties to this Agreement.  Solely for the purpose of determining the Super Majority of FX/Unsecured Claims, (1) the amounts of a creditor's FX/Unsecured Claims shall be the amounts of the claims set forth on the Houlihan Claims Schedule, subject to the amounts of the claims, at the time of determination, having been allowed, modified or disallowed, in whole or in part, under the procedures for resolving claims in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case and (2) a creditor or group of creditors under common control or management that holds both one or more Securities Customer Claims and one or more FX/Unsecured Claims and who has made an election, as contemplated by the definition of the term "Super Majority," to vote only its Securities Customer Claims, or who has failed to make the election contemplated by

that definition, shall not have its FX/Unsecured Claims counted in determining whether a Super Majority of FX/Unsecured Claims has been achieved. If the matter is submitted to arbitration, there will be only two issues to be decided by an arbitrator, who is to be selected by the Bankruptcy Court in the absence of an agreement by the Super Majority:

(A) Whether the Preference True Up Distribution should be applied; and

(B) Whether all or any portion of Preference Claim Recovery should be deemed "customer property." Any recovery of customer property shall reduce Implied Deficiency Claims.

(v) If a Preference Claim Recovery results in an allowed Section 502(h) Claim that would constitute a Securities Customer Claim, the RCM Trustee shall promptly so advise the other parties to this Agreement in writing and provide to the Plan, Negotiation and Litigation Advisory Committee copies of any documentation that the RCM Trustee possesses showing the source of the preference payments.

(vi) Within twenty business days after receipt of the notice and documentation provided by the RCM Trustee, a Super Majority of FX/Unsecured Claims must advise the other parties to this Agreement as to whether they consent to an applicable Preference True Up Distribution.

(vii) If (and only if) a Super Majority of FX/Unsecured Claims declines to permit the Preference True Up Distribution, then a Super Majority of Securities Customer Claims has the option of submitting the matter to arbitration within twenty business days. If the matter is submitted to arbitration, there will be only two issues to be decided by an arbitrator, who is to be selected by the Bankruptcy Court in the absence of an agreement by the Super Majority:

(A) Whether the Preference True Up Distribution should be applied; and

(B) Whether all or any portion of Preference Claim Recovery should be deemed "customer property." Any recovery of customer property shall reduce the Implied Deficiency Claims.

(viii) The reasonable fees and expenses of any arbitrator appointed under this subsection shall be subject to allowance as an administrative expense of the RCM estate to be assessed as determined by the arbitrator.

(f) *Certain Fees and Expenses of the MCG Members and Joinder Parties.* The reasonable attorneys' fees and expenses of the MCG Members and the Joinder Parties in connection with litigating the Conversion Motion through the filing of the motion to compel an election of a Chapter 11 trustee for RCM, not to exceed the amounts set forth on Exhibit D, shall be allowed administrative expenses, attributable as substantial contributions to the RCM estate and

the administration of customer property under §§ 503(b)(3)(D), 507(a)(2) and 752(a) of the Bankruptcy Code, and shall be payable on the Subsequent Effective Date. The reasonable attorneys' fees and expenses shall be entitled to such administrative status and shall be payable on the Subsequent Effective Date pursuant to §5(a) or 6(a), regardless of whether RCM remains in a Chapter 11 case or the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7. The RCM Trustee confirms that his initial review of the details of the attorneys' fees and expenses indicates that the overall fees and expenses are reasonable, but his initial determination of their reasonableness is subject to his final review in the exercise of his fiduciary duties.

### §8.  Determination of "Pro Rata".

(a)  *"Pro Rata" Defined.*  The term "**Pro Rata**" means, in relation to a distribution of any money or other property and at the time of determination, the distribution of the money or other property, as between the holders of the allowed Securities Customer Claims and the holders of the allowed FX/Unsecured Claims, in the ratio that each of the aggregate of the allowed Securities Customer Claims constituting Implied Deficiency Claims (as hereinafter defined) and the allowed FX/Unsecured Claims at such time bears to the total of the allowed Securities Customer Claims constituting the Implied Deficiency Claims at such time and the allowed FX/Unsecured Claims at such time.

(b)  *"Implied Deficiency Claims" Defined.*  The term "**Implied Deficiency Claims**" means, at the time of determination:

(i)  the total amount of the allowed Securities Customer Claims at such time, plus

(ii)  all allowed administrative and priority claims of the RCM estate at such time (inclusive of reserves) to the extent paid or payable from Assets in Place, net of any amounts paid at such time to the holders of the allowed Securities Customer Claims pursuant to the second sentence of §6(b), less

(iii)  the value of Assets in Place, as determined pursuant to §8(c), that would constitute customer property as determined by the Bankruptcy Court as contemplated by §14(b)(iv), less

(iv)  the proceeds of recoveries on Specified Customer Preference Claims at such time, net of the costs and expenses of recovery, less

(v)  the value of any property determined to be customer property by an arbitrator pursuant to §7(e)(iv)(B) or (vii)(B).

The value of Assets in Place shall not include Assets in Place for which the date for determining the value of those assets has not yet occurred under subsection (c).

(c)     *Determination of Value of Customer Property*.  For the purpose of determining Implied Deficiency Claims, the following provisions apply:

(i)     Customer property, other than cash or cash equivalents or securities regularly traded on recognized securities exchanges or markets, shall be valued by the independent valuation expert engaged by the RCM Trustee pursuant to §10 once as of the 15th business day prior to the date of:

(A)     the first distribution under this Agreement if in the RCM estate as of the 30th day prior to the date of first distribution under this Agreement; and

(B)     the next distribution under this Agreement if acquired by the RCM estate during the period commencing 30 days prior to the date of the immediately preceding distribution under this Agreement and ending 30 days prior to the date of the next distribution under this Agreement.

(ii)     The valuation expert's determinations of value as set forth in clause (i) shall be binding and conclusive on all other parties hereto and all other parties in interest unless challenged after notice and a hearing before the Bankruptcy Court by either (A) holders of allowed Securities Customer Claims in the aggregate amount of not less than $685 million or (B) holders of allowed FX/Unsecured Claims in the aggregate amount of not less than $220 million.  For purposes of the preceding sentence, a claim which is disputed in part must be counted to the extent of the part of the claim not disputed.

(iii)     Any customer property consisting of cash or cash equivalents or securities regularly traded on recognized securities exchanges or markets shall be valued by the RCM Trustee once as of the 15th day prior to:

(A)     the first distribution under this Agreement if in the RCM estate as of the 15th day prior to the first distribution under this Agreement; and

(B)     the next distribution under this Agreement if acquired by the RCM estate during the period commencing 15 days prior to the date of the immediately preceding distribution under this Agreement and ending 15 days prior to the date of the next distribution under this Agreement.

(iv)     Clauses (i)(B) and (iii)(B) of this subsection shall not apply to proceeds of customer property previously valued by the independent valuation expert or the RCM Trustee pursuant to this subsection.  Instead, the valuations of the original customer property shall be used.

(d)     *Estimates*.  Attached hereto as <u>Exhibit E</u> is a mathematical presentation of the assumptions used by the parties to negotiate this Agreement based on the April 25 Analysis and the proceeds of the SPhinX Settlement.  As of March 6, 2006, the Pro Rata share of the holders of the Securities Customer Claims was estimated to be approximately 46.8%, and the Pro Rata share of the holders of the FX/Unsecured Claims was estimated to be approximately 53.2%.

## §9. Establishment of Advisory Committees.

(a)     *Plan, Negotiation and Litigation Advisory Committee*.  Subject to §9(c), in negotiating a possible plan of reorganization for some or all of the Debtors including RCM or (if the Bankruptcy Court so permits) RCM alone and in considering and pursuing litigation on behalf of the RCM estate, the RCM Trustee shall from time to time consult with a plan, negotiation and litigation advisory committee (the "***Plan, Negotiation and Litigation Advisory Committee***") consisting of those creditors or their representatives listed on Exhibit F, as amended from time to time.

(b)     *Portfolio Management Advisory Committee*.  Subject to §9(c), the RCM Trustee shall, and shall cause any investment manager, valuation expert or financial advisor appointed pursuant to §10(a) to, consult from time to time with a portfolio management advisory committee (the "***Portfolio Management Advisory Committee***") consisting of those creditors or their representatives listed on Exhibit G, as amended from time to time, concerning the management of the securities and other financial assets of the RCM estate.  If the holders of the FX/Unsecured Claims have designated a representative to act for the holders of the FX/Unsecured Claims, and the representative has so notified the Portfolio Management Advisory Committee, the Portfolio Management Advisory Committee shall provide notice to the representative of all proposed securities transactions.

(c)     *Advisory Committee Procedures*.  Each committee referred to in this Section shall have such consultation rights and shall implement such other procedures, as may be agreed to from time to time with the RCM Trustee.  The procedures shall include mechanisms for providing notices and disseminating information, subject to appropriate confidentiality safeguards, and under what circumstances the RCM Trustee may represent to the Bankruptcy Court what the advisory position of the committee is on any particular issue.

(d)     *Advisory Committee Vacancies*.  In the event that any member of a committee referred to in this Section is no longer qualified, or is unable or otherwise fails to serve as a member of the committee, the RCM Trustee may fill the vacancy by selecting another creditor of the RCM estate acceptable to the majority in number of the remaining members of the committee.  A member of a committee referred to in this Section is no longer qualified to serve if it sells, transfers or assigns more than 15% of the aggregate amount of its claims, measured at the date hereof, against the RCM estate or any option thereon or any right or interest (voting or otherwise) therein and, following such sale or other action, the remaining claims of such member are less than those of any other member of such committee.  The member does not lose its qualification by the mere granting of a security interest without voting authority in favor of a secured party, but does lose its qualification if the security interest is enforced, whether by foreclosure or otherwise.

## §10. Investment, Liquidation and Distribution of Estate Financial Assets.

(a)     *Appointment of Investment Management Professionals.*  The RCM Trustee shall engage, with Bankruptcy Court approval, one or more independent persons of recognized

standing to act as a valuation expert to make the determinations of valuing customer property for purposes of §8. The RCM Trustee may engage, with Bankruptcy Court approval, one or more persons of recognized standing to act as an investment manager or financial advisor to advise the RCM Trustee on managing the securities and other financial assets included in the RCM estate, with a view to reducing the financial assets to cash consistent with good market practice and to determining True-up Distributions and Pro Rata shares.

(b)     *Claims Procedures, Reserves, Etc.*  The RCM Trustee will develop usual and customary procedures for resolving claims and, if applicable, for determining the amount of the net equity claim of any holder of a Securities Customer Claim. The RCM Trustee shall be entitled to set aside reasonable reserves, consistent with the terms and other provisions of this Agreement, from amounts otherwise distributable pursuant to this Agreement for such items as (i) actual or anticipated administrative and priority claims and (ii) prepetition claims (whether they be Securities Customer Claims or FX/Unsecured Claims) at the time disputed or still subject to possibly being disputed.  For the avoidance of doubt, the RCM Trustee shall maintain sufficient reserves so that the distributions provided for in this Agreement are based on the amount of the actual final allowed claims.  The RCM Trustee shall also be entitled to allocate to separate accounts cash or other property to be distributed to holders of allowed Securities Customer Claims or allowed FX/Unsecured Claims pending distribution.

(c)     *Distributions*.  The RCM Trustee shall as soon as practicable make distributions on or after the Subsequent Effective Date at such times and in such amounts (net of reserves) as are permitted by the Bankruptcy Code (after giving effect to the Bankrutpcy Court's approval of this Agreement) and as he deems appropriate and has otherwise determined to be consistent with his fiduciary duties.  However, all distributions following the initial distribution shall include any adjustments, including True-up Distributions, required to correct the amount of prior distributions (including, without limitation, repayment of the Advance Amounts) based on the actual amount of allowed claims.  The RCM Trustee shall not make any distributions prior to the Subsequent Effective Date without Bankruptcy Court approval.

(d)     *Distributions in Kind.*  Except as approved by the Bankruptcy Court, the RCM Trustee shall not make distributions of securities in kind.  The RCM Trustee may, subject to Bankruptcy Court approval, implement procedures (i) on a case-by-case basis for a holder of a Securities Customer Claim to receive a distribution of securities in kind, (ii) for distributees to receive a ratable share of certain securities, e.g., by the RCM Trustee contributing the securities to a special purpose entity designed to hold securities transferred to it from the RCM estate and transferring interests ratably in the special purpose entity to the distributees, or (iii) for distributions in kind using other methods that the RCM Trustee determines to be fair and equitable, including options for creditors to receive distributions in kind.

**§11.    Chapter 11 Plan**.  Any Chapter 11 plan of reorganization of some or all of the Debtors including RCM, or (if so permitted by the Bankruptcy Court) of RCM alone, proposed or supported by the RCM Trustee or any of the other parties hereto shall provide for distributions to creditors of the RCM estate, and other terms, consistent with the terms, conditions and other provisions of this Agreement.

**§12.    Chapter 7, Subchapter III Contingency.**

(a)    *Conversion to Chapter 7, Subchapter III*.  The RCM Trustee shall promptly, and any other party to the Agreement may, request that the Bankruptcy Court's preliminary ruling on the Conversion Motion become a final ruling, and that the RCM Case be converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, if:

(i)    either:

(A) this Agreement is not approved by the Bankruptcy Court, as contemplated by §14(b)(iv), on or before August 31, 2006, or

(B) the Bankruptcy Court advises the parties hereto that the Bankruptcy Court will not be willing so to approve this Agreement (or will not be willing to do so by August 31, 2006) and within a period of ten days thereafter the parties hereto have not made amendments to this Agreement satisfactory to them and to the Bankruptcy Court for the Bankruptcy Court to approve this Agreement (or to do so by August 31, 2006);

(ii)    a joint Chapter 11 plan of some or all of the Debtors including RCM or (if so permitted by  the Bankruptcy Court) of RCM alone and a related disclosure statement, in each case reasonably acceptable to the RCM Trustee and the Super Majority, are not filed with the Bankruptcy Court, by August 31, 2006;

(iii)    the Bankruptcy Court has not approved such disclosure statement by October 15, 2006;

(iv)    the Bankruptcy Court has not confirmed such plan by November 15, 2006; or

(v)    the "Effective Date" under and as defined in such plan has not occurred by December 31, 2006.

(b)    *Effect of Conversion to Chapter 7, Subchapter III*.  In the event of a conversion of the RCM Case to a Chapter 7 case to be administered under Subchapter III of Chapter 7, whether or not at the request of the RCM Trustee or any other party hereto:

(i)    all of the terms, conditions and other provisions of this Agreement will be binding upon any trustee appointed in the Chapter 7, Subchapter III case, as well as upon the parties to this Agreement and all other parties bound by the Bankruptcy Court's order approving this Agreement, and even though certain terms of this Agreement, on account of the compromises contained in this Agreement, may otherwise vary the requirements of Subchapter III of Chapter 7;

(ii)    each party hereto other than the RCM Trustee agrees to support the election of Marc S. Kirschner as the Chapter 7 trustee if Marc S. Kirschner was

serving as the RCM Trustee immediately prior to the conversion, with this Agreement constituting a pre-conversion ballot in favor of Marc S. Kirschner's election as the Chapter 7 trustee;

(iii) the RCM Trustee will (A) seek as part of the conversion order to submit his interim or final report to implement the terms of this Agreement, (B) promptly make such interim distributions, as, after reserves, the RCM Trustee believes to be in accord with his fiduciary duties and that the Bankruptcy Court may permit, consistent with the terms of this Agreement, and (C) after consultation with the Plan, Negotiation and Litigation Advisory Committee, pursue recoveries of any remaining Additional Property consisting of claims against the other Debtors and third parties with funding and the services of professionals acceptable to the RCM Trustee and approved by the Bankruptcy Court; and

(iv) the RCM Trustee will have the option, if necessary or in his judgment advisable, to seek to bind creditors not otherwise bound to the terms, conditions and other provisions of this Agreement by taking such actions as the RCM Trustee may determine to be appropriate in order for those creditors to be bound to the terms, conditions and other provisions of this Agreement. The RCM Trustee may reach agreement with one or more of the other parties hereto to act as a class representative or class representatives for purposes of such action for which the appointment of a class representative or representatives is necessary or desirable. The other parties hereto agree to support or not to object to any such actions reasonably taken by the RCM Trustee to so bind creditors not otherwise bound to the terms, conditions and other provisions this Agreement.

**§13. Representations and Warranties**

(a) *General.* Each party hereto represents and warrants to the other parties hereto that such party (i) if an organization, validly exists as an organization, and (ii) subject, in each case, to the approval of the Bankruptcy Court (other than for a party's agreements in this Section and in §§2, 7(c)(i), 9, 12(a)(i), 12(a)(ii), 12(b)(ii), 14(d) and 15(b)), such party has the right and power to enter into this Agreement, such party has duly authorized, executed and delivered this Agreement, and such party has obtained all consents of governmental organizations and third parties necessary to enter into this Agreement and to perform such party's obligations hereunder.

(b) *Ownership of Claims.* Each of the parties hereto other than the RCM Trustee represents and warrants to the other parties hereto that such person owns the claim or claims against the RCM estate purported to be owned by it and has not transferred any such claim to any other person.

(c) *Security Entitlements.* Each party hereto asserting a Securities Customer Claim to a security or other financial asset from the RCM estate represents and warrants to the other parties hereto that it acquired a security entitlement in the financial asset for value and without notice of an adverse claim to the financial asset. For purposes of this subsection, the terms "security", "financial asset", "security entitlement", "value" and "adverse claim" have the

meanings set forth in the Uniform Commercial Code of the State of New York, and the phrase "notice of an adverse claim" has the meaning set forth in § 8-105 of that Uniform Commercial Code.

### §14. Conditions Precedent.

(a) *Provisions Effective Upon Execution and Delivery.* Sections 2, 7(c)(i), 9, 12(a)(i), 12(a)(ii), 12(b)(ii), 13, 14(d) and 15(b) shall become effective upon the execution and delivery of this Agreement by the parties hereto (or their representatives) representing Securities Customer Claims in the amount of at least $1.275 billion, and FX/Unsecured Claims in the amount of at least $300 million, in each case as reflected on the Houlihan Claims Schedule.

(b) *Conditions for Certain Other Provisions of this Agreement to be Effective.* The balance of §12 and §§10, 15(a) and 16 through 23 shall become effective on the date (the "***Initial Effective Date***") on which each of the following conditions precedent has been satisfied so long as the conditions are satisfied on or before August 31, 2006:

(i) this Agreement shall have been duly executed and delivered by each of the RCM Trustee and the creditors (whether directly or through their representatives) named on the signature pages hereto representing the amounts of claims referred to in §14(a).

(ii) the RCM Trustee shall have completed his investigation of the characterization of the claims set forth on the Houlihan Claims Schedule as being Securities Customer Claims and shall have concluded and advised the other parties hereto that the amount of the Securities Customer Claims whose characterization as Securities Customer Claims the RCM Trustee intends to challenge, exclusive of the Rogers Funds Claims and claims arising under repurchase agreements, do not exceed the sum of $100 million in the aggregate;

(iii) the RCM Trustee shall have completed his final review of the details of the attorneys' fees and expenses for which payment is sought as substantial contribution claims pursuant to §7(f) and shall have concluded and have advised the other parties hereto that in his opinion the fees and expenses are reasonable and should be approved for payment; and

(iv) the Bankruptcy Court shall have entered an order or orders in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case (1) approving the terms, conditions and other provisions of this Agreement as a settlement under Bankruptcy Rule 9019 and pursuant to §§ 105(a) and 363 of the Bankruptcy Code consistent with the fiduciary duties of the RCM Trustee, (2) authorizing the distributions contemplated by this Agreement to be made from and after the Subsequent Effective Date, (3) permitting the Metals Sale as provided in § 7(c)(i) and the claims allowances referred to in §§5(c), 7(a), 7(f) and 14(c)(i), (4) confirming the status of the MCG Parties and the Joinder Parties as holders of Securities Customer Claims as provided in §3(a)(ii), (5) deferring further action on the Conversion Motion except as

provided in this Agreement, (6) continuing the stay of the Stayed Proceedings except as provided in this Agreement and (7) confirming that due and sufficient notice of the hearing on the order or orders had been given, and such order or orders shall be in form and substance reasonably satisfactory to the RCM Trustee and the other parties hereto.

The Bankruptcy Court's order or orders approving this Agreement shall include a determination that the following treatment is a reasonable compromise of the issues raised in the Conversion Motion and the Stayed Proceedings and is fully enforceable against other parties in interest in the Cases as a settlement under Bankruptcy Rule 9019 and pursuant to §§ 105(a) and 363 of the Bankruptcy Code:

(A) the sum of (1) $97.4 million of the Assets in Place, plus (2) interest from March 6, 2006, on $97.4 million calculated at the Invested Cash Rate from March 6, 2006 (the "*Interest Accrual*"), plus (3) the Leuthold Claimed Metals (subject to §5(c)) are the exclusive property and assets segregated for and available to the holders of the allowed FX/Unsecured Claims;

(B) all other Assets in Place are either "customer property", within the meaning of Section 741(4) of the Bankruptcy Code, of the holders of the allowed Securities Customer Claims, or constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims to general RCM estate property based on the deficiency claims of the holders of the allowed Securities Customer Claims;

(C) the Assets in Place referred to in the foregoing clause (B) are collectively the exclusive property and assets segregated for distribution solely to the holders of the allowed Securities Customer Claims, subject to treatment of the Advance Amounts; and

(D) the amount of the Assets in Place that constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims based on the deficiency claims of the holders of the allowed Securities Customer Clams (as distinguished from the claims of the holders of the allowed Securities Customer Claims to assets as customer property) is the sum of $99.5 million, plus interest from March 6, 2006, accruing on such amount calculated at the Invested Cash Rate.

(c) *Conditions for the Remaining Provisions of this Agreement to be Effective.* The remaining provisions of this Agreement shall become effective on the date (the "*Subsequent Effective Date*") on or after the Initial Effective Date on which the following conditions precedent have been satisfied so long as each of the conditions is satisfied on or before the date indicated for that condition:

(i) by October 15, 2006, unless the RCM Trustee and the Super Majority have agreed to a different treatment of the Rogers Funds Claims, the holders of the Rogers Funds Claims shall have agreed in a writing satisfactory to the RCM Trustee and the Super Majority for their claims to be treated as allowed Securities Customer Claims or, alternatively, as allowed FX/Unsecured Claims (even if such agreement were not reached within the 14-day period referred to in §2(d)); or, in the absence of such

agreement, the Bankruptcy Court shall have entered an order that the Rogers Funds Claims are allowed Securities Customer Claims or, alternatively, are allowed FX/Unsecured Claims;

(ii)　　　　by January 15, 2007, either:

(A)　　the provisions of this Agreement shall have been incorporated in all material respects into a joint plan of reorganization of some or all of the Debtors including RCM or (if so permitted by the Bankruptcy Court) of RCM alone, the plan shall have been confirmed by an order entered by the Bankruptcy Court, and the "Effective Date" under and as defined in the plan shall have occurred; or

(B)　　the RCM Case shall have been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7; and

(iii)　　　　by such date as of which all of the other conditions in this subsection are met, the RCM Trustee shall have determined that there are or will be sufficient funds to pay all of the allowed administrative and priority claims of the RCM estate from the amounts reserved or available pursuant to §§5(a), 6(a) and 6(e).

The provisions of this Agreement shall be considered to have been incorporated into a plan, or to be administered in a Chapter 7, Subchapter III case, even if a creditor that is not party to this Agreement is afforded materially better treatment under the plan or in the Chapter 7, Subchapter III case than a similarly situated creditor party to this Agreement, so long as the creditor's claim is in a convenience class as contemplated by § 1122(b) of the Bankruptcy Code or, in a Chapter 7, Subchapter III case, the Bankruptcy Court finds that the creditor's claim would likely have been in such a class had the RCM Case not been converted and a plan were proposed.

(d)　　*Effect if Conditions Not Met.*　If (1) the conditions set forth in §14(b) to be satisfied on the Initial Effective Date are not satisfied on or before August 31, 2006, (2) the conditions set forth in §14(c) to be satisfied on the Subsequent Effective Date are not satisfied on or before the dates set forth in §14(c), or (3) the Bankruptcy Court advises the parties hereto that the Bankruptcy Court will not be willing to take any action contemplated by §14(b) or (c) (or will not be willing to do so by the date contemplated thereby for that action to be taken) and within a period of ten days thereafter the parties hereto have not made amendments to this Agreement satisfactory to them and to the Bankruptcy Court for the Bankruptcy Court to take such action (or to take such action by the date set forth in §14(b) or (c) for such action to be taken), then:

(i)　　　　the provisions of this Agreement, other than those in this subsection, shall be void and of no force or effect;

(ii)　　　　if the RCM Case has not then been converted to a Chapter 7 case, any party hereto may request the Bankruptcy Court to take further action on the Conversion Motion to convert the RCM Case to a Chapter 7 case to be administered under Subchapter III of Chapter 7;

(iii)        any party hereto who has brought a Stayed Proceeding may seek to lift the stay of the Stayed Proceeding; and

(iv)        each of the RCM Trustee and the other parties hereto shall otherwise preserve and reserve all rights and remedies and be subject to all liabilities and obligations as if this Agreement, in so far as it relates to the provisions to become effective on the Initial Effective Date or, as the case may be, the Subsequent Effective Date, shall not have been entered into. The rights preserved and reserved include, without limitation, the right of any creditor, to the extent that the creditor's claim was not previously resolved apart from this Agreement, to (A) allege that it possesses a claim as a customer under Subchapter III of Chapter 7, (B) litigate any Stayed Proceeding or other claim that assets or property is not property of the RCM estate or (C) file and prosecute an appeal from any order on the Conversion Motion.

(e)      *Effect of the Occurrence of the Subsequent Effective Date on the Conversion Motion and the Stayed Proceedings.* If the Subsequent Effective Date shall occur, this Agreement shall constitute a full and final settlement of the Conversion Motion and the Stayed Proceedings and shall in and of itself constitute a stipulation, effective as of the Subsequent Effective Date, of the disposition of the Conversion Motion and Stayed Proceedings without the necessity of filing a separate stipulation of dismissal if otherwise appropriate. The dispositions shall be final, but preserving and reserving any claims arising out of the failure of any party to this Agreement or other party in interest to comply with the terms and provisions of this Agreement, whether embodied in a Chapter 11 plan or otherwise.

### §15.   Successor and Assigns; Claims Transfer Restrictions.

(a)      *General.* This Agreement shall bind and inure to the benefit of the parties hereto and their respective successors, assigns, heirs, executors, administrators, and representatives, including, if the RCM Case is converted to a Chapter 7 to be administered under Subchapter III of Chapter 7, any trustee appointed in the Chapter 7 case.

(b)      *Transfer of Claim.* No creditor party hereto shall sell, transfer, or assign any of its claims against the RCM estate or any option thereon or any right or interest (voting or otherwise) therein, unless the transferee agrees in writing to be bound by all the terms of this Agreement by executing a counterpart signature page of this Agreement and the transferor provides each of the RCM Trustee, the Creditors' Committee (if then in existence), and the Plan, Negotiation and Litigation Advisory Committee, with a copy thereof. No creditor party hereto shall grant any proxies, subject any of its claims to a voting trust, enter into a voting agreement or enter into any derivative transaction in respect to any of its claims unless such arrangement provides for the assignee to assume the creditor's obligations under this Agreement and the assignee does so by executing and delivering to the RCM Trustee an instrument of assumption satisfactory to the RCM Trustee.

(c)     *Security Interest in Claim.*  Subsection (b) does not apply to the mere granting of a security interest without voting authority in favor of a secured party, but does apply to the enforcement of the security interest, whether by foreclosure or otherwise.

### §16.   <u>Amendments</u>.

(a)     *General.*  No term, condition or other provision of this Agreement may be waived, modified, amended or supplemented except in writing signed by each party hereto affected thereby.  The consent in writing of a representative of a party shall be sufficient to approve any waiver, modification, amendment or supplement to this Agreement on behalf of that party.

(b)     *Super Majority Vote.*  Notwithstanding §16(a), any term, condition or other provision of this Agreement may be waived, modified, amended or supplemented in a writing signed by the RCM Trustee and the Super Majority, so long as (i) each of the parties hereto that holds Customer Securities Claims, FX/Unsecured Claims or (if applicable) the Leuthold Metals Claim is treated by the waiver, modification, amendment or supplement in the same manner as each other party holding such claims unless such party consents to any different treatment contemplated thereby or (ii) if the waiver, modification, amendment or supplement is timely objected to by another party, the forum chosen pursuant to §17 does not find that the objecting party is materially prejudiced thereby.  For purposes of this subsection, an objection by a party is timely if lodged with the RCM Trustee within 15 calendar days following its receipt of notice of the intended waiver, modification, amendment or supplement.

(c)     *Exceptions.*  Section 16(b) shall not apply to a waiver, modification, amendment or supplement to (i) this Section, to the definition of "Super Majority," or to §3(a)(ii), 4, 5, 6, 7(d) or 8 unless, where §16(b) otherwise requires the signature in writing of the Super Majority, the waiver, modification, amendment or supplement is signed by the Super Majority with the percentage of 75% referred to in the definition of the term "Super Majority" being instead 95%, or (ii) §5(c) or 7(c) without the written consent of Leuthold.

### §17.   <u>Governing Law; Chosen Forum</u>.

(a)     *Governing Law.*  Except to the extent governed by the provisions of the Bankruptcy Code, this Agreement shall be governed by and construed in accordance with the internal laws of the State of New York applicable to contracts made and to be performed entirely within the State of New York, without regard to any choice of law provision which would require the application of the law of any other jurisdiction.

(b)     *Bankruptcy Court Forum.*  Each of the parties hereto hereby irrevocably and unconditionally agrees that any legal action, suit, or proceeding by or against the party with respect to any matter under or arising out of or in connection with this Agreement shall be brought in the Bankruptcy Court, and irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding, but only, in each case, to the extent that, at the time, the Bankruptcy Court has

jurisdiction thereof. In addition, each of the parties hereto irrevocably consents to the reopening of any of the Cases for the purpose of interpreting or enforcing any provision of this Agreement.

(c)     *Other Chosen Forum if Applicable.* In the event that the Bankruptcy Court does not at the time have jurisdiction over the legal action, suit or proceeding, each of the parties hereto hereby irrevocably and unconditionally agrees that the legal action, suit, or proceeding shall be brought in a federal or New York State court located in New York City and irrevocably accepts and submits to the exclusive jurisdiction of such court, generally and unconditionally, with respect to any such action, suit, or proceeding.

## §18.   Reservations.

(a)     *Allowance of Claims.*   Nothing contained in this Agreement constitutes an allowance of any particular claim, or restricts, impairs or otherwise affects the RCM Trustee's right to seek disallowance or the equitable subordination of any claim on any basis, except:

> (i)     as provided in §5(c) for the Leuthold Metals Claim or 7(f) for certain substantial contribution claims, or

> (ii)    for the allowance of the Rogers Funds Claims to the extent provided in §7(a) or 14(c)(i).

(b)     *RCM Trustee's Actions.*   Nothing contained in this Agreement shall prohibit the RCM Trustee at any time from selling or otherwise disposing of assets of the RCM estate subject to Bankruptcy Court approval or from requesting the Bankruptcy Court to convert the RCM Case to a Chapter 7 case to be administered under Subchapter III of Chapter 7.  Nothing contained in §2(e) or 3 shall require the RCM Trustee to act or to omit from acting in any manner which in the sole judgment of the RCM Trustee would be inconsistent with his or her fiduciary duties.

(c)     *Plan Voting.*   Nothing contained in this Agreement requires any party hereto to vote in favor of any Chapter 11 plan.

(d)     *Appeals from the Conversion Motion Ruling.*   Nothing contained in this Agreement prevents any party who objected to the Conversion Motion, or who has a right to appeal under applicable law, from prior to the Subsequent Effective Date filing and pursuing a protective appeal of any order converting the RCM Case to a Chapter 7 case.  The parties hereto agree to cooperate with each other and to take such other action as may be appropriate to seek from the U.S. District Court a stay of any such appeal pending the occurrence of the Subsequent Effective Date or the application of §14(d).

## §19.   Specific Performance.  It is understood and agreed by each of the parties hereto that money damages would not be a sufficient remedy for any breach of this Agreement by any party and that each non-breaching party shall be entitled to specific performance and injunctive or other equitable relief as a remedy for any such breach.

§20.  **Interpretation.**  In the event that a provision of this Agreement conflicts with a provision of the Term Sheet, the provision of this Agreement controls.  The headings of the sections and subsections of this Agreement are inserted for convenience only and shall not affect the interpretation of this Agreement.

§21.  **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be an original and all of which, taken together, shall constitute one and the same agreement.  An executed counterpart transmitted to the RCM Trustee by facsimile shall be sufficient as an original executed counterpart.

§22.  **Joinders by Additional Creditors**.  After the execution and delivery of this Agreement by the original parties hereto, any other creditor of the RCM estate may become a party to this Agreement by (a) executing and delivering to the RCM Trustee a counterpart of this Agreement and (b) the RCM Trustee accepting the counterpart.  The RCM Trustee will notify the other parties hereto of the creditor joining as a party to this Agreement and will file a notice of the joinder with the Bankruptcy Court.  This Section does not apply to a person who becomes a party to this Agreement pursuant to §15(b).

§23.  **Notices.**  All notices or other communications under this Agreement to any party hereto shall be delivered or sent to such party at its address, or at the address of its counsel, indicated on the signature page for such party below or at such other address as such party or its counsel may communicate to the other parties hereto.

*[Remainder of page intentionally left blank]*

**IN WITNESS WHEREOF**, each of the parties hereto has caused this Agreement to be executed and delivered by its duly authorized officer as of the date first above written.

THE RCM TRUSTEE

By:
Name: Marc S. Kirschner
Title: Chapter 11 Trustee of Refco Capital Markets, Ltd.

Marc S. Kirschner (MSK3631)
1120 Park Avenue, 18A
New York, NY 10128
Telephone: (212) 860-7577

31

CLEARY GOTTLIEB STEEN
  & HAMILTON LLP

By: _____
Thomas J. Moloney (TM-9775)
Neil P. Forrest (NF-8162)
Jason P. Gottlieb (JG-8398)
One Liberty Plaza
New York, New York 10006-1470
(212) 225-2000

*Attorneys for Inter Financial Services, Ltd.*

SETTLEMENT AGREEMENT

32

CAPITAL MANAGEMENT SELECT FUND
LTD.

By:    Vyténis Rasutis
Title:  Director

*Address for notices:*

DICKSTEIN SHAPIRO MORIN
   & OSHINSKY LLP (*up to and through July 9,*
                              *2006)*

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
2101 L Street, N.W.
Washington, D.C. 20037
(202) 785-9700

DICKSTEIN SHAPIRO LLP (*as of and after July*
                              *10, 2006)*

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
1825 Eye Street, N.W.
Washington, DC 20006-5403
Tel: (202) 420-3144
Fax: (202)-420-2201

*Attorneys for Capital Management Select Fund Ltd.*

COLE, SCHOTZ, MEISEL,
  FORMAN & LEONARD, P.A.
  A Professional Corporation


By: _____
Joshua Angel (JA-3288)
Laurence May, Esq. (LM-9714)
Seth F. Kornbluth, Esq. (SK-4911)
460 Park Avenue
New York, NY 10022-1906
(212) 752-8000

*Attorneys for Global Management Worldwide*
*Limited; Arbat Equity Arbitrage Fund Limited;*
*Russian Investors Securities Limited; and Garden*
*Ring Fund Limited*

34

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By:

Rick B. Antonoff (RA-4158)
C. Nicole Gladden (CG-3707)
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for RB Securities Limited*

35

SHUTTS & BOWEN LLP *(By Larry Glick*
By: *Robert Fracasso* *w/permission)*
Robert Fracasso (RF-2538)
Peter E. Shapiro (PES-4795)
201 South Biscayne Boulevard
1500 Miami Center
(305) 379-9102

LARRY I. GLICK, P.C.
Larry I. Glick (LG-8665)
1305 Franklin Avenue, Suite 180
Garden City, New York 11530
(516) 739-1111

*As attorneys for IDC Financial S.A.;*
*Investment & Development Finance Corp.;*
*Oslo International S.A.; Alfredo Skinner–Klee*
*and Alexandra Sol de Skinner-Klee; Ernesto*
*Ruiz Sinibaldi; Christian Klose Pieters and*
*Aida Margarita Rosales de Klose; Ballery*
*Holdings; and Bilston International Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.
By: *Larry I. Glick (LG-8665)*

*As attorneys for GTC Bank Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Miguel Sauma*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.
By: *Larry I. Glick (LG-8665)*

*As attorneys for Banco Reformador S.A. and*
*Transcom Bank (Barbados) Ltd.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Banco Uno S.A.- Panama;*
*Banco Uno S.A.- El Salvador; and Banco*
*Uno S.A.- Guatemala*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.
By: *Larry I. Glick (LG-8665)*

*As attorneys for INS-Bancredito Valores*
*Puesto de Bolsa, S.A. and Servicios*
*Generales Bursatiles, S.A. de C.V.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Victor Hoyos and Altima*
*Capital Management, Inc.*

SETTLEMENT AGREEMENT

BUSDOCS/1558440

HOLLAND & KNIGHT LLP

By: _Sandra E. May_

Sandra E. Mayerson (SM-8119)
Arthur E. Rosenberg (AR-0513)
Peter A. Zisser (PZ-9634)
195 Broadway
New York, NY  10007
(212) 513-3200

*Attorneys for Turisol Casa de Cambio C.A.;*
*Heptagon Financial Services, Inc., f/k/a*
*Interfin Capital Inc.; Sud America de Seguros C.A.;*
*Sul America Compania de Seguros del*
*Ecuador C.A.; Latina Seguros y Redseguros S.A., f/k/a*
*Generali Peru Compania de Seguros y*
*Reseguros; Heptagon Financial Planners,*
*Ltd.; and Brooke Financial Services Ltd.*

37

AKIN GUMP STRAUSS HAUER
& FELD LLP

By: _____

Fred S. Hodara (FH-7497)
Andrew J. Rossman (AR-0596)
590 Madison Avenue
New York, NY 10022
(212) 872-1000

*Attorneys for VR Global Partners, L.P.; Paton
Holdings Ltd.; VR Capital Group Ltd.; and VR
Argentina Recovery Fund, Ltd.*

SETTLEMENT AGREEMENT

38

HOGAN & HARTSON L.L.P.

By: _____
Ira S. Greene (IG-2315)
Scott A. Golden (SG-6663)
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Premier Bank International N.V. and Banco de Hipotecario de Inversion Turistica de Venezuela as trustee of Fideicomiso Federal Forex Investment*

CHADBOURNE & PARKE LLP

By: _____
Joseph H. Smolinsky (JS-8408)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Markwood Investments Ltd.*

FOLEY & LARDNER LLP

By: _____
Robert A. Scher (RS 2910)
Dorit S. Heimer (DH 7511)
Emily R. Sausen (ES 9097)
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329

FOLEY & LARDNER LLP
Scott E. Early (pro hac vice)
Salvatore A. Barbatano (pro hac vice)
Geoffrey S. Goodman (pro hac vice)
321 North Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Leuthold Funds, Inc. and Leuthold
Industrial Metals Fund, L.P.*

BROWN RUDNICK BERLACK ISRAELS LLP

By:_____

Andrew Dash (AD 7913 )
Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

BROWN RUDNICK BERLACK ISRAELS LLP
William R. Baldiga
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Attorneys for Hain Capital Group, LLC; Wayzata
Investment Partners; and Contrarian Capital
Management*

KATTEN MUCHIN ROSENMAN LLP

By: _____

Jeff J. Friedman (JF-7661)
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Lyxor/Estlander & Ronnlund
Fund Ltd.; Lyxor/Beach Discretionary Fund
Ltd.; and Société Générale S.A.*

[page reserved]

BUSDOCS/15584440

[page reserved]

BUSDOCS/1558440

CHADBOURNE & PARKE LLP

By: _Christy Rivera_
Howard Seife (HS 7995)
Christy L. Rivera (CR 8895)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Carlos Sevilleja, Cosmorex, Ltd.,*
*and Creative Finance Limited*

FAEGRE & BENSON LLP

By: _____
Michael B. Fisco (#175341)
Stephen M. Mertz (#212131)
Abby E. Wilkinson (#0312981)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Cargill Financial Services
Corporation; Cargill Global Funding PLC;
Cargill, Incorporated; and Cargill Meat Solutions
Corporation (formerly Excel Corporation)*

SETTLEMENT AGREEMENT

WHITE & CASE LLP

By: _____

Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for RR Investment Company Limited*

WHITE & CASE LLP

By: _____

Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for Rovida Holdings Limited*

SETTLEMENT AGREEMENT

48

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____
Robert A. Johnson (RJ 6553)
590 Madison Avenue
New York, NY 10022-2524
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for Reserve Invest (Cyprus) Ltd.*

BLANK ROME LLP

By: _____
Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Grand Trading Limited*

BLANK ROME LLP

By: _____
Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Armajaro Commodities, Ltd.*

EVEREST ASSET MANAGEMENT INC.

By:    Peter Lamoureux
Title:   President

*Address for notices:*

HENDERSON & LYMAN

Douglas E. Arend
175 West Jackson Boulevard
Suite 240
Chicago, IL 60604
Tel: (312) 986-6960
Fax: (312) 986-6960

*Attorneys for Everest Asset Management Inc.*

SETTLEMENT AGREEMENT

BUSDOCS/15584440

# EXHIBIT A

# MCG MEMBERS AND JOINDER PARTIES

| MCG Members | Joinder Parties |
|---|---|
| Inter Financial Services, Ltd. | Banco Uno S.A.- Panama |
| | Banco Uno S.A.- El Salvador |
| Capital Management Select Fund Ltd. | Banco Uno S.A.- Guatemala |
| | INS-Bancredito Valores Puesto de Bolsa, S.A.* |
| Global Management Worldwide Limited | Servicios Generales Bursatiles, S.A. de C.V.* |
| Arbat Equity Arbitrage Fund Limited | Altima Capital Management, Inc.* |
| Russian Investors Securities Limited | |
| Garden Ring Fund Limited | Turisol Casa de Cambio C.A. |
| | Heptagon Financial Services, Inc., |
| RB Securities Limited | f/k/a Interfin Capital Inc. |
| | Sud America de Seguros C.A. |
| GTC Bank Inc. | Sul America Compania de Segurose del Ecuador C.A. |
| IDC Financial S.A. | Latina de Seguros, f/k/a Generali Peru Compania de |
| Investment & Development Finance Corp. | Seguros y Reseguros |
| Oslo International S.A. | Heptagon Financial Planners, Ltd. |
| Alfredo Skinner–Klee | Brook Financial Services Ltd. |
| and Alexandra Sol de Skinner-Klee | |
| Ernesto Ruiz Sinibaldi | VR Global Partners, L.P. |
| Christian Klose Pieters | Paton Holdings Ltd. |
| Aida Margarita Rosales de Klose | VR Capital Group Ltd. |
| Ballery Holdings | VR Argentina Recovery Fund, Ltd. |
| Bilston International Inc. | |
| Banco Reformador S.A. | Premier Bank International N.V. |
| Transcom Bank (Barbados) Ltd. | Banco de Hipotecario de Inversion Turistica de |
| | Venezuela as trustee of Fideicomiso Federal Forex |
| | Investment* |
| | |
| | Markwood Investments Ltd. |

* Treated as a Joinder Party for purposes of Sections 3(a)(ii) and 14(b)(iv)(4) of the Agreement.

# EXHIBIT B

# APRIL 25 ANALYSIS

**RCM ASSETS - DRAFT ALLOCATION OF ASSETS TO FX AND CUSTOMER GROUPS**
**AMOUNTS IN $US, BASED ON VALUATION AS OF MARCH 6, 2006**

| NOTE | LINK | COUNTER-PARTY | ACCOUNT REF | 3/6/06 BALANCE | 11/18/05 BALANCE | INCREASE/ (DECREASE) | PRELIMINARY ALLOCATION | NOT IDENTIFIABLE | FX & OTC PORTION | CUSTOMER PORTION |
|---|---|---|---|---|---|---|---|---|---|---|
| **CASH ACCOUNTS** | | | | | | | | | | |
| 1 | | Bank of NT Butterfield & Sons | xxx100 | $ 12,625 | $ - | $ 12,625 | N | $ 12,625 | | |
| 2 | | Bank of NT Butterfield & Sons | xxx206 | - | 3,804 | (3,804) | | | | |
| 3 | | Bank of NT Butterfield & Sons | xxx627 | - | 8,760 | (8,760) | | | | |
| 4 | A | CIBC Mellon Global Securities Services Company | xxx002 | 461,060 | - | 461,060 | C | | | $ 461,060 |
| 5 | B | Euroclear | xxx982 | 17,762,652 | 4,744,508 | 13,018,144 | C | | | 17,762,652 |
| 6 | C | Euroclear | xxx917 | 2,698,429 | 1,056,322 | 1,642,107 | C | | | 2,698,429 |
| 7 | D | Hanis Trust & Savings | xxx715 | 170,124,891 | 97,862,026 | 72,262,865 | N | 46,662,060 | $ (3,508,075) | 127,883,685 |
| 8 | | HSBC | xxx987 | 108,969,322 | 103,269,640 | 5,699,682 | SPLIT | | 95,915,030 | 13,054,292 |
| 9 | | HSBC | xxx274 | 6,039,337 | - | 6,039,337 | FX | | 6,039,337 | |
| 10 | | HSBC | xxx201 | 3,314,058 | 3,314,058 | - | FX | | 3,314,058 | |
| 11 | | HSBC | xxx201 | 2,336 | - | 2,336 | FX | | 2,336 | |
| 12 | E | JP Morgan Chase - London | xxx701 | (22,047,280) | - | (22,047,280) | N | $ (22,047,280) | | |
| 13 | F | JP Morgan Chase - DTC | xxx570 | 560,581 | 36,614,646 | (36,054,065) | C | | | 560,581 |
| 14 | G | JP Morgan Chase - Fed | xxx590 | 11,262 | 19,908,950 | (19,897,688) | C | | | 11,262 |
| 15 | F&G | JP Morgan Chase | | 383,916,988 | - | 383,916,988 | SPLIT | | 12,000,000 | 371,916,988 |
| 16 | | JP Morgan Chase | xxx634 | 117,941,393 | - | 117,941,393 | C | | | 117,941,393 |
| 17 | H | Merrill Lynch | | 13,393,297 | 8,196,983 | 5,196,314 | C | | | 13,393,297 |
| 18 | | Standard Charter Bank | xxx110 | - | 1,659,707 | (1,659,707) | N/A | | | |
| 19 | I | Wachovia Bank, NA | xxx853 | 36,868,791 | - | 36,868,791 | FX | | 36,868,791 | |
| | | **SUBTOTAL: CASH ACCOUNTS** | | $ 840,029,741 | $ 276,639,404 | $ 563,390,337 | | $ 24,627,405 | $ 150,631,477 | $ 665,683,638 |
| **CASH DUE FROM BROKERS** | | | | | | | | | | |
| 20 | I | Counterparty terminations - FX | | $ 6,453,523 | 42,978,395 | (36,524,872) | FX | | $ 6,453,523 | |
| 21 | D | Counterparty terminations - Sec | | 16,270,863 | 140,651,296 | (124,380,403) | C | | | $ 16,270,863 |
| 22 | | Refco Securities LTD | | - | 14,940,078 | (14,940,078) | N/A | | | |
| 23 | | Refco, LLC (Man Financial) | | 43,351,834 | 40,964,347 | 2,387,487 | N | 43,351,834 | | |
| | | **SUBTOTAL: CASH DUE FROM BROKERS** | | $ 66,076,220 | $ 239,534,086 | $ (173,457,866) | | $ 43,351,834 | $ 6,453,523 | $ 16,270,863 |
| **CUSTODY ACCOUNTS** | | | | | | | | | | |
| 24 | A | CIBC | | $ 8,318,788 | 5,875,557 | 2,443,231 | C | | | $ 8,318,788 |
| 25 | | Clearstream | | 26,808,251 | 41,375,814 | (14,567,563) | C | | | 26,808,251 |
| 26 | | Dresdner - To DTC | | - | 43,854,161 | (43,854,161) | | | | |
| 27 | | Dresdner - To Euroclear | | - | 19,002,366 | (19,002,366) | | | | |
| 28 | | Euroclear - Refco Sec Inc. 21938 | | - | 63,828,726 | (63,828,726) | | | | |
| 29 | C | Euroclear - Refco Secs LLC NY 92917 | | 92,511,976 | 5,695,419 | 86,816,557 | C | | | 92,511,976 |
| 30 | | Euroclear-RCM LDN 21936 | | 6,271 | 5,693 | 578 | C | | | 6,271 |
| 31 | B | Euroclear-RCM NY 11982 | | 407,620,419 | 410,533,021 | (2,912,602) | C | | | 407,620,419 |
| 32 | | HSBC - London (Precious Metals) | | 15,604,305 | 11,882,813 | 3,721,492 | FX | | $ 15,604,305 | |
| 33 | F | JP Morgan Chase - DTC | | 426,577,743 | 339,041,922 | 87,535,821 | C | | | 426,577,743 |
| 34 | G | JP Morgan Chase - Fed | | 91,505,480 | 389,684,706 | (298,179,226) | C | | | 91,505,480 |
| 35 | E | JP Morgan Chase - London | | 7,304,737 | 42,071 | 7,262,666 | C | | | 7,304,737 |
| 36 | H | Merrill Lynch | | 67,522,987 | 56,584,318 | 10,938,669 | C | | | 67,522,987 |
| 37 | | Refco Singapore | | 1,964,899 | 1,901,951 | 62,948 | C | | | 1,964,899 |
| | | **SUBTOTAL: CUSTODY ACCOUNTS** | | $ 1,145,745,856 | $ 1,389,308,538 | $ (243,562,682) | | $ - | $ 15,604,305 | $ 1,130,141,551 |
| | | **GRAND TOTALS** | | $ 2,051,881,817 | $ 1,905,482,028 | $ 146,369,789 | | $ 67,979,239 | $ 172,689,305 | $ 1,812,096,052 |

*Note: Allocations do not reflect any compromises that may have been reached in settlement discussions.*

**RCM ASSETS - DRAFT ALLOCATION OF ASSETS TO FX AND CUSTOMER GROUPS**
**AMOUNTS IN $US, BASED ON VALUATION AS OF MARCH 6, 2006**

### NOTES

| | |
|---|---|
| 1 | Petty cash for expenses incurred in Bermuda |
| 2 | Transferred to revised Butterfield account. |
| 3 | Transferred to revised Butterfield account. |
| 4 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts. |
| 5 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) |
| 6 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) |
| 7 | Unidentifiable amounts represent treasuries reverse repoed over time from RSL for unidentifiable cash and deposited as collateral at Lehman to for emerging market options transactions.  The balance relates to the collection of cash proceeds from securities counter-party terminations. |
| 8 | Increase related to collection of FX counter-party terminations prior to opening of Wachovia account. |
| 9 | Account identified subsequent to 11/18 as FX related activity for Hong Kong customers. |
| 10 | FX related activity for Hong Kong customers. |
| 11 | Account identified subsequent to 11/18 as FX related activity for Hong Kong customers. |
| 12 | Upon further review, it has become clear that the debit balances arose over time based on hundreds/thousands of transactions in multiple currencies and tracing the origin of the debits is not realistically feasible. |
| 13 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts.  Decrease due to cash sweep to interest bearing JP Morgan Chase account. |
| 14 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts.  Decrease due to cash sweep to interest bearing JP Morgan Chase account. |
| 15 | Various cash proceeds (maturities, coupons, dividends, etc.) from custodial securities accounts; includes proceeds from matured Rogers securities, which are assumed to be "customer" property.  Increase due to cash sweep from JP Morgan Chase accounts.  Corresponds to decreased balance in JP Morgan Chase securities accounts.  Per V. Kraker, FX amount relates to maturities of treasuries held for RIS customers in DTC account.  As of 3/6/06, $60MM of Rogers securites remained in a JPMC account and have been allocated as customer assets. |
| 16 | Balance as of 2/28/06.  Money Market account for RSL/RCM disputed cash proceeds connected with securities movement from Euroclear accounts. |
| 17 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) |
| 18 | This cash may be an RSL asset and is included in the RSL liquidation analysis.  Further, note that 11/18 amount was erroneously stated in Yen.  $US balance is approx. $13k. |
| 19 | Account set-up 2/14/06.  Balance relates to collection of FX counter-party terminations.  Deposits to account monitored by David Fox. |
| 20 | Outstanding balance for counter-party terminations related to FX transactions.  Decrease due to collections in HSBC and Wachovia accounts |
| 21 | Outstanding balance for securities counter-party terminations.  Decrease due to collections in Harris and JP Morgan Chase accounts.  11/18 contained receivable from UBS paid to HSBC account. |
| 22 | RCM securities customer accounts at RSL included in intercompany balances.  As of 3/6, balance is $16,008,222. |
| 23 | Includes $24.9MM related to OTC/Derivative trades and $18.4MM related to F/X trades the origin of which is unidentifiable.  Amounts collected subsequent to 3/6/06 |
| 24 | Increase relates to various cash proceeds (maturities, coupons, dividends, etc.) and current market valuation. |
| 25 | Decrease relates primarily to bond maturity for $0 value.  Confirmation of this maturity and current status of proceeds under review by RCM personnel. |
| 26 | Repo collateral returned to DTC custody account. |
| 27 | Repo collateral returned to Euroclear account. |
| 28 | Securities consolidated to Euroclear account 92917. |
| 29 | Increase relates to return of Dresdner collateral, consolidation of account with 21939, and current market valuation |
| 30 | Increase related to current market valuation. |
| 31 | Decrease related to maturities and current market valuation. |
| 32 | Increase related to current market valuation. |
| 33 | Increase relates to return of Dresdner collateral and current market valuation |
| 34 | Decrease relates to treasury maturities offset by increase in market valuation for remaining securities. |
| 35 | Increase relates to additional securities associated with account subsequent to 11/18/05.  Per V. Kraker, $6.3MM of the current value reported by JPM relates to 2 securities positions that RCM personnel view as illiquid and potentially valueless.  RCM continues to investigate this issue. |
| 36 | Increase related to current market valuation. |
| 37 | Increase related to current market valuation. |

**EXHIBIT C**

## Memo

Refco

**To:** Marc Kirshner

**CC:** Eric Simonsen, David Pauker

**From:** Stacey Hightower

**Date:** 5/12/2006

**Re:** RCM Assets and Investments Update

Dear Marc,

There are several RCM book-owned assets that are in various stages of due diligence to verify RCM ownership, assess value, and identify a strategy to monetize that value for the Estate. This memo addresses these assets and their current status in the due diligence/recovery pipeline. Most of them will need advisement and support from you in order to advance their position. I have placed these assets into the following three categories.

- Category 1: RCM Investments; these are assets owned by RCM that have been researched fully, but await a decision from you to either liquefy or hold the assets for now.

- Category 2: RCM Dealer Liquidations; these are RCM positions that have been liquidated as of the bankruptcy filing, and the funds need to be returned to RCM. The counterparties have been either delinquent in providing information to reconcile amounts, or will not respond to our inquiries.

- Category 3: B-33 Schedule; these are RCM book assets that are mostly in the early stage of due diligence to verify RCM ownership and determine value.

### Category 1: RCM Investments

- **Lonestar International Fund:** Lonestar International Fund is comprised of three separate funds a) Sigma Fund International, b) North Star International, and c) Northbridge Partners International.

# REDACTED

- o Sigma Fund International- RCM is the sole investor, with an approximate value of $2.3MM as of 11/05.

- o North Star International- RCM is the sole investor, with an approximate value of $2.3MM (11/05). Of the total investment, $1.03MM is held in an RCM account #4488 in the name of Northstar Fund.

- o Northbridge Partners International- RCM is one of two investors in this vehicle. RCM's investment is approximately $2.6MM (11/05) of the total $4MM.

- o Beckenham Trading Co. (BTC) has filed a claim for $250,000 held in three accounts: 4127 & 4217A01 in the name of Beckenham Trading Company, and 4138 in the name of Beckenham FX Clear. BTC is a NCM related entity.

REDACTED

**REDACTED**

REDACTED

### Next Steps.

- **Dendreon:** 152,778 shares of Dendreon, a public company, are held in an account in the name of Refco Group that is held at RCM. These shares will await the final global RCM decision. The share price has moved adversely since end of Jan from $5.06 to $3.93 at 5/10/06 ($773,000 vs. $600,000).

### Category 2: RCM Dealer Liquidations

- **Barclays Bank PLC:** Barclays is willing to pay $1.5MM for the liquidation of RCM foreign currency trades. Our RCM foreign currency dept believes Barclays owes $1.79MM. We have asked for the specific prices that Barclays' trades were liquidated to reconcile the amount owed.

    o  *Next Steps:* 

- **Dresner Bank AG:** Dresner has paid us liquidations related to the RCM securities, but we have a discrepancy regarding the liquidation of RCM foreign currency trades. Our RCM foreign currency dept believes Dresner owes $1.63MM. We've asked for the specific prices at which their trades were liquidated to reconcile the amount owed.

    *Next Steps:*

- **Bear Stearns Forex:** The RCM foreign currency department estimates that Bear Stearns owes RCM approximately $347,000 for liquidated trades. The RCM securities department needs Bear Stearns to provide them with a liquidation price on a bond in their possession.

    o  *Next Steps:*

- **FIMAT SA:** FIMAT agrees that there is $1.8MM in liquidations to be paid. They have received a counter claim by RJ Trading claiming RJ Trading is the rightful owner of the $1.8MM. FIMAT is holding onto the funds until clearly directed which party rightfully owns the funds. Upon clarification, FIMAT is willing to make the disbursement.

- o RJ Trading was the Advisor/agent for RCM on all the FIMAT trades. RJT claims that the liquidation was RJT's client positions (ABBA, Living Water, and Jenkins). They also claim that RCM is attempting to seize the property of said RJT clients.

- o *Next Steps*:

**REDACTED**

## Category 3: B-33 Schedule:

These book assets are in the early stages of due diligence to verify RCM ownership and value. We have prioritized due diligence based on highest to lowest book value. The due diligence process involves internal searches to locate any records or documents related to the asset, initial acquisition or verification of ownership. Externally, we contact the Counterparty to verify ownership through documentation. Where we can't locate an external Counterparty, we conduct internet and Bloomberg searches to locate the entity. Below is a synopsis of the assets currently in the due diligence process.

- **PFG Relative Value Opportunity Overseas Fund:** The fund is comprised of U.S. debt, exchanged traded and OTC interest rate futures and options and, to a lesser extent, currency equity, commodity, liquid foreign sovereign debt and U.S. and foreign fixed income securities. PFG Advisors LLC is the Fund's investment manager.

  - o RCM's investment value: RCM owns 5,000 shares valued at $5.26MM as of 4/30/2006

  - o Redemption can be executed with a letter notice to PFG and Citco (Fund administrator) 65 days prior to the end of the quarter. Funds will then arrive 10-15 days after the end of the quarter.

  - o *Next Steps*: 

- **Acies Assets Management SA:** This is a Geneva-based asset management company. In August, 2000 RCM and Acies Assets Management (AAM) entered into a stock purchase and business relationship agreement. RCM received 20% (30,000 shares) of AAM's equity for SF$300,000 and monthly charges of SF$200,000/month for 3 years (SF$7,200,000). RCM agreed to provide dealer and brokerage service for AAM clients. The current book value listed is $6,900,000 and 45,000 shares.

**REDACTED**

  - o *Next Steps*: 

— <u>Additional B-33 items in initial due diligence phase</u>

| Asset Name | Quantity | Book Value in USD | Comments |
|---|---|---|---|
| ACTIVCARD | 300 | 26,399 | TBD |
| BANK OF AYUNDHYA PUB CO-FORGN | 60,000 | 590 | TBD |
| BK OF AYUDHYA | 550,000 | 6,539 | TBD |
| C A LA ELECTRICIDAD DE CARACAS | 1 | 10 | TBD |
| CLICKMARKS.COM | 516,129 | 800,000 | Called company waiting on information |
| IRIDIUM WORLD COMMUNICATIONS | 1,000 | 12 | TBD |
| MINFIN OF RUSSIA 3 05/14/08 | 200,000 | 189,630 | TBD |
| ROCKCREEK PARTNER | 760,000 | 402,000 | Called company; awaiting response |
| RUSSIA-IAN (VNESHECONOMBANK) | 804,164 | 276,577 | TBD |
| SN BANK | 403,100 | 1,000,000 | We have documents Searching for pricing information and need Korean Interpreter |
| SN BANK CO LTD. CONVERTIBLE | 600,000,000 | 619,642 | We have documents Searching for pricing information and need Korean Interpreter |



**EXHIBIT D**

**ATTORNEYS' FEES / SUBSTANTIAL CONTRIBUTION**

1.  Akin Gump Strauss Hauer & Feld LLP — $927,794.00

2.  Chadbourne & Parke LLP — $10,000.00

3.  Cleary Gottlieb Steen & Hamilton LLP — $1,450,492.27

4.  Cole, Schotz, Meisel, Forman & Leonard, P.A. — $167,748.42

5.  Dickstein Shapiro Morin & Oshinsky LLP — $707,777.30

6.  Hogan & Hartson L.L.P. — $140,716.25

7.  Holland & Knight LLP — $477,109.74

8.  Larry I. Glick, P.C. — $62,631.37

9.  Pillsbury Winthrop Shaw Pittman LLP — $255,241.54

10. Shutts & Bowen LLP — $163,519.71

# Exhibit E to Settlement Agreement

## a) Per HLHZ analysis (25 April)

| | | Not identifiable | General Pool | Customer | |
|---|---|---|---|---|---|
| Gross cash: | 862.1 | | 46.7 | 150.6 | 665.7 | Estimated market value as of March 6 per HLHZ. This value was used in defining customer deficiencies for the limited purpose of determining the fixed entitlements of the respective creditor groups to general pool assets. Some or all securities may be liquidated prior to distribution and may fluctuate in value. |
| less debit amounts in JPM account: | (22.0) | | (22.0) | | | |
| Net cash: | 840.1 | | 24.7 | 150.6 | 665.7 | |
| Due from brokers: | 66.1 | | 43.4 | 6.4 | 16.2 | |
| Due from brokers: | 1,130.1 | | - | | 1,130.1 | |
| Due from brokers: | 15.6 | | | 15.6 | | Estimated market value as of March 6 per HLHZ. |
| Due from brokers: | 2,051.9 | | 68.1 | 172.6 | 1,812.0 | |

## b) Adjustments to HLHZ analysis:

| | | Not identifiable | General Pool | Customer |
|---|---|---|---|---|
| Correct for attribution of Lehman unwinds (1): | | (46.7) | | 46.7 |
| Correct for attribution of Man account (2): | | (43.4) | 43.4 | |
| Total RCM assets in place: | 2,052.7 | (22.0) | 216.0 | 1,858.7 |

## c) Attribution of Sphinx recovery

| | | Not identifiable | General Pool | Customer |
|---|---|---|---|---|
| Gross Sphinx recovery: | 263.0 | | | |
| less redemption of JPM secured loan: | (79.5) | | | |
| Remaining Sphinx proceeds: | 183.5 | | | |
| Return of customer assets used to fund 10/13 JPM partial redemption: | 121.5 | | | 121.5 |
| Balance of Sphinx proceeds: | 62.0 | 62.0 | | |
| Total Attribution of Sphinx recovery: | 183.5 | 62.0 | - | 121.5 |

## d) RCM Asset Attribution (incl. Sphinx):

| | | Not identifiable | General Pool | Customer |
|---|---|---|---|---|
| Attribution before allocation of unidentified assets: | 2,236.2 | 40.0 | 216.0 | 1,980.2 |
| Estimated allowed claims by class, per HLHZ: | 3,643.5 | | 893.1 | 2,750.4 |
| Creditor class assets other than not identified: | 1,447.3 | | 677.1 | 770.2 |
| Creditor class share of not identified assets: | | | 46.8% | 53.2% |
| Reallocation of unidentified assets: | | (40.0) | 18.7 | 21.3 |
| Attribution of all RCM Assets (incl. Sphinx): | | - | 234.7 | 2,001.5 |

## e) ADDITIONAL COMPROMISE:

| | | Not identifiable | General Pool | Customer | |
|---|---|---|---|---|---|
| Reallocation of customer assets to general pool: | | | 22.8 | -22.8 | This deemed general pool figure is fixed by agreement between the parties at this level. As it compromises only cash (with exception of metals amounts), it is not subject to market fluctuation. |
| POST-COMPROMISE FINAL ATTRIBUTION OF ALL ASSETS IN PLACE: | | | 257.5 | 1,978.7 | |

## II. RCM liabilities

### a) Assumed admin claims
| | |
|---|---|
| i) Attributable to securities administration: | 15.0 |
| ii) Not attributable to securities administration: | 45.0 |
| b) Estimated allowed Securities customers claims: | 2,750.4 |
| c) Estimated allowed FX/OTC claims: | 893.1 |

## III. Recoveries from assets in place before reallocation compromises

### a) Customer pool
| | |
|---|---|
| Customer pool assets: | 1,978.7 |
| less securities admin claim: | (15.0) |
| Net customer pool assets: | 1,963.7 |
| Allowed customer claim: | 2,750.4 |
| Implied deficiency claim: | 786.7 |

### b) General pool
| | | | |
|---|---|---|---|
| General pool assets: | 257.5 | | Parties have agreed to fix this figure for purposes of calculating upfront entitlements to General Pool assets. |
| less general pool admin claim: | (45.0) | | |
| Net general pool assets: | 212.5 | | |
| Non-customer claims: | 893.1 | 53.17% | Parties have estimated the Pro-Rata share of deemed net general pool assets for holders of FX/Unsecured Claims as of March 6, 2006. |
| Implied deficiency claim: | 786.7 | 46.83% | Parties have estimated the Pro-Rata share of deemed net general pool assets for holders of Securities Customer Claims as of March 6, 2006. |
| Total general pool claims: | 1,679.8 | 100.0% | |

### c) Customer recovery
| | |
|---|---|
| From customer pool: | 1,963.7 |
| From general pool: | 99.5 |
| Total recovery: | 2,063.2 |

### c) Non-customer recovery
| | | |
|---|---|---|
| From general pool: | 113.0 | This is an agreed, fixed figure. |

## Notes to analysis:

(1) Unwind of RCM hedges that offset securities customer options positions.
(2) Unwind of RCM hedges that offset securities fx customer positions.

| | Customer Pool | General Pool | Total |
|---|---|---|---|
| **IV. Reallocation compromises:** | | | |
| Increase general pool upfront recovery: | (123.6) | 123.6 | |
| Upfront recovery after reallocation compromises: | 1,939.6 | 236.6 | 2,176.2 |
| | | | |
| **V. Contingent recoveries from Additional Property:** | | | |
| Sharing percentage on contingent recoveries: | 46.83% | 53.17% | 100.0% |
| Contingent recoveries required for catch-up: | 232.5 | | |
| Contingent recoveries before activation of catch-up: | 150.0 | | |
| Accrual rate on catch-up (% p.a.): | 12% | | |
| Attribution of phase 1 contingent recoveries: | 70.3 | 79.7 | 150.0 |
| Recoveries after phase 1 contingent recoveries: | 2,009.9 | 316.3 | 2,326.2 |
| % recoveries after phase 1 contingent recoveries: | 73.1% | 35.4% | |
| Phase 2 contingent recovery catch-up: | 232.5 | | |
| Phase 2 contingent recovery interest (3): | 9.3 | | |
| Recoveries after phase 2 contingent recoveries: | 2,251.6 | 316.3 | 2,568.0 |
| % recoveries after phase 2 contingent recoveries: | 81.9% | 35.4% | |

> This is the agreed Advance Amount, which will be reduced dollar-for-dollar by interest accrued on $97.4mm from March 6, 2006.

> This amount was a fixed $221mm plus the then value of the Leuthold Metals.

> Percentages here are for illustration purposes only. Actual percentages to be calculated based on actual allowed Implied Deficiency Claims and actual allowed FX/Unsecured Claims.

> This figure is illustrative. Actual amount will be calculated as: ($123.6mm less interest accrued on $97.4mm from March 6, 2006) divided by a fraction of the final allowed FX/Unsecured Claims (i.e., the numerator) and the total of the final allowed FX/Unsecured Claims and the Implied Deficiency Claims of the holders of the final allowed Securities Customer Claims (i.e., the denominator), subject to any adjustments provided for in the Agreement.

> This annual rate will apply to all Advance Amounts.

**VI. Estimated Recovery chart:**

| | | Customer Pool | General Pool | Total |
|---|---|---|---|---|
| Assets in place plus Advance Amount: | | 1,939.6 | 236.6 | 2,176.2 |
| Contingent recoveries from Additional Property: | 50.0 | 1,963.0 | 263.2 | 2,226.2 |
| | 100.0 | 1,986.4 | 289.8 | 2,276.2 |
| | 150.0 | 2,009.9 | 316.3 | 2,326.2 |
| | 200.0 | 2,059.9 | 316.3 | 2,376.2 |
| | 250.0 | 2,109.9 | 316.3 | 2,426.2 |
| | 300.0 | 2,159.9 | 316.3 | 2,476.2 |
| | 350.0 | 2,209.9 | 316.3 | 2,526.2 |
| | 400.0 | 2,259.9 | 316.3 | 2,576.2 |
| | 450.0 | 2,283.8 | 342.4 | 2,626.2 |
| | 500.0 | 2,307.2 | 369.0 | 2,676.2 |
| | 550.0 | 2,330.7 | 395.5 | 2,726.2 |
| | 600.0 | 2,354.1 | 422.1 | 2,776.2 |
| | 650.0 | 2,377.5 | 448.7 | 2,826.2 |
| | 700.0 | 2,400.9 | 475.3 | 2,876.2 |
| | 750.0 | 2,424.3 | 501.9 | 2,926.2 |
| | 800.0 | 2,447.7 | 528.5 | 2,976.2 |
| | 850.0 | 2,471.2 | 555.0 | 3,026.2 |
| | 900.0 | 2,494.6 | 581.6 | 3,076.2 |
| | 950.0 | 2,518.0 | 608.2 | 3,126.2 |
| | 1,000.0 | 2,541.4 | 634.8 | 3,176.2 |
| | | | | |
| Assets in place plus Advance Amount: | | 70.5% | 26.5% | |
| Contingent recoveries from Additional Property: | 50.0 | 71.4% | 29.5% | |
| | 100.0 | 72.2% | 32.4% | |
| | 150.0 | 73.1% | 35.4% | |
| | 200.0 | 74.9% | 35.4% | |
| | 250.0 | 76.7% | 35.4% | |
| | 300.0 | 78.5% | 35.4% | |
| | 350.0 | 80.3% | 35.4% | |
| | 400.0 | 82.2% | 35.4% | |
| | 450.0 | 83.0% | 38.3% | |
| | 500.0 | 83.9% | 41.3% | |
| | 550.0 | 84.7% | 44.3% | |
| | 600.0 | 85.6% | 47.3% | |
| | 650.0 | 86.4% | 50.2% | |
| | 700.0 | 87.3% | 53.2% | |
| | 750.0 | 88.1% | 56.2% | |
| | 800.0 | 89.0% | 59.2% | |
| | 850.0 | 89.8% | 62.1% | |
| | 900.0 | 90.7% | 65.1% | |
| | 950.0 | 91.5% | 68.1% | |
| | 1,000.0 | 92.4% | 71.1% | |

**Notes to analysis:**

(3) Premium for risk and delay. Assumes six-month delay.

**EXHIBIT F**

**PLAN, NEGOTIATION AND LITIGATION
ADVISORY COMMITTEE**

The Plan, Negotiation and Litigation Advisory Committee shall be composed of all MCG Members and Joinder Parties as well as all holders of FX/Unsecured Claims who are party to the Agreement and who have signed the Agreement (either individually or through counsel) on or before July 12, 2006. However, the Plan, Negotiation and Litigation Advisory Committee shall not include any party that elects not to serve as a member or any party that the RCM Trustee determines to be unsuitable to serve as a member as a result of wrongful conduct or for other good cause.

**EXHIBIT G**

**PORTFOLIO MANAGEMENT ADVISORY COMMITTEE**

Fintech Advisory Inc.
IDC Financial S.A.
RB Securities Limited
VR Advisory Services, Ltd.

## AMENDMENT TO SETTLEMENT AGREEMENT

This **AMENDMENT** (this "*Amendment*") is made and entered into as of August 14, 2006, among (i) Refco Capital Markets, Ltd., acting by and through Marc S. Kirschner in his capacity as trustee of RCM in its Chapter 11 case and (ii) those customers and other creditors of Refco Capital Markets Ltd. party to the Settlement Agreement dated as of June 29, 2006 (the "*Settlement Agreement*") among Refco Capital Markets, Ltd. and such creditors. Terms defined in the Settlement Agreement have the same meanings herein as specified therein.

**WHEREAS**, the parties hereto wish to amend the Settlement Agreement as provided herein;

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

**§1.     Amendments**. The Settlement Agreement is hereby amended in the following respects:

(a)     The Settlement Agreement is amended, to correct certain typographical errors, by deleting the words "MCG Parties" wherever those words appear and by substituting therefore the defined term "MCG Members".

(b)     Subsection (a) of §3 of the Settlement Agreement is amended by deleting the words "each of the parties hereto" in clause (v) and by substituting therefore the words "each of the parties to this Agreement that is also".

(c)     Subsection (a) of §3 of the Settlement Agreement is further amended by adding at the end of the subsection the following:--

(viii)     Nothing contained in this Agreement shall preclude any creditor of the RCM estate from, except as provided in clauses (ii) and (v), (A) seeking to characterize a prepetition claim held by it against the RCM estate as a Securities Customer Claim or an FX/Unsecured Claim regardless of whether or not the claim is listed on the Houlihan Claims Schedule and regardless of how the claim, if listed, is characterized on the Houlihan Claims Schedule, (B) disputing the amount of its claim as listed on the Houlihan Claims Schedule or (C) asserting the amount of its claim as listed on such creditor's proof of claim.

(d)     Subsection (f) of §7 of the Settlement Agreement is amended by deleting in the first sentence of the subsection the words "and the administration of customer property under §§ 503(b)(3)(D), 507(a)(2) and 752(a)" and by substituting therefore the words "under §§ 503(b)(3)(D) and 503(b)(4)".

(e)     Subsection (b) of §8 of the Settlement Agreement is amended by deleting the last sentence of the subsection and by substituting therefore the following sentence:--

The value or amount of any asset referred to in this subsection shall not include an asset for which the date for determining the value or amount of the asset has not yet occurred under subsection (c).

(f)     Subsection (d) of Section 10 is amended by adding the following sentence:--

If, in connection with the RCM Trustee seeking approval from the Bankrutpcy Court for the distribution of a security in kind, the value of the security is put at issue, any presumption of value contained in §3(b) shall not apply.

(g)     Section 11 is amended by deleting the words "or supported".

(h)     As a result of the RCM Trustee completing his due diligence investigation of the characterization of the claims of Banco Uno, S.A. Nicaragua, Exhibit A to the Settlement Agreement is amended by adding Banco Uno, S.A. Nicaragua as a Joinder Party solely for purposes of §§3(a)(ii) and 14(b)(iv)(4) of the Settlement Agreement. The addition shall not increase the amounts of substantial contribution claims contemplated by §7(f) of the Settlement Agreement.

(i)     Exhibit E to the Settlement Agreement is amended, in order to correct certain typographical errors contained in part (a) thereof, by deleting the Exhibit E attached to the Settlement Agreement and by substituting therefore the Exhibit E attached hereto.

(j)     Exhibit G to the Settlement Agreement, setting forth the list of the names of the members of the Portfolio Management Advisory Committee, is amended by adding to the list the name of Markwood Investments Ltd.

**§2.    Settlement Agreement Approval Order**. The parties hereto acknowledge and agree that the form of Proposed Revised Order attached hereto satisfies the requirements of §14(b)(iv) of the Settlement Agreement.

**§3.    Joinder**. The signatories to this Amendment who are not signatories to the Settlement Agreement are joining in this Amendment as signatories to the Settlement Agreement as amended by this Amendment.

**§4.    Effective Time**. This Amendment shall become effective when it has been signed by or on behalf of the Super Majority inclusive of the parties joining the Settlement Agreement pursuant to §3 of this Amendment.

**§5.    Savings Clause**. Except as provided in this Amendment, the Settlement Agreement shall continue in full force and effect. The Settlement Agreement and this Amendment shall be read and construed together as a single agreement.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Amendment to be executed and delivered by its duly authorized officer or other representative as of the date first above written.

*[Remainder of page intentionally left blank]*

THE RCM TRUSTEE

By: _____
Name: Marc S. Kirschner
Title: Chapter 11 Trustee of Refco Capital Markets, Ltd.

Marc S. Kirschner (MSK3631)
1120 Park Avenue, 18A
New York, NY 10128
Telephone: (212) 860-7577

CLEARY GOTTLIEB STEEN
   & HAMILTON LLP

By: _Thomas J. Moloney_

Thomas J. Moloney (TM-9775)
Neil P. Forrest (NF-8162)
Jason P. Gottlieb (JG-8398)
One Liberty Plaza
New York, New York 10006-1470
(212) 225-2000

*Attorneys for Inter Financial Services, Ltd.*

CAPITAL MANAGEMENT SELECT FUND
LTD.

By:    Vytenis Rasutis
Title:   Director

*Address for notices:*

DICKSTEIN SHAPIRO LLP

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
1825 Eye Street, N.W.
Washington, DC 20006-5403
Tel: (202) 420-3144
Fax: (202)-420-2201

*Attorneys for Capital Management Select Fund Ltd.*

COLE, SCHOTZ, MEISEL,
   FORMAN & LEONARD, P.A.
   A Professional Corporation

By:_____
Joshua Angel (JA-3288)
Laurence May, Esq. (LM-9714)
Seth F. Kornbluth, Esq. (SK-4911)
460 Park Avenue
New York, NY 10022-1906
(212) 752-8000

*Attorneys for Global Management Worldwide
Limited; Arbat Equity Arbitrage Fund Limited;
Russian Investors Securities Limited; and
Garden Rind Fund Limited*

PILLSBURY WINTHROP SHAW
   PITTMAN LLP

By: _____
Rick B. Antonoff (RA-4158)
C. Nicole Gladden (CG-3707)
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for RB Securities Limited*

AKIN GUMP STRAUSS HAUER
& FELD LLP

By: _Fred S. Hodara_

Fred S. Hodara (FH-7497)
Andrew J. Rossman (AR-0596)
590 Madison Avenue
New York, NY 10022
(212) 872-1000

*Attorneys for VR Global Partners, L.P.; Paton
Holdings Ltd.; VR Capital Group Ltd.; and VR
Argentina Recovery Fund, Ltd.*

HOGAN & HARTSON L.L.P.

By: _____
Ira S. Greene (IG-2315)
Scott A. Golden (SG-6663)
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Premier Bank International N.V. and
Banco de Hipotecario de Inversion Turistica de
Venezuela as trustee of Fideicomiso Federal Forex
Investment*

SHUTTS & BOWEN LLP *(By Larry Glick w/permission)*

By: *Robert Fracasso*
Robert Fracasso (RF-2538)
Peter E. Shapiro (PES-4795)
201 South Biscayne Boulevard
1500 Miami Center
(305) 379-9102

LARRY I. GLICK, P.C.
Larry I. Glick (LG-8665)
1305 Franklin Avenue, Suite 180
Garden City, New York 11530
(516) 739-1111

*As attorneys for IDC Financial S.A.;*
*Investment & Development Finance Corp.;*
*Oslo International S.A.; Alfredo Skinner–Klee*
*and Alexandra Sol de Skinner-Klee; Ernesto*
*Ruiz Sinibaldi; Christian Klose Pieters and*
*Aida Margarita Rosales de Klose; Ballery*
*Holdings; and Bilston International Inc.*


SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for GTC Bank Inc.*


SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Banco Reformador S.A. and*
*Transcom Bank (Barbados) Ltd.*


SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: *Larry I. Glick*
LARRY I. GLICK (LG-8665)
*As attorneys for Banco Uno S.A.- Panama;*
*Banco Uno S.A.- El Salvador; Banco Uno,*
*S.A. Nicaragua; and Banco Uno S.A.-*
*Guatemala*


SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: *Larry I. Glick*
LARRY I. GLICK (LG-8665)
*As attorneys for INS-Bancredito Valores*
*Puesto de Bolsa, S.A. and Servicios*
*Generales Bursatiles, S.A. de C.V.*

HOLLAND & KNIGHT LLP

By: _Sandra E. Mayerson /BCP_

Sandra E. Mayerson (SM-8119)
Arthur E. Rosenberg (AR-0513)
Peter A. Zisser (PZ-9634)
195 Broadway
New York, New York 10007
(212) 513-3200

*Attorneys for Turisol Casa de Cambio C.A.;*
*Heptagon Financial Services, Inc., f/k/a*
*Interfin Capital Inc.; Sud America de Seguros C.A.;*
*Sul America Compania de Segurose del*
*Ecuador C.A.; Latina de Seguros, f/k/a*
*Generali Peru Compania de Seguros y*
*Reseguros; Heptagon Financial Planners,*
*Ltd.; and Brook Financial Services Ltd.*

CHADBOURNE & PARKE LLP

By: _Joseph H Smolinsky_

Joseph H. Smolinsky (JS-8408)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Markwood Investments Ltd.*

FOLEY & LARDNER LLP

By: _____
Robert A. Scher (RS 2910)
Dorit S. Heimer (DH 7511)
Emily R. Sausen (ES 9097)
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329

FOLEY & LARDNER LLP
Scott E. Early (pro hac vice)
Salvatore A. Barbatano (pro hac vice)
Geoffrey S. Goodman (pro hac vice)
321 North Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Leuthold Funds, Inc. and Leuthold Industrial Metals Fund, L.P.*

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Andrew Dash (AD 7913 )
Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

BROWN RUDNICK BERLACK ISRAELS LLP
William R. Baldiga
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Attorneys for Hain Capital Group, LLC; Wayzata
Investment Partners; and Contrarian Capital
Management*

KATTEN MUCHIN ROSENMAN LLP

By: _____
Jeff J. Friedman (JF-7661)
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Lyxor/Estlander & Ronnlund*
*Fund Ltd.; Lyxor/Beach Discretionary Fund*
*Ltd.; and Société Générale S.A.*

CHADBOURNE & PARKE LLP

By: _Christy Rivera_

Howard Seife (HS 7995)
Christy L. Rivera (CR 8895)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Carlos Sevilleja; Cosmorex, Ltd.;
and Creative Finance Limited*

FAEGRE & BENSON LLP

By: _[signature]_
Michael B. Fisco (#175141)
Stephen M. Mertz (#212131)
Abby E. Wilkinson (#0313981)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Cargill Financial Services
Corporation; Cargill Global Funding PLC;
Cargill, Incorporated; and Cargill Meat Solutions
Corporation (formerly Excel Corporation)*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for RR Investment Company Limited*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for Rovida Holdings Limited*

EVEREST ASSET MANAGEMENT INC.

By:     Peter Lamoureux
Title:  President

*Address for notices:*

HENDERSON & LYMAN

Douglas E. Arend
175 West Jackson Boulevard
Suite 240
Chicago, IL 60604
Tel: (312) 986-6960
Fax: (312) 986-6960

*Attorneys for Everest Asset Management Inc.*

BUSDOCS/1574571

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____
Robert A. Johnson (RJ 6653)
590 Madison Avenue
New York, NY 10022-2524
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for Reserve Invest (Cyprus) Ltd.*

**JOINDER OF ROGERS FUNDS TO AMENDMENT TO SETTLEMENT AGREEMENT**

ROGERS RAW MATERIALS FUND, L.P. and ROGERS INTERNATIONAL RAW MATERIALS FUND, L.P. (the "Rogers Funds") hereby confirm that all references to the Settlement Agreement in the Joinder of Rogers Funds to Settlement Agreement dated as of July 20th 2006, between the Funds and the RCM Trustee shall be to the Settlement Agreement as amended by the foregoing Amendment.

SIDLEY AUSTIN LLP

By: _Guy Neal_

Guy Neal
Brian Krakauer
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8041
Fax: (202) 736-8711

*Attorneys for Rogers Raw Materials*
*Fund, L.P. and Rogers International*
*Raw Materials Fund, L.P.*

ANNEX 1 TO AMENDMENT

REVISED EXHIBIT E

# Exhibit E to Settlement Agreement

| | Not Identifiable | General Pool | Customer | |
|---|---|---|---|---|
| **a) Per HLHZ analysis (25 April)** | | | | |
| Gross cash: | 862.1 | 46.7 | 150.6 | 665.7 | Estimated market value as of March 6 per HLHZ. This value was used in defining customer deficiencies for the limited purpose of determining the fixed entitlements of the respective creditor groups to general pool assets. Some or all securities may be liquidated prior to distribution and may fluctuate in value. |
| less debit amounts in JPM account | (22.0) | (22.0) | | |
| Net cash: | 840.1 | 24.7 | 150.6 | 665.7 |
| Due from brokers: | 66.1 | 43.4 | 6.4 | 16.2 |
| Securities: | 1,130.1 | | - | 1,130.1 |
| Precious metals: | 15.6 | | 15.6 | | Estimated market value as of March 6 per HLHZ. |
| **Total RCM assets in place per HLHZ:** | **2,051.9** | **68.1** | **172.6** | **1,812.0** |
| | | | | |
| **b) Adjustments to HLHZ analysis:** | | | | |
| Correct for attribution of Lehman unwinds (1) | | (46.7) | | 46.7 |
| Correct for attribution of Man account (2) | | (43.4) | 43.4 | |
| **Total RCM assets in place:** | **2,052.7** | **(22.0)** | **216.0** | **1,858.7** |
| | | | | |
| **c) Attribution of Sphinx recovery** | | | | |
| Gross Sphinx recovery | 283.0 | | | |
| less redemption of JPM secured loan | (79.5) | | | |
| Remaining Sphinx proceeds | 183.5 | | | |
| Return of customer assets used to fund 10/13 JPM partial redemption: | 121.5 | | | 121.5 |
| Balance of Sphinx proceeds | 62.0 | 62.0 | - | |
| **Total Attribution of Sphinx r recovery:** | **183.5** | **62.0** | **-** | **121.5** |
| | | | | |
| **d) RCM Asset Attribution (incl. Sphinx):** | | | | |
| Attribution before allocation of unidentified assets | 2,236.2 | 40.0 | 216.0 | 1,980.2 |
| Estimated allowed claims by class, per HLHZ | 3,643.5 | | 893.1 | 2,750.4 |
| Creditor class assets other than not identified | 1,447.3 | | 677.1 | 770.2 |
| Creditor class share of not identified assets | | | 46.8% | 53.2% |
| Reallocation of unidentified assets | | (40.0) | 18.7 | 21.3 |
| Attribution of all RCM Assets (incl. Sphinx): | | 234.7 | 2,001.5 |
| | | | | |
| **e) ADDITIONAL COMPROMISE:** | | | | |
| Reallocation of customer assets to general pool | | | 22.9 | -22.9 | This deemed general pool figure is fixed by agreement between the parties at this level. As it compromise only cash (with exception of metals amounts), it is not subject to market fluctuation. |
| **POST-COMPROMISE FINAL ATTRIBUTION OF ALL ASSETS IN PLACE:** | | | 257.5 | 1,978.7 |
| | | | | |
| **II. RCM liabilities** | | | | |
| a) Assumed admin claims | | | | |
| i) Attributable to securities administration | 15.0 | | | |
| ii) Not attributable to securities administration | 45.0 | | | |
| b) Estimated allowed securities customers claims | 2,750.4 | | | |
| c) Estimated allowed FX/OTC claims | 893.1 | | | |
| | | | | |
| **III. Recoveries from assets in place before reallocation compromises** | | | | |
| **a) Customer pool** | | | | |
| Customer pool assets: | 1,978.7 | | | |
| less securities admin claim: | (15.0) | | | |
| Net customer pool assets: | 1,963.7 | | | |
| Allowed customer claim: | 2,750.4 | | | |
| Implied deficiency claim: | 786.7 | | | |
| | | | | |
| **b) General pool** | | | | |
| General pool assets: | 257.5 | | | Parties have agreed to fix this figure for purposes of calculating upfront entitlements to General Pool assets. |
| less general pool admin claim: | (45.0) | | | |
| Net general pool assets: | 212.5 | | | |
| Non-customer claims | 893.1 | 53.17% | | Parties have estimated the Pro-Rata share of deemed net general pool assets for holders of FX/Unsecured Claims as of March 6, 2006. |
| Implied deficiency claim | 786.7 | 46.83% | | |
| Total general pool claims | 1,679.8 | 100.0% | | Parties have estimated the Pro-Rata share of deemed net general pool assets for holders of Securities Customer Claims as of March 6, 2006. |
| | | | | |
| **c) Customer recovery** | | | | |
| From customer pool | 1,963.7 | | | |
| From general pool | 99.5 | | | |
| Total recovery | 2,063.2 | | | |
| | | | | |
| **c) Non-customer recovery** | | | | |
| From general pool | 113.0 | | | This is an agreed, fixed figure. |

**Notes to analysis:**

(1) Unwind of RCM hedges that offset securities options positions.
(2) Unwind of RCM hedges that offset securities fx customer positions.



**IV. Reallocation compromises:**

| | Customer Pool | General Pool | Total |
|---|---|---|---|
| Increase general pool upfront recovery. | (123.8) | 123.8 | |
| Upfront recovery after reallocation compromises. | 1,939.6 | 236.6 | 2,176.2 |

> This is a the agreed Advance Amount, which will be reduced dollar-for-dollar by interest accrued on $97.4mm from March 6, 2006.

> This amount was a fixed $121mm plus the then value of the Leafhold Metals

**V. Contingent rec overies from Additional Property:**

| | Customer Pool | General Pool | Total |
|---|---|---|---|
| Sharing percentage on contingent recoveries. | 46.83% | 53.17% | 100.0% |
| Contingent recoveries required for catch-up: | | | |
| Contingent recoveries before activation of catch-up | 232.5 | | |
| Accrual rate on catch-up (% p.a.): | 150.0 | | |
| | 12% | | |
| Attribution of phase 1 contingent recoveries | 70.3 | 79.7 | 150.0 |
| Recoveries after phase 1 contingent recoveries | 2,009.9 | 316.3 | 2,326.2 |
| % recoveries after phase 1 contingent recoveries | -23.1% | 35.4% | |
| Phase 2 contingent recovery catch-up: | 232.5 | | |
| Phase 2 contingent recovery interest (3): | 9.3 | | |
| Recoveries after phase 2 contingent recoveries | 2,251.6 | 316.5 | 2,568.0 |
| % recoveries after phase 2 contingent recoveries | 61.9% | 35.4% | |

> Percentages here are for illustration purposes only. Actual percentages to be calculated based on actual allowed Implied Deficiency Claims and actual allowed FXX/Unsecured Claims.

> This figure is illustrative. Actual amount will be calculated as ($123.8mm less interest accrued on $97.4mm from March 6, 2006) divided by a fraction of the final allowed FX/Unsecured Claims (i.e., the numerator) and the total of the final allowed FX/Unsecured Claims and the Implied Deficiency Claims of the holders of the final allowed Securities Customer Claims (i.e., the denominator), subject to any adjustments provided for in the Agreement.

> The annual rate will apply to all Advance Amounts.

**VI. Estimated Rec overy chart:**

Assets in place plus Advance Amount:
Contingent recoveries from Additional Property:

| | Customer Pool | General Pool | Total |
|---|---|---|---|
| 50.0 | 1,939.6 | 236.6 | 2,176.2 |
| 100.0 | 1,963.0 | 263.2 | 2,226.2 |
| 150.0 | 1,986.4 | 289.8 | 2,276.2 |
| 200.0 | 2,009.9 | 316.3 | 2,326.2 |
| 250.0 | 2,109.9 | 316.3 | 2,426.2 |
| 300.0 | 2,159.9 | 316.3 | 2,476.2 |
| 350.0 | 2,209.9 | 316.3 | 2,526.2 |
| 400.0 | 2,259.9 | 316.3 | 2,576.2 |
| 450.0 | 2,283.8 | 342.4 | 2,626.2 |
| 500.0 | 2,307.2 | 369.0 | 2,676.2 |
| 550.0 | 2,330.7 | 395.5 | 2,726.2 |
| 600.0 | 2,354.1 | 422.1 | 2,776.2 |
| 650.0 | 2,377.5 | 448.7 | 2,826.2 |
| 700.0 | 2,400.9 | 475.3 | 2,876.2 |
| 750.0 | 2,424.3 | 501.9 | 2,926.2 |
| 800.0 | 2,447.7 | 528.5 | 2,976.2 |
| 850.0 | 2,471.2 | 555.0 | 3,026.2 |
| 900.0 | 2,494.6 | 581.6 | 3,076.2 |
| 950.0 | 2,518.0 | 608.2 | 3,126.2 |
| 1,000.0 | 2,541.4 | 634.8 | 3,176.2 |

Assets in place plus Advance Amount:
Contingent recoveries from Additional Property:

| | Customer Pool | General Pool | Total |
|---|---|---|---|
| 50.0 | 70.5% | 28.5% | |
| 100.0 | 71.4% | 29.5% | |
| 150.0 | 72.2% | 32.4% | |
| 200.0 | 73.1% | 35.4% | |
| 250.0 | 74.9% | 35.4% | |
| 300.0 | 76.7% | 35.4% | |
| 350.0 | 78.5% | 35.4% | |
| 400.0 | 80.3% | 35.4% | |
| 450.0 | 82.2% | 35.4% | |
| 500.0 | 83.0% | 38.3% | |
| 550.0 | 83.9% | 41.3% | |
| 600.0 | 84.7% | 44.3% | |
| 650.0 | 85.6% | 47.3% | |
| 700.0 | 86.4% | 50.2% | |
| 750.0 | 87.3% | 53.2% | |
| 800.0 | 88.1% | 56.2% | |
| 850.0 | 89.0% | 59.2% | |
| 900.0 | 89.8% | 62.1% | |
| 950.0 | 90.7% | 65.1% | |
| 1,000.0 | 91.5% | 68.1% | |
| | 92.4% | 71.1% | |

**Notes to analysis:**

(3) Premium for risk and delay  Assumes six-month delay

ANNEX 2 TO AMENDMENT

**PROPOSED REVISED FORM OF ORDER**

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------ x
                                                             :
In re:                                                       :     **Chapter 11 Case**
                                                             :
REFCO INC., *et al.*,                                        :     **No. 05-60006 (RDD)**
                                                             :
                               Debtors.                      :     **(Jointly Administered)**
                                                             :
------------------------------------------------------------ x

**ORDER APPROVING SETTLEMENT AGREEMENT AMONG REFCO CAPITAL**
**MARKETS LTD. AND CERTAIN SECURITIES CUSTOMERS AND CREDITORS**

This matter is before the Court on the Motion (the "**Motion**")[1] of Marc S. Kirschner as

Chapter 11 Trustee (the "**RCM Trustee**") of Refco Capital Markets, Ltd. ("**RCM**"), for

Approval of an Agreement Among Securities Customers and General Unsecured Creditors of

Refco Capital Markets, Ltd. pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy

Procedure (the "**Bankruptcy Rules**") and sections 105(a) and 363 of chapter 11 of title 11 of the

United States Code (the "**Bankruptcy Code**").

This Order shall constitute the findings of fact and conclusions of law under Bankruptcy

Rule 7052.[2]

Based upon the Court's review and consideration of (a) the Motion, (b) the terms,

conditions and other provisions of the proposed settlement, which is embodied by that certain

settlement agreement annexed hereto as <u>Annex A</u> as amended by the amendment to settlement

agreement annexed hereto as <u>Annex B</u> (the settlement agreement, as so amended, being herein

called the "**Settlement Agreement**"), (c) all unresolved objections to the Motion, and (d) the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement
Agreement.

[2] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law
shall be construed as findings of fact when appropriate.

matters reflected in the record, including all of the evidence proffered or adduced at, filings in connection with, and arguments of counsel made at the hearing held on the Motion (the "**Hearing**"); and after due deliberation thereon and good cause appearing therefor, and for the reasons set forth on the record at the Hearing:

It is hereby FOUND AND DETERMINED THAT:

A.     On December 12, 2005, certain creditors of RCM (the "**MCG Members**") brought a motion (the "**Conversion Motion**") against RCM alleging, among other things, that (a) RCM is a "stockbroker" as defined in Section 101(53)(A) of the Bankruptcy Code, (b) the MCG Members are "customers" of RCM as defined in Section 741(2) of the Bankruptcy Code, (c) under Section 109(d) of the Bankruptcy Code RCM was not eligible to be a debtor under Chapter 11, (d) under Section 1112 of the Bankruptcy Code RCM's case must be converted to Chapter 7 and administered under Subchapter III of Chapter 7, and (e) the MCG Members are entitled under Section 752 of the Bankruptcy Code to enforce their claims as customers to "customer property" as defined in Section 741(4) of the Bankruptcy Code;

B.     Certain other creditors of RCM (the "**Joinder Parties**") subsequently joined with the MCG Members in the Conversion Motion;

C.     The Bankruptcy Court entered certain procedural orders expediting discovery and the trial of the issues raised by the Conversion Motion;

D.     The MCG Members and the Joinder Parties prosecuted the Conversion Motion while the Debtors, the Official Committee of Unsecured Creditors and various objecting parties, including foreign exchange and metals customers of RCM, actively opposed the Conversion Motion;

E.     The litigation of the Conversion Motion included expedited discovery (interrogatories, document production and approximately 30 depositions taken), expedited

briefing, and a five-day evidentiary trial that began on February 14, 2006, and concluded with final arguments on March 14, 2006;

F.    After final arguments were concluded before the Bankruptcy Court on the Conversion Motion on March 14, 2006, the Bankruptcy Court issued a preliminary ruling finding that (a) RCM met the Bankruptcy Code's definition of a stockbroker, (b) at least one of the MCG Members met the requirements of the Bankruptcy Code to be a customer and (c) the Bankruptcy Court required the appointment of a Chapter 11 trustee of RCM . However, at the request of the MCG Members, the Joinder Parties and certain other parties, the Bankrutpcy Court agreed to defer acting on the Conversion Motion while various parties in the RCM Case attempted to fashion a settlement of the priority and other issues raised by the Conversion Motion;

G.    On March 22, 2006, the Bankruptcy Court entered an order requiring the appointment of a Chapter 11 trustee for RCM;

H.    The MCG Members and the Joinder Parties prepared and filed an application on April 5, 2006, with the Bankruptcy Court requesting it to establish procedures in order to conduct an immediate creditor election of a Chapter 11 trustee for RCM;

I.    On April 10, 2006, the U.S. Trustee filed a notice with the Bankruptcy Court that the U.S. Trustee had appointed Marc S. Kirschner as the Chapter 11 trustee for RCM, subject to further order of the Bankruptcy Court;

J.    On April 13, 2006, the Bankruptcy Court entered an order authorizing Marc S. Kirschner to act as the Chapter 11 trustee of RCM in the RCM Case;

K.    There are pending before the Bankruptcy Court various adversary proceedings, contested matters and other actions against the RCM estate seeking a determination of whether certain property held by or on behalf of RCM constitutes property of the RCM estate, which actions have been stayed by the Bankruptcy Court's "Order Staying 'Estate Property Issue'

Proceedings" dated November 28, 2005 (Docket No. 634), as modified to the date hereof (such actions being referred to in such order, and being hereinafter referred to, as the "**Stayed Proceedings**");

L.    The RCM Trustee and the other parties to the Settlement Agreement negotiated among each other with a view to avoiding protracted litigation and expense relating to the issues raised by the Conversion Motion and the Stayed Proceedings, including whether the RCM Case must be converted to a Chapter 7 case administered under Subchapter III of Chapter 7, who is a customer of RCM, what constitutes customer property, how to value and administer customer property and other financial assets of the RCM estate, what other assets might or might not constitute property of the RCM estate and how to address certain other claims by, on behalf of or against the RCM estate in the context of administering and liquidating the property of the RCM estate;

M.    In order to resolve the issues raised by the Conversion Motion and the Stayed Proceedings, the parties to the Settlement Agreement reached an agreement in principle embodied in a term sheet read into the record *in camera* before the Bankruptcy Court on May 16, 2006;

N.    After further negotiations following the May 16, 2006, *in camera* proceeding, the parties to the Settlement Agreement have reached the agreements among them embodied in the Settlement Agreement, and the RCM Trustee now seeks approval of the Settlement Agreement by the Bankruptcy Court pursuant to Rule 9019 of the Bankruptcy Rules and Sections 105(a) and 363 of the Bankruptcy Code;

O.    The Court has jurisdiction over this proceeding. Venue is proper. Approval of the settlement arrangements embodied in the Settlement Agreement is a core proceeding.

P. Notice of the Motion and order approving the Settlement Agreement was proper and has been provided, served and published in accordance with the Court's order dated June 30, 2006. No further notice is necessary.

Q. The terms, conditions and other provisions of the settlement embodied in the Settlement Agreement and entry into the Settlement Agreement are consistent with the RCM Trustee's fiduciary duties.

R. The Settlement Agreement is the product of arm's-length and good faith negotiations among the Settling Parties.

S. The relief sought in the Motion and the settlement arrangements embodied in the Settlement Agreement are fair and reasonable and in the best interests of RCM, its estate, and all creditors and parties in interest in the Cases.

T. The following treatment of the property and assets of RCM under the Settlement Agreement is a fair and reasonable compromise of the issues raised in the Conversion Motion and Stayed Proceedings and, subject to paragraph 3 of this Order, is fully enforceable against other parties in interest in the Cases as a settlement under Bankruptcy Rule 9019 and Bankruptcy Code sections 105(a) and 363, and pursuant to this order:

    (i)    The sum of (1) $97.4 million of the Assets in Place, plus (2) interest from March 6, 2006, on $97.4 million calculated at the Invested Cash Rate from March 6, 2006, plus (3) the Leuthold Claimed Metals (subject to §5(c) of the Settlement Agreement) are the exclusive property and assets segregated for and available to the holders of the allowed FX/Unsecured Claims;

    (ii)    all other Assets in Place are either "customer property", within the meaning of Section 741(4) of the Bankruptcy Code, of the holders of the allowed Securities Customer Claims, or constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims to general RCM estate property based on the deficiency claims of the holders of the allowed Securities Customer Claims;

(iii)   the Assets in Place referred to in the foregoing clause (ii) are collectively the exclusive property and assets segregated for distribution solely to the holders of the allowed Securities Customer Claims, subject to treatment of the Advance Amounts; and

(iv)   the amount of the Assets in Place that constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims based on the deficiency claims of the holders of the allowed Securities Customer Clams (as distinguished from the claims of the holders of the allowed Securities Customer Claims to assets as customer property) is the sum of $99.5 million, plus interest from March 6, 2006, accruing on such amount calculated at the Invested Cash Rate.

U.    The MCG Members and Joinder Parties identified on <u>Exhibit A</u> to the Settlement Agreement made a substantial contribution by their prosecution of the Conversion Motion in the RCM bankruptcy proceedings and in seeking to compel the election of a Chapter 11 trustee for RCM.

V.    Good and sufficient cause exists for the relief sought in the Motion and that the Settlement Agreement should be approved in its entirety.

Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED that:

1.    The Motion is GRANTED in its entirety.

2.    Except as provided in paragraph 3, the Settlement Agreement among RCM, acting by and through the RCM Trustee, and those securities customers and other creditors who are signatories (including by joinder) to the Settlement Agreement (collectively, the "**Settling Parties**"), and each and every term, condition and other provision therein, is approved in its entirety pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 105(a) and 363.

3.    All objections that have not been withdrawn, resolved, waived or settled are overruled on the merits. The RCM Trustee is ordered to reserve (a) the amount of $1,809,971.82 until Adversary Complaint Number 0601318 brought by Living Water Fund, L.P., ABBA Funds, L.P. and RJ Trading, LLC and entitlement to such funds are resolved, and (b) the securities, or an

amount equal to the full current value of the securities, referred to in paragraph 8 of the limited objection of Bencorp Casa de Bolsa, C.A. until Bencorp Casa de Bolsa, C.A.'s entitlement to the securities or the value thereof, as set forth in its proof of claim, is resolved. By separate order, the Court will establish the procedures for resolving these two disputed matters with a view to resolving them promptly.

4.      The Settling Parties are authorized and directed to implement the Settlement Agreement in accordance with its terms, conditions and other provisions.

5.      Prosecution of the Conversion Motion shall be stayed. The MCG Members and Joinder Parties are directed to defer further action on the Conversion Motion, except as provided in the Settlement Agreement.

6.      Subject to paragraph 3, the Order Staying 'Estate Property Issue Proceedings' dated November 28, 2005 (Docket No. 634), as modified or amended, shall continue to be in effect. Subject to paragraph 3, the Stayed Proceedings shall continue to be stayed. The Settling Parties are directed to defer prosecution of the Stayed Proceedings, except as provided in the Settlement Agreement.

7.      The reasonable attorneys' fees and expenses of the MCG Members and the Joinder Parties, identified on Exhibit A to the Settlement Agreement, in connection with litigating the Conversion Motion through the filing of the motion to compel an election of a Chapter 11 trustee for RCM, not to exceed the amounts set forth on Exhibit D to the Settlement Agreement, shall be allowed administrative expenses, attributable as substantial contributions to the RCM estate under §§ 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, and shall be payable on the Subsequent Effective Date regardless of whether RCM remains in chapter 11 or has been converted to a chapter 7 case. This Order does not make any determination as to the

amount of attorneys' fees and expenses that are reasonable, and the Court reserves its making of that determination for a later date.

8.      In accordance with the Settlement Agreement, the Leuthold Claimed Metals or the proceeds of any Metals Sale as contemplated in the Settlement Agreement, together with any interest actually earned on the proceeds after the Metals Sale, shall be distributed exclusively to Leuthold as an allowed claim concurrently with the initial distributions to the holders of allowed FX/Unsecured Claims under the Settlement Agreement, and shall reduce the Leuthold Remaining Claim as set forth in the Settlement Agreement.

9.      The Rogers Funds Claims shall be allowed claims as provided in a separate order of the Court approving the settlement of the Rogers Funds Claims.

10.     The status of the MCG Members and the Joinder Parties, identified on <u>Exhibit A</u> to the Settlement Agreement, as holders of Securities Customer Claims, as determined by the Trustee and as provided in the Settlement Agreement, is confirmed.

11.     Neither this Order nor the Settlement Agreement (a) except to the extent set forth in paragraphs 7, 8 and 9, allows the amount of any claim, (b) affects in any way the right of any party in interest in any of the Cases to prosecute or defend any claim to recover property that, but for such recovery, would constitute Additional Property under the Settlement Agreement, (c) modifies the requirement in the Court's previously issued order dated June 9, 2006, approving the SPhinX Settlement that there be no distribution of the proceeds of the SPhinX Settlement until all appeals therefrom have been exhausted, or (d) limits or impairs any right of JPMorgan Chase Bank, N.A. ("<u>JPMorgan</u>") as an oversecured creditor in the event that JPMorgan's secured claim against the RCM estate is allowed but the SPhinX Settlement is reversed on appeal or the proceeds of the SPhinX Settlement otherwise become unavailable or are insufficient to satisfy JPMorgan's allowed secured claim.

12.     In connection with the Settlement Agreement, the RCM Trustee is authorized to (a) set aside reserves from amounts otherwise distributable under the Settlement Agreement for actual or anticipated administrative, priority and prepetition claims (whether Securities Customer Claims or FX/General Unsecured Claims) at the time such claim is disputed or disallowed, (b) allocate to separate accounts cash or other property to be distributed to holders of allowed Securities Customer Claims or allowed FX/General Unsecured Claims pending distribution, (c) make distributions as set forth in the Settlement Agreement as soon as practicable from and after the Subsequent Effective Date at such times and in such amounts (net of reserves) as the RCM Trustee deems appropriate and consistent with his fiduciary duties, (d) implement the Metals Sale through any recognized market at which sales of metals of that type are regularly conducted, (e) propose procedures to make distributions of securities in kind, subject to approval by the Court, and (f) in the RCM Trustee's sole judgment, act in any manner that would be consistent with, or omit from acting in any manner that would be inconsistent with his fiduciary duties.

13.     The RCM Trustee is not authorized to make distributions of financial assets in kind, except by procedures implemented by the RCM Trustee and approved by the Court.

14.     The determination of value of any securities as set forth in the Settlement Agreement by a valuation expert, engaged by the RCM Trustee with the approval of the Court, shall be binding and conclusive on all Settling Parties and all other parties in interest in the Cases to the extent provided in the Settlement Agreement.

15.     In the event the RCM chapter 11 case is converted to a liquidating case under subchapter III of  chapter 7, all the terms, conditions and other provisions of the Settlement Agreement approved by this order shall, in all events, be final, valid, binding and enforceable

upon any trustee appointed in the chapter 7, the Settling Parties, and all other parties in interest in the Cases regardless of such conversion.

16.     The Settlement Agreement, including any term, condition or other provision therein, may not be waived, modified, amended or supplemented, except as provided in the Settlement Agreement. No such term, condition or other provision that is waived, modified, amended or supplemented shall in any significant respect adversely affect a material economic entitlement of an entity not a party to the Settlement Agreement without the consent of that entity or further order of the Court.

17.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2006
        New York, New York

_____
Hon. Robert D. Drain
UNITED STATES BANKRUPTCY JUDGE

## SECOND AMENDMENT TO SETTLEMENT AGREEMENT

This **SECOND AMENDMENT** (this "*Amendment*") is made and entered into as of August 22, 2006, among (i) Refco Capital Markets, Ltd., acting by and through Marc S. Kirschner in his capacity as trustee of RCM in its Chapter 11 case and (ii) those customers and other creditors of Refco Capital Markets Ltd. party to the Settlement Agreement dated as of June 29, 2006, as amended by an Amendment to Settlement Agreement dated as of August 14, 2006 (as amended, the "*Settlement Agreement*"), among Refco Capital Markets, Ltd. and such creditors. Terms defined in the Settlement Agreement have the same meanings herein as specified therein.

**WHEREAS**, the parties hereto wish further to amend the Settlement Agreement as provided herein;

**NOW, THEREFORE**, the parties hereto hereby agree as follows:

**§1.** **Amendments**. The Settlement Agreement is hereby amended in the following respects:

(a) Subsection (b) of §3 of the Settlement Agreement is amended by deleting clause (B) of the last sentence of the subsection and by substituting therefore the following:--

(B) unless and until there has been an objection by the RCM Trustee or a holder of a Securities Customer Claim and, after notice and a hearing, a determination of a different value by Final Order of the Bankruptcy Court.

(b) Subsection (c) of §3 of the Settlement Agreement is amended by adding at the end of the subsection the following new sentence:--

However, an insider or affiliate whose net equity claim relates to a security described in, and whose value would otherwise be presumptively determined under, clause (i) of §3(b) shall be entitled to the presumption of value for the security to the extent provided in §3(b).

(c) Subsection (b) of §14 of the Settlement Agreement is amended by (i) deleting the word "and" at the end of clause (iv)(C) of such subsection, (ii) deleting the period at the end of clause (iv)(D) of such subsection and by substituting therefor a semi-colon followed by the word "and", and (iii) adding the following new clause:--

(E) all of the Assets in Place, other than the Assets in Place referred to in the foregoing clauses (A) and (D), constitute "customer property" within the meaning of § 741(4) of the Bankruptcy Code.

(d)     Section 22 of the Settlement Agreement is amended by adding after the first sentence the following new sentence:--

The RCM Trustee shall not unreasonably withhold or delay his acceptance of the counterpart.

(e)     As a result of the RCM Trustee completing his due diligence investigation of the characterization of the claims of Mrs. Josefina Franco Siller, <u>Exhibit A</u> to the Settlement Agreement is amended by adding Mrs. Josefina Franco Siller as a Joinder Party solely for purposes of §§3(a)(ii) and 14(b)(iv)(4) of the Settlement Agreement.  The addition shall not increase the amounts of substantial contribution claims contemplated by §7(f) of the Settlement Agreement.

**§2.     Settlement Agreement Approval Order**.  The parties hereto acknowledge and agree that the form of Proposed Revised Order attached hereto satisfies the requirements of §14(b)(iv) of the Settlement Agreement.

**§3.     Joinder**.  The signatories to this Amendment who are not signatories to the Settlement Agreement are joining in this Amendment as signatories to the Settlement Agreement as amended by this Amendment with all rights and duties as all other signatories.

**§4.     Effective Time**.  This Amendment shall become effective when it has been signed by or on behalf of the Super Majority inclusive of the parties joining the Settlement Agreement pursuant to §3 of this Amendment.  However, if at the hearing before the Bankruptcy Court seeking entry of the order required by §14(b)(iv) of the Settlement Agreement as amended by this Amendment, there is objection to §1(e) of this Amendment by a person not a party to the Settlement Agreement or this Amendment, then the effectiveness of §1(e) shall be further conditioned upon the entry of an order of the Bankruptcy Court, subsequent to the order required by such §14(b)(iv), confirming the RCM Trustee's determination of Mrs. Josefina Franco Siller as a holder of Securities Customer Claims.

**§5.     Savings Clause**.  Except as provided in this Amendment, the Settlement Agreement shall continue in full force and effect.  The Settlement Agreement and this Amendment shall be read and construed together as a single agreement.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Amendment to be executed and delivered by its duly authorized officer or other representative as of the date first above written.

*[Remainder of page intentionally left blank]*

THE RCM TRUSTEE

By: _____

Name: Marc S. Kirschner

Title: Chapter 11 Trustee of Refco Capital Markets, Ltd.

Marc S. Kirschner (MSK3631)

1120 Park Avenue, 18A

New York, NY 10128

Telephone: (212) 860-7577

CLEARY GOTTLIEB STEEN
& HAMILTON LLP

By: _____
Thomas J. Moloney (TM-9775)
Neil P. Forrest (NF-8162)
Jason P. Gottlieb (JG-8398)
One Liberty Plaza
New York, New York 10006-1470
(212) 225-2000

*Attorneys for Inter Financial Services, Ltd.*

CAPITAL MANAGEMENT SELECT FUND
LTD.

By: Vytenis Rasutis
Title: Director

*Address for notices:*

DICKSTEIN SHAPIRO LLP

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
1825 Bye Street, N.W.
Washington, DC 20006-5403
Tel: (202) 420-3144
Fax: (202)-420-2201

*Attorneys for Capital Management Select Fund Ltd.*

COLE, SCHOTZ, MEISEL,
   FORMAN & LEONARD, P.A.
   A Professional Corporation

By:_____
Joshua Angel (JA-3288)
Laurence May, Esq. (LM-9714)
Seth F. Kornbluth, Esq. (SK-4911)
460 Park Avenue
New York, NY 10022-1906
(212) 752-8000

*Attorneys for Global Management Worldwide
Limited; Arbat Equity Arbitrage Fund Limited;
Russian Investors Securities Limited; and
Garden Rind Fund Limited*

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By: _C. Nicole Gladden_

Rick B. Antonoff (RA-4158)
C. Nicole Gladden (CG-3707)
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for RB Securities Limited*

SHUTTS & BOWEN LLP

By: _Robert Fracasso_ (By Larry Glick w/permission)
Robert Fracasso (RF-2538)
Peter E. Shapiro (PES-4795)
201 South Biscayne Boulevard
1500 Miami Center
(305) 379-9102

LARRY I. GLICK, P.C.
Larry I. Glick (LG-8665)
1305 Franklin Avenue, Suite 180
Garden City, New York 11530
(516) 739-1111

*As attorneys for IDC Financial S.A.;*
*Investment & Development Finance Corp.;*
*Oslo International S.A.; Alfredo Skinner–Klee*
*and Alexandra Sol de Skinner-Klee; Ernesto*
*Ruiz Sinibaldi; Christian Klose Pieters and*
*Aida Margarita Rosales de Klose; Ballery*
*Holdings; and Bilston International Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _Larry I. Glick_
    LARRY I. GLICK (LG-8665)

*As attorneys for GTC Bank Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _Larry I. Glick_
    LARRY I. GLICK (LG-8665)

*As attorneys for Banco Reformador S.A. and*
*Transcom Bank (Barbados) Ltd.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _Larry I. Glick_
    LARRY I. GLICK- (LG-8665)

*As attorneys for Banco Uno S.A.- Panama;*
*Banco Uno S.A.- El Salvador; Banco Uno,*
*S.A. Nicaragua; and Banco Uno S.A.-*
*Guatemala*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _Larry I. Glick_
    LARRY I. GLICK (LG-8665)

*As attorneys for INS-Bancredito Valores*
*Puesto de Bolsa, S.A. and Servicios*
*Generales Bursatiles, S.A. de C.V.*

HOLLAND & KNIGHT LLP

By: _Sandra E. Mayerson /BEP_
Sandra E. Mayerson (SM-8119)
Arthur E. Rosenberg (AR-0513)
Peter A. Zisser (PZ-9634)
195 Broadway
New York, New York 10007
(212) 513-3200

*Attorneys for Turisol Casa de Cambio C.A.;*
*Heptagon Financial Services, Inc., f/k/a*
*Interfin Capital Inc.; Sud America de Seguros C.A.;*
*Sul America Compania de Segurose del*
*Ecuador C.A.; Latina de Seguros, f/k/a*
*Generali Peru Compania de Seguros y*
*Reseguros; Heptagon Financial Planners,*
*Ltd.; and Brook Financial Services Ltd.*

AKIN GUMP STRAUSS HAUER
  & FELD LLP

By: _____
Fred S. Hodara (FH-7497)
Andrew J. Rossman (AR-0596)
590 Madison Avenue
New York, NY 10022
(212) 872-1000

*Attorneys for VR Global Partners, L.P.; Paton
Holdings Ltd.; VR Capital Group Ltd.; and VR
Argentina Recovery Fund, Ltd.*

BUSDOCS/1578419.3

HOGAN & HARTSON L.L.P.

By: _____
Ira S. Greene (IG-2315)
Scott A. Golden (SG-6663)
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Premier Bank International N.V. and
Banco de Hipotecario de Inversion Turistica de
Venezuela as trustee of Fideicomiso Federal Forex
Investment*

CHADBOURNE & PARKE LLP

By: _Joseph H. Smolinsky_
Joseph H. Smolinsky (JS-8408)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Markwood Investments Ltd.*

FOLEY & LARDNER LLP

By: _Salvatore A. Barbatano_

Robert A. Scher (RS 2910)
Dorit S. Heimer (DH 7511)
Emily R. Sausen (ES 9097)
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329

FOLEY & LARDNER LLP
Scott E. Early (pro hac vice)
Salvatore A. Barbatano (pro hac vice)
Geoffrey S. Goodman (pro hac vice)
321 North Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Leuthold Funds, Inc. and Leuthold
Industrial Metals Fund, L.P.*

BROWN RUDNICK BERLACK ISRAELS LLP


By:_____
Andrew Dash (AD 7913 )
Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

BROWN RUDNICK BERLACK ISRAELS LLP
William R. Baldiga
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Attorneys for Hain Capital Group, LLC; Wayzata
Investment Partners; and Contrarian Capital
Management*

KATTEN MUCHIN ROSENMAN LLP

By: _____
Jeff J. Friedman (JF-7661)
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Lyxor/Estlander & Ronnlund
Fund Ltd.; Lyxor/Beach Discretionary Fund
Ltd.; and Société Générale S.A.*

CHADBOURNE & PARKE LLP

By: _Christy Rivera_
Howard Seife (HS 7995)
Christy L. Rivera (CR 8895)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Carlos Sevilleja; Cosmorex, Ltd.;*
*and Creative Finance Limited*

FAEGRE & BENSON LLP

By: _____
Michael B. Fisco (#175341)
Stephen M. Mertz (#212131)
Abby E. Wilkinson (#0313981)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Cargill Financial Services
Corporation; Cargill Global Funding PLC;
Cargill, Incorporated; and Cargill Meat Solutions
Corporation (formerly Excel Corporation)*

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _[signature]_
Robert A. Johnson (RJ 6553)
590 Madison Avenue
New York, NY 10022-2524
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for Reserve Invest (Cyprus) Ltd.*

BLANK ROME LLP

By: _____
Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Grand Trading Limited*

BLANK ROME LLP

By: _____
Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Armajaro Commodities, Ltd.*

EVEREST ASSET MANAGEMENT INC.

_____

By: Peter Lamoureux
Title: President

*Address for notices:*
HENDERSON & LYMAN
Douglas E. Arend
175 West Jackson Boulevard
Suite 240
Chicago, IL 60604
Tel: (312) 986-6960
Fax: (312) 986-6960

*Attorneys for Everest Asset Management Inc.*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for RR Investment Company Limited*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for Rovida Holdings Limited*

## JOINDER OF ROGERS FUNDS TO SECOND AMENDMENT
## TO SETTLEMENT AGREEMENT

ROGERS RAW MATERIALS FUND, L.P. and ROGERS INTERNATIONAL RAW MATERIALS FUND, L.P. (the "Rogers Funds") hereby confirm that all references to the Settlement Agreement in the Joinder of Rogers Funds to Settlement Agreement dated as of July 20, 2006, between the Funds and the RCM Trustee shall be to the Settlement Agreement as amended by the foregoing Second Amendment.

SIDLEY AUSTIN LLP

By: ~SNEAL~

Guy Neal
Brian Krakauer
1501 K Street, N.W.
Washington, D.C. 20005 Tel: (202) 736-8041
Fax: (202) 736-8711

*Attorneys for Rogers Raw Materials
Fund, L.P. and Rogers International
Raw Materials Fund, L.P.*

ANNEX 1 TO AMENDMENT

REVISED FORM OF PROPOSED ORDER

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------- x
                      :

In re:                    :       **Chapter 11 Case**
                      :

**REFCO INC.,** *et al.,*        :       **No. 05-60006 (RDD)**
                      :

            **Debtors.**     :       **(Jointly Administered)**
                      :
------------------------------------------------------- x

## ORDER APPROVING SETTLEMENT AGREEMENT AMONG REFCO CAPITAL MARKETS LTD. AND CERTAIN SECURITIES CUSTOMERS AND CREDITORS

This matter is before the Court on the Motion (the "**Motion**")[1] of Marc S. Kirschner as Chapter 11 Trustee (the "**RCM Trustee**") of Refco Capital Markets, Ltd. ("**RCM**"), for Approval of an Agreement Among Securities Customers and General Unsecured Creditors of Refco Capital Markets, Ltd. pursuant to Rule 9019(a) of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**") and sections 105(a) and 363 of chapter 11 of title 11 of the United States Code (the "**Bankruptcy Code**").

This Order shall constitute the findings of fact and conclusions of law under Bankruptcy Rule 7052.[2]

Based upon the Court's review and consideration of (a) the Motion, (b) the terms, conditions and other provisions of the proposed settlement, which is embodied by that certain Settlement Agreement dated as of June 29, 2006, annexed hereto as <u>Annex A</u> as amended by the Amendment to Settlement Agreement dated as of August 14, 2006 (the "**First Amendment**"), annexed hereto as <u>Annex B</u> and as further amended by the Second Amendment to Settlement

---

[1] Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Settlement Agreement.

[2] Pursuant to Bankruptcy Rule 7052, findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.

Agreement dated as of August 22, 2006 (the "**Second Amendment**"), annexed hereto as <u>Annex C</u> (the Settlement Agreement, as amended by the First Amendment and the Second Amendment, being herein called the "**Settlement Agreement**"), (c) all unresolved objections to the Motion, and (d) the matters reflected in the record, including all of the evidence proffered or adduced at, filings in connection with, and arguments of counsel made at the hearing held on the Motion (the "**Hearing**"); and after due deliberation thereon and good cause appearing therefor, and for the reasons set forth on the record at the Hearing:

It is hereby FOUND AND DETERMINED THAT:

A.    On December 12, 2005, certain creditors of RCM (the "**MCG Members**") brought a motion (the "**Conversion Motion**") against RCM alleging, among other things, that (a) RCM is a "stockbroker" as defined in Section 101(53)(A) of the Bankruptcy Code, (b) the MCG Members are "customers" of RCM as defined in Section 741(2) of the Bankruptcy Code, (c) under Section 109(d) of the Bankruptcy Code RCM was not eligible to be a debtor under Chapter 11, (d) under Section 1112 of the Bankruptcy Code RCM's case must be converted to Chapter 7 and administered under Subchapter III of Chapter 7, and (e) the MCG Members are entitled under Section 752 of the Bankruptcy Code to enforce their claims as customers to "customer property" as defined in Section 741(4) of the Bankruptcy Code;

B.    Certain other creditors of RCM (the "**Joinder Parties**") subsequently joined with the MCG Members in the Conversion Motion;

C.    The Bankruptcy Court entered certain procedural orders expediting discovery and the trial of the issues raised by the Conversion Motion;

D.    The MCG Members and the Joinder Parties prosecuted the Conversion Motion while the Debtors, the Official Committee of Unsecured Creditors and various objecting parties,

including foreign exchange and metals customers of RCM, actively opposed the Conversion Motion;

E.      The litigation of the Conversion Motion included expedited discovery (interrogatories, document production and approximately 30 depositions taken), expedited briefing, and a five-day evidentiary trial that began on February 14, 2006, and concluded with final arguments on March 14, 2006;

F.      After final arguments were concluded before the Bankruptcy Court on the Conversion Motion on March 14, 2006, the Bankruptcy Court issued a preliminary ruling finding that (a) RCM met the Bankruptcy Code's definition of a stockbroker, (b) at least one of the MCG Members met the requirements of the Bankruptcy Code to be a customer and (c) the Bankruptcy Court required the appointment of a Chapter 11 trustee of RCM . However, at the request of the MCG Members, the Joinder Parties and certain other parties, the Bankruptcy Court agreed to defer acting on the Conversion Motion while various parties in the RCM Case attempted to fashion a settlement of the priority and other issues raised by the Conversion Motion;

G.      On March 22, 2006, the Bankruptcy Court entered an order requiring the appointment of a Chapter 11 trustee for RCM;

H.      The MCG Members and the Joinder Parties prepared and filed an application on April 5, 2006, with the Bankruptcy Court requesting it to establish procedures in order to conduct an immediate creditor election of a Chapter 11 trustee for RCM;

I.      On April 10, 2006, the U.S. Trustee filed a notice with the Bankruptcy Court that the U.S. Trustee had appointed Marc S. Kirschner as the Chapter 11 trustee for RCM, subject to further order of the Bankruptcy Court;

J.      On April 13, 2006, the Bankruptcy Court entered an order authorizing Marc S. Kirschner to act as the Chapter 11 trustee of RCM in the RCM Case;

K.     There are pending before the Bankruptcy Court various adversary proceedings, contested matters and other actions against the RCM estate seeking a determination of whether certain property held by or on behalf of RCM constitutes property of the RCM estate, which actions have been stayed by the Bankruptcy Court's "Order Staying 'Estate Property Issue' Proceedings" dated November 28, 2005 (Docket No. 634), as modified to the date hereof (such actions being referred to in such order, and being hereinafter referred to, as the "**Stayed Proceedings**");

L.     The RCM Trustee and the other parties to the Settlement Agreement negotiated among each other with a view to avoiding protracted litigation and expense relating to the issues raised by the Conversion Motion and the Stayed Proceedings, including whether the RCM Case must be converted to a Chapter 7 case administered under Subchapter III of Chapter 7, who is a customer of RCM, what constitutes customer property, how to value and administer customer property and other financial assets of the RCM estate, what other assets might or might not constitute property of the RCM estate and how to address certain other claims by, on behalf of or against the RCM estate in the context of administering and liquidating the property of the RCM estate;

M.     In order to resolve the issues raised by the Conversion Motion and the Stayed Proceedings, the parties to the Settlement Agreement reached an agreement in principle embodied in a term sheet read into the record *in camera* before the Bankruptcy Court on May 16, 2006;

N.     After further negotiations following the May 16, 2006, *in camera* proceeding, the parties to the Settlement Agreement have reached the agreements among them embodied in the Settlement Agreement, and the RCM Trustee now seeks approval of the Settlement Agreement

by the Bankruptcy Court pursuant to Rule 9019 of the Bankruptcy Rules and Sections 105(a) and 363 of the Bankruptcy Code;

O.     The Court has jurisdiction over this proceeding.  Venue is proper.  Approval of the settlement arrangements embodied in the Settlement Agreement is a core proceeding.

P.     Notice of the Motion and order approving the Settlement Agreement was proper and has been provided, served and published in accordance with the Court's order dated June 30, 2006.  No further notice is necessary.

Q.     The terms, conditions and other provisions of the settlement embodied in the Settlement Agreement and entry into the Settlement Agreement are consistent with the RCM Trustee's fiduciary duties.

R.     The Settlement Agreement is the product of arm's-length and good faith negotiations among the Settling Parties.

S.     The relief sought in the Motion and the settlement arrangements embodied in the Settlement Agreement are fair and reasonable and in the best interests of RCM, its estate, and all creditors and parties in interest in the RCM Case.

T.     The following treatment of the property and assets of RCM under the Settlement Agreement is a fair and reasonable compromise of the issues raised in the Conversion Motion and Stayed Proceedings and, subject to paragraphs 11(d) and 12 of this Order, is fully enforceable against other parties in interest in the Cases as a settlement under Bankruptcy Rule 9019 and Bankruptcy Code sections 105(a) and 363, and pursuant to this order:

    (i)     The sum of (1) $97.4 million of the Assets in Place, plus (2) interest from March 6, 2006, on $97.4 million calculated at the Invested Cash Rate from March 6, 2006, plus (3) the Leuthold Claimed Metals (subject to §5(c) of the Settlement Agreement) are the exclusive property and assets segregated for and available to the holders of the allowed FX/Unsecured Claims;

(ii)     all other Assets in Place are either "customer property", within the meaning of Section 741(4) of the Bankruptcy Code, of the holders of the allowed Securities Customer Claims, or constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims to general RCM estate property based on the deficiency claims of the holders of the allowed Securities Customer Claims;

(iii)    the Assets in Place referred to in the foregoing clause (ii) are collectively the exclusive property and assets segregated for distribution solely to the holders of the allowed Securities Customer Claims, subject to treatment of the Advance Amounts;

(iv)     the amount of the Assets in Place that constitute the pro rata entitlement of the holders of the allowed Securities Customer Claims based on the deficiency claims of the holders of the allowed Securities Customer Clams (as distinguished from the claims of the holders of the allowed Securities Customer Claims to assets as customer property) is the sum of $99.5 million, plus interest from March 6, 2006, accruing on such amount calculated at the Invested Cash Rate; and

(v)      all of the Assets in Place, other than the Assets in Place referred to in the foregoing clauses (i) and (iv), constitute "customer property" within the meaning of Section 741(4) of the Bankruptcy Code.

U.      The MCG Members and Joinder Parties identified on Exhibit A to the Settlement Agreement made a substantial contribution by their prosecution of the Conversion Motion in the RCM bankruptcy proceedings and in seeking to compel the election of a Chapter 11 trustee for RCM (with the reasonableness of the amounts of their substantial contribution claims to be determined at a later date as provided in paragraph 7).

V.      Good and sufficient cause exists for the relief sought in the Motion and that the Settlement Agreement should be approved in its entirety.

Accordingly, it is hereby ORDERED, ADJUDGED AND DECREED that:

1.      The Motion is GRANTED in its entirety, with all references therein to the original Settlement Agreement dated as of June 29, 2006, being to the Settlement Agreement inclusive of the First and Second Amendments..

2. Except as provided in paragraphs 11(d) and 12, the Settlement Agreement among RCM, acting by and through the RCM Trustee, and those securities customers and other creditors who are signatories (including by joinder) to the Settlement Agreement (collectively, the "**Settling Parties**"), and each and every term, condition and other provision therein, is approved in its entirety pursuant to Bankruptcy Rule 9019 and Bankruptcy Code section 105(a) and 363.

3. All objections that have not been withdrawn, resolved, waived or settled are overruled on the merits.

4. The Settling Parties are authorized and directed to implement the Settlement Agreement in accordance with its terms, conditions and other provisions.

5. Prosecution of the Conversion Motion shall be stayed. The MCG Members and Joinder Parties are directed to defer further action on the Conversion Motion, except as provided in the Settlement Agreement.

6. Subject to paragraph 12, the Order Staying 'Estate Property Issue Proceedings' dated November 28, 2005 (Docket No. 634), as modified or amended, shall continue to be in effect. Subject to paragraph 12, the Stayed Proceedings shall continue to be stayed. The Settling Parties are directed to defer prosecution of the Stayed Proceedings, except as provided in the Settlement Agreement.

7. The reasonable attorneys' fees and expenses of the MCG Members and the Joinder Parties, identified on Exhibit A to the Settlement Agreement, in connection with litigating the Conversion Motion through the filing of the motion to compel an election of a Chapter 11 trustee for RCM, not to exceed the amounts set forth on Exhibit D to the Settlement Agreement, shall be allowed administrative expenses, attributable as substantial contributions to the RCM estate under §§ 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code, and shall be

payable on the Subsequent Effective Date regardless of whether RCM remains in chapter 11 or has been converted to a chapter 7 case. This Order does not make any determination as to the amount of attorneys' fees and expenses that are reasonable, and the Court reserves its making of that determination for a later date in connection with the fee application dated August 9, 2006, filed by the MCG Members and Joinder Parties.

8.      In accordance with the Settlement Agreement, the Leuthold Claimed Metals or the proceeds of any Metals Sale as contemplated in the Settlement Agreement, together with any interest actually earned on the proceeds after the Metals Sale, shall be distributed exclusively to Leuthold as an allowed claim concurrently with the initial distributions to the holders of allowed FX/Unsecured Claims under the Settlement Agreement, and shall reduce the Leuthold Remaining Claim as set forth in the Settlement Agreement.

9.      The Rogers Funds Claims shall be allowed claims as provided in a separate order of the Court approving the settlement of the Rogers Funds Claims.

10.     The status of the MCG Members and the Joinder Parties, identified on <u>Exhibit A</u> to the Settlement Agreement, as holders of Securities Customer Claims, as determined by the Trustee and as provided in the Settlement Agreement, is confirmed.

11.     Neither this Order nor the Settlement Agreement (a) except to the extent set forth in paragraphs 8, 9 and 10, allows the amount of any claim, (b) affects in any way the right of any party in interest in any of the Cases to prosecute or defend any claim to recover property that, but for such recovery, would constitute Additional Property under the Settlement Agreement, (c) modifies the requirement in the Court's previously issued order dated June 9, 2006 (the "**SPhinX Settlement Order**"), approving the SPhinX Settlement that there be no distribution of the proceeds of the SPhinX Settlement until all appeals from the SPhinX Settlement Order have been exhausted, (d) permits the proceeds of the SPhinX Settlement to be included in Assets in Place to

the extent that, after all appeals from the SPhinX Settlement Order have been exhausted, it is determined, as a final result of such appeals from the SPhinX Settlement Order, that the RCM estate is not entitled to the proceeds, or (e) limits or impairs any right of JPMorgan Chase Bank, N.A. ("**JPMorgan**") as an oversecured creditor in the event that JPMorgan's secured claim against the RCM estate is allowed but the SPhinX Settlement is reversed on appeal or the proceeds of the SPhinX Settlement otherwise become unavailable or are insufficient to satisfy JPMorgan's allowed secured claim.

12. The RCM Trustee is ordered to reserve each amount or other asset, otherwise included in Assets in Place, set forth in the table below and claimed by the person indicated in the table opposite such amount or other asset. Such amount or other asset may not be included in Assets in Place under the Settlement Agreement unless and until it is determined by the Court that the person claiming the amount or other asset is not entitled thereto.

| Amount or Asset | Claimant |
| --- | --- |
| The securities (or an amount equal to the full current value of the securities) referred to in paragraph 8 of the limited objection of the claimant | Bencorp Casa de Bolsa, C.A. |
| $921,252.22 | Emerging Strategies Fund, L.P. |
| $100,510.21 | Debick Partners LLC |
| $1,809,971.82 or, if applicable, such larger amount as is turned over to the RCM Trustee by FIMAT as provided below | Living Water Fund, L.P., ABBA Funds, L.P and RJ Trading, LLC |
| $8,942,277.00 | Claimants comprised in the Ad Hoc Refco F/X Customer Committee, and FXCM Capital Markets, L.L.C. and FXCM Trading, L.C.C. |
| $1,072,044.83 | Makor Issues & Rights Ltd. |

To the extent that FIMAT Alternative Strategies, Inc. or FIMAT USA, Inc. (individually and collectively, "**FIMAT**") is holding funds claimed by both RCM and any of Living Water Fund, L.P., ABBA Funds, L.P and RJ Trading, LLC, FIMAT is directed to turn over the funds to the

RCM Trustee for the purpose of the RCM Trustee funding the reserve applicable to the amount claimed by Living Water Fund, L.P., ABBA Funds, L.P and RJ Trading, LLC, and FIMAT shall have no liability to any of the RCM Trustee, Living Water Fund, L.P., ABBA Funds, L.P and RJ Trading, LLC for complying with such turnover order. Unless and until it is determined that Bencorp Casa de Bolsa, C.A. is not entitled to the amount or other asset claimed by it, this Order does not modify paragraph 12 of the Court's previously issued order dated March 31, 2006, providing that the property claimed by Bencorp Casa de Bolsa, C.A. shall not be treated as a "Miscellaneous Asset" under and defined in such order and shall not be the subject of a "Miscellaneous Asset Sale" as defined in such order. By separate order, the Court will establish the procedures for resolving the disputed matters referred to in this paragraph with a view to resolving them promptly.

13.    In connection with the Settlement Agreement, the RCM Trustee is authorized to (a) set aside reserves from amounts otherwise distributable under the Settlement Agreement for actual or anticipated administrative, priority and prepetition claims (whether Securities Customer Claims or FX/General Unsecured Claims) at the time such claim is disputed or disallowed, (b) allocate to separate accounts cash or other property to be distributed to holders of allowed Securities Customer Claims or allowed FX/General Unsecured Claims pending distribution, (c) make distributions as set forth in the Settlement Agreement as soon as practicable from and after the Subsequent Effective Date at such times and in such amounts (net of reserves) as the RCM Trustee deems appropriate and consistent with his fiduciary duties, (d) implement the Metals Sale through any recognized market at which sales of metals of that type are regularly conducted, (e) propose procedures to make distributions of securities in kind, subject to approval by the Court, and (f) in the RCM Trustee's sole judgment, act in any manner that would be

consistent with, or omit from acting in any manner that would be inconsistent with his fiduciary duties.

14.    The RCM Trustee is not authorized to make distributions of financial assets in kind, except by procedures implemented by the RCM Trustee and approved by the Court.

15.    The determination of value of any securities as set forth in the Settlement Agreement by a valuation expert, engaged by the RCM Trustee with the approval of the Court, shall be binding and conclusive on all Settling Parties and all other parties in interest in the Cases to the extent provided in the Settlement Agreement.

16.    In the event the RCM chapter 11 case is converted to a liquidating case under subchapter III of chapter 7, all the terms, conditions and other provisions of the Settlement Agreement approved by this order shall, in all events, be final, valid, binding and enforceable upon any trustee appointed in the chapter 7, the Settling Parties, and all other parties in interest in the Cases regardless of such conversion.

17.    The Settlement Agreement, including any term, condition or other provision therein, may not be waived, modified, amended or supplemented, except as provided in the Settlement Agreement.  No such term, condition or other provision that is waived, modified, amended or supplemented shall in any significant respect adversely affect a material economic entitlement of an entity not a party to the Settlement Agreement without the consent of that entity or further order of the Court.

18.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation of this order.

Dated: _____, 2006
           New York, New York


                                                    _____
                                                    Hon. Robert D. Drain
                                                    UNITED STATES BANKRUPTCY JUDGE

## THIRD AMENDMENT TO SETTLEMENT AGREEMENT

This **THIRD AMENDMENT** (this "*Amendment*") is made and entered into as of August 30, 2006, among (i) Refco Capital Markets, Ltd., acting by and through Marc S. Kirschner in his capacity as trustee of RCM in its Chapter 11 case and (ii) those customers and other creditors of Refco Capital Markets Ltd. party to the Settlement Agreement dated as of June 29, 2006, as amended by an Amendment to Settlement Agreement dated as of August 14, 2006, and a Second Amendment to Settlement Agreement dated as of August 22, 2006 (as amended, the "*Settlement Agreement*"), among Refco Capital Markets, Ltd. and such creditors. Terms defined in the Settlement Agreement have the same meanings herein as specified therein.

**WHEREAS**, the parties hereto wish further to amend the Settlement Agreement as provided herein;

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

§1.    **Amendments**.  The Settlement Agreement is hereby amended in the following respects:

(a)    Subsection (f) of §7 of the Settlement Agreement is amended by deleting the subsection in its entirety and by substituting therefor the following new subsection (f):--

(f)    *Certain Fees and Expenses of the MCG Members and Joinder Parties.*  The reasonable attorneys' fees and expenses of the MCG Members and the Joinder Parties in connection with litigating the Conversion Motion through the filing of the motion to compel an election of a Chapter 11 trustee for RCM, not to exceed the amounts set forth on Exhibit D, shall be allowed administrative expenses in the RCM Case, attributable as substantial contributions to the RCM estate under §§ 503(b)(3)(D) and 503(b)(4) of the Bankruptcy Code.  If on the Subsequent Effective Date the RCM Case has not been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, the reasonable attorneys' fees and expenses shall be entitled to such administrative status and shall be payable pursuant to §5(a) or 6(a) on the Subsequent Effective Date.  However, if on the Subsequent Effective Date the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, the reasonable attorneys' fees and expenses shall be entitled to administrative status only in the RCM Case, subordinate to the allowed administrative claims in the Chapter 7 case, and, unless the Bankruptcy Court orders otherwise, shall be payable pursuant to §5(a) or 6(a) on the later to occur of the Subsequent Effective Date and such date as the RCM Trustee shall have determined that there are or will be sufficient funds to pay all of the allowed administrative claims in the Chapter 7 case from the amounts reserved or available pursuant to § § 5(a), 6(a) and 6(e).  The RCM Trustee confirms that his initial review of the details of the attorneys' fees and expenses indicates that the overall fees and expenses are reasonable, but his initial

determination of their reasonableness is subject to his final review in the exercise of his fiduciary duties.

(b) Subsection (a) of §12 of the Settlement Agreement is amended by deleting "August 31, 2006" wherever that date appears in clause (i) or (ii) of such subsection and by substituting therefor "September 15, 2006".

(c) Subsection (a) of §12 of the Settlement Agreement is further amended by deleting "October 15, 2006" contained in clause (iii) of such subsection and by substituting therefor "October 17, 2006".

(d) Subsection (a) of §12 of the Settlement Agreement is further amended by deleting "November 15, 2006" contained in clause (iv) of such subsection and by substituting therefor "December 15, 2006".

(e) Subsection (a) of §12 of the Settlement Agreement is further amended by (i) deleting the word "or" at the end of clause (iv) of such subsection, (ii) deleting the period at the end of clause (v) of such subsection and by substituting therefor a semi-colon followed by the word "or", and (iii) adding the following new clause (vi):--

(vi) by October 31, 2006, the Bankruptcy Court shall not have entered an order or orders in the RCM Case determining that the treatment of Assets in Place referred to in clauses (A) through (E) of §14(b)(iv) is fully enforceable against other parties in interest in the Cases, as well as among the parties to this Agreement, subject to any rights of the appellants to the Bankruptcy Court's order approving the SPhinX Settlement to claim, as a final result of their appeals if successful, that the proceeds of the SPhinX Settlement are not Assets in Place.

(f) Subsection (b) of §14 of the Settlement Agreement is amended by deleting "August 31, 2006" appearing in the fourth line of such subsection and by substituting therefor "September 15, 2006".

(g) Subsection (b) of §14 of the Settlement Agreement is further amended by deleting the words "against other parties in interest in the Cases" appearing in the first full paragraph following the end of clause (iv) of such subsection and by substituting therefor the words "among the parties to this Agreement".

(h) Subsection (c) of §14 of the Settlement Agreement is amended by (i) renumbering clauses (ii) and (iii) as clauses (iii) and (iv) respectively and by inserting after clause (i) the following new clause:--

(ii) by October 31, 2006, the Bankruptcy Court shall have entered an order or orders in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7, in the Chapter 7 case determining that the treatment of Assets in Place referred to in clauses (A) through (E) of §14(b)(iv) is fully enforceable against other parties in interest in the Cases, as well as among the

parties to this Agreement, subject to any rights of the appellants to the Bankruptcy Court's order approving the SPhinX Settlement to claim, as a final result of their appeals if successful, that the proceeds of the SPhinX Settlement are not Assets in Place.

(i)     Subsection (c) of §14 of the Settlement Agreement is amended by deleting renumbered clause (iii) (former clause (ii)) of such subsection and by substituting therefor the following new clause (iii):--

(iii)     by January 15, 2007, any one of the following events shall have occurred:

(A)     the provisions of this Agreement shall have been incorporated in all material respects into a joint plan of reorganization of some or all of the Debtors including RCM or (if so permitted by the Bankruptcy Court) of RCM alone, the plan shall have been confirmed by an order entered by the Bankruptcy Court, and the "Effective Date" under and as defined in the plan shall have occurred;

(B)     the RCM Case shall have been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7 but (1) prior to or concurrently with the conversion, the provisions of this Agreement shall have been incorporated in all material respects into a settlement agreement between the RCM Trustee, acting on behalf of the RCM estate, and the other Debtors (which settlement agreement may have been incorporated into a joint plan of reorganization of some or all of the other Debtors), (2) subsequent to the conversion, the settlement agreement shall have been approved by an order entered by the Bankruptcy Court, and the settlement agreement shall have become effective in accordance with its terms (and the terms of any such joint plan of reorganization for some or all of the other Debtors), and (3) the date of November 30, 2006, shall have passed; or

(C)     if neither the foregoing clause (A) nor the foregoing clause (B) is applicable, or if the foregoing clause (B) was applicable but the RCM Trustee is no longer bound by the settlement agreement referred to in clause (B), the RCM Case shall have been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7; and

**§2.     Settlement Agreement Approval Order**.  The parties hereto acknowledge and agree that the form of Proposed Revised Order attached hereto satisfies the requirements of §14(b)(iv) of the Settlement Agreement.

**§3.     Joinder**.  The signatories to this Amendment who are not signatories to the Settlement Agreement are joining in this Amendment as signatories to the Settlement Agreement as amended by this Amendment.

**§4.     Effective Time**.  This Amendment shall become effective when it has been signed by or on behalf of the Super Majority inclusive of the parties joining the Settlement Agreement pursuant to §3 of this Amendment.

§5.    **Savings Clause**.    Except as provided in this Amendment, the Settlement Agreement shall continue in full force and effect.    The Settlement Agreement and this Amendment shall be read and construed together as a single agreement.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Amendment to be executed and delivered by its duly authorized officer or other representative as of the date first above written.

*[Remainder of page intentionally left blank]*

THE RCM TRUSTEE

By: _____

Name: Marc S. Kirschner

Title: Chapter 11 Trustee of Refco Capital Markets, Ltd.

Marc S. Kirschner (MSK3631)
1120 Park Avenue, 18A
New York, NY 10128
Telephone: (212) 860-7577

CLEARY GOTTLIEB STEEN
& HAMILTON LLP

By: _____
Thomas J. Moloney (TM-9775)
Neil P. Forrest (NF-8162)
Jason P. Gottlieb (JG-8398)
One Liberty Plaza
New York, New York 10006-1470
(212) 225-2000

*Attorneys for Inter Financial Services, Ltd.*

BUSDOCS/1560001.6

CAPITAL MANAGEMENT SELECT FUND
LTD.

By:    Vytenis Rasutis
Title:  Director

*Address for notices:*

DICKSTEIN SHAPIRO LLP

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
1825 Eye Street, N.W.
Washington, DC 20006-5403
Tel: (202) 420-3144
Fax: (202)-420-2201

*Attorneys for Capital Management Select Fund Ltd.*

COLE, SCHOTZ, MEISEL,
  FORMAN & LEONARD, P.A.
  A Professional Corporation


By:_____
Joshua Angel (JA-3288)
Laurence May, Esq. (LM-9714)
Seth F. Kornbluth, Esq. (SK-4911)
460 Park Avenue
New York, NY 10022-1906
(212) 752-8000

*Attorneys for Global Management Worldwide
Limited; Arbat Equity Arbitrage Fund Limited;
Russian Investors Securities Limited; and
Garden Rind Fund Limited*

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By: _____  8/1/06
Rick B. Antonoff (RA-4158)
C. Nicole Gladden (CG-3707)
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for RB Securities Limited*

SHUTTS & BOWEN LLP

By: _____

Robert Fracasso (RF-2538)
Peter E. Shapiro (PES-4795)
201 South Biscayne Boulevard
1500 Miami Center
(305) 379-9102

LARRY I. GLICK, P.C.
Larry I. Glick (LG-8665)
1305 Franklin Avenue, Suite 180
Garden City, New York 11530
(516) 739-1111

*As attorneys for IDC Financial S.A.;*
*Investment & Development Finance Corp.;*
*Oslo International S.A.; Alfredo Skinner–Klee*
*and Alexandra Sol de Skinner-Klee; Ernesto*
*Ruiz Sinibaldi; Christian Klose Pieters and*
*Aida Margarita Rosales de Klose; Ballery*
*Holdings; and Bilston International Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _____

*As attorneys for Altima Capital*
*Management, Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _____

*As attorneys for Banco Uno S.A.- Panama;*
*Banco Uno S.A.- El Salvador; Banco Uno,*
*S.A. Nicaragua; and Banco Uno S.A.-*
*Guatemala*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By: _____

*As attorneys for INS-Bancredito Valores*
*Puesto de Bolsa, S.A. and Servicios*
*Generales Bursatiles, S.A. de C.V.*

HOLLAND & KNIGHT LLP

By: *[signature: Sandra E. Mayerson]*
Sandra E. Mayerson (SM-8119)
Arthur E. Rosenberg (AR-0513)
Peter A. Zisser (PZ-9634)
195 Broadway
New York, New York 10007
(212) 513-3200

*Attorneys for Turisol Casa de Cambio C.A.;*
*Heptagon Financial Services, Inc., f/k/a*
*Interfin Capital Inc.; Sud America de Seguros C.A.;*
*Sul America Compania de Segurose del*
*Ecuador C.A.; Latina de Seguros, f/k/a*
*Generali Peru Compania de Seguros y*
*Reseguros; Heptagon Financial Planners,*
*Ltd.; and Brook Financial Services Ltd.*

AKIN GUMP STRAUSS HAUER
  & FELD LLP

By: _____
Fred S. Hodara (FH-7497)
Andrew J. Rossman (AR-0596)
590 Madison Avenue
New York, NY 10022
(212) 872-1000

*Attorneys for VR Global Partners, L.P.; Paton
Holdings Ltd.; VR Capital Group Ltd.; and VR
Argentina Recovery Fund, Ltd.*

HOGAN & HARTSON L.L.P.

By: _____

Ira S. Greene (IG-2315)
Scott A. Golden (SG-6663)
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Premier Bank International N.V. and
Banco de Hipotecario de Inversion Turistica de
Venezuela as trustee of Fideicomiso Federal Forex
Investment*

CHADBOURNE & PARKE LLP

By: _____

Joseph H. Smolinsky (JS-8408)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Markwood Investments Ltd.*

FOLEY & LARDNER LLP

By: _Salvatore A. Barbatano (par)_

Robert A. Scher (RS 2910)
Dorit S. Heimer (DH 7511)
Emily R. Sausen (ES 9097)
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329

FOLEY & LARDNER LLP
Scott E. Early (pro hac vice)
Salvatore A. Barbatano (pro hac vice)
Geoffrey S. Goodman (pro hac vice)
321 North Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Leuthold Funds, Inc. and Leuthold*
*Industrial Metals Fund, L.P.*

BROWN RUDNICK BERLACK ISRAELS LLP

By:_____
Andrew Dash (AD 7913 )
Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

BROWN RUDNICK BERLACK ISRAELS LLP
William R. Baldiga
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Attorneys for Hain Capital Group, LLC; Wayzata
Investment Partners; and Contrarian Capital
Management*

KATTEN MUCHIN ROSENMAN LLP

By: _____

Jeff J. Friedman (JF-7661)
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Lyxor/Estlander & Ronnlund Fund Ltd.; Lyxor/Beach Discretionary Fund Ltd.; and Société Générale S.A.*

CHADBOURNE & PARKE LLP

By: _Chris Rivera_
Howard Seife (HS 7995)
Christy L. Rivera (CR 8895)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Carlos Sevilleja; Cosmorex, Ltd.;*
*and Creative Finance Limited*

FAEGRE & BENSON LLP

By: _____

Michael B. Fisco (#175341)
Stephen M. Mertz (#212131)
Abby E. Wilkinson (#0313981)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Cargill Financial Services
Corporation; Cargill Global Funding PLC;
Cargill, Incorporated; and Cargill Meat Solutions
Corporation (formerly Excel Corporation)*

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _[signature]_

Robert A. Johnson (RJ 6553)
590 Madison Avenue
New York, NY 10022-2524
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for Reserve Invest (Cyprus) Ltd.*

BLANK ROME LLP

By: _____

Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Grand Trading Limited*


BLANK ROME LLP

By: _____

Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Armajaro Commodities, Ltd.*

EVEREST ASSET MANAGEMENT INC.

By: Peter Lamoureux
Title: President

*Address for notices:*
HENDERSON & LYMAN
Douglas E. Arend
175 West Jackson Boulevard
Suite 240
Chicago, IL 60604
Tel: (312) 986-6960
Fax: (312) 986-6960

*Attorneys for Everest Asset Management Inc.*

BUSDOCS/1980001.9

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for RR Investment Company Limited*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for Rovida Holdings Limited*

HUGHES HUBBARD & REED LLP

By: *James W. Giddens*
James W. Giddens (JG-0235)
James B. Kobak, Jr. (JK-1218)
Christopher K. Kiplok (CK-5039)
Jeffrey S. Margolin (JM-4853)
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for Mrs. Josefina Franco Siller*

BUSDOCS/1580001.6

## JOINDER OF ROGERS FUNDS TO THIRD AMENDMENT
## TO SETTLEMENT AGREEMENT

ROGERS RAW MATERIALS FUND, L.P. and ROGERS INTERNATIONAL RAW MATERIALS FUND, L.P. (the "Rogers Funds") hereby confirm that all references to the Settlement Agreement in the Joinder of Rogers Funds to Settlement Agreement dated as of July 20, 2006 (the "Joinder"), between the Funds and the RCM Trustee (as defined in the Joinder) shall be to the Settlement Agreement as amended by the foregoing Third Amendment.

SIDLEY AUSTIN LLP

By: _C-SNEAL_____

Guy S. Neal
1501 K Street, N.W.
Washington, D.C. 20005
Tel: (202) 736-8041
Fax: (202) 736-8711

Bryan Krakauer
One South Dearborn Street
Chicago, IL 60603
Tel: (312) 853-7515
Fax: (312) 853-7036

*Attorneys for Rogers Raw Materials Fund, L.P. and Rogers International Raw Materials Fund, L.P.*

## FOURTH AMENDMENT TO SETTLEMENT AGREEMENT

This **FOURTH AMENDMENT** (this "*Amendment*") is made and entered into as of October 11, 2006, among (i) Refco Capital Markets, Ltd., acting by and through Marc S. Kirschner in his capacity as trustee of RCM in its Chapter 11 case and (ii) those customers and other creditors of Refco Capital Markets Ltd. party to the Settlement Agreement dated as of June 29, 2006, as amended by an Amendment to Settlement Agreement dated as of August 14, 2006, a Second Amendment to Settlement Agreement dated as of August 22, 2006, and a Third Amendment to Settlement Agreement dated as of August 30, 2006 (as amended, the "*Settlement Agreement*"), among Refco Capital Markets, Ltd. and such creditors. Terms defined in the Settlement Agreement have the same meanings herein as specified therein.

**WHEREAS**, the parties hereto wish further to amend the Settlement Agreement as provided herein;

**NOW, THEREFORE,** the parties hereto hereby agree as follows:

**§1.** **Amendments**. The Settlement Agreement is hereby amended in the following respects:

(a) Section 1 of the Settlement Agreement is amended by adding the following new definitions in proper alphabetical order: --

"*Initial Approval Order*" means the Bankruptcy Court's order entitled "Order Approving Settlement Agreement Among Refco Capital Markets Ltd and Certain Securities Customers and Creditors" dated September 15, 2006, in the RCM Case contemplated by §14(b)(iv)(Docket No. 2863).

"*Inter-Debtor Settlement*" means a joint plan of reorganization of some or all of the Debtors including RCM, or a settlement agreement between the RCM Trustee, acting on behalf of the RCM estate, and some or all of the other Debtors (which settlement agreement may have been incorporated into a joint plan of reorganization of some or all of the other Debtors). The term includes the Amended Joint Chapter 11 Plan of Refco Inc. and Certain of Its Direct and Indirect Subsidiaries filed on October 6, 2006, with the Bankruptcy Court.

"*Specified Constructive Trust Claims*" means those claims expressly reserved in paragraph 12 of the Initial Approval Order.

(b) Subsection (d) of §5 of the Settlement Agreement is amended by deleting subsection (d) and by substituting therefor the following new subsections (d) and (e): --

(d)     *Balance of Distributions*.  Subject to §5(e), the balance to be applied towards payment of the allowed Securities Customer Claims.

(e)     *Adjustment for Certain Administrative and Priority Claims Paid by Other Debtors in Connection With an Inter-Debtor Settlement.*  If, in connection with an Inter-Debtor Settlement that has been approved by the Bankruptcy Court and has become effective, any of the other Debtors pays all or any portion of the allowed administrative and priority claims of the RCM estate that would otherwise have been subject to the reserve for the first $60 million of distributions of Assets in Place as provided in the second sentence of §5(a), then the amount so paid by the other Debtor shall be considered to have been reserved within the first $60 million of Assets in Place for purposes of the third sentence of §5(a).  If, as a result of the payment by the other Debtor, the amount of Additional Property that the RCM estate would have otherwise received under the Inter-Debtor Settlement is reduced, an amount of the Assets in Place equal to the amount of such reduction (not to exceed $60 million in the aggregate for all such amounts) shall be treated as Additional Property and distributed pursuant to §§6(b) through (d) before any further distributions are made pursuant to §5(d).  The RCM Trustee shall establish appropriate reserves of Assets in Place to assure that there will be sufficient Assets in Place to make any distributions treated as Additional Property under this subsection.

(c)     Section 10 of the Settlement Agreement is amended by adding at the end of the section the following new subsections (e) and (f): --

(e)     *Distributions of Proceeds of the BAWAG Settlement*.  This Agreement does not prevent the RCM Trustee from (i) relinquishing a distribution of a share of the proceeds of the BAWAG Settlement allocable to the RCM estate and that otherwise would have been distributed to a creditor of the RCM estate if the creditor fails to accept the release contemplated by the BAWAG Settlement in order to receive the distribution or (ii) distributing the balance of the proceeds of the BAWAG Settlement allocable to the RCM estate to the creditors of the RCM estate who do accept the release.  For purposes of this paragraph,  the term "***BAWAG Settlement***" means the settlement stipulation among, *inter alia*, the Creditors' Committee, Bawag P.S.K. Fur Arbeit Und Wirtschaft Und Osterreichische Postsparkasse Arktiengesellschaft, and the Debtors as approved by the Bankruptcy Court by an order entered on July 6, 2006.

(f)     *Distributions Contemplated by an Inter-Debtor Settlement.*  In the event that an Inter-Debtor Settlement Agreement is approved by the Bankruptcy Court and becomes effective, and the Inter-Debtor Settlement provides for or permits any action referred to in this subsection, then this Agreement does not prevent the RCM Trustee:

(i)     from withholding, relinquishing or equitably reallocating among other creditors of the RCM estate a distribution of Additional Property otherwise to be made to any creditor of the RCM estate who fails to provide a release, subordination, waiver or assignment of claims required from that creditor under the Inter-Debtor Settlement for that creditor to receive the distribution, if the distribution was or would have been funded by a payment from another Debtor

under the Inter-Debtor Settlement or from a private litigation trust established under the Inter-Debtor Settlement;

(ii)     contributing Additional Property consisting of avoidance claims or other causes of action (other than claims, rights of action, suits, or proceedings held by the RCM estate pursuant to §§ 547, 550 and 749 of the Bankruptcy Code) to a litigation trust established under the Inter-Debtor Settlement in return for allocable interests in or an allocable share of recoveries by the litigation trust constituting Additional Property;

(iii)     as a result of the contribution of the Additional Property to the litigation trust, permitting Additional Property (including the interests in or share of recoveries by the litigation trust) to be distributed to creditors of the RCM estate directly by the trustee or trustees of the litigation trust as if distributed as Additional Property by the RCM Trustee under this Agreement; or

(iv)     making a larger distribution, exclusive of interests in or recoveries by the litigation trust, to members of convenience classes of RCM creditors that do not receive interests in or recoveries by the litigation trust so long as the aggregate amount of distributions to members of all RCM convenience classes do not exceed the sum of $2 million.

(d)     Subsection (a) of §12 of the Settlement Agreement is amended by deleting the word "or" appearing at the end of clause (v) of such subsection, by deleting clause (vi) of such subsection, and by substituting therefor the following new clauses (vi) and (vii):--

(vi)     by October 31, 2006, the Bankruptcy Court shall not have entered an order or orders in the RCM Case determining that the treatment of Assets in Place referred to in clauses (A) through (E) of §14(b)(iv) is fully enforceable against other parties in interest in the Cases, as well as among the parties to this Agreement, subject to any rights of (A) the appellants to the Bankruptcy Court's order approving the SPhinX Settlement to claim, as a final result of their appeals if successful, that the proceeds of the SPhinX Settlement are not Assets in Place and (B) the holders of Specified Constructive Trust Claims to claim that the assets reserved for them in paragraph 12 of the Initial Approval Order are not Assets in Place; or

(vii)     by December 15, 2006, the Bankruptcy Court shall not have entered an order or orders in the RCM Case determining that the assets reserved for the holders of Specified Constructive Trust Claims in paragraph 12 of the Initial  Approval Order are Assets in Place.

(e)     Subsection (c) of §14 of the Settlement Agreement is amended by deleting clause (ii) of such subsection and by substituting therefor the following new clause (ii):--

(ii)     by October 31, 2006, the Bankruptcy Court shall have entered an order or orders in the RCM Case or, if the RCM Case has been converted to a Chapter 7 case to be

administered under Subchapter III of Chapter 7, in the Chapter 7 case determining that the treatment of Assets in Place referred to in clauses (A) through (E) of §14(b)(iv) is fully enforceable against other parties in interest in the Cases, as well as among the parties to this Agreement, subject to any rights of (A) the appellants to the Bankruptcy Court's order approving the SPhinX Settlement to claim, as a final result of their appeals if successful, that the proceeds of the SPhinX Settlement are not Assets in Place and (B) the holders of Specified Constructive Trust Claims to claim that the assets reserved for them in paragraph 12 of the Initial Approval Order are not Assets in Place;

(f)     Subsection (c) of §14 of the Settlement Agreement is further amended by deleting clauses (iii)(B) and (C) of such subsection and by substituting therefor the following new clauses (iii)(B) and (C):

(B)     the RCM Case shall have been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7 but (1) prior to or concurrently with the conversion, the provisions of this Agreement shall have been incorporated in all material respects into an Inter-Debtor Settlement, (2) the Inter-Debtor Settlement shall have been approved by an order entered by the Bankruptcy Court, and the Inter-Debtor Settlement shall have become effective in accordance with its terms, and (3) the date of November 30, 2006, shall have passed; or

(C)     if neither the foregoing clause (A) nor the foregoing clause (B) is applicable, or if the foregoing clause (B) was applicable but the RCM Trustee is no longer bound by the Inter-Debtor Settlement referred to in clause (B), the RCM Case shall have been converted to a Chapter 7 case to be administered under Subchapter III of Chapter 7; and

**§2.     "Quiet Title" Approval Order**.  The parties hereto acknowledge and agree that the order attached hereto satisfies the requirements of §14(c)(ii) of the Settlement Agreement as amended by this Amendment.

**§3.     Joinder**.  Any signatories to this Amendment who are not signatories to the Settlement Agreement are joining in this Amendment as signatories to the Settlement Agreement as amended by this Amendment.

**§4.     Effective Time**.  This Amendment shall become effective when it has been signed by or on behalf of the Super Majority inclusive of any parties joining the Settlement Agreement pursuant to §3 of this Amendment.  However, those provisions of this Amendment for which the signatures of a 95% Super Majority are required under §16(c) of the Settlement Agreement shall not be effective until this Amendment has been signed by the RCM Trustee and by or on behalf of those parties representing the 95% Super Majority.

**§5.     Savings Clause**.  Except as provided in this Amendment, the Settlement Agreement shall continue in full force and effect.  The Settlement Agreement and this Amendment shall be read and construed together as a single agreement.

**IN WITNESS WHEREOF,** each of the parties hereto has caused this Amendment to be executed and delivered by its duly authorized officer or other representative as of the date first above written.

*[Remainder of page intentionally left blank]*

THE RCM TRUSTEE


By: _____

Name: Marc S. Kirschner

Title: Chapter 11 Trustee of Refco Capital Markets, Ltd.


Marc S. Kirschner (MSK3631)

1120 Park Avenue, 18A

New York, NY 10128

Telephone: (212) 860-7577

CLEARY GOTTLIEB STEEN
& HAMILTON LLP

By: _Tom Maloney_ MG

Thomas J. Moloney (TM-9775)
Neil P. Forrest (NF-8162)
Jason P. Gottlieb (JG-8398)
One Liberty Plaza
New York, New York 10006-1470
(212) 225-2000

*Attorneys for Inter Financial Services, Ltd.*

CAPITAL MANAGEMENT SELECT FUND
LTD.

By: Vytenis Rasutis
Title: Director

*Address for notices:*

DICKSTEIN SHAPIRO LLP

Daniel M. Litt (DL-9227; admitted pro hac vice)
Paul B. Bran (PB-5659; admitted pro hac vice)
1825 Eye Street, N.W.
Washington, DC 20006-5403
Tel: (202) 420-3144
Fax: (202)-420-2201

*Attorneys for Capital Management Select Fund Ltd.*

COLE, SCHOTZ, MEISEL,
FORMAN & LEONARD, P.A.
A Professional Corporation

By: _Seth Kornbluth_ _____

Joshúa Angel (JA-3288)
Laurence May, Esq. (LM-9714)
Seth F. Kornbluth, Esq. (SK-4911)
460 Park Avenue
New York, NY 10022-1906
(212) 752-8000

*Attorneys for Global Management Worldwide
Limited; Arbat Equity Arbitrage Fund Limited;
Russian Investors Securities Limited; and
Garden Rind Fund Limited*

PILLSBURY WINTHROP SHAW
PITTMAN LLP

By _____  10/11/06

Rick B. Antonoff (RA-4158)
C. Nicole Gladden (CG-3707)
1540 Broadway
New York, New York 10036
(212) 858-1000

*Attorneys for RB Securities Limited*

SHUTTS & BOWEN LLP *(By Lb*

By: *Robert Fracasso* *(permission)*

Robert Fracasso (RF-2538)
Peter E. Shapiro (PES-4795)
201 South Biscayne Boulevard
1500 Miami Center
(305) 379-9102

LARRY I. GLICK, P.C.
Larry I. Glick (LG-8665)
1305 Franklin Avenue, Suite 180
Garden City, New York 11530
(516) 739-1111

*As attorneys for IDC Financial S.A.;
Investment & Development Finance Corp.;
Oslo International S.A.; Alfredo Skinner–Klee
and Alexandra Sol de Skinner-Klee; Ernesto
Ruiz Sinibaldi; Christian Klose Pieters and
Aida Margarita Rosales de Klose; Ballery
Holdings; and Bilston International Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____ _____

*As attorneys for Altima Capital
Management, Inc.*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____

*As attorneys for Banco Uno S.A.- Panama;
Banco Uno S.A.- El Salvador; Banco Uno,
S.A. Nicaragua; and Banco Uno S.A.-
Guatemala*

SHUTTS & BOWEN LLP and
LARRY I. GLICK, P.C.

By:_____ _____

*As attorneys for INS-Bancredito Valores
Puesto de Bolsa, S.A. and Servicios
Generales Bursatiles, S.A. de C.V.*

HOLLAND & KNIGHT LLP

By: *Sandra E. Mayerson* (signature)

Sandra B. Mayerson (SM-8119)
Arthur E. Rosenberg (AR-0513)
Peter A. Zisser (PZ-9634)
195 Broadway
New York, New York 10007
(212) 513-3200

*Attorneys for Turisol Casa de Cambio C.A.;*
*Heptagon Financial Services, Inc., f/k/a*
*Interfin Capital Inc.; Sud America de Seguros C.A.;*
*Sul America Compañia de Seguros del*
*Ecuador C.A.; Latina Seguros y Reaseguros S.A.,*
*f/k/a Generali Peru Compañia de Seguros y*
*Reseguros; Heptagon Financial Planners,*
*Ltd.; and Brooke Financial Services Ltd.*

AKIN GUMP STRAUSS HAUER
  & FELD LLP

By:_____

Fred S. Hodara (FH-7497)
Andrew J. Rossman (AR-0596)
590 Madison Avenue
New York, NY 10022
(212) 872-1000

*Attorneys for VR Global Partners, L.P.; Paton
Holdings Ltd.; VR Capital Group Ltd.; and VR
Argentina Recovery Fund, Ltd.*

13    DeltaView comparison of iManageDeskSite://IMANDMS/BUSDOCS/1588893/5 and
iManageDeskSite://iManDMS/BUSDOCS/1588893/6. Performed on 10/11/2006.

HOGAN & HARTSON L.L.P.

By:_____

Ira S. Greene (IG-2315)
Scott A. Golden (SG-6663)
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Facsimile: (212) 918-3100

*Attorneys for Premier Bank International N.V. and
Banco de Hipotecario de Inversion Turistica de
Venezuela as trustee of Fideicomiso Federal Forex
Investment*

CHADBOURNE & PARKE LLP

By: _____

Joseph H. Smolinsky (JS-8408)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Markwood Investments Ltd.*

FOLEY & LARDNER LLP

By: _Salvatore A. Barbatano/656_
Robert A. Scher (RS 2910)
Dorit S. Heimer (DH 7511)
Emily R. Sausen (ES 9097)
90 Park Avenue
New York, NY 10016
Phone: (212) 682-7474
Fax: (212) 682-2329

FOLEY & LARDNER LLP
Scott E. Early (pro hac vice)
Salvatore A. Barbatano (pro hac vice)
Geoffrey S. Goodman (pro hac vice)
321 North Clark Street, Suite 2800
Chicago, IL 60610
Phone: (312) 832-4500
Fax: (312) 832-4700

*Attorneys for Leuthold Funds, Inc. and Leuthold
Industrial Metals Fund, L.P.*

BROWN RUDNICK BERLACK ISRAELS LLP

By: _____
Andrew Dash (AD 7913 )
Seven Times Square
New York, New York 10036
Tel: (212) 209-4800
Fax: (212) 209-4801

BROWN RUDNICK BERLACK ISRAELS LLP
William R. Baldiga
One Financial Center
Boston, MA 02111
Tel: (617) 856-8200
Fax: (617) 856-8201

*Attorneys for Hain Capital Group, LLC; Wayzata
Investment Partners; and Contrarian Capital
Management*

KATTEN MUCHIN ROSENMAN LLP

By: _____
Jeff J. Friedman (JF-7661)
575 Madison Avenue
New York, New York 10022-2585
Telephone: (212) 940-8800
Facsimile: (212) 940-8776

*Attorneys for Lyxor/Estlander & Ronnlund
Fund Ltd.; Lyxor/Beach Discretionary Fund
Ltd.; and Société Générale S.A.*

CHADBOURNE & PARKE LLP

By: _Christy Rivera_

Howard Seife (HS 7995)
Christy L. Rivera (CR 8895)
30 Rockefeller Plaza
New York, NY 10112
Tel: (212) 408-5100
Fax: (212) 408-5369

*Attorneys for Carlos Sevilleja; Cosmorex, Ltd.;
and Creative Finance Limited*

FAEGRE & BENSON LLP

By: _____
Michael B. Fisco (#175341)
Stephen M. Mertz (#212131)
Abby E. Wilkinson (#0313981)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

*Attorneys for Cargill Financial Services*
*Corporation; Cargill Global Funding PLC;*
*Cargill, Incorporated; and Cargill Meat Solutions*
*Corporation (formerly Excel Corporation)*

AKIN GUMP STRAUSS HAUER & FELD LLP

By: _____

Robert A. Johnson (RJ 6553)
590 Madison Avenue
New York, NY 10022-2524
Telephone: (212) 872-1000
Facsimile: (212) 872-1002

*Attorneys for Reserve Invest (Cyprus) Ltd.*

BLANK ROME LLP

By: _[signature]_

Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Grand Trading Limited*

BLANK ROME LLP

By: _[signature]_

Michael Z. Brownstein (MB 9379)
Edward J. LoBello (EL 3337)
The Chrysler Building
405 Lexington Avenue
New York, New York 10174
Telephone: (212) 885-5000
Facsimile: (212) 885-5002

*Attorneys for Armajaro Commodities, Ltd.*

EVEREST ASSET MANAGEMENT INC.

_____

By: Peter Lamoureux
Title: President

*Address for notices:*
HENDERSON & LYMAN
Douglas E. Arend
175 West Jackson Boulevard
Suite 240
Chicago, IL 60604
Tel: (312) 986-6960
Fax: (312) 986-6960

*Attorneys for Everest Asset Management Inc.*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for RR Investment Company Limited*

WHITE & CASE LLP

By: _____
Sam J. Alberts
701 Thirteenth Street, NW
Washington, DC 20005
Telephone: (202) 626-3616
Facsimile: (202) 639-9355

*Attorneys for Rovida Holdings Limited*

HUGHES HUBBARD & REED LLP

By: *James W. Giddens*

James W. Giddens (JG-0235)
James B. Kobak, Jr. (JK-1218)
Christopher K. Kiplok (CK-5039)
Jeffrey S. Margolin (JM-4853)
One Battery Park Plaza
New York, New York 10004
Telephone: (212) 837-6000
Facsimile: (212) 422-4726

*Attorneys for Mrs. Josefina Franco Siller*

ROGERS RAW MATERIALS FUND, L.P.

By:  Beeland Management Company, LLC , a General Partner

By: _S. N Fel_____
Name: Guy S. Neal
Title: Councl

Beeland Management Company, LLC
Attention: Tom Price
141 West Jackson Blvd.
Suite 1340A
Chicago, IL 60604

ROGERS INTERNATIONAL RAW MATERIALS FUND, L.P.

By:  Beeland Management Company, LLC , a General Partner

By: _S. NEAL_____
Name: Guy S. Neal
Title: casncl

Beeland Management Company, LLC
Attention: Tom Price
141 West Jackson Blvd.
Suite 1340A
Chicago, IL 60604

# Exhibit C

# Exhibit D

# Exhibit E

# Exhibit F

# Exhibit G

# Exhibit H

# Refco Inc., et al

*Distributable Asset Values as of 9/22/2006*

*($ in millions)*

|  | 9/22/2006 Estimate |
|---|---|
| **_Refco Group Ltd. (Bank Obligor)_** | |
| Beginning Cash | $11.8 |
| Bawag Settlement - First Installment | 337.5 |
| Repayment of Interco from Refco Sing Pte | 0.3 |
| Distribution Refco LLC - Sub Debt Repaid | 16.3 |
| Distribution Refco Securities LLC - Sub Debt Repaid | - |
| Repayment of RTS (UK) Intercompany Loans | 8.0 |
| Remaining Estimated Proceeds from Sale of Art Collection | 0.6 |
| Distribution from LLC regarding sales proceeds | 8.2 |
| Bawag Settlement | 168.8 |
| Estimated Value of FXCM Shares | 90.0 |
| Tradeworx | 0.2 |
| Xinhua Financial Network | - |
| Partners Capital Investment Group, LLC | - |
| Refco Alternative Investments, LLC | - |
| Refco Commodity Management, Inc | - |
| Proceeds from Interest in Dendreon | 0.7 |
| Estimated Book Value of Cantor Index Holdings (10%) Interest | 1.0 |
| **Total** | **$643.4** |
| | |
| **_Refco LLC_** | |
| Beginning Cash | $790.1 |
| Estimate of additional proceeds, net of items due to Man under APA | 33.3 |
| Preliminary estimate of claims | (60.0) |
| Repayment of Refco Group sub debt | (16.3) |
| Seat Loan Repayment to Refco Capital LLC | (120.5) |
| Repayment of intercompany loan from ROL | 24.0 |
| Repayment of intercompany loan from RTS (UK) | 1.0 |
| Repayment of Interco from Refco Sing Pte | 0.6 |
| Liquidation of Refco Taiwan Branch Office | 3.0 |
| Distribution to various entities regarding sales proceeds | (24.6) |
| Repayment of Interco from Refco Hong Kong | - |
| I/C Receivable from Refco Capital | - |
| I/C Receivable from Refco Capital Markets | - |
| I/C Receivable from Refco F/X Associates LLC | - |
| I/C Receivable from Refco Group Ltd., LLC | - |
| I/C Payable to Kroeck & Associates, LLC | - |
| I/C Payable to Refco Fixed Assets Management LLC | - |
| **Total** | **$630.5** |
| | |
| **_Refco Global Holdings, LLC (Guarantor)_** | |
| Beginning Cash | $31.3 |
| Distribution from Refco Canada (from Tax Refunds) | 0.3 |
| Repayment of Net Capital from Refco Sing Pte | 63.4 |
| Repayment of Interco from Refco Singapore Pte | |
| Estimated Proceeds from Refco India winddown | - |
| Repayment from Refco Securities SA (France) sub debt | 1.9 |
| Distribution from LLC regarding sale proceeds | 9.5 |
| Repayment of Loan from REL | 29.9 |
| Estimated Equity proceeds from REL sale | - |
| I/C Payable to Refco Capital Markets | - |
| I/C Payable to Refco Group Ltd., LLC | - |
| Cargill Investor Services Ltd. | - |
| Refco Japan, Ltd | - |
| **Total** | **$136.2** |

# Refco Inc., et al

*Distributable Asset Values as of 9/22/2006*

*($ in millions)*

|  | 9/22/2006 Estimate |
|---|---|
| **Refco F/X Associates (Guarantor)** | |
| Beginning Cash | $20.0 |
| Beginning Cash - Japan KK Account | 32.1 |
| Post Petition Deposits | (2.0) |
| Payment of Refco Forex interco | - |
| Sale of Assets to potential buyer | - |
| Assumed Estimated ACM Value | 0.9 |
| **Total** | **$51.0** |
| | |
| **Refco Capital LLC (Guarantor)** | |
| Beginning Cash | $126.6 |
| Recovery of Misc. Assets | 8.5 |
| Recovery of PlusFunds Loan | - |
| Seat Loan Repayment from Refco LLC | 120.5 |
| I/C Payable to Refco LLC | - |
| Repayment of Interco from Refco Singapore Pte | 0.5 |
| Repayment of Interco from RSL | 26.1 |
| Repayment of Interco from ROL | 0.4 |
| Proceeds from Refco Forex sale (through interco with Refco East Services) | 3.0 |
| **Total** | **$285.5** |
| | |
| **Kroeck & Assoc. (Guarantor)** | |
| Estimated assets available for distribution to intercos and equity | $0.3 |
| **Total** | **$0.3** |
| | |
| **Refco Global Futures (Guarantor)** | |
| Beginning Cash | $8.8 |
| Distribution of proceeds from Refco HK | - |
| Man Refco HK Take or Pay Fee | 1.0 |
| **Total** | **$9.8** |
| | |
| **Refco Capital Holdings, LLC (Guarantor)** | |
| Beginning Cash | $0.0 |
| Repayment of Interco from RSL | 3.5 |
| **Total** | **3.5** |
| | |
| **Refco Fixed Asset Management (Guarantor)** | |
| Beginning Cash | 0.1 |
| Repayment of Interco from RSL | 0.2 |
| **Total** | **$0.3** |
| | |
| **Refco Capital Markets** | |
| Beginning Cash | $1,303.0 |
| Equities, Bonds, Other Securities | 1,081.0 |
| Collection of Cash Due from Brokers | 30.3 |
| Repayments from RTS (UK) Interco | - |
| Tradeworx interest | - |
| Lonestar investment | 7.6 |
| Dendreon interest | - |
| Assumed Estimated ACM Value | 4.3 |
| I/C Payable to Various Entities | - |
| I/C Receivable from Various Entities | - |
| **Total** | **$2,426.3** |

# Refco Inc., et al

*Distributable Asset Values as of 9/22/2006*

*($ in millions)*

|  | 9/22/2006 Estimate |
|---|---|
| **_Refco Global Finance Ltd._** | |
| Beginning Cash | $2.3 |
| Estimated Proceeds from sale of Bank Frick equity interest | 0.9 |
| Distribution from LLC regarding sales proceeds | 1.1 |
| Distribution from Refco Canada (from Tax Refund) | 0.3 |
| **Total** | **$4.6** |
| | |
| **_Refco Alternative Investments LLC/Fund Holdings_** | |
| Beginning Cash | $0.8 |
| Repayment of Interco from RSL | 0.4 |
| Recovery from ROL intercompany | - |
| Recovery from wind-down of RAI/fund holdings | 0.6 |
| **Total** | **$1.8** |
| | |
| **_Refco Resources Ltd_** | |
| Repayment of Interco from ROL | $0.0 |
| **Total** | **$0.0** |
| | |
| **_Refco Canada Finance_** | |
| Beginning Cash | $9.1 |
| Proceed from LLC | 4.8 |
| Distribution from Refco Canada (through sub debt) | 1.3 |
| **Total** | **$15.2** |
| | |
| **_Refco Clearing LLC (owned by Refco Regulated Cos.)_** | |
| Beginning Cash | $1.3 |
| Repayment of Interco from RSL | 0.4 |
| **Total** | **$1.7** |
| | |
| **_Refco Trading Services_** | |
| Beginning Cash | $1.6 |
| Potential tax liability | (0.9) |
| **Total** | **$0.7** |
| | |
| **_Commodity Management Inc,_** | |
| Beginning Cash | $1.6 |
| Projected collections | 1.4 |
| **Total** | **$3.0** |
| | |
| **_Refco, Inc._** | |
| Beginning Cash | $0.1 |
| **Total** | **$0.1** |
| | |
| **_Refco Easy Solutions_** | |
| Beginning Cash/estimated assets available for Distribution | $0.1 |
| **Total** | **$0.1** |
| | |
| **Total All Entities** | **$4,214.0** |
| | |
| **Additional RSL Value** | **$40.1** |
| | |
| **Total Including RSL** | **$4,254.1** |

# Exhibit I

# Exhibit J

# Exhibit K

# Exhibit L

# Schedule 1.56

# Schedule 2.2(c)

This Plan Schedule 2.2(c) sets forth the sub-Classes of Claims against Contributing Debtors in Classes 4, 5(a) and 5(b). Class 4 sub-Classes consist of Senior Subordinated Note Claims against each Contributing Debtor. Class 5(a) sub-Classes consist of General Unsecured Claims against each Contributing Debtor. Class 5(b) sub-Classes consist of Related Claims against each Contributing Debtor.

| SUB-CLASS | NAME OF DEBTOR |
|-----------|----------------|
| .01 | Bersec International LLC |
| .02 | Kroeck & Associates, LLC |
| .03 | Lind-Waldock Securities LLC |
| .04 | Marshall Metals, LLC |
| .05 | New Refco Group Ltd., LLC |
| .06 | Refco Administration, LLC |
| .07 | Refco Capital Holdings, LLC |
| .08 | Refco Capital Management, LLC |
| .09 | Refco Capital LLC |
| .10 | Refco Capital Trading LLC |
| .11 | Refco Finance Inc. |
| .12 | Refco Financial, LLC |
| .13 | Refco Fixed Assets Management, LLC |
| .14 | Refco Global Capital Management LLC |
| .15 | Refco Global Finance Limited |
| .16 | Refco Global Futures, LLC |
| .17 | Refco Global Holdings, LLC |
| .18 | Refco Group Ltd., LLC |
| .19 | Refco Inc. |
| .20 | Refco Information Services, LLC |
| .21 | Refco Managed Futures, LLC |
| .22 | Refco Mortgage Securities, LLC |
| .23 | Refco Regulated Companies, LLC |
| .24 | Summit Management, LLC |
| .25 | Westminster-Refco Management LLC |